IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

SHAWRON LOUNDS,     )
             )
     Plaintiff,   )
             )
v.            )   Case No. 13-CV-1091-RDR-KGS
             )
LINCARE INC.,      )
             )
     Defendant.  )
_____)

**MEMORANDUM IN SUPPORT OF
LINCARE INC.'S MOTION FOR SUMMARY JUDGMENT**

Defendant Lincare Inc. files this brief in support of its Motion for Summary Judgment on all claims asserted by Plaintiff Shawron Lounds.  Lounds alleges that Lincare subjected her to a hostile work environment in violation of 42 U.S.C. § 1981. *See* Pretrial Order ("PTO"), Dkt. 46, ¶ 4.a.2.  She also alleges that Lincare retaliated against her in violation of Title VII of the Civil Rights Act of 1964.  PTO, Dkt. 46, ¶ 4.a.1.  There are therefore two straightforward issues in this case:

1. **Hostile Work Environment.**  Under Section 1981, employees have a right to work in an environment free from severe and pervasive racial epithets and slurs.  Here, Lounds has filed suit against Lincare because some of its employees made a few racial comments or jokes in Lounds' presence.  But the comments that Lounds complains about were neither severe nor pervasive, and Lincare reacted promptly and effectively to all complaints that it received. Was Lounds subjected to a hostile work environment?

2. **Retaliation.**  Lounds claims that Lincare violated her rights under Title VII, which forbids employers from retaliating against an employee for complaining about racial discrimination.  But filing a Title VII complaint is not a get-out-of-jail-free card—an employee who files one may still be disciplined for legitimate reasons. Here, Lincare disciplined Lounds and eventually fired her for a good faith reason:  she missed at least 34 days of work (the majority of which were unscheduled) in less than a year.  Can Lounds show that she would not have been disciplined but for her complaints?

## SUMMARY

Lincare is a national medical services provider which specializes in the field of respiratory care.  Lincare has many centers across the country, including one in Wichita, Kansas.  Lounds worked as a customer service representative in Lincare's Wichita center from September 27, 2011 to September 24, 2012.

In January 2012, Lincare learned that there had been a few inappropriate statements with racial connotations in the Wichita center.  Lincare immediately investigated, and gave final written warnings to all persons who Lounds identified as having made (what she perceived to be) offensive comments in the workplace.  Lincare also held anti-harassment training at the Wichita facility as a result of these complaints.  Additionally, Lincare followed up with Lounds at least three different times.  On all three occasions, Lounds led Lincare to believe that the inappropriate comments had stopped, as she did not complain of any new racial statements or conduct.  And when Lounds later submitted complaints to the Kansas Human Rights Commission or Equal Employment Opportunity Commission and exchanged letters with Lincare's Human Resources Department, she did not raise any new issues.  Instead, she simply rehashed the same allegations that had already been raised and addressed in January 2012.  The one time she mentioned any new comments in the workplace was on July 24, 2012, when she informed her manager that a co-worker had made an inappropriate statement.  Lincare immediately gave the co-worker a final written warning.

Lounds' work attendance was poor, to say the least.  She missed at least 34 days of work (the majority of which were unscheduled) in less than a year.  And in addition to the days she missed, she was frequently late to work or left early.  Lounds was informally counseled regarding her attendance in January and February 2012.  By late April 2012—after only seven

months of employment—Lounds already had sixteen unscheduled absences, far more than anyone else in the Wichita office.  So on April 26, 2012, Lounds received a Documented Counseling regarding her poor attendance.  But Lounds' attendance did not improve.  Over the next two months, she missed several more days of work, for which she was given a Documented Verbal Warning on June 22, 2012.  Lounds' attendance problems continued in July 2012, when she missed two more days of work.  Because of her continued absences, Lounds was given a Final Written Warning on July 24, 2012.  Despite these disciplinary actions, Lounds missed several more days of work in August and September 2012.  As a result of her continued absences, Lincare terminated Lounds' employment on September 24, 2012.  This lawsuit followed.

## STATEMENT OF UNCONTROVERTED FACTS

The following facts are uncontroverted solely for purposes of this Motion and constitute all of the material facts necessary for decision of this motion.

### General Background

1.      Lounds is an African American woman.  PTO, ¶ 2.a.1.

2.      Lincare is a medical services provider which specializes in the field of respiratory care.  PTO, ¶ 2.a.2.

3.      Lincare's headquarters are in Clearwater, Florida, and it has a facility in Wichita, Kansas.  Deposition of Shawron Lounds ("Lounds Deposition"), Ex. 1, at 59:3-5; PTO, ¶ 2.a.2.

4.      Lincare hired Lounds as a customer service representative ("CSR") on September 27, 2011. Lounds remained a CSR for the duration of her employment.  PTO, ¶ 2.a.3.

5.      Lounds was hired by Suzanne Kraft ("Kraft"), the center manager in Wichita who supervised the day-to-day operations of the facility.  PTO, ¶ 2.a.4.

6.      Kraft was Lounds' direct supervisor.  PTO, ¶ 2.a.5.

7.      Kraft's supervisor was Jeremy Felts ("Felts"), a district manager at Lincare.  As a district manager, Felts oversaw Kraft and seven other center managers within his district.  Deposition of Jeremy Felts ("Felts Deposition"), Ex. 2, at 4:19 – 5:12.

8.      Felts' direct supervisor was Karen Schanbacher ("Schanbacher"), a divisional manager.  Deposition of Karen Schanbacher ("Schanbacher Deposition"), Ex. 3, at 6:23 – 8:9.

9.      There were about seventeen or eighteen employees in the Wichita facility, about four of whom were CSRs.  Felts Deposition, Ex. 2, at 11:21 – 12:5; Deposition of Suzanne Kraft ("Kraft Deposition"), Ex. 4, at 7:13-15; 9:15-22.

### FACTS RELEVANT TO LOUNDS' HOSTILE WORK ENVIRONMENT CLAIM

#### Relevant Lincare policies and procedures

10.      Lincare has a number of policies in place to regulate employee conduct, which can be found in Lincare's Employee Handbook (LIN_0000009-LIN_0000040), which has been attached as Ex. 5.

11.      Lincare is an equal opportunity employer, and it has anti-discrimination/anti-harassment policies intended to ensure that all employees have the ability to work in a workplace free from harassment or discrimination of any kind, including discrimination on the basis of race, gender, religion, age, national origin, or disability, whether by co-workers or supervisors.  Employee Handbook, Ex. 5, at 15.

12.      Lincare expressly prohibits any conduct that racially harasses employees or otherwise disrupts or interferes with their work performance or the terms, conditions, and privileges of their employment.  Lincare advises employees that violation of the anti-

discrimination/anti-harassment policies will result in disciplinary action, up to and including termination. Employee Handbook, Ex. 5, at 15-16.

13.     Lincare has a reporting procedure that describes the steps employees should take if they believe they are being subjected to discriminatory conduct. Under the policy, if a Lincare employee believes he or she is being harassed, the employee should immediately report the conduct to his or her Regional Manager, Employee Relations Director, or Human Resources Manager. Lincare's policy is to treat complaints confidentially (to the extent possible), and to investigate them fully to determine the appropriate course of action. If the investigation reveals conduct that violates Lincare's policies, Lincare takes appropriate action, up to and including termination. Employee Handbook, Ex. 5, at 17.

14.     Lincare provides its employees with a 1-800 number to contact Lincare's corporate office. The number is given to employees when they start, and is in the break room of the various centers so that it is readily available to employees. *See* Deposition of Linda Feller ("Feller Deposition"), Ex. 6, at 24:7-14; 142:20 – 143:4.

15.     Lincare strictly prohibits retaliation against a person who makes a complaint of harassment, and anyone who violates Lincare's anti-retaliation policy will be subject to discipline, up to and including termination. Employee Handbook, Ex. 5, at 17.

16.     Under Lincare's "Corrective Action" policy, employees may be disciplined when their performance or behavior is considered unacceptable. Employee Handbook, Ex. 5, at 21. The normal sequence for corrective action is as follows: (1) counseling by the employee's immediate supervisor; (2) verbal warning by the employee's immediate supervisor; (3) final written warning reiterating the Company's concern about the employee's performance and plainly stating that the next step will be termination; and (4) termination. The above sequence is

optional, and Lincare may proceed straight to termination if it deems appropriate under the circumstances. Employee Handbook, Ex. 5, at 21.

17.　　When Lounds began her employment with Lincare, she received a copy of Lincare's Employee Handbook. Lounds Deposition, Ex. 1, at 29:7-23; Lounds' September 27, 2011, Employee Handbook Acknowledgment (LIN_0000050), Ex. 7.

18.　　Lounds knew that Lincare's headquarters were in Clearwater, Florida, and that members of Lincare's Human Resources ("HR") department could be contacted there. *See* Lounds Deposition, Ex. 1, at 59:13-23.

## Lounds' complaints in January 2012 and Lincare's response

19.　　On January 27, 2012, Greg McCarthy, a vice president at Lincare, visited the Wichita facility. *See* Deposition of Greg McCarthy ("McCarthy Deposition"), Ex. 8, at 5:5-8, 11:17-20; Feller Deposition, Ex. 6, at 32:10-14.

20.　　During a staff meeting with the CSRs, McCarthy asked how things were going in the office. Amber Renard ("Renard"), another CSR at the Wichita facility, complained that there had been inappropriate racial statements in the workplace that had made Lounds uncomfortable. McCarthy Deposition, Ex. 8, at 12:11 – 14:6; Deposition of Amber Renard ("Renard Deposition"), Ex. 9, at 28:21 – 30:19.

21.　　After the staff meeting, McCarthy met with Lounds one-on-one to discuss what had happened. McCarthy Deposition, Ex. 8, at 13:22 – 14:19; Lounds Deposition, Ex. 1, at 66:14 – 67:8. The inappropriate comments that Lounds reported to McCarthy at this time are described below in SOF ¶¶ 24.a – 24.e.

22.　　Immediately after the one-on-one meeting with Lounds, McCarthy told Jeremy Felts, a district manager with Lincare, to call Paula Adams ("Adams"), Lincare's employee

relations director, so that she could conduct further investigation.  Feller Deposition, Ex. 6, at 144:11-14; Felts Deposition, Ex. 2, at 24:18 – 25:2.

23.    That same day (January 27, 2012), Adams spoke with Lounds to discuss her complaints.  Lounds Deposition, Ex. 1, at 64:25 – 65:15[1]; Affidavit of Paula Adams ("Adams Affidavit"), Ex. 10, ¶ 6.

24.     In her conversations with McCarthy and Adams on January 27, 2012, Lounds identified three Lincare employees as having made offensive racial comments in the workplace: co-worker Laynee Kempke ("Kempke"), a healthcare specialist; Kraft; and co-worker Kevin Kunz ("Kunz"), a salesman in the Wichita center.  Lounds Deposition, Ex. 1, at 65:5 – 67:8; Adams Affidavit, Ex. 10, ¶ 7; Adams Handwritten Notes (LIN_0000476-LIN_0000478) (Adams Affidavit Ex. A), Ex. 10, ¶ 6.  Specifically, Lounds reported that:

   a.  Kempke had said, "Boom nigga" and "peace out my nigga" in the workplace. (Lounds Deposition, Ex. 1, at 66:3-4; 67:4-5);

   b.  Kunz had made a comment about lynching. (Lounds Deposition, Ex. 1, at 66:4-5);

   c.  Kunz had made a comment that Hitler would be proud of him because of his blue eyes, but not his black hair. (Lounds Deposition, Ex. 1, at 66:5-7);

   d.  Kraft had told her to address McCarthy as "yes massa." (Lounds Deposition, Ex. 1, at 67:2-4);

   e.  Kraft had asked her why black people give their children names like "Roshonda." (Lounds Deposition, Ex. 1, at 66:9-10; 81:19 – 82:14).

25.    After speaking with Lounds, and based on the information she had obtained, Adams concluded that Kempke, Kraft, and Kunz should be disciplined because of the statements

---

[1]  In her deposition, Lounds remembered that she spoke with someone besides Linda Feller, but could not recall her name.  *See* Lounds Deposition, Ex. 1, at 58:21-25.  This person was Paula Adams, who Lounds misidentified as Linda Feller at various points in her deposition.  *See* Feller Deposition, Ex. 6, at 143:22 – 144:17; Lounds Deposition, 64:25 – 65:15.

they had been alleged to have made in the workplace.  Adams Affidavit, Ex. 10, ¶ 9; Feller Deposition, Ex. 6, at 45:6-15.

26.     On January 30, 2012, Kempke, Kraft, and Kunz were given final written warnings.  Feller Deposition, Ex. 6, at 50:17-20; 52:3-6; 144:4-22; Felts Deposition, Ex. 2, 36:10 – 37:1; Kempke Final Written Warning (LIN_0000135-LIN_0000136), Ex. 12; Kraft Final Written Warning (LIN_0000137-LIN_0000138), Ex. 13; Kunz Final Written Warning (LIN_0000139-LIN_0000140), Ex. 14.

27.     In their final written warnings, Kempke, Kraft, and Kunz were advised that their actions had violated Lincare's Anti-Discrimination/Anti-Harassment policy and that any further violations of the policy would result in the immediate termination of their employment.  They were also told that if they observed any additional harassment, they were obligated to immediately report it.  Finally, they were reminded of Lincare's policy against retaliation, and informed that if they retaliated against Lounds, or appeared to retaliate against her, they would be immediately terminated.  Kempke Final Written Warning, Ex. 12; Kraft Final Written Warning, Ex. 13; Kunz Final Written Warning, Ex. 14.

28.     That same day (January 30, 2012), Felts held an in-service training in the Wichita facility, in which he discussed Lincare's Anti-Discrimination/Anti-Harassment policy. *See* January 30, 2012 In-Service Record (LIN_0000008), Ex. 15; Felts Deposition, Ex. 2, at 33:7 – 34:9; Renard Deposition, Ex. 9, at 39:17 – 40:5.  In addition to discussing Lincare's policies, Felts discussed appropriate workplace comments and reminded employees that "even if they don't perceive something as offensive, somebody else could possibly."  Felts Deposition, Ex. 2, at 33:16-23.  Felts' intention in holding the in-service was to "make sure everyone was clear on

our company policy on anti-discrimination and harassment" and to "make things as comfortable for Shawron as possible."  Felts Deposition, Ex. 2, at 33:17-19; 34:2-3.

### Lounds' written complaints in February 2012 and Lincare's response

29.     When McCarthy met with Lounds, he asked her to put everything in writing so that Lincare could address her allegations appropriately.  McCarthy Deposition, Ex. 8, at 13:22 – 15:24.

30.     Thereafter, on February 3, 2012, Lounds sent McCarthy and Lincare HR a "Memorandum for Record" containing her written statement.  Lounds Deposition, Ex. 1, at 85:4-10; *see* February 3, 2012 Memorandum (LIN_0000194-LIN_0000201), Ex. 16.  Lounds stated in the Memorandum that she had given McCarthy and Adams a brief statement on January 27, 2012, and told them she would follow up with a written statement.  *See* February 3, 2012 Memorandum, Ex. 16, at LIN_0000201.

31.     Lounds' February 3, 2012 Memorandum contains a number of allegations that are not relevant to the claims and defenses of this lawsuit.  But with respect to her hostile work environment claim, Lounds identified the same three Lincare employees as having made inappropriate statements as the three employees she identified on January 27—Kempke, Kraft, and Kunz.  In the Memorandum, Lounds reported a few new comments from these three employees and provided detail and context for the comments she had already reported to McCarthy and Adams (described above in SOF ¶ 24.a – 24.e).  *See* February 3, 2012 Memorandum, Ex. 16, at LIN_0000194-201.  Specifically, Lounds' Memorandum contained the following allegations:

        a.  Around January 14, 2012, Kempke returned from seeing a patient and loudly said, "I just came back from the 'Hood'" then chanted "Boom" and "Boom Nigga."  One of Lounds' co-workers then told her that before Lounds began employment for

Lincare, Kempke said, "Peace out my nigga."[2] (February 3, 2012 Memorandum, Ex. 16, at LIN_0000195);

b.  Kraft made comments about Lounds' name or asked about other African-Americans' names.  (February 3, 2012 Memorandum, Ex. 16, at LIN_0000194-95);

c.  On January 17, 2012, Kraft was speaking at a staff meeting that Nathan Van Dever ("Van Dever") was attending along with five women.  Kraft said to Van Dever, "Nate do you feel like a minority[?]" (February 3, 2012 Memorandum, Ex. 16, at LIN_0000195);

d.  At the same staff meeting on January 17, 2012, Kraft told everyone they did not want to make McCarthy mad, and to say yes to his every word.  Kraft then told them to say, "Yes Massa" to him.[3] (February 3, 2012 Memorandum, Ex. 16, at LIN_0000196)

e.  A patient called in late October 2011, and after Lounds answered the phone, he threatened to kill everyone in the office.  When Lounds reported this to Kraft, Kraft said, "I'm sure you can give him attitude." (February 3, 2012 Memorandum, Ex. 16, at LIN_0000198);

f.  Other employees witnessed Kraft referring to this patient as a black man.  Later, when the patient came to the facility, Kraft said, "I thought he was a big black man, no offense . . . he sounded mean and his name sounded black" and "I can't believe he was a white guy." (February 3, 2012 Memorandum, Ex. 16, at LIN_0000198-199);

g.  On November 14, 2011, Kunz and Van Dever were discussing a black man who had murdered his wife.  Kunz said, "we need to bring back lynching, because we have enough trees." Kunz then spoke about Vietnamese people offensively and said they have bad teeth. Kunz then disagreed with a co-worker that his comments were racist, saying, "I'm not racist, and there was nothing wrong with lynching." Kunz then approached Lounds and said, "I'm not trying to offend you, it's not like I said 'lets go down [to] 9th and Grove (the Black Neighborhood) and drag every black person with a noose, tie them to a truck, and drag them after hanging them.'"[4] (February 3, 2012 Memorandum, Ex. 16, at LIN_0000194);

h.  On January 26, 2012, Kunz said, "I never go in the ghetto, the hood has gangsters," then approached Lounds and said, "you know . . . the Hood." (February 3, 2012 Memorandum, Ex. 16, at LIN_0000200);

---

[2]  Lounds had already reported Kempke's statements to McCarthy and Adams.  *See* SOF ¶ 24.a.
[3]  Lounds had already reported this comment to McCarthy and Adams.  *See* SOF ¶ 24.d.
[4]  Lounds had already reported this comment to McCarthy and Adams.  *See* SOF ¶ 24.b.

      i.   Several co-workers (Lounds did not identify who) approached Lounds by saying, "Yo! Yo whats up?" in a black accent dialect.  (February 3, 2012 Memorandum, Ex. 16, at LIN_0000198);

      j.   A patient made a remark about a picture of a garden, saying "I wonder how many slaves it took to keep that garden pretty, and I wonder how many wet backs it took to pour water on them."  Felts had said he would remove the picture, but had not done so yet, and Lounds claimed the picture was a constant reminder of the patient's comments.  (February 3, 2012 Memorandum, Ex. 16, at LIN_0000198).

32.    A few days later (February 6, 2012), Lounds sent a second "Memorandum for record" to McCarthy.  *See* February 6, 2012 Memorandum (LIN_0000192-LIN_0000193), Ex. 17; McCarthy Deposition, Ex. 8, at 22:13-19.  The February 6 Memorandum is shorter than the February 3 Memorandum, and all of the allegations in it were already raised in the February 3 Memorandum.  *See* Ex. 16 *and* Ex. 17.  The only new allegation in the February 6 Memorandum is a contention that Kempke had "a habit of returning from seeing a black patient and stating how she thought she would be raped."  *See* February 6 Memorandum, Ex. 17, at LIN_0000192.

33.    When McCarthy received this February 6 Memorandum, he forwarded it to Adams.  McCarthy Deposition, Ex. 8, at 23:16-19.  Adams reviewed the allegations in Lounds' two Memorandums, and determined that all of Lounds' specific allegations involved Kempke, Kraft, and Kunz, the same three Lincare employees who had already received Final Written Warnings on January 30, 2012.  Adams Affidavit, Ex. 10, at ¶ 11.  Adams concluded that the Final Written Warnings had addressed all the issues and that no further corrective action was needed.  Adams Affidavit, Ex. 10, at ¶ 12.

34.    Adams received Lounds' memorandums on February 13, 2012, but was traveling for work and was unable to reach out to Lounds until February 22, 2012.  At that time, Adams sent Lounds an email and attempted to arrange a telephone meeting to discuss Lounds' statements in the Memorandum.  Adams Affidavit, Ex. 10, at ¶¶ 10, 12; *see also* February 22-29,

2012 Email Exchange between Paula Adams and Shawron Lounds (LIN_0000185-LIN_0000186), Ex. 18; Lounds Deposition, Ex. 1, at 91:11-15.

35.     Before Adams was able to arrange a telephone conference with Lounds, Schanbacher met with Lounds at the Wichita facility. Schanbacher Deposition, Ex. 3, at 6:23-25, 9:24 – 10:1; Lounds Deposition, Ex. 1, at 68:18 – 69:6. Schanbacher was in Wichita to address an unrelated business matter, and while in a meeting, Lounds brought up an issue involving a purported lack of training. Schanbacher Deposition, Ex. 3, at 11:13-17; 13:1-12.

36.     Schanbacher and Felts then had a private meeting with Lounds to address her concerns, and discussed Lounds' perception that she had not received adequate training. Schanbacher told Lounds they would make sure she got additional training. Schanbacher Deposition, Ex. 3, at 24:10 – 25:5; Lounds Deposition, Ex. 1, at 69:7-15.

37.     During their private meeting, Schanbacher asked Lounds several times whether she had any other concerns that Schanbacher could address. Lounds did not report any new racial comments in the workplace, did not allege that she had been subjected to retaliation, and did not complain of a hostile work environment. Schanbacher Deposition, Ex. 3, at 28:4 – 30:5; Lounds Deposition, Ex. 1, at 69:21 – 70:8; Felts Deposition, Ex. 2, at 79:21 – 80:4. To the contrary, in response to Schanbacher's questions, Lounds stated that nothing new had happened. Schanbacher Deposition, Ex. 3, at 29:20 – 30:5; Felts Deposition, Ex. 2, at 79:21 – 80:4.

38.     Lounds' only complaint was that when people went into Kraft's office, Lounds felt like they were talking about her, and that she felt like the pink elephant in the room. Schanbacher Deposition, Ex. 3, at 28:4-15; Lounds Deposition, Ex. 1, at 69:21 – 70:8. Schanbacher explained that managers, like Kraft, had a variety of reasons they would need to have private conversations with employees, and that Lounds should not worry when Kraft shut

the door to her office while speaking with one of Lounds' co-workers. Schanbacher Deposition, Ex. 3, at 28:4 – 29:9; 30:11-16.

39. After Schanbacher and Felts' meeting with Lounds in mid-February 2012, Adams and Lounds spoke on March 6, 2012. Adams Affidavit, Ex. 10, ¶ 13; Lounds Deposition, Ex. 1, at 92:3-11.

40. Adams' conversation with Lounds covered a variety of topics, including Lounds' complaints about a purported lack of training, her interaction with Rebecca Roettering ("Roettering"), the regional trainer who had been assigned to work with Lounds, and her meeting with Schanbacher and Felts. But in the conversation, Lounds did not report any new racial comments in the workplace, did not allege that she had been subjected to retaliation, and did not complain of a hostile work environment.  Adams Affidavit, Ex. 10, ¶ 14; Adams Handwritten Notes, Ex. _ (LIN_0000469-470) (Adams Affidavit Ex. B), Ex. 10, ¶ 13.

41. Based on Lounds' representation that there had been no more offensive statements in the workplace and on the fact that she had not identified any other Lincare employees as having made offensive statements, Adams concluded that the final written warnings to Kempke, Kraft, and Kunz had been effective, and that it was unnecessary to impose any additional disciplinary action.  Adams Affidavit, Ex. 10, ¶ 15.

42. Adams told Lounds that she would send someone from HR to Wichita to check in with her and the situation.  Lounds Deposition, Ex. 1, at 92:12-17.  Linda Feller ("Feller"), a human resources manager in Lincare's HR department, subsequently traveled to Wichita and met with Lounds on March 14, 2012.  Feller Deposition, Ex. 6, at 23:6-11; 69:5-6; 85:21 – 86:9; Feller Notes on March 14, 2012 (LIN_0000179-LIN_0000182), Ex. 19.

43.     Lounds made a variety of statements in the meeting.  Among other things, she mentioned some of the same allegations that had been previously raised and addressed, and again said that she felt like the pink elephant in the room.  She also mentioned the painting of the garden that a patient had made racial comments about, so Feller had the painting removed. *See* Feller Notes on March 14, 2012, Ex. 19, at LIN_0000179 – 181; Feller Deposition, Ex. 6, at 146:20 – 147:17.

44.     During the meeting, Lounds did not report any new racial comments in the workplace, did not allege that she had been subjected to retaliation, and did not complain of a hostile work environment.  *See* Feller Notes on March 14, 2012, Ex. 19.  Instead, Lounds informed Feller that she felt that things had gotten better and that she appreciated Lincare's efforts.  Lounds also represented that she had no new complaints and that it was a much more comfortable work environment.  Feller's notes reflect that Lounds said, "It seems like slowly, slowly things are coming around" and "I appreciate you guys listening.  I think you guys really care." Feller Deposition, Ex. 6, at 77:17-19; 146:20 – 147:17; Feller Notes on March 14, 2012, Ex. 19, at LIN_0000181-182.

45.     Feller believed that the meeting with Lounds went well and called Adams to report that Lounds was feeling better about the work environment.  Feller Deposition, Ex. 6, at 147:11 – 17; Adams Affidavit, Ex. 10, at ¶ 17.

### Lounds' Charge of Discrimination in April 2012, her documented counseling, and subsequent communications with Lincare

46.     Lounds filed a complaint with the Kansas Human Rights Commission ("KHRC") on April 6, 2012—KHRC Charge No. 35554-12W, which was dual-filed with the Equal Employment Opportunity Commission ("EEOC") as EEOC Charge No. 28D-2012-00534.  PTO,

¶ 2.a.6; *see* April 6, 2012 KHRC Complaint (LIN_0000434-LIN_0000435) (Lounds Depo Exhibit 16), Ex. 20.

47.     In the April 6, 2012 KHRC Complaint, Lounds alleged that her rights under the Kansas Act Against Discrimination, K.S.A. 44 § 1001 *et seq.* ("KAAD") and Title VII were violated.  Lounds alleged that she was subjected to derogatory racial comments, slurs, and innuendoes, and that she was discriminated against on the basis of her race. April 6, 2012 KHRC Complaint, Ex. 20.

48.     Lounds did not, however, specify any new racial comments or statements in the workplace.  She did not allege there had been any further comments after Lincare had issued final written warnings to Kempke, Kraft, and Kunz on January 30, 2012.  *See* April 6, 2012 KHRC Complaint, Ex. 20.

49.     Lounds received a Documented Counseling on April 26, 2012 in connection with her frequent tardiness and excessive number of unscheduled absences (described *infra* in SOF ¶¶ 86-92).  Lounds subsequently sent Lincare HR a "Rebuttal" objecting to the disciplinary action she had received.  *See* May 1, 2012 Rebuttal (LIN_0000410-LIN_0000411) (Lounds Depo Exhibit 20), Ex. 21.

50.     In her May 1, 2012 Rebuttal, Lounds made a number of allegations that have no bearing on this lawsuit.  But relevant here, she did not report any new racial comments in the workplace. *See* May 1, 2012 Rebuttal, Ex. 21.

51.     In early May 2012, Lounds sent Kraft a text saying that she would not come into work because of a "hostile workplace."  Lounds' text regarding a "hostile workplace" was not based on purported racial comments or statement, but instead on Lounds' claim that Kunz had slapped a female employee on the thigh, leaving a hand print.  Lounds claimed that she could not

be around this kind of behavior in the workplace. *See* Lounds Texts (LIN_0000237-LIN_0000238), Ex. 22.

52.     Feller spoke with Kraft about the incident, and found that some of the employees were horsing around one afternoon, and Kunz had jokingly slapped someone on the leg. Feller did not consider this to be a violation of Lincare's Anti-Discrimination/Anti-Harassment policies. *See* Affidavit of Linda Feller ("Feller Affidavit"), Ex. 23, ¶ 7; Feller Notes on May 7, 2012 (LIN_0000123), Ex. 24; Kraft Deposition, Ex. 4, 100:7 – 101:8.

### Lounds' Charge of Discrimination in May 2012, her documented verbal warning, and subsequent communications with Lincare

53.     Lounds filed a second complaint with the KHRC on May 18, 2012—KHRC Charge No. 35657-12W, which was dual filed with the EEOC as EEOC Charge No. 28D-2012-00643. *See* PTO, ¶ 2.a.7. In the May 18, 2012 KHRC Complaint, Lounds alleged that Lincare retaliated against her in violation of her rights under the KAAD. Lounds did not, however, allege that there had been any additional racial comments in the workplace. *See* May 18, 2012 KHRC Complaint (LIN_0000268-LIN_0000269) (Lounds Depo Exhibit 22), Ex. 25.

54.     On June 22, 2012, Lounds received a "Documented Verbal Warning" in connection with her continued unscheduled absences, which are described *infra* in SOF ¶ 98. June 22, 2012 Documented Verbal Warning (LIN_0000046-LIN_0000047), Ex. 26.

55.     Felts and Kraft met with Lounds to discuss the basis for the Documented Verbal Warning, and Feller appeared by phone and took notes from the meeting. Feller Deposition, Ex. 6, at 74:22 – 75:8; Feller Notes on June 22, 2012 (LIN_0000088-LIN_0000089), Ex. 27. In the meeting, Lounds never reported any new racial comments in the workplace, nor did she allege that her absences were the result of a perceived hostile work environment. *See* Feller Notes on June 22, 2012, Ex. 27.

56.     On July 16, 2012, Lounds sent Lincare HR a "Rebuttal" objecting to the disciplinary action she had received on June 22, 2012.  *See* July 16, 2012 Rebuttal (LIN_0000368) (Lounds Depo Exhibit 30), Ex. 28.  Feller reviewed Lounds' "Rebuttal," and determined that there were no new complaints in her Rebuttal—she did not allege any new statements or comments that had been made after the January 27, 2012 report to McCarthy and Lincare HR.  *See* July 16, 2012 Rebuttal, Ex. 28; Feller Deposition, Ex. 6, at 79:12-21.

### Lounds' Final Written Warning in July 2012, and subsequent communications with Lincare

57.     Lounds received a Final Written Warning on July 24, 2012, the background of which is described *infra* in SOF ¶¶ 101-103.  *See* July 24, 2012 Final Written Warning (LIN_0000048), Ex. 29.  Feller took notes of the meeting when Lounds received the Final Written Warning.  Kraft Deposition, Ex. 4, at 28:17 – 29:7; Feller Deposition, Ex. 6, at 80:7-24; Feller Notes on July 24, 2012 (LIN_0000079-LIN_0000082), Ex. 30.

58.     In the meeting Lounds complained that every time she heard someone say, "Boom," she heard Kempke saying "Boom Nigga."  She did not, however, say that there had been any new incidents of anyone saying, "Boom Nigga."  Feller Notes on July 24, 2012, Ex. 30, at LIN_0000079.

59.     Lounds also raised, for the first time, another complaint.  She claimed that Renard had said "BON" to her every day, that Kraft had heard Renard using the term, but that Kraft had not done anything about it.  Kraft denied hearing Renard say "BON," but said even if she had heard it, she would not have done anything because she did not know what it meant or that it was offensive.  Feller Notes on July 24, 2012, Ex. 30, at LIN_0000079.

60.     Lounds informed Kraft and Felts that "BON" meant "Big Ol' Nigga."  Feller Deposition, Ex. 6, at 80:14 – 81:7; Feller Notes on July 24, 2012, Ex. 30, at LIN_0000079.

Lounds also said that Renard had mentioned a comment that her son's football coach had made along the lines of, "all blackies are stupid."  Feller Notes on July 24, 2012, Ex. 30, at LIN_0000080.

61.    Kraft immediately spoke with Renard regarding Lounds' claim that she had said "BON" in the workplace.  Renard explained that she was on the phone with her boyfriend, who was African-American, and he kept calling himself a "BON."  Renard was laughing and telling him she would not say it.  Once Renard got off the phone, Lounds asked her what "BON" meant. Renard told her that it meant "Big Old N"—Renard denies using the "N" word.  Renard Deposition, Ex. 9, at 49:4-18; Feller Notes on July 24, 2012, Ex. 30, at LIN_0000079-82

62.    That same day (July 24, 2012), Kraft gave Renard a Final Written Warning, informing her that her actions had created an uncomfortable environment for Lounds, and that any additional violation of Lincare's Anti-Discrimination/Anti-Harassment policy would result in termination.  She was also reminded of Lincare's policy against retaliation, and informed that if she retaliated against Lounds, or appeared to retaliate against her, she would be immediately terminated.  Renard Deposition, Ex. 9, at 48:16-18; Kraft Deposition, Ex. 4, at 35:4 – 36:3; Renard July 24, 2012 Final Written Warning (LIN_0000375-LIN_0000376) (Renard Depo Exhibit 1), Ex. 31.

63.    On July 25, 2012, Lounds sent Lincare HR a "Rebuttal" to the final written warning she received on July 24, 2012.  Kraft Deposition, Ex. 4, at 77:17 – 78:2; Lounds July 25, 2012 Rebuttal (LIN_0000353-LIN_0000354) (Lounds Depo Exhibit 38), Ex. 32.  While Lounds' July 25 Rebuttal contained a number of allegations and accusations, Lounds did not report a single new racial statement or comment in the workplace that had been made after her January

27, 2012 report to McCarthy and Lincare HR.  Lounds July 25, 2012 Rebuttal, Ex. 32, at LIN_0000353-354.

**Lounds' psychologist's letter to Lincare in July 2012**

64.     On July 27, 2012, Lounds' mental health counselor, Dr. Joseph Donaldson ("Donaldson"), sent a letter to Lincare HR.  *See* Donaldson Letter (LIN_0000361-LIN_0000363) (Feller Depo Exhibit 20), Ex. 33; Feller Deposition, Ex. 6, at 105:15-17.  Lounds had been seeing Donaldson since June 13, 2012.  Lounds Deposition, Ex. 1, at 121:5-13.

65.     In the letter, Donaldson represented that he had been meeting with Lounds "on a weekly basis" and listening to her problems.  He further represented that Lounds had been subjected to "an ongoing onslaught of verbal abuse and harassing racial comments, slurs, epithets, and innuendos" and "blatant racist verbal attacks and threats" in the workplace. Donaldson Letter, Ex. 33, at LIN_0000361-362.

66.     But in the letter, Donaldson did not provide a single new example of the alleged verbal abuse Lounds had allegedly been subjected to.  Instead, Donaldson's examples of alleged harassment included the statements that Lounds had already raised and which Lincare had addressed after Lounds' January 27, 2012 complaint to McCarthy and Lincare HR (e.g., the "boom nigga" statement, the "lynching" comment, the "yes massa" comment).  The other example Donaldson gave was the "BON" comment, which had likewise been addressed as soon as it was brought to Lincare's attention.  *See* Donaldson Letter, Ex. 33, at LIN_0000361-362; SOF ¶¶ 26, 31, 61-63.

**Lounds' termination and her subsequent correspondence and complaints**

67.     Lounds was terminated on September 24, 2012 because of her continuous, excessive absenteeism.  PTO, ¶ 2.a.8; Lounds Employment Termination (LIN_0000049), Ex. 35; Feller Deposition, Ex. 6, at 129:18-23.

68.     Lounds sent a letter to Lincare HR on October 3, 2012.  Lounds Deposition, Ex. 1, at 114:7-14.  While Lounds claimed that she was subjected to a hostile work environment, she did not cite a single new racial statement alleged to have been made after her January 27, 2012 complaint to McCarthy and Lincare HR.  *See* Lounds October 3, 2012 Letter (P109-P111) (Lounds Depo Exhibit 48), Ex. 36.

69.     Lounds amended KHRC Charge No. 35657-12W/EEOC Charge No. 28D-2012-00643 on October 19, 2012.  PTO, ¶ at 2.a.9.  Lounds did not, however, present any new alleged comments or statements in her amended KHRC complaint.  *See* Lounds Amended KHRC Complaint (LIN_0000002-LIN_0000003), Ex. 37.

70.     On February 13, 2013, the EEOC sent Lounds a "Notice of Right to Sue" letter with regard to EEOC Charge No. 28D-2012-00534 and EEOC Charge No. 28D-2012-00643.  PTO, ¶¶ 2.a.10, 2.a.11.

71.     Lounds filed the current lawsuit against Lincare on March 6, 2013.  *See* Complaint, Dkt. 1.  In her Complaint, Lounds' hostile work environment claim was based on (1) the alleged comments and statements that were made before the January 27, 2012 complaint to McCarthy and Lincare HR and (2) the BON comment.  *Compare* Complaint, Dkt. 1, ¶ 12, *and* SOF ¶¶ 31, 61-63.

**Deposition testimony during discovery**

72.     Lounds was deposed on August 21, 2013.   Lounds Deposition, Ex. 1, at 1.
Lounds was asked to identify all alleged racial comments in the workplace.   In addition to the
comments she had already identified in previous correspondence and communications with
Lincare, Lounds identified the following additional alleged statements:

a.   Roettering said that her car was a black boy and referred to it as boy.   Lounds
     admitted that she never reported this comment to Lincare. (Lounds Deposition,
     Ex. 1, at 56:1-20; 60:21-25);

b.   Kunz asked her what "skeet skeet" meant in rap songs.   Lounds admitted that this
     comment was made before the January 27, 2012 complaint to McCarthy and
     Lincare HR. (Lounds Deposition, Ex. 1, at 78:9 – 79:1);

c.   Kunz said that Nicki Minaj, a "female black rapper with a voluptuous body," was
     attractive. (Lounds Deposition, Ex. 1, at 101:23 – 102:3);

d.   Kraft spoke with an exaggerated slave dialect.   As an example, Lounds said that
     Kraft would say things like, "I's be's getting this fax" or "you's be's getting this."
     Lounds admitted, however, that she never reported these alleged comments.
     (Lounds Deposition, Ex. 1, at 80:16 – 81:18);

e.   Kraft asked Lounds if she spoke Ebonics or looked up words in the urban
     dictionary. These comments were allegedly made before the McCarthy complaint.
     (Lounds Deposition, Ex. 1, at 82:15-23);

f.   On Lounds' last day, Kraft apologized and said that she had "six black cousins."
     (Lounds Deposition, Ex. 1, at 87:15-25); and

g.   Co-worker Nathan Van Dever asked her why black people smoke Newports.
     Lounds admitted this comment was made before the January 27, 2012 complaint
     to McCarthy and Lincare HR. She further admitted that she never mentioned Van
     Dever's alleged statements about Newports to anyone at Lincare HR. (Lounds
     Deposition, Ex. 1, at 89:8 – 90:2).

73.     In her deposition, Lounds admitted to the context in which Kunz' "lynching"
comment was made.   Kunz made the comment in November 2011 while Renard was at a funeral
for her son's friend's mother, an African American woman who had been murdered by an African
American man.   While Kunz was discussing the crime with Van Dever, he stated that the

murderer should be lynched.  Renard Deposition, Ex. 9, at 23:5 – 25:17; Lounds Deposition, Ex. 1, at 77:18-23; 90:2-12.

74.     Lounds provided additional context for Kunz' other allegedly racist statements. Lounds testified that she told Kunz his statements were inappropriate, and that he responded "Oh, it's not like I'm saying, let's, you know, take every black person and hang them by the neck and drive them in the hood."  Lounds Deposition, Ex. 1, at 77:13-17.

75.     Kraft was homeschooled through 12th grade.  She did not know that the phrase "yes massa" has racial connotations, and did not intend to offend Lounds when she used it.  She also apologized to Lounds when she learned that it was inappropriate.  Kraft Deposition, Ex. 4, at 14:23 – 15:8, 21:2-21, 31:1-18; Felts Deposition, Ex. 2, at 31:21 – 32:11; Feller Deposition, Ex. 6, at 73:3-12.

76.     Lounds admitted that she used the word "boom" in conversation, and did not use it in a racial or discriminatory manner.  She agreed that it was a word that was used to communicate that something good had happened. Lounds Deposition, Ex. 1, at 67:9 – 68:6. Renard likewise testified that "Shawron and I used to say boom all the time."   Renard Deposition, Ex. 9, at 44:17-18.

77.     Renard testified that she never heard any racial statements after the complaint to Greg McCarthy on January 27, 2012.  Also, Renard testified that she never heard Lounds bring up any new allegations after the complaint to McCarthy, saying that "[e]verything she talked about was stuff that had been brought up and talked about."  Renard Deposition, Ex. 9, at 44:21 – 45:8.

78.     Roettering worked in close proximity to Lounds from October 2011 to August 2012.  Roettering never heard any racial comments in the workplace—either before or after

Lounds' January 2012 complaint to McCarthy and Lincare HR.  Affidavit of Rebecca Roettering ("Roettering Affidavit"), Ex. 39, at ¶¶3-6.

79.     Kraft never heard Kempke or Kunz make racial statements in the workplace.  Kraft Deposition, Ex. 4, at 23:8 – 24:8; 38:15 – 39:5.

80.     Felts never heard racial comments in the workplace.  Felts Deposition, Ex. 2, at 30:5-9.

### FACTS RELEVANT TO LOUNDS' RETALIATION CLAIM

#### Lincare's attendance policy and expectations

81.     Lincare has very strict attendance requirements.   Under Lincare's attendance policy, employees are expected to timely report to work when they are scheduled and to remain at work, except during meals, until the end of their workday.  Feller Deposition, Ex. 6, at 115:6-19; Employee Handbook, Ex. 5, at 22.

82.      Given the nature of Lincare's operations, attendance and punctuality are important to the productivity of its centers—when one employee is absent, the other employees in the center have to shoulder the work of the absent employee, in addition to their own work.  Adams Affidavit, Ex. 10, ¶ 23.

83.     Among other things, CSRs answer phones, take and process orders, maintain files, verify insurance, and respond to patient requests.  *See* Lincare CSR Job Description (LIN_0000554-LIN_0000555) (Lounds Depo Exhibit 7), Ex. 40.  Since CSRs are the primary point of contact for most of Lincare's customers when they have questions or concerns, Lincare expects CSRs to work from 8 a.m. to 5 p.m., Monday to Friday.  Time off is at the center manager's discretion, and must be approved in advance.  *See* Lincare Measures of Performance

(MOPS) for Customer Service Representative (LIN_0000556-LIN_0000558) (Lounds Depo Exhibit 8), Ex. 41; Adams Affidavit, Ex. 10, ¶ 21-22.

84.     Lounds was given Lincare's Measures of Performance when she began her employment.   Lounds' regular hours were 8 a.m. to 5 p.m., Monday to Friday.   Lounds Deposition, Ex. 1, at 34:12-24.

85.     Generally, Lincare gives center managers the discretion to decide when an employee under their supervision has incurred an excessive number of absences.   Feller Deposition, Ex. 6, at 59:21 – 60:13.

**Lounds' excessive unscheduled absences**

86.     Lounds received the first informal "Documented Counseling" on January 20, 2012.  A documented counseling is an informal conversation with an employee about an issue that needs to be addressed.   The documented counseling Lounds received related to her attendance.   Felts Deposition, Ex. 2, at 81:17 – 83:5; Lounds Employee Calendar (LIN_0000202), Ex. 38.

87.     Lounds received a second informal documented counseling on February 17, 2012. This documented counseling also arose in connection with Lounds' attendance.  Felts Deposition, Ex. 2, at 81:17 – 83:5; Lounds Employee Calendar, Ex. 38.

88.     These absences were brought to Schanbacher's attention on Friday, April 13, 2012, during her weekly conference call with Felts.  After Lounds' complaints about a purported lack of training, Schanbacher had assigned Lincare's regional trainer to meet with Lounds and give her additional training.   During Schanbacher's conference call with Felts, she asked how Lounds' training was going.   Felts informed her that Lounds' progress was hampered by her

excessive absences.  Affidavit of Karen Schanbacher ("Schanbacher Affidavit"), Ex. 11, ¶¶ 5 – 9; Schanbacher Deposition, Ex. 3, at 24:10 – 25:5, 40:16 – 41:12.

89.    Schanbacher examined Lounds' attendance record, which at that time indicated that Lounds had missed thirteen days of work in about six-and-a-half months of employment. Schanbacher considered these absences to be excessive, so she contacted McCarthy that same day (April 13, 2012) to let him know of the problem with Lounds' attendance.  At that time, Schanbacher did not know that Lounds had filed a charge of discrimination with the KHRC on April 6, 2012.  Schanbacher Affidavit, Ex. 11, ¶¶ 10-13.

90.    McCarthy subsequently reached out to Adams and asked if it would be appropriate to begin the corrective action process with Lounds in connection with her excessive absences.  Feller Deposition, Ex. 6, at 62:18-21; Adams Affidavit, Ex. 10, ¶ 18.

91.    Adams analyzed the time sheets for the employees in the Wichita center from January 1, 2011 through April 16, 2012, and sent an email summarizing her findings to Felts. *See* April 23, 2012 Email from Adams to Felts (LIN_0000128-LIN_0000130) (Adams Affidavit Ex. C), Ex. 10, ¶19.  Adams found that Lounds had fourteen unscheduled absences in the relevant time frame.  This was far more absences than anyone else in the Wichita office.  By way of comparison, Kunz had the second highest number of unscheduled absences, with a total of six. Kunz, however, accumulated his six unscheduled absences in sixteen months, compared to Lounds, who had accrued her fourteen unscheduled absences in only seven months.  April 23, 2012 Email from Adams to Felts, (Adams Affidavit Ex. C), Ex. 10, ¶19; Adams Affidavit, Ex. 10, at ¶¶ 19-20.

92.    After Adams' email to Felts, Lounds missed two more unscheduled days of work—April 24, 2012 and April 25, 2012—meaning that she had missed a total of sixteen days

of unscheduled time.  As a result of her excessive absences, Lounds received a Documented Counseling on April 26, 2012.  *See* Lounds Documented Counseling on April 26, 2012 (LIN_0000044-LIN_0000045), Ex. 34.  Lounds admitted that she missed all of the days listed on her Documented Counseling.  Lounds Deposition, Ex. 1, 97:4 – 98:16.

93.    As Lounds' immediate supervisor, Kraft was the manager who signed the Documented Counseling.  This was because Lincare prefers for direct supervisors to manage employees so that they maintain credibility in the eyes of their employees.  Lounds Documented Counseling on April 26, 2012, Ex. 34; Feller Deposition, Ex. 6, 65:15-22.

94.    Felts believed it was appropriate for Kraft to be the one to give Lounds the Documented Counseling, even though Kraft had received a final written warning in connection with Lounds' complaint to McCarthy and Lincare HR in January 2012.  Because Kraft was still Lounds' supervisor, he believed that she "had every right to hold her employee accountable." Felts Deposition, Ex. 2, at 46:12-25.

95.    When Kraft and Felts met with Lounds to give her the Documented Counseling, Feller appeared by phone.  Feller asked Lounds if she felt that 16 unscheduled absences were excessive, Lounds responded, "No comment."  Feller Deposition, Ex. 6, at 67:8 – 68:11.

96.    Lounds was advised that if she did not demonstrate immediate and sustained improvement, further corrective action, up to and including termination, would occur. Lounds Documented Counseling on April 26, 2012, Ex. 34.

97.    The decision to give Lounds the Documented Counseling on April 26, 2012, was made for business reasons, and had no connection to her previous complaints.  Instead, Lounds received the Documented Counseling solely because her unscheduled absences had gotten out of

control and had not been managed appropriately.   Feller Deposition, Ex. 6, at 65:1-10 Feller Affidavit, Ex. 23, ¶ 8.

98.     Despite the Documented Counseling, Lounds' attendance did not improve.   Over the next two months, she missed nine more days or partial days of work which were not approved in advance, as required by Lincare policy.   As a result, she was given a Documented Verbal Warning on June 22, 2012, attached as Ex. 26.   *See also* Feller Affidavit, Ex. 23, ¶ 9. Lounds admitted that she missed all of the days listed on the June 22, 2012 Documented Verbal Warning. Lounds Deposition, Ex. 1, at 106:22 – 107:20.

99.     Lounds was advised that if she did not demonstrate immediate and sustained improvement in her attendance, Lincare would take further corrective action, up to and including termination of her employment.   *See* June 22, 2012 Documented Verbal Warning, Ex. 26.

100.     The decision to give Lounds the Documented Verbal Warning on June 22, 2012, was made for business reasons, and had no connection to her previous complaints.   Instead, the Documented Verbal Warning was given to Lounds because she had not improved her poor attendance.  Feller Affidavit, Ex. 23, ¶ 10.

101.     Lounds had two more unscheduled absences in July 2012, missing work on July 9 and July 20.   Lounds received a Final Written Warning on July 24, 2012 as a result of these unscheduled absences, attached as Ex. 29.   *See* Feller Affidavit, Ex. 23, ¶ 11.   Lounds admitted that she missed the days listed on the Final Written Warning.   *See* Lounds Deposition, Ex. 1, at 109:23 – 110:15.

102.     In the Final Written Warning, Lounds was told that if she did not show immediate and sustained improvement in adhering to Lincare policy, her employment would be terminated. *See* July 24, 2012 Final Written Warning, Ex. 29.

103.    The decision to give Lounds the Final Written Warning on July 24, 2012, was made for business reasons, and had no connection to her April 6, 2012 KHRC Complaint, her May 18, 2012 KHRC Complaint 18, or her other complaints of discrimination, harassment, or retaliation in her previous correspondence with Lincare.  Instead, she received it because of her continued unscheduled absences and her disrespectful message to Kraft.  Feller Affidavit, Ex. 23, ¶ 12.

104.    After her Final Written Warning on July 24, 2012, Lounds missed seven more days of work over the next two months, a fact Lounds conceded.  Because of Lounds' excessive absenteeism, Lincare terminated her employment on September 24, 2012.  Lounds Deposition, Ex. 1, at 111:22 – 112:17; Lounds Employment Termination, Ex. 35.

105.    In calculating Lounds' unapproved absences between July 24, 2012 and September 24, 2012, Lincare did not consider the absences she incurred for visits to her mental health counselor, Dr. Donaldson—even when the time she missed for Dr. Donaldson was excluded, the remaining absences were considered excessive.  Feller Deposition, Ex. 6, at 118:16-21, 120:16-20; Feller Affidavit, Ex. 23, ¶ 13; Kraft Deposition, Ex. 4, at 101:9 – 102:10.

106.    The decision to terminate Lounds' employment was made for business reasons, and had no connection to her April 6, 2012 KHRC Complaint, her May 18, 2012 KHRC Complaint, or her other complaints of discrimination, harassment, or retaliation in her previous correspondence with Lincare.  Instead, she was terminated because of Lincare management's belief that her absences were excessive and violated Lincare's attendance policy.  Feller Deposition, Ex. 6, at 134:16- 135:9; Feller Affidavit, Ex. 23, ¶¶ 14-15.

107.    During Lounds' time with Lincare, the only employee who had an even remotely comparable attendance record was Tracey Hackney ("Hackney").   Hackney is a Caucasian woman who was hired as a CSR in May 2011.  Feller Affidavit, Ex. 23, ¶ 16.

108.    Similarly to Lounds, Hackney frequently clocked in late or completely failed to show up at all.   Like Lounds, Hackney was fired after going through Lincare's disciplinary procedure—Documented Counseling, then Documented Verbal Warning, then Final Written Warning, then termination in February 2012.   Lounds, however, had far more absences than Hackney, yet was given many more chances than Hackney.   Lounds was given nearly a full year to correct her behavior, while Hackney was terminated after less than nine months.   Hackney never complained of discrimination or harassment of any kind during her employment.   Feller Affidavit, Ex. 23, ¶¶ 17-18.; Kraft Deposition, Ex. 4, at 102:2-10.

**Lounds deposition testimony during discovery regarding her retaliation claim**

109.    When Lounds was deposed, she was asked to describe the retaliation that she had allegedly been subjected to.   Lounds responded as follows:

a.  Her work started becoming more scrutinized.  (Lounds Deposition, Ex. 1, at 95:9-10);

b.  People started to make a mess at her desk – Kraft would eat at her cubicle and leave food wrappers on the desk.  (Lounds Deposition, Ex. 1, at 95:13-17);

c.  Kraft would go into her cubicle and rearrange Lounds' files.  (Lounds Deposition, Ex. 1, at 123:13-17);

d.  Roettering told her that she had messed up orders or put in the wrong code, when Lounds hadn't actually made a mistake.  (Lounds Deposition, Ex. 1, at 95:11-13);

e.  Roettering would tell her that she could go to Winfield to train, but would never actually let her go.  (Lounds Deposition, Ex. 1, at 123:19-23);

f.  Roettering had another CSR redo Lounds' folders.  Then when files were missing, Roettering would blame Lounds.  (Lounds Deposition, Ex. 1, at 123:23 – 124:12);

g.   Roettering forged Lounds' name on a work order. (Lounds Deposition, Ex. 1, at 125:25 – 126: 2);

h.   Lincare began to make an issue out of her absences and complained about her work.  (Lounds Deposition, Ex. 1, at 95:22 – 96:4); and

i.   When she walked into meetings, people would say, "shh, be quiet or you might get HR called on you," and would not say anything around her. (Lounds Deposition, Ex. 1, at 104:4-8).

## ARGUMENT

Lounds has only two claims: (1) she was subjected to a hostile work environment in violation of 42 U.S.C. § 1981, and (2) Lincare retaliated against her in violation of Title VII. PTO, Dkt. 46, ¶ 4.a.1-2.  Both of these claims fail.  Although there were a few inappropriate and insensitive comments in the Wichita office that violated Lincare's anti-harassment policies, the statements were not sufficiently severe or pervasive to give rise to an actionable hostile work environment claim.  Besides that, Lincare promptly and appropriately addressed all the complaints that it received. For these reasons, Lounds cannot prevail on her hostile work environment claim.  As to Lounds' retaliation claim, the majority of Lincare's actions do not even qualify as materially adverse actions giving rise to a claim.  And as to the ones that do, there is no causal connection (let alone but-for causation, as plaintiffs are required to prove in retaliation cases) between Lounds' complaints and the disciplinary actions taken against her.   To the contrary, Lounds was disciplined and fired purely because of her excessive absences.  In short, Lounds was neither discriminated nor retaliated against, and her claims against Lincare should be denied.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is not a disfavored procedural shortcut.  It is an important procedure intended to secure a just, speedy, and inexpensive determination of every action. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325 (1986).  The standards applied to summary judgment motions are well known and are described in detail in *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).  Lincare incorporates those standards here.

**I.    Lounds' Section 1981 hostile work environment claim fails because Lounds was not subjected to severe and pervasive harassment.**

The requirements for proving Section 1981 discrimination or harassment are identical to those applied to Title VII.  *Crowe v. ADT Sec. Services, Inc.*, 649 F.3d 1189, 1193 (10th Cir. 2011); *e.g. Tademy v. Uniion Pac. Corp*, 520 F.3d 1149, 1170 (10th Cir. 2008) (stating that the "elements of a hostile work environment claim 'under section 1981 are the same as those under Title VII.'").  To establish a *prima facie* case of a hostile work environment, Lounds must show the following:

   (1)    she is a member of a protected class;
   (2)    the alleged conduct was unwelcome;
   (3)    the alleged harassment was based on race;
   (4)    the alleged harassment was sufficiently severe or pervasive to create an abusive
          working environment; and
   (5)    some basis exists for imputing liability to Lincare.

*See Jones v. Wichita State University*, 528 F. Supp. 2d 1196, 1214 (D. Kan. 2007).  The first two elements are not in dispute—there's no question that Lounds is a member of a protected class, and that the alleged statements were unwelcome.  But Lounds cannot meet the requirements of the remaining three elements.

**A.    Much of the alleged harassment was not based on Lounds' race.**

Lounds has the burden of showing that the conduct she complains about was "racial or stemmed from racial animus."  *Witt v. Roadway Express*, 136 F.3d 1424, (10th Cir 1998) (internal quotations omitted).  This is because "[g]eneral harassment if not racial or sexual is not actionable."  *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994), *cert. denied* 516 U.S. 826 (1995).  Although the entire environment, including race-neutral conduct, is considered to

determine the context of the alleged harassment, "only conduct which occurred because of plaintiff's [race] can be a basis for liability under Title VII." *Jones*, 528 F. Supp. 2d at 1215. The Tenth Circuit has discussed this principle at length in the context of sexual harassment, which is analogous to racial harassment. "Sexual harassment is behavior that would not occur but for the sex of the employee." *Vigil v. City of Las Cruces*, 113 F.3d 1247, *2 (10th Cir. 1997) (table decision), *reh'g denied* 119 F.3d 871 (1997) (internal quotations omitted). "[I]f the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Riske v. King Soopers*, 366 F.3d 1085, 1092 (10th Cir. 2004). So to establish harassment based on race, Lounds must prove the conduct about which she complains would not have occurred but for her race. *See Vigil*, 113 F.3d 1247 at *2.

Many of the comments that Lounds has complained about have nothing to do with race, and therefore should not be taken into account when weighing whether she was subjected to a hostile work environment. *See Carter v. Meridian Auto. Sys.*, 368 F. Supp. 2d 1130, 1138 (D. Kan. 2004) (stating that the plaintiff's hostile work environment claim failed, in part, because many of the incidents "about which plaintiff complains bears no relation to plaintiff's race."). The first is Lounds allegation about Kraft's statement to Nathan Van Dever. *See* SOF ¶ 31.c (alleging that Kraft was speaking at a staff meeting that Nathan Van Dever was attending along with five women. Kraft said to Van Dever, "Nate do you feel like a minority[?]"). Lounds has made no attempt to explain how this comment was racial, probably in recognition of the fact that any attempt would fail miserably. In context, Kraft was plainly making a joke that Van Dever was outnumbered by five women. It had nothing to do with race.

In the same way, Lounds twists the conversation she had with Kunz after the "lynching" comment. Lounds likes to emphasize the "lets go down [to] 9th and Grove (the Black Neighborhood) and drag every black person with a noose, tie them to a truck, and drag them after hanging them." But she deemphasizes the most important part of the sentence, the part where Kunz said, ""**I'm <u>not</u> trying to offend you, it's <u>not</u> like I said, 'lets go down to 9th and Grove . . .**" *See* SOF ¶ 31(g). The language Kunz' used makes clear what happened. Kunz was having a conversation with Van Dever, and made the statement that the person who murdered Renard's friend should be lynched. Later, when he heard that Lounds had overheard his lynching comment, he approached her and tried to explain to her that he was only talking about lynching the murderer in particular, not African-Americans in general. Kunz' words may have been inartfully chosen, but it is clear that they did not "stem from racial animus." In fact, they were made for the exact opposite reason—to clarify his statements and make sure Lounds did not mistakenly believe that they were intended to offend.

In the same way, Kunz' alleged statement about Nicki Minaj being attractive (SOF ¶ 79.c) is also not a racial statement, and the fact that Lounds relies on it for her hostile work claim speaks volumes about the weakness of her position and her desperation to twist anything—*anything*—into a racially offensive statement. It beggars belief that Lounds is actually contending that Kunz' statement that an African-American woman was *attractive* was racially offensive. The same is true of Kraft's advice to Lounds to give "attitude" to a threatening caller, and Lounds' co-workers' greetings of "Yo" and "What's up?" (SOF ¶¶ 33.e; 33.i).

Finally, Lounds' allegations about her co-workers' use of the word "boom" is nonsense. Lounds is asking this Court to hold that because one co-worker in one isolated incident used the phrase, "boom nigga," the word "boom" became irreversibly tainted and any later use of the

word was a racial dogwhistle. But Lounds admitted that she herself had frequently used the word "boom" in conversation, and that it did not have a racial meaning. *See* SOF ¶ 76. "Boom" is not a racial word, and the fact that Lounds' co-workers used it has no relevance to this litigation. Title VII and Section 1981 do not give overeager plaintiffs the right to force people to stop using the ordinary, race neutral words they use in every day conversation.

**B. Lounds cannot show that the alleged harassment was severe or pervasive enough to create a hostile working environment.**

Although Title VII and Section 1981 "'afford employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult,' . . . [o]nly severe or pervasive workplace conduct that affects the terms, conditions, or privileges of employment are protected by Title VII." *Hounton v. Gallup Independent Co.*, 113 Fed. Appx. 329, 332 (10th Cir. 1994) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). To establish that a hostile work environment existed, Lounds must show that a rational jury would find that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. Barnhart*, 349 F.3d 1260, 1268 (10th Cir. 2003) (quotations omitted). The challenged conduct must create an "objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive." *Meritor Sav. Bank*, 477 U.S. at 65; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

The conduct must be either severe or pervasive in order to support a hostile work environment claim. No "mathematically precise test" exists for determining whether the conduct is sufficiently severe or pervasive, *Harris*, 510 U.S. at 22, but whether the conduct is "sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." *Sauers v. Salt Lake County*, 1 F.3d 1122, 1126 (10th Cir.

1993).   Circumstances to consider in each case include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 21.   When determining whether harassment is pervasive, "simple numbers alone are not determinative."  *Braden*, 176 F. Supp. 2d at 1112.   Instead, the analysis "begins with the number, sequence, and timing of the conduct.   The fact-finder then looks at the nuances of an environment that is imposed by each instance of discriminatory behavior."  *Id.* (citations and quotations omitted).

Here, the statements Lounds complains about were neither severe nor pervasive.   The only comments that could possibly be described as "severe" were those attributed to Kunz. Lounds' attempt to paint Kunz' statement as "severe" fails. As discussed above, the only way to take offense to those comments is to divorce them entirely from their context.   But that is forbidden by the case law—comments must be viewed under the totality of the circumstances. *See id.*  The undisputed facts show that Kunz' statements, under the totality of the circumstances, were not severe.

The other comments ("Boom nigga," "yes massa," etc.) do not rise to the level of "severe."  Other courts addressing similar comments have rejected the argument that such words were sufficiently severe as to give rise to a hostile work environment. For example, in *Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1035 (8th Cir. 2006), the court held that a white supervisor's statements to an African-American employee—including a description of himself as a "slave driver" and saying "What's up, my nigga?"—were insufficient to give rise to a hostile work environment claim.  Also, in *Carter v. Meridian Auto. Sys.*, 368 F. Supp. 2d 1130 (D. Kan. 2004), the court addressed a hostile work environment claim from a plaintiff who had received

two anonymous notes, one saying "You Are On Your Way Out Colored Boy," and the other saying, "Lazy black ass nigga." *Id.* at 1140. The court rejected plaintiff's claim, stating that while the notes were socially unacceptable, the court could not find, as a matter of law, that the two incidents created a hostile work environment. *Id.* As the court put it, "[a]t most, plaintiff has made a showing of 'a few isolated incidents of racial enmity' insufficient to establish a hostile work environment claim." *Id.* The *Carter* court's analysis was guided by *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994), *cert. denied* 516 U.S. 826 (1995), in which the Tenth Circuit found that a plaintiff had not been subjected to a hostile work environment despite evidence showing that two of plaintiff's coworkers made overtly racial remarks, warned plaintiff that they knew people in the Ku Klux Klan, and used the term "nigger" in plaintiff's presence.[5]

The comments Lounds complains about are significantly less offensive than those that were at issue in the preceding cases. It is much more offensive to be called a "lazy black ass nigga" than it is to hear a co-worker say, "boom nigga." And a co-worker warning about his connections with the Ku Klux Klan is much more offensive (and threatening) than it is to be asked a question about why African-Americans name their children "Roshonda." If the comments in the above cases were not severe, the statements alleged by Lounds are not, either, and Lounds claim should likewise be dismissed on summary judgment.

---

[5] *Canady*, *Carter*, and *Bolden* are only a few examples of courts holding that comments similar those at issue here were insufficient to give rise to a hostile work environment. There are several other examples from the courts in the 10th Circuit. *See, e.g.*, *Taj v. Safeway, Inc.*, Case No. 01-4172, 2003 U.S. Dist. LEXIS 14550, *11-12, 2003 WL 22000560 (D. Kan. May 22, 2003) ("Plaintiff was called a 'nigger' or 'sand nigger' by four Safeway employees. Plaintiff was also subjected to the use of the term 'nigger-rigged' and a joke regarding a blonde woman and a nigger. The court does not find that the evidence offered by the plaintiff is sufficiently severe or pervasive to alter the conditions of his employment. . . . Moreover, the record demonstrates that disciplinary action was taken against the four employees when the defendant was made aware of the inappropriate language. Accordingly, the court finds that Safeway is entitled to summary judgment on this claim."); *Harp v. Dep't of Human Servs.*, 932 F. Supp. 2d 1217, 1231-34 (D. Colo. 2013) (plaintiff's allegations that she was called "a little monkey," told she was incompetent, subjected to a joke about her weave hairstyle, and that she overheard a racial slur were insufficient to create a hostile work environment); *Hill v. Bd. of Regents for Okla. City Cmty. College*, Case No. CIV-10-1232, 2012 U.S. Dist. LEXIS 52326, *28-29, 2012 WL 1252641 (W.D. Okla. Apr. 13, 2012) (holding that "a single episode of use of the word 'nigger' by a coworker, while offensive, falls short of the necessary showing" and that the plaintiff's allegation he had been "continually harassed . . . is far too general to support his claim.").

Lounds also has not shown that the comments were pervasive, as she has not shown a "steady barrage" of offensive racial comments. The facts show that there were only a handful of comments all total (*see* SOF ¶ 31), and what few comments there were essentially came to a halt after the January 27, 2012 complaint to McCarthy and Lincare HR.   In all of her numerous complaints, "rebuttals," "memorandums," and meetings with Lincare HR, Lounds never brought up any new inappropriate statements after the January 27th complaint.  *See* SOF ¶¶ 33, 37, 40, 44, 48-50, 53, 55, 56, 63, 66,68.   All she did was recycle the same allegations, over and over again.   She was told several times to report inappropriate comments, but the only thing she brought up after January 27th was the "BON" comment, which was immediately addressed the same day she mentioned it.   If she was being barraged by offensive comments on a daily basis, as she claimed, why didn't she complain about these new statements in her letters?   Why is it that Lounds' mental health counselor, who Lounds had been seeing for weeks, only cited stale allegations from before January 27th in his letter to Lincare?   *See* SOF ¶¶ 64-66.   The uncontroverted facts provide the answer to these questions:  what few comments there had been before January 27, 2012 ceased once the matter was brought to Lincare's attention, and the only insensitive comment Lounds reported after that time was immediately and properly addressed.

To be clear, Lincare does not dispute that many of the comments Lounds complains about were distasteful or outright inappropriate (which is why it promptly disciplined those who were alleged to have made such comments).   But Section 1981 is not a civility code.   It's intended to protect from extreme comments that are so severe that they literally interfere with the employee's ability to do his or her job.   That's not what we have here.   The comments Lounds complains about simply do not meet the requirements of Section 1981, and judgment should be entered in Lincare's favor as a result.

## II.   Lounds' retaliation claim fails because she was disciplined and terminated for good faith, non-retaliatory reasons.

Lounds' retaliation claim is subject to the *McDonnell Douglas* burden shifting framework, under which (1) the plaintiff must first establish a *prima facie* case of discrimination or retaliation; (2) the defendant thereafter may present a legitimate, non-discriminatory or non-retaliatory rationale for the adverse employment action; and (3) if the defendant brings forth such a reason, the plaintiff must show that the defendant's rationale is pretextual.  *Crowe v. ADT Sec. Services, Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).  These steps will be addressed in turn.

### A.   Lounds cannot make a *prima facie* retaliation claim.

For Lounds to establish a *prima facie* retaliation claim, she must show:

(1)   a protected employee action;
(2)   a reasonable person would have found the employer's following action to be materially adverse; and
(3)   a causal connection between the employee's action and the employer's adverse action.

*See Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009).  This standard focuses on the employer's retaliatory action, not the underlying discrimination the employee has opposed. *Id.* at 1185.

### 1.   Most of the conduct Lounds complains about is not "materially adverse" for purposes of Title VII.

There is no question that Lounds engaged in a protected activity, and therefore can meet the first element.  But the majority of Lincare's actions that Lounds relies upon to support her retaliation claim (*see* SOF ¶ 109) do not meet the definition of a "materially adverse" action.  "To qualify as retaliatory, actions 'must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Steele v. Kroenke Sports Enterprises, L.L.C.*, 264 Fed. Appx. 735, 746 (10th Cir. 2008).  Lounds must prove, by objective evidence, that each of the actions she complains about was a materially adverse

38

employment action. *Wheeler v. BNSF Ry. Co.*, 418 Fed. Appx. 738, 750-51 (10th Cir. 2011) (plaintiff failed to establish by "'objective evidence of material disadvantage'" that work assignments with short time requirements was materially adverse action) (quoting *Semsroth*, 555 F.3d at 1185).

"The substantive anti-discrimination provisions of Title VII are limited to adverse actions affecting employment or altering the conditions of the workplace." *Steele*, 264 Fed. Appx. at 743.   "Adverse employment actions include 'acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *DeWalt v. Meredith Corp.*, 288 Fed. Appx. 484, 493 (10th Cir. 2008) (quotations omitted).   "'[A] mere inconvenience or an alteration of job responsibilities will not rise to the level of an adverse employment action.'"   *Id.*   "'While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.   Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *MacKenzie*, 414 F.3d at 1279 (citations omitted).

The words "minor" and "trivial" come to mind when reviewing the majority of the "adverse" actions Lounds complains about.   As discussed in SOF ¶ 109, Lounds cited the following alleged conduct as the basis for her retaliation claim:

      a.  Her work started becoming more scrutinized;

      b.  People started to make a mess at her desk – Kraft would eat at her cubicle and leave food wrappers on the desk;

      c.  Kraft would go into her cubicle and rearrange Lounds' files;

    d.  Roettering told her that she had messed up orders or put in the wrong code, when Lounds hadn't actually made a mistake;

    e.  Roettering would tell her that she could go to Winfield to train, but would never actually let her go;

    f.  Roettering had another CSR, Jody Weimar, redo Lounds' folders.  Then when files were missing, Roettering would blame Lounds;

    g.  Roettering forged Lounds' name on a work order;

    h.  Lincare began to make an issue out of her absences and complained about her work; and

    i.  When she walked into meetings, people would say, "shh, be quiet or you might get HR called on you," and would not say anything around her.

The only "adverse" action in this list is the disciplinary action Lincare took against Lounds in connection with her absences—it is the only action that led to a significant change in Lounds' employment status (notably, however, Lounds does not even allege that her termination was retaliatory).  Lounds has not shown how Kraft supposedly eating lunch at her desk or rearranging her files, for example, created a significant change in her work status.  As a result, these purported actions cannot form the basis of a valid Title VII claim—they are the sort of "trivial employment actions that an irritable, chip-on-the-shoulder employee" should not be allowed to rely upon for a discrimination suit.  *See MacKenzie*, 414 F.3d at 1279.

    **B.**    **Lounds cannot show that Lincare's good faith reason for disciplining her and terminating her employment was pretext.**

The temporal connection between Lounds' first KHRC complaint and her first documented counseling is purely coincidental.  Nonetheless, Lincare concedes that Lounds can at least make a *prima facie* retaliation case simply from the close timing between her KHRC complaint and her first documented counseling.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (holding that a time period of one and one-half months between the

protected activity and adverse action may be enough, by itself, to establish causation for purposes of showing a *prima facie* case).

Since Lounds can establish a *prima facie* case, the burden shifts to Lincare to show a legitimate reason for the adverse action. *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009). Lincare can easily meet this burden. It is undisputed that regular attendance is a critical requirement for Lincare's CSRs. *See* SOF ¶¶ 81-83. And there is no dispute that Lounds missed every one of the days listed on the disciplinary actions she received. *See* SOF ¶¶ 92, 98, 101, 104. Lounds missed at least 34 days of work (the majority of which were unscheduled) in less than a year. Lounds cannot possibly argue that Lincare did not have a legitimate, good faith reason to terminate her employment in light of her abysmal attendance record and her inability or unwillingness to correct her poor attendance.

Nor can Lounds show that this good faith reason is pretext, especially when the discipline Lounds received is compared to that received by Hackney, a similarly situated employee.[6] To determine whether a plaintiff and co-worker are similarly situated, courts look looks to whether the plaintiff and the other employee "deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of "comparable seriousness." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800-01 (10th Cir. 2007) (citation omitted). Applying these factors here, Hackney was similarly situated with Lounds. Both were in the Wichita office, and therefore subject to the same supervisor. Both were CSRs, and therefore subject to the same performance evaluation and discipline standards. And

---

[6] The Tenth Circuit does not require Title VII plaintiffs to be compared to "similarly-situated" co-workers. *See Sorbo v. UPS*, 432 F.3d 1169, 1173 (10th Cir. 2005) (Title VII race discrimination claim). But while not required, the Tenth Circuit has recognized that comparing the plaintiff to similarly-situated employees is useful when analyzing Title VII claims. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800-01 (10th Cir. 2007).

crucially, both engaged in conduct of comparable seriousness—Hackney, like Lounds, was terminated because of her poor attendance.  SOF ¶¶ 107-108.

Examining Lounds' termination in comparison to Hackney's shows that Lincare did not act for pretextual, retaliatory, or discriminatory reasons.  The similarities between Lounds and Hackney make the point clear:  Both Lounds and Hackney were CSRs, both were supervised by Kraft in the Wichita office, both had excessive absences, and both were eventually terminated as a result.  But it's actually the differences between the Lounds and Hackney that drive the point home and show that Lincare did not act for retaliatory or discriminatory reasons.  The first difference between the two is that Lounds is African-American, while Hackney is Caucasian.  The second difference is that Hackney never made any complaints of discrimination or retaliation, unlike Lounds, who filed KHRC complaints and sent numerous letters to Lincare HR.  The third difference is that Lounds received far *more* chances to correct her behavior than did Hackney—even though Lounds had far more absences than Hackney, she (Lounds) was not fired for nearly a year, unlike Hackney who was terminated in less than nine months.

The differences between Lounds and Hackney show that Lincare takes attendance seriously and disciplines employees who are not meeting Lincare's attendance requirements.  Lounds cannot show that the discipline she received was pretextual.  If Lincare was retaliating against Lounds for engaging in protected activity, as she claims, one would expect the facts to show that Lounds was treated *less* favorably than comparable employees who had not engaged in protected activity.  But the facts show the exact opposite.  If anything, Lounds was given preferential treatment—she was given far *more* chances than the Caucasian employee who had not filed any complaints.

As a result, Lounds cannot show that Lincare's actions were pretextual, and therefore cannot prevail on this claim.  This is especially the case in light of the U.S. Supreme Court's recent decision in *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, __ U.S. __,  133 S. Ct. 2517, 186 L. Ed. 2d 503  (2013).  In *Nassar*, the Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 133 S. Ct. at 2533.  Here, Lounds has presented no evidence (other than her unfounded accusations) showing that but-for her complaints, she would not have been disciplined.

The reasoning behind the *Nassar* Court's decision is relevant here.  In holding that traditional "but-for" causation should be applied to retaliation claims rather than the lesser causation standard applied to other Title VII claims, the Court stated:

> . . . lessening the causation standard could also contribute to the filing of frivolous claims, which would siphon resources from efforts by employer, administrative agencies, and courts to combat workplace harassment.  Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location.  To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation.  If respondent were to prevail in his argument here, that claim could be established by a lessened causation standard, all in order to prevent the undesired change in employment circumstances.  Even if the employer could escape judgment after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage.  It would be inconsistent with the structure and operation of Title VII to so raise the costs, both financial and reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent.

*Nassar*, 133 S. Ct. at 2531-32 (citations omitted).

Lounds epitomizes the hypothetical plaintiff described by the Supreme Court.  Lounds' attendance was obviously a problem, as shown by the informal counseling and three formal

warnings she received during her employment.  *See* SOF ¶¶ 86-87, 92, 98, 101, 104.  But rather than correct this problem, Lounds continually peppered Lincare HR with various complaints after the initial complaint had already been properly addressed.  And when the unrelated employment action came, Lounds relied on her barrage of letters and other complaints to accuse Lincare of retaliation.  She will, presumably, argue that pretext should be assumed because of the temporal connection between her complaints and the discipline she received.  This argument fails.  Of course there's a temporal connection—by submitting so many complaints, Lounds made it virtually impossible for Lincare to discipline her without opening itself up to an accusation of retaliation.  This is the exact situation the Supreme Court was concerned about in *Nassar*.

For this reason, Lounds' retaliation claim should not be permitted to go trial.  To avoid summary judgment, Lounds must show that there is a material dispute of fact about whether her KHRC complaints and letters were *the* but-for cause of her termination.  Lounds cannot meet this burden.  Lincare should not be forced to go to trial to defend against her dubious claim—as the Supreme Court stated, it is "inconsistent with the structure and operation of Title VII to so raise the costs, both financial and reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent."  *Nassar*, 133 S. Ct. at 2532.  The Court's holding that but-for causation applies to retaliation claims was intended to protect employers from claims like this one.  Lounds' retaliation claim should be dismissed.

## CONCLUSION

For the above reasons, all of Lounds' claims fail and should be dismissed.  Judgment should be entered in Lincare's favor on all claims.

Respectfully submitted,


 s/Stephanie N. Scheck
Stephanie N. Scheck          (#17641)
Jesse Tanksley          (#24162)
STINSON MORRISON HECKER LLP
1625 N. Waterfront Parkway, Suite 300
Wichita, KS 67206-6620
Telephone (316) 265-8800
Facsimile (316) 265-1349
sscheck@stinson.com
jtanksley@stinson.com

*Attorneys for Defendant Lincare Inc.*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 20, 2013, a true and correct copy of the above and foregoing was electronically served via the ECF system to the following:

Anne Schiavone
Kirk D. Holman
HOLMAN SCHIAVONE, LLC
aschiavone@hslawllc.com
kholman@hslawllc.com

*Attorneys for Plaintiff Shawron Lounds*


 s/Stephanie N. Scheck