# EXHIBIT 2

Page 1

```
1        UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF KANSAS
2
3
  SHAWRON LOUNDS,            )
4                            )
                             )
5       Plaintiff,           )
                             )
6                            )
    vs.            )Case No. 13-CV-1091
7                            )
                             )
8 LINCARE, INC.,             )
                             )
9                            )
        Defendant.   )
10                           )
11
12
13       D E P O S I T I O N
14      The videotape deposition of JEREMY FELTS taken on
15 behalf of the Plaintiff pursuant to the Federal Rules of
16 Civil Procedure before:
17        DARLENE K. KELLEY, CSR
            KELLEY, YORK & ASSOCIATES, LTD.
18        Suite 105, 515 South Main Street
            Wichita, KS  67202
19
20
21 a Certified Shorthand Reporter of Kansas, at 1625 N.
22
23 Waterfront Parkway, Suite 300, Wichita, Sedgwick County,
24
25 Kansas, on Thursday, October 10, 2013, at 10:37 a.m.
```

Page 2

```
1       A P P E A R A N C E S
2 PLAINTIFF:
      HOLMAN SCHIAVONE, LLC
3     Ms. Anne Schiavone
      4600 Madison Avenue
4     Suite 810
      Kansas City, Missouri 64112
5     (816) 283-8738
      aschiavone@hslawllc.com
6
7
  DEFENDANT:
8     STINSON MORRISON HECKER LLP
      Ms. Stephanie N. Scheck
9     Suite 300
      1625 North Waterfront Parkway
10    Wichita, Kansas 67206-6602
      (316)265-8800
11    sscheck@stinson.com
12
13
14 VIDEOGRAPHER:
15    ADVANCED DOCUMENT IMAGING
16    Mr. Kyle B. Kelley
17    Suite 105
18    515 South Main
19    Wichita, Kansas 67202
20    (316) 267-0800
21    kkelley@kelleyyork.com
22
23
24
25 Also present was Plaintiff, Ms. Shawron Lounds.
```

Page 3

```
1            I N D E X
2                        Page
3 JEREMY FELTS
4   Direct Examination              4
5   Cross-Examination By Ms. Scheck       81
6   Redirect Examination By Ms. Schiavone    83
7   Recross-Examination By Ms. Scheck      84
8
9
10
11          E X H I B I T S
12 No.    Description          Page
13   1  Kempke Final Written Warning (2 pgs.)
14
      2  Kunz Final Written Warning (2 pgs.)
15
      3  Felts/Lounds e-mails (1 pg.)
16
17
18
19
20
21
22
23 Signature of Witness              85
24
25 Certificate                86
```

Page 4

```
1        THE VIDEOGRAPHER:  This begins
2    the videotape deposition of Jeremy Felts.
3    Today is October 10th, 2013.  The time is
4    10:38 a.m.  Will the court reporter please
5    swear in the witness.
6        JEREMY FELTS,
7    having been first duly sworn on his oath to
8    state the truth, the whole truth, and nothing
9    but the truth, testifies as follows:
10        DIRECT EXAMINATION
11 BY MS. SCHIAVONE:
12 Q.   Good morning, Mr. Felts.
13 A.   Good morning.
14 Q.   Can you state your full name for the record,
15    please.
16 A.   Jeremy Michael Felts.
17 Q.   And who is your current employer?
18 A.   Lincare.
19 Q.   And what's your current position?
20 A.   District manager.
21 Q.   And was that the same position you held in
22    the fall of 2011?
23 A.   Yes, ma'am.
24 Q.   And do you oversee the same area or district
25    as did you back in the fall of 2011?
```

1 A.   Yes.

2 Q.   And how many center managers do you oversee

3    in your role as district manager?

4 A.   Eight.

5 Q.   And is one of them the center manager for the

6    Wichita office?

7 A.   It is.

8 Q.   And during the time period of fall 2011

9    through July or so of 2013, is it accurate

10    that one of those center managers for Wichita

11    would have been Suzanne Kraft?

12 A.   It was.

13 Q.   And she was the only center manager, just so

14    the record is clear; is that accurate?

15 A.   Yes.

16 Q.   What are the duties and responsibilities of a

17    center manager as you understand them?

18 A.   To really oversee the day-to-day operations

19    from a sales standpoint, clinical, customer

20    service, service.

21 Q.   And are they the direct supervisor for the

22    sales representatives in the Wichita office

23    as well as the customer service

24    representatives?

25 A.   They are.

1 Q.   And the center manager has the authority to

2    discipline their subordinates, I assume?

3 A.   Yes.

4 Q.   And that includes deciding when a written

5    counseling or some type of document of

6    counseling is warranted?

7 A.   Generally what happens is that there's an

8    issue that's brought to human resources and

9    decided upon jointly with the human resources

10    department.

11 Q.   And it's the responsibility of the center

12    manager to bring that to the attention of the

13    corporate office or HR department; is that

14    accurate?

15 A.   That's accurate.

16 Q.   What role do you play, if any, in that line

17    of command when it comes to employee

18    discipline? Is that really something that's

19    between the center manager and corporate, or

20    at some point are you involved in that

21    decision?

22 A.   Depending on the circumstances, I can be

23    involved in those decisions.

24 Q.   What type of decisions are you typically

25    involved in as it relates to employee

1    discipline in your role as a district

2    manager?

3 A.   Anything that would be brought to my

4    attention.  If ever a manager is possibly not

5    comfortable in a one-on-one situation with an

6    employee, or a lot of times having to do with

7    the sales representatives because I spend a

8    lot of time with our sales reps and interact

9    with them one on one.

10 Q.   As far as a documented counseling for

11    attendance, is that something that a center

12    manager can just handle directly with

13    corporate without your involvement?

14 A.   Most of the time.

15 Q.   And what about an employee disciplinary

16    issue, is that something that the center

17    manager, if they feel they're competent to do

18    so, can just deal directly with corporate on?

19 A.   Sure.

20 Q.   So there's no obligation or a policy that a

21    center manager contact a district manager in

22    order to take certain steps, is that a fair

23    statement?

24 A.   That's a fair statement.  Not a -- not a

25    direct policy.  It's a case-by-case situation

1    I would say.

2 Q.   And is it up to the center manager's

3    discretion as to when they think the district

4    manager's involvement it warranted or when

5    they should reach out to the district

6    manager?

7 A.   Most cases, yes.

8 Q.   And how long have you been an employee of

9    Lincare?

10 A.   Since May 11, 2009.

11 Q.   Okay.  And what positions did you hold, if

12    any, prior to being a district manager?

13 A.   I was a sales representative in the Wichita

14    location, and center manager in Wichita, and

15    then district manager for Kansas.

16 Q.   And when did you get promoted to the district

17    manager position?

18 A.   September of 2010.

19 Q.   What is your educational background?

20 A.   I have a Bachelor's in chemistry and business

21    from Wichita State University.

22 Q.   When you came on board with Lincare in a

23    manager -- managerial role, what type of

24    training do you recall receiving on

25    anti-discrimination and EEO policies?

Page 9

1  A.   As a manager, we typically have trainers that
2       come in and spend some one-on-one time with
3       our managers reviewing policies and
4       procedures.  There's a -- what's called an
5       employee relations manual, smaller than that
6       binder there, with a lot of information that
7       starts with the hiring process of an employee
8       as far as interviews up to background checks
9       and things that need to be done through the
10      corporate office, the first -- employee's
11      first day and on through the employment
12      process.
13 Q.   And did some of that training include
14      anti-discrimination and equal employment
15      opportunity policies?
16 A.   Yes, I believe that information is in there
17      as well as the handbook.
18 Q.   And looking at Exhibit 1 of Suzanne Kraft's
19      deposition, the employee handbook.  It's the
20      thickest document.  There you go, almost
21      there.  Yes.
22 A.   Yes.
23 Q.   Looking at Pages 15 and 16 of the employee
24      handbook --
25 A.   Yes, ma'am.

Page 10

1  Q.   -- are you familiar with the company's equal
2       employment opportunity policies and the
3       policies concerning harassment, both sexual
4       harassment and racial harassment?
5  A.   Yes.
6  Q.   And did you understand that there were
7       certain violations that could warrant
8       disciplinary action up to and including
9       termination as it relates to the EEO and
10      harassment policies?
11 A.   Certainly.
12 Q.   And as a district manager did you understand
13      that some instances may warrant immediate
14      termination as opposed to just a written
15      counseling or a final written warning?
16 A.   Yes.
17 Q.   Did you play any role in hiring Shawron
18      Lounds?
19 A.   I did.  I did sit in on an interview with
20      her.
21 Q.   And who was the decision-maker in hiring her?
22 A.   Ultimately Suzanne.
23 Q.   And prior to Shawron coming to the Wichita
24      office, had there been other black employees
25      employed as a CSR in the Wichita office?

Page 11

1  A.   Not to my knowledge.
2  Q.   Was -- is it accurate to say that Shawron was
3       the only black employee between the time
4       period of the fall of 2011 and the fall of
5       2012 when she was terminated?
6  A.   In the Wichita office?
7  Q.   Yes.
8  A.   Yes.
9  Q.   And the only location that Suzanne Kraft
10      oversaw was the Wichita office; is that
11      accurate?
12 A.   During that time period?
13 Q.   Yes.
14 A.   Yes.
15 Q.   Were there black employees at the Winfield
16      office during the same time period of fall of
17      2011 and fall of 2012?
18 A.   No.
19 Q.   How about the Hutchinson office?
20 A.   No.
21 Q.   How big was the Winfield office?
22 A.   About six employees.
23 Q.   And then what about the Hutchinson office?
24 A.   I believe five.
25 Q.   And then how many would you say were employed

Page 12

1       at the Wichita office during the relevant
2       time period that we're talking about here,
3       the fall of 2011 to the fall of 2012?
4  A.   Fully staffed, I would say about seventeen or
5       eighteen, something like that.
6  Q.   Other than the Wichita office, the Hutchinson
7       office, the Winfield office, was there any
8       other Kansas office that you would consider
9       to be in somewhat close proximity to the
10      Wichita office?
11 A.   Not really.  Everything else would be an hour
12      and a half or more away.
13 Q.   Of the eight offices that you oversee, or
14      more specifically did oversee between the
15      time period of September of 2011 to September
16      of 2012, how many black employees were in the
17      other offices, if you can recall?
18 A.   I think total two or three.
19 Q.   Did those two or three include Shawron or was
20      that separate and apart from Shawron?
21 A.   Including Shawron.
22 Q.   So either a total of two or a total of three?
23 A.   Yes.
24 Q.   Do you recall what -- how many employees
25      would you say were within those eight offices

1  Q.   And you were present for Ms. Renard's
2       deposition; is that accurate, yesterday?
3  A.   I was.
4  Q.   And did you hear her testify that she came to
5       you in December of 2011 to inform you of
6       things of a racial nature that were going on
7       at the Lincare office?
8  A.   I did hear her testify that.  I have no
9       recollection of that.
10 Q.   Do you believe it could have occurred or do
11      you believe that it absolutely did not occur?
12 A.   I believe it absolutely did not occur from a
13      standpoint of her saying anything racial or
14      anything like that was going on.  Could she
15      have said that there was an uncomfortable
16      environment?  Possibly.  But I don't recall
17      anything being said with regards to there
18      being anything racial.  That, to me, would
19      have been a key word for action, immediate
20      action.
21 Q.   If she came to you and said there's an
22      uncomfortable environment because people are
23      saying things with a racial undertone, what
24      would you have done?
25 A.   I would have addressed the issue.  I would

1       have contacted our human resources department
2       as we did when Greg visited the location.
3  Q.   So when she testified that she came to you in
4       December of 2011 about the racial environment
5       at the Lincare office, do you just believe
6       her to be wrong or do you believe she's
7       lying?  I mean what's your take on what she
8       said?
9            MS. SCHECK:  Object to the form,
10      calls for speculation.
11 A.   I believe Amber to be a truthful person.  And
12      this was a long time ago, so, you know, the
13      details as she remembers them could be
14      different than the details as I remember
15      them.  I'm going to give my best and most
16      honest recollection of what happened, as I'm
17      sure she did.
18 Q.   And those could -- do you believe that those
19      could possibly differ on some points?
20 A.   There's always a possibility.
21 Q.   Now, Greg McCarthy came to the office,
22      Wichita office in January of 2012.  Is that
23      your recollection?
24 A.   Yes, ma'am.
25 Q.   Okay.  And it was towards the end of the

1       month; is that accurate?
2  A.   I think so.
3  Q.   So how did you come to learn that an issue of
4       race discrimination had been brought up to
5       him?
6  A.   We sat in a meeting, Greg and I sat with the
7       customer service reps around a little table
8       we have, and Amber spoke up -- spoke up that
9       some things are not right around here and
10      someone is being mistreated.  I don't
11      remember her exact verbiage, but that someone
12      is being mistreated.  And then a conversation
13      ensued after that with Greg and Shawron.  I
14      was in fairly close proximity.
15 Q.   And were you participating in that
16      conversation or were you just in the general
17      area?
18 A.   Initially Greg and I were both going to be in
19      the room and Shawron requested to speak to
20      Greg one on one.
21 Q.   Had Shawron ever made complaints of an
22      uncomfortable work environment to you?
23 A.   Prior to that date, no.
24 Q.   Subsequent to, did she -- and we'll get to
25      it, but subsequent to January of 2012 had she

1       made statements about an uncomfortable work
2       environment?
3  A.   No.  Absolutely not.
4  Q.   So it's your testimony that subsequent to
5       January 2012 she never made comments about an
6       uncomfortable work environment based on her
7       race?
8  A.   Correct.
9  Q.   So after Greg McCarthy met with Shawron did
10      you ever meet with Shawron one on one in
11      January of 2012, beginning of January 2012?
12 A.   No.
13 Q.   Did you discuss with Greg McCarthy what was
14      said between him and Shawron?
15 A.   Very briefly, yes.
16 Q.   Okay.  And what do you recall from that
17      conversation?
18 A.   He said that she stated there's several
19      employees or three employees actually that
20      had said things that made her uncomfortable.
21      And I believe he had already let our human
22      resources director know, and that I needed to
23      follow up with her and make sure that we
24      immediately addressed those concerns and make
25      sure that Shawron felt comfortable, and that

1    we take corrective action with the employees
2    that had allegedly said those things.
3  Q.   Who were the three employees?
4  A.   Suzanne Kraft, Laney Kempke and Kevin Kunz.
5  Q.   And looking at -- in the pile of documents
6      you'll see that there's a Kraft Exhibit 3
7      which is the write-up that Suzanne Kraft
8      received.  It's probably towards the front of
9      your pile -- I mean the back of your file.
10     It was one of the first exhibits that was
11     marked.
12 A.   Okay.
13 Q.   Did you issue this final written warning to
14     her?
15 A.   I did.
16 Q.   And it states in there that, "It has been
17     reported by more than one individual that
18     you've made inappropriate racially-motivated
19     comments in the center."
20        Do you see where I'm at?
21 A.   I do.
22 Q.   Okay.  When it says it's been reported by
23     more than one individual, who were the
24     individuals who reported that?
25 A.   Initially Amber Renard and then Shawron

1    Lounds is my understanding.
2  Q.   Anybody else?
3  A.   No, not to my knowledge.
4  Q.   Okay.  What is your understanding as to what
5      the racially-motivated comments were?
6  A.   The aforementioned, "yes, massa" comment.
7  Q.   Anything else?
8  A.   No.
9  Q.   And would you agree with me that this says
10     comments plural?
11 A.   It does.
12 Q.   And did you draft this or who drafted this
13     document?
14 A.   This was drafted by our human resources
15     department.
16 Q.   Did anyone ever, whether it be Shawron or
17     Amber, ever relay to you that Suzanne had
18     called Shawron by a different name other than
19     her given name of Shawron?
20 A.   Throughout the course of this, I remember
21     hearing it.  I couldn't tell you exactly when
22     I first had knowledge of it.
23 Q.   And did you understand that Shawron's
24     perception was that the names that Suzanne
25     had called her other than her given name of

1    Shawron had a racial stereotype associated
2    with them?
3  A.   Could you repeat the question, I'm sorry.
4  Q.   Sure.  Did you ever come to learn, prior to
5      this lawsuit, that Shawron had been called
6      other names than her given name by Suzanne
7      Kraft?
8  A.   I believe that this is the first time in the
9      last few days that I heard that.
10 Q.   Okay.  So it's your testimony that you were
11     not aware of that prior to this lawsuit being
12     initiated?
13 A.   I believe so, yes.
14 Q.   And we talked about the "yes, massa" comment.
15     Is there any other comments you were aware of
16     prior to this lawsuit being initiated that
17     Suzanne Kraft had made?
18 A.   Not that I can recall.
19 Q.   Do you as a district manager believe that
20     it's appropriate for a center manager to tell
21     employees that they should address their
22     superiors with "yes, massa"?
23 A.   No.
24 Q.   Do you, in your personal world --
25 A.   Sure.

1  Q.   -- understand that to have racial
2      connotations?
3  A.   Yes.
4  Q.   And do you understand it to have connotations
5      associated with slavery?
6  A.   I do.
7  Q.   Whose determination was it to issue a final
8      written warning to Suzanne Kraft?
9  A.   Human resources.
10 Q.   Did you discuss with them what the
11     appropriate action should be as it relates to
12     disciplining Suzanne Kraft?
13 A.   As far as my opinion, no.
14 Q.   Did you believe she should have been
15     terminated for that?
16 A.   At the time, no.  You know, I think there's
17     degrees of discriminatory language, I guess
18     you could say.  And although very offensive,
19     you know, people do make mistakes.  And given
20     Suzanne's background and the circumstances,
21     the context of it, again, it wasn't my
22     decision, but I don't think I would have
23     terminated her at the time.
24 Q.   And hindsight being 20-20, do you think as a
25     district manager the best course of action

1    would have been to terminate her for making
2    that statement?
3            MS. SCHECK:  Objection, calls for
4    speculation.
5  A.   I stand by the decision.  No.
6  Q.   Do you believe that a center manager should
7    lead by example?
8  A.   Certainly.
9  Q.   Do you believe that if a center manager is
10    making statements or even a single statement
11    that has racially discriminatory animus
12    associated with it that it could create an
13    environment within the center where employees
14    think that might be okay?
15            MS. SCHECK:  Objection to the
16    form.
17  A.   I think individuals look at their managers as
18    leaders, good or bad, and a lot of times do
19    imitate those things.  Do I think it happened
20    in this case?  No.
21  Q.   Where it goes on to state in her write-up in
22    that first paragraph, "In addition to making
23    comments yourself, you witnessed and allowed
24    other individuals who report directly to you
25    to make similar comments in the center."

1    What did you base that statement on?
2  A.   I didn't write the write-up.
3  Q.   What is your understanding as to what that
4    referred to?
5  A.   That it was claimed that Suzanne had to have
6    overheard some of these things.  That's the
7    way I understood it.  Again she's claiming
8    she didn't.  As far as I know she didn't.  I
9    know I never heard anything.
10        So due to the fact that we gave
11    Ms. Lounds the benefit of the doubt in
12    stating that that, you know, had quite
13    possibly have been heard.
14  Q.   Is it accurate that it wasn't just Ms. Lounds
15    who was relaying that these other things had
16    been said, it was also Amber Renard was
17    reporting to corporate, or at least to Greg
18    McCarthy, that other individuals have also
19    said things that had a racial animus or
20    racial undertone to them?
21  A.   Could you repeat the question?
22  Q.   Sure.  Where you said you were giving Shawron
23    the benefit of the doubt, isn't it accurate
24    that Amber Renard also reported that comments
25    of a racial nature had been made by other

1    employees at the time Suzanne Kraft was the
2    center manager?
3  A.   Amber did report on Kevin and Laney, however,
4    when I was referring to giving Shawron the
5    benefit of the doubt, I was referring to the
6    comments that had been made.
7  Q.   But Suzanne was also being written up for
8    allegedly witnessing and allowing other
9    individuals who report directly to her to
10    make similar comments in a sense; is that
11    accurate?  I mean she was getting written up
12    for not doing anything about it if she knew?
13  A.   According to the language in this write-up,
14    absolutely.
15  Q.   And those other individuals who reported
16    directly to Suzanne, was it your
17    understanding that it was Kevin and Laney who
18    were the main issues?
19  A.   Yes, those were the only three individuals
20    that were brought up.
21  Q.   What was Suzanne's response when you gave her
22    this write-up?
23  A.   She was upset about it.  You know, I don't
24    recall the exact conversation, but she was
25    upset because there wasn't an intention of

1    harm in there or offending.
2  Q.   Did you believe her when she said that she
3    had no idea that "yes, massa" had a racial
4    connotation associated with it?
5  A.   Yeah.
6  Q.   And why?
7  A.   She's a little naive in certain respects.
8    And I don't know if that's attributable to
9    her home schooling, but not everyone has the
10    same educational opportunities, and we have
11    to be respectful of different backgrounds.
12  Q.   And with respect to the write-up, how long
13    did your meeting with her last when you
14    issued this final written warning to her?
15  A.   Oh, probably five minutes.
16  Q.   Did you -- I'll hand you -- or if you could
17    look at what we marked as Exhibit 4, it's
18    going to be the Lincare in-service record.
19  A.   Uh-huh.
20  Q.   Did you do any sort of training within Amber
21    after giving her this final written warning
22    as it relates to EEO policies?
23            MS. SCHECK:  Suzanne?
24  BY MS. SCHIAVONE:
25  Q.   I mean Suzanne.

Page 33

1 A.   Just the discussion we had with regards to
2      the write-up itself addressing not only the
3      fact that there are certain comments that can
4      be perceived as inappropriate, having racial
5      undertones and then the fact that there's no
6      retaliation for that, that sort of thing.
7 Q.   And then Exhibit 4 is a document that it
8      looks like there was -- it was an in-service
9      record and it's dated January 30th of 2012;
10     is that accurate?
11 A.  Yes.
12 Q.  And tell me about this in-service.  How long,
13     let's start with how long did it last?
14 A.  I would say less than ten minutes.
15 Q.  And what happened in this in-service?
16 A.  I had a meeting with the individuals here on
17     the sign-in sheet and just wanted to make
18     sure everyone was clear on our company policy
19     on anti-discrimination and harassment.  And
20     not only things that -- just make sure people
21     understand that -- excuse me -- even if they
22     don't perceive something as offensive,
23     somebody else could possibly.
24         So the effort there was to make sure
25     everyone was on the same page with regards to

Page 34

1      treating everyone fair and well.  And in the
2      back of my mind I just wanted to make things
3      as comfortable for Shawron as possible
4      because you could tell she was not
5      comfortable when Amber brought that up.  And
6      that was the intention, is to make sure that
7      whatever comments were said stopped and that
8      we could all move forward and get back to
9      business.
10 Q.  Was Shawron visibly upset by the environment,
11     based on your observations, at the end of
12     January when this report was made?
13 A.  Was she visibly upset?  When Greg was there?
14 Q.  Yes.
15 A.  She was upset that day.  You could tell she
16     was not comfortable with the situation.
17         (Deposition Exhibit No. 1 was marked
18     for identification.)
19 A.  And rightfully.
20 Q.  Let me hand you what we'll mark as Exhibit 1
21     of your deposition.
22 A.  Okay.
23 Q.  Have you seen this document before?
24 A.  I believe so.
25 Q.  And this is a final written warning that was

Page 35

1      issued to Laney Kempke on January 30th of
2      2012; is that accurate?
3 A.  I believe so.
4 Q.   Is there a reason why you issued this as a
5      district manager rather than Suzanne Kraft
6      issuing it as a center manager?
7 A.   Under the circumstances where Suzanne was
8      given a final written warning for the same
9      thing or similar comment, it was decided that
10     it would be most appropriate for me to do
11     that.
12 Q.  And do you have an understanding as to what
13     inappropriate comments had been made by Laney
14     Kempke?
15 A.  The "boom nigga" comment and the, you know,
16     "peace out" comment as well.
17 Q.  Peace out nigga; is that right?
18 A.  Yes.
19 Q.  Okay.  Any other comments that you were aware
20     of?
21 A.  Something regarding the ghetto, just
22     stating -- yeah, referring to a certain
23     neighborhood in Wichita as the ghetto.
24 Q.  And was it an area of Wichita that was a
25     lower socioeconomic class?

Page 36

1 A.  It's very well known for higher crime, low
2      income.
3 Q.   Do you know if there's a predominant race
4      that lives in that neighborhood?
5 A.   There's a lot of minorities in that part of
6      town.
7         (Deposition Exhibit No. 2 was marked
8      for identification.)
9 BY MS. SCHIAVONE:
10 Q.  I'm going to hand you what we'll mark as
11     Exhibit 2 of your deposition.  Have you seen
12     this document before?
13 A.  I have.
14 Q.  And is this a final written warning issued to
15     Kevin Kunz?  How do you pronounce his last
16     name?
17 A.  Kunz.
18 Q.  Dated January 30th of 2012?
19 A.  Yes, ma'am.
20 Q.  And it's signed by you; is that accurate?
21 A.  Yes.
22 Q.  And this is a final written warning
23     associated with inappropriate,
24     racially-motivated comments that he's made;
25     is that accurate?

1  A.   Yes.

2  Q.   What is your understanding what comments were

3       made by Kevin that warranted this action?

4  A.   My understanding, Kevin was talking about the

5       murder that was committed, was talking I

6       believe to Shawron and Amber, I don't know

7       exactly, that I believe it was an African

8       American that killed another African

9       American, and had made a comment about

10      lynching that person that committed the

11      murder.

12 Q.   And the person who committed the murder was a

13      black person; is that correct?

14 A.   Yes, yes.

15 Q.   And would you agree with me that -- and you

16      don't have to agree with me -- but typically

17      in our society lynching is something that has

18      a racial connotation?

19 A.   It does, yes.

20 Q.   Are you aware of any other comments that were

21      allegedly made by Kevin of a racial nature?

22 A.   I believe there was some discussion in

23      Ms. Lounds' deposition regarding him saying

24      something about -- I can't remember --

25      something about -- I don't know if it was an

1       Asian person having bad teeth, something like

2       that.

3  Q.   But that wouldn't have been on your radar at

4       the time of this write-up?

5  A.   No, no, no.

6  Q.   That's something you became aware of that

7       later?

8  A.   That was -- I believe the first I heard that

9       was Ms. Lounds' deposition.

10 Q.   Now with respect to Laney's write-up and

11      Kevin's write-up, is it accurate that Shawron

12      and Amber both reported that they had made

13      those statements or heard that such

14      statements had been made by those two

15      individuals?

16 A.   I think so, yes.  I don't think anyone is

17      disputing those comments were made.

18 Q.   Did you say no one is disputing?

19 A.   I don't think anyone is.

20 Q.   Why, based on your opinion as a district

21      manager, why was Laney Kempke only given a

22      final written warning and not terminated for

23      using the word nigga in the workplace?

24 A.   Why?

25 Q.   Yes.

1  A.   I don't know.

2  Q.   As a district manager, what do you believe

3       the appropriate action should be if an

4       employee uses a word like nigga in the work

5       environment?

6  A.   Depends on the context of the word.  That was

7       open for interpretation.

8  Q.   Can you, sitting here today, think of any

9       time when in the workplace the word nigga

10      would be appropriate to use?

11 A.   I don't think it's ever appropriate, but upon

12      Laney's write-up she stated that that word

13      was used by Shawron.

14 Q.   Did you document that anyplace, that that's

15      what she said?

16 A.   No.

17 Q.   Would you believe something like that would

18      be important to document if an employee said,

19      hey, I'm getting written up for this but the

20      person complaining about it also says it?

21 A.   Now, yes.  At the time, no.

22 Q.   So you believe at this time 20-20 that that

23      would be a good business practice to document

24      such a statement?

25 A.   Yes.

1  Q.   And you didn't?

2  A.   It may be on file in human resources

3       somewhere.

4  Q.   And if it were, I would assume it would be in

5       some file that would have been produced in

6       this litigation?

7  A.   One would think.

8  Q.   And why wasn't Kevin fired, in your mind, as

9       a district manager for making a comment that

10      was associated with lynching a black person?

11      Do you know why he wasn't terminated?

12 A.   Again, context and it was an HR decision, all

13      three were.

14 Q.   Can you think as a district manager of any

15      situation where it would be appropriate for

16      an employee in the workplace to say anything

17      about a black person being hung or lynched?

18 A.   I don't think it's the appropriate thing to

19      say.

20 Q.   After January -- let me ask you this.  In

21      January of 2012, did you have a one-on-one

22      meeting with Shawron about the environment?

23 A.   After January?  No.  There was no time that I

24      met with Shawron one on one behind closed

25      doors.

1   remember the dates, it's been too long, but I
2   believe I was present for -- for these, for
3   most of them anyway.
4   Q.   Were you part of the decision that this
5       documented counseling would be issued or was
6       that between Suzanne and corporate and then
7       you were present for the meeting?
8   A.   It was really up to our corporate office on
9       when those occurred.
10  Q.   And Suzanne was in touch with corporate on
11      those issues?
12  A.   Yes.
13  Q.   And this is dated April 26th of 2012; is that
14      accurate, Exhibit 6 of Suzanne Kraft's
15      deposition?
16  A.   Yes, appears to be dated, looks like that,
17      4-26.
18  Q.   And as far as you're aware, was this the
19      first documented counseling that Shawron
20      Lounds had received regarding attendance was
21      in April of 2012?
22  A.   Not a hundred percent sure, but it appears to
23      be.
24  Q.   And this occurred a few weeks after her
25      charge of discrimination was filed; is that

1       accurate, if you look at the date on her
2       charge of discrimination which was Exhibit 5
3       of Ms. Kraft's deposition?
4   A.   It appears to be 20 days after.
5   Q.   Did -- sitting here today as the district
6       manager, do you think it would have been a
7       better course of action to have someone other
8       than Suzanne Kraft issue a disciplinary
9       counseling form to Ms. Lounds?
10          MS. SCHECK:  Object to the form.
11  A.   No.
12  Q.   Is it accurate that approximately three
13      months prior to issuing this write-up to
14      Shawron Lounds, Suzanne Kraft had been
15      disciplined for a racial comment that had
16      offended Shawron Lounds?
17  A.   Yes.
18  Q.   Do you believe a better course of practice
19      would have been to have somebody else issue
20      the write-up to Shawron because Suzanne had
21      previously been disciplined for a racial
22      comment that involved Shawron Lounds?
23  A.   There's no relationship to the two.
24      Suzanne's still Shawron's supervisor and had
25      every right to hold her employee accountable.

1   Q.   Do you --
2   A.   As long as it's not retaliatory.
3   Q.   And do you understand that an employee who
4       had just filed a charge of discrimination in
5       the preceding weeks could view a write-up as
6       retaliatory, regardless of whether or not
7       they're actually correct on their view?  My
8       question is whether as a district manager you
9       understand that an employee could view such
10      action as retaliatory?
11          MS. SCHECK:  Object to the form.
12  A.   People perceive things in all sorts of
13      different ways, so is the possibility there?
14      Sure.
15  Q.   Is there a certain number of absences that
16      warrants a documented counseling?
17  A.   I believe it's a case-by-case basis, and even
18      one absence that's unscheduled is generally
19      worth more than just a documented counseling.
20      It may be a step or two ahead in the
21      disciplinary process.  It just depends on the
22      individual.
23  Q.   And is it accurate that looking at this
24      document, it looks like Shawron had absences
25      in the November, December, January, February

1       and March at least up to that point, and I'll
2       go to April in a second, but this includes,
3       this write-up, absences in November,
4       December, January, February and March?
5   A.   Uh-huh.
6   Q.   Is that a yes?
7   A.   Yes.
8   Q.   Okay.  And as far as you know, Shawron had
9       not received a documented counseling prior to
10      this April 26 date; is that accurate?
11  A.   I don't remember the dates, but this appears
12      to be her first disciplinary action as it
13      pertains to her missing work, excessive
14      amount of work.
15  Q.   And again, this was issued subsequent to her
16      filing a charge of discrimination, based on
17      if you look at just only the dates of the
18      charge of discrimination in this write-up; is
19      that accurate?
20  A.   Yes.
21  Q.   If you could look at Exhibit 8 of Ms. Kraft's
22      deposition.  Do you have it?
23  A.   Uh-huh.
24  Q.   Okay.
25  A.   Yes.

Page 77

1  Q.  You don't know either way?
2  A.  I don't know that she did, but the
3      understanding that I have is that this was
4      solely a decision made by our human resources
5      department and other individuals at the
6      corporate office.  Suzanne, to my
7      understanding, had no -- her opinion, I don't
8      believe, was weighed in on it, nor was mine.
9  Q.  What do you base that on?  And I don't want
10     to know anything that you learned from an
11     attorney.  What do you base that on that it
12     was solely corporate?
13 A.  We weren't really allowed to make any
14     decisions with regards to this towards the
15     end.
16 Q.  This meaning Shawron?
17 A.  This set of circumstances.
18 Q.  Meaning a complaint of discrimination
19     pending?
20 A.  Meaning Shawron's excessive absenteeism and
21     all the circumstances surrounding it.
22 Q.  Which would include her complaints of
23     discrimination and retaliation; is that
24     accurate?
25 A.  I would say so, yes.

Page 78

1  Q.  Did you have any meetings with Linda Feller
2      regarding Shawron Lounds?
3  A.  No, a couple of phone conversations but most
4      of those are really Suzanne and Linda.
5  Q.  Were you present for a meeting with Linda
6      Feller and Shawron Lounds, did you sit in on
7      a meeting?
8  A.  I don't recall if I actually sat in.  I was
9      trying to think about that earlier, and I
10     can't remember if I actually sat in when she
11     talked to her or if it was more one on one.
12     We were in the same room.  I don't know if I
13     stayed the whole time.  I do remember Linda
14     coming and being in Suzanne's office, but I
15     don't remember if I was in there for all of
16     that.  If I recall correctly, they did meet
17     one on one, but I can't be a hundred percent
18     sure.
19 Q.  Do you recall any substance of that
20     conversation if in fact you were present when
21     she met with Linda Feller?
22 A.  No.  Linda was just very pleasant.
23 Q.  What about a meeting with Karen?
24 A.  Yes.
25 Q.  Were you in on that meeting?

Page 79

1  A.  Yes.
2  Q.  In that meeting -- do you recall if that
3      occurred March or so of 2012?
4  A.  I'm not sure.  I know Karen came after Greg,
5      I don't know if it was previous to or
6      before -- or after, excuse me, Linda.  I
7      think Karen might have came a few times there
8      in the first part of that year.
9  Q.  When Karen met with Shawron, were you
10     present?
11 A.  I was.
12 Q.  Okay.  And do you recall in that meeting you
13     stating that you had seen a change in
14     Shawron's overall demeanor?
15 A.  Yeah, I do remember something to that effect.
16 Q.  Do you remember Shawron saying something
17     about feeling like she lost her spirit?
18 A.  I do recall the word spirit being mentioned,
19     yes.
20 Q.  Do you remember Karen's response?
21 A.  That we just want to see her get her spirit
22     back.  And I believe the conversation was
23     very positive and supportive trying to
24     identify anything else that had been said
25     that wasn't addressed.  And Shawron mentioned

Page 80

1      that nothing -- nothing new had been said.
2      And that we just wanted to see how we could
3      positively move on together making Shawron as
4      comfortable as possible.
5  Q.  And that would have been in February or March
6      of 2012 you believe?
7  A.  Yeah, it was in spring, I think.  I'm not
8      sure exactly when.  I know it was after Greg,
9      so...
10 Q.  Do you recall her telling Shawron, Karen
11     telling Shawron to go find her spirit?
12 A.  I don't think she used that.  We just said we
13     wanted to help her, or she said she wanted to
14     make sure that we help her be happy in the
15     workplace basically.
16 Q.  Was Shawron crying in this meeting?
17 A.  I don't recall specifically.  Seemed to be a
18     pretty positive meeting and everyone seemed
19     to take it in a positive way.
20 Q.  Did you ever see Shawron crying in the
21     workplace?
22 A.  Yeah, I think she was crying that first day
23     when Greg was there.
24 Q.  Any other time that you can recall?
25 A.  I'm not sure.  No, I'm not sure.

Page 81

1   MS. SCHIAVONE:  Give me one
2   minute and we may be done.
3   THE VIDEOGRAPHER:  Off the record
4   12:05.
5   (Off-the-record discussion.)
6   THE VIDEOGRAPHER:  On the record
7   12:06.
8   MS. SCHIAVONE:  I don't have
9   anymore questions.  I appreciate your time.
10  A.   Sure, thank you.
11  CROSS-EXAMINATION
12  BY MS. SCHECK:
13  Q.   Mr. Felts, I just have a couple of questions.
14  If you could pull out Kraft Exhibit 13, which
15  is the employee calendar.
16  A.   Got it.
17  Q.   And you recall the discussion about the use
18  of different counseling terms versus verbal
19  warnings, counseling.  And Exhibit 6 and
20  Exhibit 8 are actually the written, more
21  formal memo of counselings that Ms. Lounds
22  received.  But if you look on Exhibit 13, are
23  there also notations on the employee calendar
24  on January 20th and then again on
25  February 17th about documented counselings?

Page 82

1   A.   Uh-huh.
2   Q.   Do you see that?
3   A.   There are.
4   Q.   And is it your understanding that's a way to
5   note maybe just an informal conversation with
6   an employee about an issue, in this case an
7   attendance issue?
8   A.   Yes, I'm sure it was likely related to the
9   attendance issues, but there are times when
10  you have an extremely minor issue or just an
11  issue that's popped up that you may just have
12  a conversation with someone.
13  The best example I can give you is a
14  sales rep who is maybe not reaching their
15  goals.  I may have a conversation saying,
16  hey, we're not quite where we need to be.
17  What do we need to do to get there?  How can
18  I help you?  Here's the circumstances.  What
19  do we need to do to correct the issue?
20  Q.   So in that situation there may not be any
21  notation of anything.  It just happens
22  naturally as a way to help an employee
23  improve?
24  A.   Yes, absolutely.  If we had to, I guess, go
25  to HR on every little thing then...

Page 83

1   Q.   So this could be an example of Ms. Kraft
2   meeting with Shawron informally to talk about
3   attendance issues and she just made a
4   notation on the calendar?
5   A.   Yes.
6   MS. SCHECK:  Those are all the
7   questions I have.
8   REDIRECT EXAMINATION
9   BY MS. SCHIAVONE:
10  Q.   Real quick question.
11  You don't know for certain what these
12  notations mean, do you, because you weren't
13  present?
14  A.   I don't know for certain, but I know there
15  was attendance issues sort of on the radar
16  from the get-go.
17  Q.   So in Exhibit 13, any notations that are on
18  here that aren't self-explanatory, you would
19  be speculating what Suzanne meant or what
20  took place in the meeting; is that accurate?
21  A.   Repeat the question, please.
22  (The requested portion of the record
23  was read by the reporter, as follows:
24  Question:  "So in Exhibit 13, any notations
25  that are on here that aren't

Page 84

1   self-explanatory, you would be speculating
2   what Suzanne meant or what took place in the
3   meeting; is that accurate?")
4   A.   I would say so.
5   MS. SCHIAVONE:  I don't have
6   anymore questions.
7   RECROSS-EXAMINATION
8   BY MS. SCHECK:
9   Q.   And just to be clear, when it says D.C. on
10  January 20th and on February 17th down below,
11  it's written documented counseling, correct?
12  A.   Yes.
13  MS. SCHECK:  I don't have any
14  further questions.  He will read and sign.
15  Do you want it sent to your home address?
16  THE WITNESS:  That's fine.
17  THE VIDEOGRAPHER:  Off the record
18  12:09.
19  (Deposition concluded at 12:09 p.m.)
20  *   *   *
21
22
23
24
25

# EXHIBIT 3

Page 1

1     UNITED STATES DISTRICT COURT
         DISTRICT OF KANSAS
2
3
  SHAWRON LOUNDS,      )
4        Plaintiff,  )
5        vs.       ) No. 13-CV-1091
6  LINCARE, INC.,      )
7        Defendant.  )
8
9
10
11
12
       VIDEOTAPED DEPOSITION OF KAREN SCHANBACHER
13
       TAKEN ON BEHALF OF THE PLAINTIFF
14
           OCTOBER 22, 2013
15
   (Starting time of the deposition:  10:40 a.m.)
16
17
18
19
20
21
22
23
24
25

Page 3

1     UNITED STATES DISTRICT COURT
         DISTRICT OF KANSAS
2
3
  SHAWRON LOUNDS,      )
4        Plaintiff,  )
5        vs.     ) No. 13-CV-1091
6  LINCARE, INC.,      )
7        Defendant.  )
8
9      VIDEOTAPED DEPOSITION OF KAREN SCHANBACHER,
10  produced, sworn and examined on October 22, 2013,
11  between the hours of 8:00 o'clock in the forenoon and
12  5:00 o'clock in the afternoon of that day, at the
13  offices of Quincy Library, 526 Jersey, Quincy,
14  Illinois 62301, before Melissa J. Lane, a Certified
15  Court Reporter (MO), Certified Shorthand Reporter
16  (IL), and a Notary Public within and for the State of
17  Missouri, in a certain cause now pending in the United
18  States District Court, District of Kansas, between
19  SHAWRON LOUNDS, Plaintiff, vs. LINCARE, INC.,
20  Defendant; on behalf of the Plaintiff.
21
22
23
24
25

Page 2

1           I N D E X
2 QUESTIONS BY:                    PAGE
  Ms. Schiavone                6
3
4         E X H I B I T S
5 EXHIBIT        DESCRIPTION        PAGE
   1    Handwritten notes        38
6  2    E-mail                   42
   3    Customer services representative training  44
7  4    Injury data card document    47
   5    FirstStar Rehabilitation document   48
8  6    Full-day absences document   49
9 (The original exhibits were retained by the court
  reporter and will be copied and attached to copies of
10 the transcript.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        A P P E A R A N C E S
2
   For the Plaintiff by webcam:
3
4     Anne Schiavone
      Holman Schiavone, LLC
5     4600 Madison Avenue, Suite 810
      Kansas City, Missouri  64112
      816-283-8738
6
7  For the Defendant by webcam:
8     Stephanie Scheck
      Stinson, Morrison, Hecker, LLP
9     1625 N. Waterfront Parkway, Suite 300
      Wichita, Kansas  67206
10    316-268-7948
11
12
      Also present: John Niehaus, Videographer
13
14
15
16
17
18
19
20
21
22
23
   Court Reporter:
24 Melissa J. Lane, CCR/CSR
   Missouri CCR #957
25 Illinois CSR #084-004481

Page 5

1        IT IS HEREBY STIPULATED AND AGREED by and
2  between counsel for the Plaintiff and counsel for the
3  Defendant that this deposition may be taken in
4  shorthand by Melissa J. Lane, CCR/CSR, a Certified
5  Court Reporter, Certified Shorthand Reporter, and
6  Notary Public, and afterwards transcribed into
7  typewriting; and the signature of the witness is
8  expressly reserved.
9              *    *    *    *    *
10       THE VIDEOGRAPHER:  This is tape number 1 to
11 the videotaped deposition of Karen Schanbacher in the
12 matter of Shawron Lounds versus Lincare, Inc., being
13 heard before the U.S. District Court, District of
14 Kansas.  Case number 13-CV-1091.
15       This deposition is being held at the Quincy
16 Library on October 22nd, 2013, at approximately
17 10:40 a.m.
18       My name is John Niehaus, and I'm the legal
19 videographer.  The court reporter is Missy Lane.
20       Counsel, will you please introduce yourself
21 and affiliations, and the witness will be sworn.
22       MS. SCHIAVONE:  Anne Schiavone for
23 plaintiff, Shawron Lounds.
24       MS. SCHECK:  Stephanie Scheck for
25 defendant, Lincare, Inc.

Page 6

1          KAREN SCHANBACHER,
2  of lawful age, produced, sworn and examined on behalf
3  of the PLAINTIFF, deposes and says:
4              EXAMINATION
5  QUESTIONS BY MS. SCHIAVONE:
6    Q.  Can you state your full name for the
7  record, please?
8    A.  Karen Ann Schanbacher.
9    Q.  Ms. Schanbacher, if you can't hear me
10 today, will you please let me know?
11   A.  Sure.
12   Q.  Okay.  And if you have -- if you don't
13 understand one of the questions I ask, just go ahead
14 and feel free to ask me to rephrase it or for
15 clarification, if you don't understand what I'm asking
16 you; okay?
17   A.  Okay.
18   Q.  Who is your present employer?
19   A.  Lincare.
20   Q.  Okay.  And how long have you been employed
21 with Lincare?
22   A.  13 years.
23   Q.  And what is the present position you hold
24 with Lincare?
25   A.  I'm a divisional manager for Lincare.

Page 7

1    Q.  And is that the same type of position you
2  held during the September 2011, through September
3  2012, time period when Shawron Lounds was employed
4  with Lincare?
5    A.  Yes.
6    Q.  Okay.  What were the duties and
7  responsibilities of the division manager position that
8  you presently hold and held back in September 2011,
9  through September of 2012?
10   A.  I oversee approximately 40 Lincare
11 locations around the state of Kansas, Missouri,
12 Illinois and Oklahoma.  I help them run day-to-day
13 operations and help manage their business and their
14 sales force.
15   Q.  Do you have authority to discipline in your
16 position as division manager?
17   A.  Yes.
18   Q.  Okay.  And as division manager, in the
19 organizational hierarchy or structure of Lincare back
20 in 2011, and 2012, were you a supervisor to Suzanne
21 Kraft in some form?
22   A.  Yes.
23   Q.  Okay.  And does the same hold true for
24 Jeremy Felts?
25   A.  Yes.

Page 8

1    Q.  Were you Jeremy Felts' direct supervisor,
2  or did he have a different direct supervisor?
3    A.  No.  That would be me.
4    Q.  Okay.  And then is it accurate that
5  Suzanne -- I'm sorry, Suzanne Kraft's direct
6  supervisor would have been Jeremy Felts during the
7  time period at issue, which was September 2011,
8  through September of 2012?
9    A.  Correct.
10   Q.  What did you do to prepare for your
11 deposition today?
12   A.  I spoke to our attorney, Stephanie, for
13 maybe an hour and a half yesterday.
14   Q.  Okay.  And did you review any documents in
15 preparation for your deposition?
16   A.  Yes.  The documents that were sent to me.
17   Q.  Okay.  And those documents were the ones, I
18 assume, that I sent that would be used as exhibits in
19 today's deposition?
20   A.  Correct.
21   Q.  Did you discuss your deposition today with
22 any current employees of Lincare?
23   A.  No, I did not.
24   Q.  And what about any former employees?
25   A.  No.

Page 9

1    Q.   Outside the presence of counsel, have you
2 discussed this lawsuit or allegations that are being
3 made in this lawsuit with any current employee of
4 Lincare?
5    A.   Did you say, did I, I'm sorry?
6    Q.   Yeah.  Have you --
7    A.   No.
8    Q.   -- outside the presence of any lawyers
9 discussed this lawsuit or the allegations surrounding
10 this lawsuit with any current employee of Lincare?
11    A.   No, I have not.
12    Q.   And what about any former employee?
13    A.   No.
14    Q.   And are you aware that we're here today
15 related to a lawsuit that was brought by Shawron
16 Lounds alleging racial discrimination and retaliation?
17    A.   Yes.
18    Q.   And you understand you're not a defendant
19 in this lawsuit; is that accurate?
20    A.   I understand, what, I'm sorry?
21    Q.   That you're not a defendant in this
22 lawsuit?
23    A.   Right.
24    Q.   When did you first meet Shawron Lounds?
25    A.   The first and only time that I met Shawron

Page 10

1 was approximately the middle of February 2012.
2    Q.   Okay.  And so had you had any -- I assume
3 you had no interactions with her prior to that date?
4    A.   Correct.
5    Q.   And no interaction subsequent to that date;
6 is that accurate?
7    A.   Correct.
8    Q.   And you didn't play any role in her hiring;
9 did you?
10    A.   No, I did not.
11    Q.   How did you -- let me ask you this.
12        How often would you be at the Lincare
13 office that was located in Wichita, Kansas?
14    A.   It really depends on what's going on in the
15 other 40 locations that I have --
16    Q.   Okay.
17    A.   -- as far as the need of the -- I don't
18 have a certain rotation.  It -- it's just basically if
19 there's a need that arises or, you know, like sales
20 training, management training, then I would be at that
21 location.
22    Q.   Do you know how often you visited the
23 Lincare Wichita location in the year 2012?  I mean,
24 was there an average amount of time?  And really I'm
25 not trying to pin you down.  I'm just trying to get a

Page 11

1 feel if you were there approximately once a month,
2 every other month, once every six months.  I know it's
3 dependent on other needs of other offices, but do you
4 have a general idea of how much you may have been
5 there in 2012?
6    A.   Generally, I'm in like the Kansas area
7 someplace like every other month.  It may not be the
8 Wichita office.  It may be other locations, but -- so
9 probably, you know, the Wichita office, probably four
10 times a year typically.
11    Q.   Okay.  Now, what was -- let me ask you
12 this.
13        When you went to the Wichita office in
14 mid-February of 2012, did it have anything to do with
15 the allegations of racial discrimination, or were you
16 there on a business-related matter?
17    A.   Business-related matter.
18    Q.   So tell me how you came to know of or get
19 to meet Shawron Lounds in mid-February of 2012.
20    A.   I was there for a couple of days in
21 February, and basically the workload wasn't getting
22 completed by the customer service reps in a timely
23 matter or at all.  And so we had a meeting that day
24 that I asked the regional customer service rep trainer
25 and Jeremy Felts, myself and the customer service reps

Page 12

1 to attend.
2    Q.   Now, was your trainer Becky?
3    A.   Yes.
4    Q.   Is her last name Rowding (sic) or --
5    A.   Roettering, I believe, is how you say it.
6    Q.   Okay.  So it was Becky Roettering, Jeremy
7 Felts, customer service representatives,
8 who were in attendance?
9    A.   Correct.
10    Q.   Was Suzanne Kraft in attendance at that
11 meeting?
12    A.   I -- I can -- I'm not sure.
13    Q.   Okay.  And so you were at this meeting, and
14 is it you who initiated this meeting because the
15 workload's not being completed at the Wichita office
16 in your opinion?
17    A.   Correct.
18    Q.   And so tell me what unfolds at this
19 meeting.
20    A.   During the meeting, we -- we talked about
21 just my expectations of a customer service rep, and I
22 had asked them if there were -- you know, and what --
23 if -- you know, what was going on and what could I do
24 to help and if there were any concerns that were
25 keeping them from doing their position.

Page 13

1 At that time Shawron did speak up very
2 disrespectfully, rudely, abruptly and caused some
3 disharmony, I guess, in -- in the meeting and -- about
4 her training and that she felt like she wasn't given
5 enough training to do her job to do the appropriate
6 workload that I'm asking of her. And due to the --
7 her comments and the way -- not necessarily her
8 comments but the way she commented, the disrespectful
9 part, I told her that we could meet privately in a
10 different office after the meeting so that we could,
11 you know, one-on-one I could talk to her about her
12 concerns.
13 Q. Did you say anything else during the
14 meeting with this person?
15 A. No.
16 Q. Can you hear me?
17 A. Yes.
18 Q. Okay. Did she say anything else in this
19 meeting with the CSRs?
20 A. Can you repeat that, I'm sorry? You were
21 cutting out a little bit.
22 Q. Yes.
23 Did she say anything else in the meeting
24 where you had the CSRs and Jeremy Felts and Becky
25 present, or was that the extent of what she said?

Page 14

1 A. The extent was, of what she said was, that
2 she didn't feel like she had received adequate amount
3 of training, and then that was it at that time with
4 the others present.
5 Q. You said that you viewed her, when she
6 spoke up, as being very disrespectful and that she
7 spoke up abruptly and in a rude fashion. Can you just
8 describe to me the demeanor or what actions or tone of
9 voice she used that led you to believe that it was
10 very disrespectful and rude on her part?
11 A. I don't remember her exact comments, but
12 you know, basically, I mean, I had had a trainer there
13 for the most part since October 2011, because -- and
14 so I -- you know, it was more that she didn't know how
15 I expected her to do her job when she hadn't been
16 fully trained, and it was just -- it was -- it was
17 the -- the tone and -- and basically the way she said
18 it that was disrespectful.
19 Q. How -- what kind of tone did she use? Was
20 she loud? Was she sarcastic? I mean, how would you
21 describe her tone? And I'm not trying to badger you.
22 I'm just trying to get a feel of how she said what she
23 said.
24 A. Very loud and mean, I would say.
25 Q. Did she have hand gestures or facial

Page 15

1 gestures that you interpreted as rude or
2 disrespectful?
3 A. I don't recall that.
4 Q. Okay. At that time did she say anything
5 about discrimination or a discriminatory work
6 environment?
7 A. No.
8 Q. Were you aware in mid-February of 2012,
9 that there had been allegations of racial
10 discrimination at the Lincare Wichita office that had
11 been made at the end of January of 2012?
12 A. Yes, I was aware of that.
13 Q. How did you become aware of that fact, and
14 when did you become aware of it?
15 A. I became aware of it -- I -- I honestly
16 don't know the exact date, but it was after my
17 manager, Greg McCarthy, had visited, and she had
18 talked to him about her concerns and issues, and
19 Jeremy Felts had let me know about that conversation
20 and -- and basically, that was it. I -- I -- I don't
21 know the exact date of that, though.
22 Q. And did you at all interpret Shawron's
23 comments in the meeting that you were holding as
24 expressing frustration on her part about the training
25 she had received?

Page 16

1 A. Yes, I would say she acted frustrated.
2 Q. As of mid-February of 2012, were you aware
3 of how many days of training and how much training she
4 had received?
5 A. Can you repeat that? I didn't hear the
6 date you said for sure.
7 Q. Sure.
8 As of that mid-February 2012, meeting, were
9 you aware of what type of training she had received in
10 terms of like length of time per day and how many days
11 she had been trained?
12 A. Yes.
13 Q. Okay. And what was your understanding of
14 the training that she had received prior to your
15 meeting on -- in mid-February of 2012?
16 A. My understanding of the training was that
17 the time that was spent with her, that one-on-one
18 training that Becky, my trainer, spent with her, she
19 wasn't engaging in the training, she wasn't taking
20 adequate amount of notes, she wasn't -- I mean, I
21 guess, for the most part, acting like she wanted to
22 learn or giving it her -- her best or her all. And I
23 know my -- my staff, my trainer, was feeling like she
24 should be taking more notes and engaging, you know,
25 instead of -- as she's going through things having

1  mid-February of 2012, whether or not employees had
2  been disciplined or given written counseling or final
3  written counseling for their conduct?
4      A.  I knew at some point that they were given
5  counseling and written -- given disciplinary action,
6  but I -- I can't tell you that I knew that before or
7  after my visit.
8      Q.  Okay.  Did you know whether or not there
9  had been an investigation conducted into the
10  allegations of discrimination?  Were you privy to that
11  type of information?
12      A.  I knew -- when Jeremy told me about the
13  conversation, I knew that there would be an
14  investigation, but I had no knowledge of anything
15  about the investigation.
16      Q.  Do you know if an investigation was
17  actually conducted into the allegations of
18  discrimination?  Do you personally know?
19      A.  No.  I -- I mean, I personally have not had
20  the -- given the information of what they found in the
21  investigation.
22      Q.  And do you have any personal knowledge as
23  to whether an investigation was actually conducted and
24  what was done as part of an investigation?  Do you
25  have any personal knowledge of that?

1      A.  I know that there were disciplinary action
2  taken that was appropriate.  And for them to feel what
3  was appropriate or not appropriate, I would say, yes,
4  an investigation was done.
5      Q.  Okay.  Do you know with certainty whether
6  or not it was done?
7      A.  I'm sorry?
8      Q.  Do you know with certainty whether or not
9  it was actually done?
10      A.  I wasn't part of that.  So I don't know
11  with certainty that was done, no.
12      Q.  Okay.  But you're assuming that an
13  investigation was conducted into the allegations of
14  race discrimination; is that accurate?
15      A.  Correct.
16      Q.  Would you expect as a division manager if
17  there is, in fact, a complaint of racial
18  discrimination or sexual harassment that an
19  investigation would be conducted into those
20  allegations?
21      A.  Yes.
22      Q.  And you yourself were never interviewed as
23  part of any investigation; is that accurate?
24      A.  Correct.
25      Q.  So let's go back to that February,

1  mid-February 2012, meeting.  After you end the
2  meeting, how much time passes before you call a
3  meeting with Shawron Lounds and Jeremy Felts?
4      A.  I don't know the exact time.  I do know
5  that I, at that point in time, did talk to Becky by
6  herself and -- without Shawron present -- to find out
7  how she was doing with the ongoing training that she
8  was receiving.  And she -- you know, I had told her
9  that we would probably need to schedule additional
10  one-on-one training, because the initial training that
11  she had that was one-on-one, you know, she -- she
12  wasn't absorbing or keeping that information or she's
13  able to use that information, so that we would need to
14  schedule a -- an additional training for her in the
15  near future.
16      Q.  When Shawron complained about or expressed,
17  you know, a statement that she hadn't received
18  training, did she ever in that group meeting say
19  anything about that no one had received the training
20  that Amber Renard had received?  Do you recall
21  whether --
22      A.  I don't recall.
23      Q.  -- stated?
24      A.  I don't recall that.
25      Q.  Okay.  You don't recall either way?

1      A.  I don't, no.
2      Q.  And is it your testimony that she did not
3  say anything at that point in time in a group meeting
4  come out a discriminatory or hostile work environment?
5      A.  That's correct.  She did not.
6      Q.  So and after you have this meeting with
7  Becky Roettering, the trainer, then -- and setting
8  up some one-on-one training with Shawron, what happens
9  next?
10      A.  After I talk to Becky, I do call Shawron --
11  we have her go into a private office -- Jeremy Felts
12  and I -- to talk to her about the meeting and about
13  her training concerns.
14      Q.  Okay.  And so what happens in the meeting?
15      A.  At that time I did -- you know, I did tell
16  Shawron that I felt her outburst was disrespectful and
17  rude and, you know, I would appreciate if, you know,
18  she didn't talk to me in that tone.  I asked her
19  further about the training and, you know, she just
20  felt like -- she basically responded that she felt
21  like that she was not given enough training to do her
22  job, her workload.  I did explain to her at that time
23  that I had talked to Becky, the customer service rep
24  trainer, already and that we would be getting her
25  additional training in the near future and -- that

1 would be one-on-one training and as well if she had
2 questions about projects she was working on or
3 different accounts that Becky was in office Monday
4 through Thursday, sometimes Monday through Friday even
5 on the weekends sometimes to be able to assist her.
6     Q.   In the meeting, did Shawron cry at all?
7     A.   I don't recall that.
8     Q.   You don't recall either way or do you
9 think -- you don't believe she cried in the meeting?
10     A.   I don't believe she cried, but I -- I
11 don't -- I don't recall that she did.
12     Q.   And did she appear upset in the meeting?
13     A.   Not necessarily upset.  Kind of like a
14 bully, I guess, I would say.  Not necessarily like
15 she -- it wasn't necessarily -- kind of mean, I guess.
16     Q.   So it's your testimony that she was kind of
17 mean and acting like a bully in this meeting; is that
18 accurate?
19     A.   I mean, just -- you know, basically, I
20 guess standing up for her -- her and her job saying, I
21 can't do what you're expecting me to do because I
22 haven't had enough training.
23     Q.   Okay.  And you took that as -- what makes
24 you say it was bullying and mean?  Was it a tone of
25 voice --

1     A.   The tone, yes.
2     Q.   -- or what was -- what kind of tone did she
3 use?
4     A.   Loud.  And just a --
5     Q.   Did you --
6     A.   Very negative tone.
7     Q.   Did you interpret her as being frustrated?
8     A.   Possibly frustrated.
9     Q.   Were you aware in mid-February of 2012,
10 what kind of comments had been made in the workplace
11 for which people were disciplined?  Did Jeremy Felts
12 tell you the specifics of what had been said?
13     A.   Jeremy had mentioned a couple examples but
14 not in detail.
15     Q.   Were you aware the N word being used and
16 people being written up for -- at least one person
17 being written up for using the N word in the
18 workplace?
19     A.   Not at that time I wasn't.
20     Q.   Okay.  But mid-February of 2012, you
21 weren't privy to the fact that the N word had been
22 used in the workplace and that somebody had been
23 written up for using the N word; is that an accurate
24 representation of what you knew in mid-February of
25 2012?

1     A.   Yes.
2     Q.   Okay.  Were you aware mid-February of 2012,
3 in your meeting with Shawron that Suzanne Kraft had
4 been written up for telling Shawron and another
5 employee to respond to superiors who were coming to
6 the office by saying, yes, Masta?  Were you aware of
7 that in mid-February of 2012?
8     A.   I knew that she was written up for that,
9 but I -- I have no idea what timeframe that would have
10 been, if that was before or after that.
11     Q.   Were you aware in mid-2000 -- February --
12 mid-February of 2012, at the time that you met with
13 Shawron that an employee had been written up for
14 talking about lynching or hanging black people?
15     A.   Kind of the same thing.  I had heard that
16 now, but I don't know if that was before or after my
17 meeting with Shawron.
18     Q.   Did you know at the time you met with
19 Shawron that she had contacted corporate at the
20 beginning of February following Greg McCarthy's visit
21 to the Wichita office and let them know that she was
22 not happy with or did not feel like the situation had
23 been adequately handled with respect to the
24 discriminatory work environment?  Were you aware of
25 that in mid 2000 -- mid-February of 2012?

1     A.   No.
2         MS. SCHECK:  Object to the form.
3     Q.   (By Ms. Schiavone:)  No.
4         Okay.  Now, in this meeting, did Shawron
5 talk about her work environment at all?
6     A.   I did ask her point blank, direct, several
7 times because I, you know, wanted to make sure that
8 with giving her proper training that she felt like she
9 could move forward and do her position, and I did ask
10 her if there were any other concerns that I could help
11 her with today, when I was there.  And what she told
12 me was, she felt like when people went to Suzanne
13 Kraft's office that they were always talking about
14 her, and that she -- that was one of the reasons -- I
15 guess she was distracted because of that.  And so we
16 had a very lengthy conversation about -- that Suzanne
17 Kraft is the manager of the facility, that she does
18 have private conversations with her staff that would
19 be about their performance or about their accounts,
20 their referral accounts, or about goals or objectives
21 they're trying to get done that day or that week.  She
22 always has -- she also has private conference calls.
23 Jeremy does conference calls with all of his center
24 managers, and we ask that they shut the door because
25 there might be discussions of things that we don't

1 want all the staff to -- to have knowledge of within
2 our business.  And so I -- I did explain to her that,
3 you know, with Suzanne having 15 to 20 employees,
4 there were going to be times where Suzanne had people
5 in her office and close the door, but, you know, that
6 didn't mean that they were talking about her, that
7 there were lots of different things that Suzanne would
8 need to have the door closed for her to have private
9 conversations about.
10     Q.   Did she say anything in that meeting about
11 feeling like she was in a hostile environment as it
12 relates to her co-workers always saying, watch what
13 you say about Shawron, or something of that nature?
14     A.   No, not at all.
15         MS. SCHECK:  Object to the form.
16     Q.   (By Ms. Schiavone)  Did she say anything
17 to you about believing she was in a hostile workplace
18 during your meeting in mid-February of 2012?
19     A.   No.
20     Q.   Other than talking about the training issue
21 and talking about people going into Suzanne's office,
22 did you all discuss anything else in that meeting?
23     A.   I did ask her if -- you know, when she said
24 she felt like people were talking about her, I asked
25 her if there was anything new that she needed to talk

1 about or -- or discuss other than what she had already
2 reported to Mr. McCarthy, that made her feel like they
3 would be talking about her behind closed doors, and
4 she did say at that time that there was nothing new
5 that had happened.
6     Q.   Did you ever tell her in this meeting that
7 maybe she was imagining that people were talking about
8 her?
9     A.   No.  Not imagining, no.
10     Q.   What do -- what do you believe you said?
11     A.   I -- I basically said there would be lots
12 of times that Suzanne Kraft would have conversations
13 behind closed doors and not necessarily that they
14 would be about Shawron, that they would be about that
15 personal employee's performance or goals or objectives
16 that they were trying to meet.
17     Q.   Did you personally believe she was being
18 too sensitive about the situation, the situation being
19 her work environment that she had previously
20 complained about?
21     A.   No.  I mean, I don't --
22     Q.   Did you think -- did you think she was
23 being too sensitive as it relates to believing that
24 people were talking about her behind closed doors with
25 Suzanne Kraft?

1     A.   I felt like she was -- not necessarily that
2 she was too sensitive, that, you know, she -- I just
3 wanted her to realize in other people's work
4 environment that they would have closed door
5 conversations and they may not be about her.
6     Q.   During the meeting, was there a
7 conversation where Jeremy said that Shawron wasn't as
8 bubbly as she used to be?  That her personality had
9 seemed to change?
10     A.   I don't recall that.
11     Q.   Do you believe it did not -- that did not
12 occur, or do you not recall either way?
13     A.   I don't recall it either way.
14     Q.   Do you recall anything about a conversation
15 about Shawron saying that she thought her spirit had
16 been lost working there?
17     A.   That her what, I'm sorry?
18     Q.   Her spirit?  That she had lost her spirit
19 working in this environment?
20     A.   I do not recall that being said at all.
21     Q.   Okay.  Do you recall any conversation about
22 her needing to find her spirit or go find a new job?
23     A.   No, I don't recall that at all.
24     Q.   Did you say anything to the effect of her
25 needing to find a new job if her attitude didn't

1 change?
2     A.   No, I did not.
3     Q.   Did you mention at all to her about her
4 potentially looking for another job?
5     A.   No, I did not.
6     Q.   And it's your testimony that she didn't cry
7 or appear upset during the meeting; is that accurate?
8         MS. SCHECK:  Objection, asked and answered.
9     Q.   (By Ms. Schiavone:)  You can answer.
10     A.   I don't recall her crying.
11     Q.   In the meeting, did you think she was rude
12 or disrespectful to you in this private meeting?
13     A.   At times she was loud, yes.
14     Q.   And you took that loudness as rude and
15 disrespectful in your interpretation of her tone of
16 voice?
17     A.   Due to her tone and being loud.  It was
18 more at the beginning, and then -- I mean, when we
19 started talking, she was able to have -- we had a
20 normal conversation.
21     Q.   At any point in time whether based on her
22 conduct in a group meeting or this individual meeting
23 did you think about giving her some type of
24 disciplinary form as it relates to her conduct?
25     A.   I mean, I -- I -- I would say, yes, but

1  with Becky and her time while she's there is a
2  decision that Jeremy and I both make to figure out who
3  requires additional training in -- in certain areas or
4  for certain projects.
5      Q.   Now, following -- is there -- was there
6  anything else discussed in that meeting, which was in
7  mid-February of 2012, and held between you, Jeremy and
8  Shawron Lounds?  Was there anything else that you all
9  discussed that we haven't yet touched upon?
10     A.   No.
11     Q.   How was the demeanor when the meeting
12 concluded of Shawron Lounds?  Based on your personal
13 observations that you had --
14     A.   I mean, I -- I know that I reassured her
15 Becky would be getting in contact with her as far as
16 when she could schedule additional training with her,
17 and we left the room.
18     Q.   Did you have a one-on-one meeting with
19 Jeremy, then, after Shawron left the room?
20     A.   I don't recall that at all.
21     Q.   Do you know if Suzanne Kraft was present at
22 the office that day?
23     A.   I don't recall that either.  I -- I'm -- I
24 don't think she was, but I don't recall.
25     Q.   Did you memorialize this meeting?  Did you

1  take notes or take notes and send them to anybody
2  about this meeting you had with Shawron and Jeremy?
3      A.   I did take notes.  I just -- I had put
4  them -- I have a planner and I have a notebook that we
5  talked about -- I'm sorry?
6           And I believe Jeremy took notes as well.
7      Q.   Can you look at -- you should have a stack
8  of documents in front of you.  There's some
9  handwritten notes that -- if you look on the bottom
10 right-hand corner, it'll say, Lincare 0000476 through
11 0000478.  They're handwritten notes, if you could find
12 those documents.
13     A.   Okay.  I have those.
14     MS. SCHIAVONE:  Okay.  Can we mark those,
15 court reporter, as Exhibit 1, please?
16     THE COURT REPORTER:  Yes.
17     MS. SCHIAVONE:  -- of this --
18     (WHEREIN, Deposition Exhibit No. 1 was
19 marked for identification by the Court Reporter.)
20     THE COURT REPORTER:  They're marked as
21 Deposition Exhibit 1.
22     MS. SCHIAVONE:  Thank you.
23     THE COURT REPORTER:  Uh-huh.
24     Q.   (By Ms. Schiavone:)  Are these your
25 handwritten notes?

1      A.   They are not.
2      Q.   Okay.  Do you -- have you seen this
3  document before?
4      A.   First time was yesterday with my attorney.
5      Q.   Okay.  And do you know who wrote these
6  notes?
7      A.   I do not.
8      Q.   Okay.  You can set that aside.
9      A.   Okay.
10     Q.   Did you discuss your meeting with Shawron
11 with anyone?
12     A.   No.
13     Q.   Okay.  Did you have a conversation with
14 Greg McCarthy about it after it took place?
15     A.   No, not that I recall.
16     Q.   Did you have any other discussions about
17 Shawron Lounds with anyone other than what we've
18 talked about thus far?
19     A.   No.
20     Q.   Did you have discussions about Shawron
21 Lounds and her allegations of discrimination after
22 your meeting in February 2012, with any Lincare
23 employees?  Separate and apart from what you've talked
24 about maybe in the presence of a lawyer.
25     A.   I -- you know, I don't know what timeframe

1  that was, but I did find -- you know, I did hear that
2  the employees were written up and that disciplinary
3  action was taken.  And I don't know if that was before
4  or after my meeting with Shawron.
5      Q.   Do you -- did you play any role in the
6  decision to terminate Shawron Lounds?
7      A.   Not -- no, not the actual termination.
8      Q.   Okay.  What did you participate in as it
9  relates to Shawron Lounds' termination?  You said, not
10 the actual termination.  I'm just trying to figure out
11 what you did participate in.
12     A.   I did bring to light her absences to my
13 boss, Greg McCarthy, when she was having excessive
14 absences, but at that time I believe that it only led
15 to a formal write-up.
16     Q.   Okay.  Do you know when that time period
17 was where you brought that to the attention of Greg
18 McCarthy?
19     A.   I believe it was the end of April of --
20     Q.   How did you --
21     A.   -- 2012.
22     Q.   How did you become aware of the excessive
23 absences, as you phrased it?  Was it -- did Suzanne
24 Kraft point it out to you, or did you come across it
25 upon your own review of employees' attendance?

Page 41

1   A.   I -- I don't know the exact conversation,
2 but I do know that on Fridays we have either
3 conference calls or I talk to each of my employees
4 that have six area managers that work for me.  And on
5 Fridays, typically, we wrap up the week, talk about
6 outstanding projects that may be needing done, goals
7 for next week, that kind of thing.  And I don't recall
8 the exact conversation, but Wichita -- you know, we
9 talked about the training and my trainer's ongoing
10 presence there.  And so, typically, we would reflect
11 on what Becky was doing and where she was at with her
12 training.
13   Q.   Other than the conversation that you would
14 have had in mid -- or at some point in April of 2012,
15 regarding Shawron Lounds' attendance, do you have any
16 subsequent conversation regarding her attendance
17 between the end of April 2012, until the time she was
18 terminated at the end of September 2012?
19   A.   No.
20   Q.   Did anybody let you know she was going to
21 be terminated prior to her being terminated?
22   A.   No.
23   Q.   So when did you first find out that she was
24 being terminated?  Was it after it occurred?
25   A.   Yes.

Page 42

1   Q.   If you could look at an e-mail that -- from
2 Linda Feller to Greg McCarthy and you, and it's
3 Lincare document 0000323.
4        When you find that document, would you mind
5 handing it to the court reporter to mark as Exhibit 2
6 of your deposition?
7   A.   Yes.
8        (WHEREIN, Deposition Exhibit No. 2 was
9 marked for identification by the Court Reporter.)
10   Q.   (By Ms. Schiavone:)  Have you seen this
11 e-mail before that we've marked as Exhibit 2 of your
12 deposition?
13   A.   Did you say, have I seen it before?
14   Q.   Yes.
15   A.   Yes.  I saw it yesterday with my attorney.
16   Q.   Do you recall receiving this e-mail back on
17 September 24th, 2012?
18   A.   I -- once I saw it, I did remember getting
19 it, yes.
20   Q.   Did you ever have any conversations with
21 Linda Feller or Greg McCarthy either before or after
22 you received this e-mail about the Wichita office
23 doors being kept locked for the next few days as a
24 precaution following Shawron Lounds' termination?
25   A.   No.

Page 43

1   Q.   Did you guys have any conversation
2 regarding that?
3   A.   No.
4   Q.   Is it standard protocol for the doors to be
5 locked based on your experience as a division manager
6 for several days following a termination of an
7 employee?
8   A.   At times we do, yes.
9   Q.   And when is the decision made based on your
10 information and experience as a division manager as to
11 when that is implemented?  That being the locking of
12 the doors for a few days following a termination?
13   A.   Basically, it's the center manager's
14 discretion.  If they feel that they may be -- any kind
15 of retaliation, I guess, against their termination, we
16 allow them to lock the door.
17   Q.   So, in this case, it would have been
18 Suzanne Kraft as the center manager, who would have
19 made that decision based on your previous experience
20 with Lincare as to who can make that determination?
21        MS. SCHECK:  Object to the form.
22   Q.   (By Ms. Schiavone:)  You can answer.
23   A.   Well, it looks like from the e-mail, it
24 looks like Linda Feller made that decision for that
25 particular employee.

Page 44

1   Q.   And you don't know whether or not that was
2 discussed between Linda Feller and Suzanne Kraft prior
3 to this e-mail going out; is that accurate?
4   A.   Correct.
5   Q.   Now, if you could look at exhibit --
6 Lincare document, and then we'll mark it as an
7 exhibit.  It's the notes, the customer service
8 representative training.  Do you see it?  It's a
9 two-page document.
10   A.   Okay.
11   Q.   If you could have the court reporter mark
12 that as Exhibit 3, that would be great.
13        THE VIDEOGRAPHER:  This is the
14 videographer.  I'm going to switch tapes.
15        MS. SCHIAVONE:  Okay.
16        (WHEREIN, Deposition Exhibit Number 3 was
17 marked for identification by the Court Reporter.)
18        (WHEREIN, a recess was taken.)
19        THE VIDEOGRAPHER:  We're back on the record
20 on tape 2 at approximately 11:36 a.m.
21   Q.   (By Ms. Schiavone:)  Now, with respect to
22 Exhibit 3, the customer service representative
23 training, is this the summary of notes that you
24 referenced previously that you typically see Becky
25 Roettering doing as it relates to the training that's

# EXHIBIT 4

Page 1

```
 1        UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF KANSAS
 2
 3
   SHAWRON LOUNDS,              )
 4                             )
                               )
 5        Plaintiff,    )
                               )
 6                             )
       vs.             )Case No. 13-CV-1091
 7                     )CONFIDENTIAL
                               )
 8 LINCARE, INC.,            )
                               )
 9                             )
          Defendant.   )
10                     )
11
12
13        D E P O S I T I O N
14     The videotape deposition of SUZANNE KRAFT taken on
15 behalf of the Plaintiff pursuant to the Federal Rules of
16 Civil Procedure before:
17        DARLENE K. KELLEY, CSR
          KELLEY, YORK & ASSOCIATES, LTD.
18        Suite 105, 515 South Main Street
          Wichita, KS  67202
19
20
21 a Certified Shorthand Reporter of Kansas, at 1625 N.
22
23 Waterfront Parkway, Suite 300, Wichita, Sedgwick County,
24
25 Kansas, on Thursday, October 10, 2013, at 8:03 a.m.
```

Page 2

```
 1        A P P E A R A N C E S
 2 PLAINTIFF:
          HOLMAN SCHIAVONE, LLC
 3        Ms. Anne Schiavone
          4600 Madison Avenue
 4        Suite 810
          Kansas City, Missouri 64112
 5        (816) 283-8738
          aschiavone@hslawllc.com
 6        (816) 283-8739
 7
   DEFENDANT:
 8        STINSON MORRISON HECKER LLP
          Ms. Stephanie N. Scheck
 9        Suite 300
          1625 North Waterfront Parkway
10        Wichita, Kansas 67206-6602
          (316)265-8800
11        sscheck@stinson.com
          (816) 283-8739
12
13
   VIDEOGRAPHER:
14        ADVANCED DOCUMENT IMAGING
15        Mr. Kyle B. Kelley
16        Suite 105
17        515 South Main
18        Wichita, Kansas 67202
19        (316) 267-0800
20        kkelley@kelleyyork.com
21        (816) 283-8739
22
23
24 Also present were Plaintiff, Ms. Shawron Lounds; and
25 Mr. Jeremy Felts.
```

Page 3

```
 1            I N D E X
 2 SUZANNE KRAFT
 3 Direct Examination by Ms. Schiavone          4
 4 Cross-Examination by Ms. Scheck          99
 5 Kraft Exhibits
 6 NO.        D E S C R I P T I O N        PAGE
 7  1    Employee Handbook (31 pgs.)          13
 8  2    7-24-1 Meeting Notes (4 pgs.)        28
 9  3    1-27-12 Kraft Final Written Warning (2 pgs.) 39
10  4    In-Service Record (1 pg.)          43
11  5    April Ks Human Rights Complaint (2 pgs.)   56
12  6    4-26-12 Lounds Counseling (2 pgs.)      60
13  7    May Ks Human Rights complaint (2 pgs.)   64
14  8    Lounds Verbal Warning (2 pgs.)       65
15  9    Leaves of Absence Update (1 pg.)      69
16  10   Injury Data Card (2 pgs.)          70
17  11   7-16-12 Rebuttal to Counseling (1 pg.)   75
18  12   7-25-12 Rebuttal to counseling (2 pgs.)   77
19  13   Employee Calendar (1 pg.)          81
20  14   Lounds Final Written Warning (1 pg.)    81
21  15   Termination (1 pg.)             85
22  16   Full-day Absences (1 pg.)          85
23  17   E-mails (4 pgs.)                88
24  18   Statement (1 pg.)               92
25  19   Transcript of call to Doctor (1 pg.)    96
26 SIGNATURE OF WITNESS             104
27 CERTIFICATE                   105
```

Page 4

```
 1        THE VIDEOGRAPHER:  This begins
 2 the videotape deposition of Suzanne Kraft.
 3 Today is October 10, 2013.  The time is
 4 8:03 a.m.  Will the court reporter please
 5 swear the witness.
 6        DIRECT EXAMINATION
 7 BY MS. SCHIAVONE:
 8 Q.  Good morning, Ms. Kraft.
 9 A.  Good morning.
10 Q.  My name is Anne Schiavone, and I represent
11 Shawron Lounds in a lawsuit she's filed
12 against Lincare.  We've never met before
13 today; is that accurate?
14 A.  That is accurate.
15 Q.  Now, today is my opportunity to just get some
16 information from you.  There's no right or
17 wrong here.  So if you don't understand one
18 of my questions, let me know and I'm happy to
19 rephrase it.  Okay?
20 A.  Okay.
21 Q.  Do you understand that you are not a
22 defendant in this lawsuit, that you are not
23 individually named as a defendant?
24 A.  I do.
25 Q.  And that the lawsuit is against Lincare, not
```

1    you?
2  A.   Yes, ma'am.
3  Q.   Now, who are you presently employed by?
4  A.   Broadway Home Medical.
5  Q.   And what's your current position there?
6  A.   Home care specialist.
7  Q.   And what do you do as a home care specialist?
8  A.   I do sales and I do their audits, their
9     insurance audits and some of their billing.
10 Q.   And how long have you been there?
11 A.   Six weeks.
12 Q.   And did you work somewhere prior to your
13    current employment between -- let me rephrase
14    that.
15        When did you leave Lincare?
16 A.   July 5th, 2013.
17 Q.   And did you work somewhere between Lincare
18    and your present position?
19 A.   No.  I stayed home with my children.
20 Q.   How long were you employed by Lincare?
21 A.   Two months shy to the day of eight years.
22 Q.   Okay.  And during the entire duration, were
23    at the Wichita office or were you at other
24    locations as well?
25 A.   For three years I was in the Hutchinson,

1    Kansas, location.
2  Q.   Was that the first three years of your
3     employment?
4  A.   No.
5  Q.   Can you just give me a quick rundown of your
6     employment with Lincare?
7  A.   Yes, ma'am.  I got hired on September 12th of
8     2005 as a customer service representative.  I
9     was a customer service representative and an
10    area trainer until April of 2008.  At that
11    time then I was a sales representative for
12    the Wichita location from April of 2008 until
13    September of 2008, where I was then the
14    center manager of the Hutchinson location
15    until August of 2011 when I transferred to
16    the Wichita office as the Wichita center
17    manager.  And that is the current position
18    that I resided until I was no longer with
19    Lincare.
20 Q.   How would you compare the Hutchinson location
21    with the Wichita location in terms of how
22    busy they are?  Are they comparable or does
23    one do more volume?
24 A.   Correct.  The Wichita office is three times
25    as big as the Hutchinson location.

1  Q.   Was that a promotion, for lack of a better
2     word, to be moved to the Wichita office as
3     center manager because it was a bigger
4     location?
5  A.   Not necessarily a promotion.  I mean I did
6     the exact same thing.  I was just closer to
7     home.
8  Q.   And did you have more duties and
9     responsibilities because it was a bigger
10    office or not really?
11 A.   Not necessarily.  I just had more people to
12    manage.
13 Q.   And how many people did you manage at the
14    Wichita office?
15 A.   Fully staffed, about seventeen.
16 Q.   And were you the one who hired Shawron
17    Lounds?
18 A.   I am.
19 Q.   Did you have to get approval from anybody to
20    be able to hire her?
21 A.   We do go through an approval process for
22    every single employee, and that runs a
23    background check and that goes through our
24    corporate office.
25 Q.   But you are the one who made the decision to

1     hire Shawron?
2  A.   Absolutely.
3  Q.   And at the time you hired Shawron in I'll
4     represent to you it was about September of
5     2011, did you -- were there any other black
6     employees at the Wichita location?
7  A.   No.
8  Q.   Had there previously -- well, you would have
9     only been there a month at that point in
10    time; is that accurate?
11 A.   Correct.  That time around, but I was there
12    previously in 2005 to 2008.
13 Q.   But not as center manager?
14 A.   No.
15 Q.   What were your duties and responsibilities as
16    center manager of Wichita office?
17 A.   To hire and fire employees, to reprimand
18    employees, to also oversee the day-to-day
19    operations and the growth of the center.
20 Q.   And so you had the ability to write employees
21    up?
22 A.   Yes.
23 Q.   And issue disciplinary counselings?
24 A.   Right.  It all had to go through the
25    corporate office, though.

Page 9

1    Q.   Okay.  And when you say it all had to go
2        through the corporate office, what do you
3        mean by that?
4    A.   Like I would have to go through the corporate
5        office and they would write up our written
6        document and then send it back to me so then
7        I could present it.
8    Q.   Okay.  But did you make the decision if
9        somebody needed to be written up for
10       something since you were on the front line?
11   A.   Yes.
12   Q.   And then the corporate would do the paperwork
13       on it?
14   A.   Correct.
15   Q.   How many CSRs were there at the Wichita
16       office in fall of 2011 to fall of 2012?  An
17       approximate number is fine.
18   A.   Four.
19   Q.   And who were those employees?
20   A.   Shawron Lounds, Amber Renard, Tracy Hackney.
21       She wasn't there until fall of 2012, though.
22       Elyse Grisamore and...
23   Q.   And if you don't remember, that's okay.
24   A.   I don't.  Sorry.
25   Q.   And then there were also sales reps within

Page 10

1        that location?
2    A.   Yes.
3    Q.   Now, were you terminated from Lincare?
4    A.   I was.
5    Q.   Okay.  And what was the reason for your
6        termination?
7    A.   The reason for my termination was -- how do I
8        put this -- timely pickups, not following
9        process and timely pickups.
10   Q.   Okay.  Were the not following processes
11       solely related to timely pickups or were
12       those two separate issues?
13   A.   It was the same.
14   Q.   And the timely pickups, what is that?
15   A.   We did a lot of home oxygen.  And so you get
16       patients all the time that need set up on
17       oxygen.  And then you get patients that die
18       or their doctor discontinues their O2, so
19       they need to be picked up.  So I got
20       terminated for not following the pickup
21       process in a timely fashion.
22   Q.   Do you believe that that was the true reason
23       for your termination?  I mean do you believe
24       that they were not timely pickups that
25       warranted your termination?

Page 11

1    A.   I think that is what warranted my
2        termination, yes.
3    Q.   Can you think of any other reason that would
4        have warranted your termination, in your
5        mind?
6    A.   No.
7    Q.   Do you know who took the position of center
8        manager after you at Lincare?
9    A.   Yes, I do.  Michelle McWilliams.
10   Q.   And do you know how long she was in that
11       position?
12   A.   After me?
13   Q.   Uh-huh.
14   A.   She's still there.
15   Q.   She's still there, okay.
16   A.   Uh-huh.
17   Q.   Did you have anything to do with Amber Renard
18       being promoted to center manager?
19   A.   That's not my decision.
20   Q.   Whose decision was that?
21   A.   Jeremy Felts.
22   Q.   And was Amber the center manager at the -- is
23       it the Winfield location?
24   A.   Yes, ma'am.
25   Q.   While you were still employed?

Page 12

1    A.   Yes.
2    Q.   Do you still keep in touch with any of the
3        Lincare employees?
4    A.   Yes.
5    Q.   And who do you still keep in touch with?
6    A.   Elyse Grisamore, Michelle McWilliams, Ashley
7        Jantz, Tara Keck, numerous, Eric Owen, Sarah
8        Howell.
9    Q.   Do you keep in touch with any former
10       employees of Lincare?
11   A.   Tracy Hackney.  Yeah, I mean several, yes.
12   Q.   Have you discussed Shawron Lounds or this
13       lawsuit with any former employees of Lincare?
14   A.   No.
15   Q.   What about any present employees?
16   A.   No.
17   Q.   Now, we briefly discussed your time at
18       Lincare.  Other than holding the position of
19       center manager at the Hutchinson location and
20       center manager at the Wichita location, did
21       you have any other management level
22       experience?
23   A.   No.
24   Q.   When you first started at Lincare, did you
25       receive training on -- and I'm talking about

Page 13

1   when you first became a manager, a center
2   manager within Lincare, did you receive
3   training on anti-discrimination and equal
4   employment opportunity policy within Lincare?
5 A.   Yes.  I had to watch a video.
6 Q.   Did you receive any training other than
7   watching a video, as a management level
8   employee, as to how to handle complaints of
9   discrimination?
10 A.   Not that I recall.
11 Q.   Okay.  What was your understanding as a
12   management level employee as to if you
13   learned of a complaint of discrimination,
14   whether it was based on gender, race,
15   disability, any protected class, what you as
16   a manager were supposed to do with such a
17   report?
18 A.   Contact corporate.
19 Q.   I'm going to hand you what we'll mark as
20   Exhibit 1 of your deposition.
21         (Deposition Exhibit No. 1 was marked
22   for identification.)
23         (Off-the-record discussion.)
24 BY MS. SCHIAVONE:
25 Q.   I assume you've seen this document before?

Page 14

1 A.   Yes, ma'am.
2 Q.   And this is the employee handbook; is that
3   accurate?
4 A.   Yes, ma'am.
5 Q.   If you could turn to Page 15 of the employee
6   handbook.  Do you see the EEO policy, the
7   equal employment opportunity policy?
8 A.   Yes, ma'am.
9 Q.   Do you see where it states under the EEO
10   policy that "Violation of this policy will
11   subject an employee to disciplinary action,
12   up to and including immediate discharge"?
13 A.   Yes, ma'am.
14 Q.   Did you ever terminate anyone at the Wichita
15   office for violating the equal employment
16   opportunity policy while Shawron Lounds was
17   employed?
18 A.   No, ma'am.
19 Q.   Looking at Page 16, do you see the policy
20   concerning harassment, sexual and racial
21   harassment?
22 A.   Yes.
23 Q.   Did you understand that phrases that would
24   have a racially biased tone to them or things
25   that were of a racial nature could violate

Page 15

1   the company's policy against harassment and
2   racial harassment?
3 A.   I do understand what I perceived to be a
4   racial undertone would -- yes, if that is
5   acknowledged.
6 Q.   And what do you mean if that is acknowledged?
7 A.   If -- I wasn't raised to be racist, and so
8   some things I just don't know are racial.
9 Q.   Okay.  Now, the -- do you understand that if
10   somebody said something in the workplace that
11   was -- had racial undertone, that that could
12   also violate the equal employment opportunity
13   policy?
14 A.   I understand if I heard it or it was brought
15   to my attention, yes.
16 Q.   And even if it wasn't brought to your
17   attention, if in fact one employee said
18   something of a racial nature to the other,
19   even if you didn't know about it, that could
20   technically violate the equal employment
21   opportunity policy; isn't that accurate?
22 A.   It could if we're told about it, yes.
23 Q.   But even if you're not told about it, I'm not
24   expecting if you're not told about it you can
25   necessarily do anything about it, but would

Page 16

1   you agree that if one employee calls another
2   employee a racial term, that that could
3   violate the EEO policy?
4 A.   Yes.
5         MS. SCHECK:  Objection, calls for
6   speculation.
7 BY MS. SCHIAVONE:
8 Q.   Now, do you know if the company had a
9   progressive disciplinary policy?
10         MS. SCHECK:  Object to the form.
11 BY MS. SCHIAVONE:
12 Q.   Do you as a management level employee know
13   what a progressive disciplinary policy is?
14 A.   Yes.
15 Q.   Okay.  Did the company, based on your
16   knowledge as a center manager of the Wichita
17   office and previously the Hutchinson office,
18   have a progressive disciplinary policy?
19 A.   Right, yes.
20 Q.   And what was that policy as you understand
21   it?
22 A.   There would be documented counseling.  Then
23   there would be verbal warnings if that still
24   wasn't taken care of.  And then there would
25   be a written warning.  And then there would

Page 21

1    racial remark, I would never have said it.
2 Q.   Tell me the circumstances in which you said
3       that.
4 A.    Our way upper management was coming into
5       town, and Amber and Shawron were sitting at
6       the table and they were joking around saying,
7       when Greg McCarthy gets here, we're going to
8       show him, you know, who's boss around here
9       and we're not going to do what he says.  And
10      I said that is not a way to act.  And then I
11      did say, when they say to do something, you
12      say, yes massa.  I had no idea that that was
13      a racial remark.  And if I did, I wouldn't
14      have said it.
15 Q.   Just in terms of your background, where did
16      you grow up?
17 A.   Here in Wichita.
18 Q.   And what's your educational background?
19 A.   I was home schooled.
20 Q.   Was home school through twelfth grade?
21 A.   Yes.
22 Q.   And then did you have a GED?
23 A.   No.  I had a high school diploma.
24 Q.   Okay.  Through home schooling?
25 A.   Yes.

Page 22

1 Q.   Do you recall what Shawron's reaction was
2       when you made that statement?
3 A.   Yes.  She smiled.
4 Q.   So it's your testimony she smiled when you
5       said to refer to them as yes, massa?
6 A.   Yes.
7 Q.   Do you recall what Amber's reaction was?
8 A.   She smiled as well.
9 Q.   Did any of this discussion have to do with
10      CHAPs and them coming in and potentially
11      asking questions about CHAPs?  Them being
12      upper level management.
13 A.   No.
14 Q.   Did you indicate to Shawron and Amber and
15      whoever else may have been in that meeting
16      that they were to not contact Greg or upper
17      level management with any issues with CHAPs?
18 A.   Absolutely not.
19 Q.   What is CHAPs?
20 A.   That is the company that accreditates
21      Lincare.  They all -- they come in and do --
22      it's just make sure that the centers are
23      abiding by the FDA guidelines.  That's all
24      they do.
25 Q.   Could -- does -- if there are certain

Page 23

1    violations could they pull accreditation or
2       do something to affect Lincare's status?
3 A.   No, not right offhand, no.
4 Q.   But eventually if there are enough
5       violations?
6 A.   Eventually, but you would have to be in
7       severe violation.
8 Q.   Prior to the comment you made in January of
9       2012, had you become aware of other employees
10      making comments of a racial nature?
11 A.   I was never made aware, no.
12 Q.   Did you ever hear Laney Kempke use the "N"
13      word in the workplace?
14 A.   Absolutely not.
15 Q.   Did you ever hear Kevin or did it ever come
16      to your attention that Kevin Kuntz,
17      K-U-N-T-Z, I believe it's spelled.
18 A.   K-U-N-Z.
19 Q.   Made a comment about hanging or lynching
20      black people?
21 A.   No.
22 Q.   Amber Renard never brought that to your
23      attention?
24 A.   No.
25 Q.   And it's your testimony that you never heard

Page 24

1    Laney Kempke use the "N" word in the
2       workplace?
3 A.   Yes.
4 Q.   Yes, that's your testimony?
5 A.   No, that is not my testimony.  I never heard
6       her say that in the workplace.
7 Q.   And I think that's what I thought you said.
8       I was just making sure the record was clear.
9           Did Shawron ever come to you to let
10      you know that people were saying things that
11      made you uncomfortable -- made her
12      uncomfortable?
13 A.   One time.
14 Q.   And when was that?
15 A.   That was May, June.  May or June of 2012.
16 Q.   And what was -- what was -- what did she
17      bring to your attention?
18 A.   She brought to me and Jeremy's attention that
19      Amber had made a remark that she was very
20      uncomfortable with.
21 Q.   Okay.  Was that a remark pertaining to BON,
22      big old nigger?
23 A.   I do believe that is what it was, yes.
24 Q.   And did you issue a disciplinary counseling
25      to Amber as a result of that?

1  A.   It was a final written warning.
2  Q.   And we'll look at that.  I'll hand you what
3       we'll mark as Exhibit 2 of your deposition.
4       Or maybe we will not.  Here, I'll just give
5       this one to you.  I think we used it for
6       Amber's deposition yesterday.
7            (Off-the-record discussion.)
8  BY MS. SCHIAVONE:
9  Q.   I'm going to hand you instead, rather than
10      mark this as Exhibit 2 to your deposition,
11      what we previously marked as -- is that
12      Exhibit 1 of Amber Renard's deposition?
13 A.   Yes, ma'am.
14 Q.   Is this the disciplinary counseling form or
15      final written warning form that was issued to
16      Amber on July 24th of 2012?
17 A.   Yes.
18 Q.   And is this the write-up that you issued to
19      her because of the statement that Shawron
20      reported to you?
21 A.   Yes, ma'am.
22 Q.   And it was for -- the write-up is
23      essentially, looking at the first paragraph,
24      for inappropriate and racially offensive
25      comments; is that correct?

1  A.   That's what it says.
2  Q.   What is your understanding as to what
3       occurred that warranted you to do this final
4       written warning?
5  A.   Shawron had -- was called into my office by
6       Jeremy and myself, and I do believe that she
7       was being given a warning as well.  And at
8       the end of that, she stated that Amber had
9       made some comments, but she just kind of was
10      like, you're not going to do anything about
11      it anyway, so why should I tell you.
12 Q.   And then did you get her to tell you?
13 A.   Absolutely.
14 Q.   And one of those comments was something about
15      a big old nigger?
16 A.   I do believe that is the case.
17 Q.   Was there anything else that she said in that
18      meeting about what Amber had said?  Was there
19      another comment as well, do you recall?
20 A.   Not that I recall.
21 Q.   I'm going to hand you what we'll mark as
22      Exhibit 2 -- well, let me ask you this.
23           Do you recall in the meeting Shawron
24      stating, in this July meeting, that she still
25      felt uncomfortable in the environment?

1  A.   I don't recall.
2  Q.   Do you recall her stating that everybody,
3       every time somebody says boom it bothers her
4       because Laney Kempke had previously said,
5       "Boom nigger"?
6  A.   Yes, I do recall that.
7  Q.   And this was in July of 2012 that she was
8       relaying this to you; is that accurate?
9  A.   To the best of my knowledge.
10 Q.   Do you recall her reporting in this meeting
11      that Amber had also made a statement about
12      the coach of Amber's son's football team
13      saying something about all black kids are
14      stupid, do you remember her making that
15      report as well?
16 A.   Not that I recall.
17 Q.   I'm going to hand you --
18           MS. SCHIAVONE:  And I apologize
19      but it looks like my assistant did not erase
20      my underlining on here.
21           MS. SCHECK:  What document is it?
22      Do you want me to print a new copy of it?
23           MS. SCHIAVONE:  You know what,
24      that would be great, yeah.
25           MS. SCHECK:  What's the number?

1            MS. SCHIAVONE:  It's 0000079
2       through 82.
3            MS. SCHECK:  And that's our
4       document numbers?
5            MS. SCHIAVONE:  Yes.
6  A.   May I take a break.
7            MS. SCHECK:  Yes.
8            THE VIDEOGRAPHER:  Off the record
9       8:34.
10           (A recess was taken from 8:34 a.m. to
11      8:40 a.m.)
12           THE VIDEOGRAPHER:  On the record
13      8:40.
14           (Deposition Exhibit No. 2 was marked
15      for identification.)
16 BY MS. SCHIAVONE:
17 Q.   I'll hand you what we'll mark as Exhibit 2 to
18      your deposition.  Have you ever seen this
19      document before?
20 A.   No.
21 Q.   Do you see at the top where it says July 24th
22      of 2012?
23 A.   Yes.
24 Q.   And it says, "Present Suzanne Kraft, Jeremy
25      Felts, Shawron Lounds and Linda Feller by

1   phone"?
2 A.   Yes.
3 Q.   Do you believe these to be notes of the
4     meeting you all had with Shawron that we were
5     discussing when you brought her in to talk to
6     her about attendance issues?
7 A.   Yes.
8 Q.   And this meeting is the one that led to Amber
9     Renard receiving a final written warning?
10 A.   Amber Renard?
11 Q.   Yes.
12 A.   Yes.
13 Q.   Do you know if these notes were taken by
14     Linda Feller?
15 A.   It appears to have been, yes.
16 Q.   And looking at the fifth paragraph where it
17     says, "Shawron claimed that because she's the
18     only black person in the office," do you see
19     where I'm at?
20 A.   Yes.
21 Q.   "She feels like the pink elephant in the room
22     and feels that people are always talking
23     about her.  She said, 'Every time someone
24     says 'Boom', I hear Laney saying "Boom
25     Nigga!'  Shawron then said that Amber says

1   'BON' to her every day, and she's sure
2     Suzanne has heard it, but Suzanne hasn't done
3     anything about it.  Suzanne says she doesn't
4     remember hearing it, but since she doesn't
5     know what it means or know that it's
6     offensive, she would not have triggered her
7     to taken action.  All three of us told
8     Shawron that she needs to bring things to us
9     if she's feeling targeted, but so far, she
10     hasn't."
11         Did I read that accurately?
12 A.   You read that accurately.
13 Q.   So you understood in this meeting that
14     Shawron was bringing up the "boom" issue,
15     that people were still saying boom, is that
16     accurate?
17 A.   That's accurate.
18 Q.   And that that bothered her?
19 A.   Yes.
20 Q.   And that Amber saying BON also bothered her?
21 A.   That is what it appeared to say, yes.
22 Q.   Looking at the second page of this where it
23     says, "At 10:00 a.m. I received a call from
24     Jeremy and Suzanne," do you see that?
25 A.   Yes.

1 Q.   It says in here, "Suzanne said she apologized
2     for 'anything I may have said in the past
3     that offended Shawron.  She accepted my
4     apology.'"
5 A.   That is correct.
6 Q.   What do you recall of that conversation with
7     Shawron?  And was this on July 24th that this
8     conversation occurred?
9 A.   This was, but this was not the first apology
10     that I had made to Shawron.
11 Q.   Okay.  So you had apologized to her more than
12     once?
13 A.   Yes.
14 Q.   And what did you apologize to her for?
15 A.   I apologized to her for saying the, "Yes,
16     massa," comment.  And that I didn't
17     understand that it was a racial saying, but I
18     apologized for that.
19 Q.   Okay.  Did you apologize for anything else?
20 A.   That's the only thing I said.
21 Q.   Okay.  Did you ever ask her about the name
22     Rashanda?
23 A.   No.
24 Q.   And why black people name their children
25     Rashanda?

1 A.   No, I've never said that.
2 Q.   It says in here, "She accepted my apology.
3     Suzanne told Shawron she is not a prejudiced
4     person and doesn't even know some of the
5     words that have been used that Shawron found
6     offensive had that meaning."
7         What words were you referring to?
8 A.   Boom and BON, I don't know what those mean.
9 Q.   But you understood in the meeting after
10     Shawron told you that Amber had said BON, big
11     old black -- or big old nigger, correct?
12 A.   I understood it after that.
13 Q.   And in turn you issued a counseling form, an
14     final written warning to Amber?
15 A.   It wasn't a counseling.  It was a final
16     written warning.
17 Q.   Looking at this third paragraph under this
18     section, "Shawron then said, 'I did come to
19     you about Kevin because he was treating me
20     differently.'  Suzanne told her, 'And I met
21     with him about it.'"
22         Do you recall having a meeting with
23     Kevin about an issue that Shawron was having
24     with him?
25 A.   Yes.

Page 33

1 Q.   Okay.  And what do you recall Shawron
2     reporting to you about Kevin?
3 A.   She reported that he wouldn't talk to her,
4     and that she thought it felt like he was
5     walking on eggshells around her.
6 Q.   And do you know when she reported that?
7 A.   May or June.
8 Q.   Of 2012?
9 A.   Yes.
10 Q.   When Shawron said that she felt, looking back
11     at the first paragraph, that she feels like
12     the pink elephant in the room and feels like
13     people are always talking about her, do you
14     see the paragraph where it says, "Shawron
15     claimed because she's the only black person
16     in the office, she feels like the pink
17     elephant in the room and feels that people
18     are always talking about her"?
19 A.   I see that comment, yes.
20 Q.   Did you understand her to be feeling like
21     that based on what she was relaying to you
22     all in this meeting in July 2012?
23         MS. SCHECK:  Object to the form.
24 BY MS. SCHIAVONE:
25 Q.   I mean, this meeting was taking place in July

Page 34

1     of 2012; is that accurate?
2 A.   The meeting was taking place in July of 2012.
3 Q.   And in that meeting she informed you all that
4     she feels like the pink elephant in the room
5     because she's the only black person; is that
6     accurate?
7 A.   Correct.
8 Q.   Did you understand her in July of 2012 as
9     feeling like that when she was reporting
10     these things to you?
11         MS. SCHECK:  Object to the form.
12     Calls for speculation.
13 BY MS. SCHIAVONE:
14 Q.   I mean based on what she relayed to you, was
15     it your impression that she was still feeling
16     uncomfortable as the only black person in the
17     office?
18 A.   No.
19 Q.   Okay.  So where it says, "Shawron claimed
20     that because she's the only black person in
21     the office, she feels like the pink elephant
22     in the room and feels that people are talking
23     about her," you didn't take that to mean that
24     she was feeling uncomfortable in July of
25     2012?

Page 35

1 A.   At that time that's what I took it as, yes.
2 Q.   Okay.  And that was in July of 2012?
3 A.   That's what the form says, correct.
4 Q.   What was Amber's reaction when you issued her
5     the final written warning that was marked as
6     Exhibit 1 of Amber's deposition?
7 A.   She was visibly upset.
8 Q.   What did she say to you?  Did she say
9     anything?
10 A.   I don't recall.  I just recall her being
11     upset.
12 Q.   And when you say upset, what do you mean by
13     that?
14 A.   Crying, a little heart broken.
15 Q.   And what leads you to believe that, that she
16     was heart broken?  Just by her physical
17     reaction?
18 A.   Right.
19 Q.   Okay.  Did she say anything to you?
20 A.   I don't remember.
21 Q.   Did she say I shouldn't have said that?  Did
22     she say anything of that nature when you
23     issued the final written warning to her?
24 A.   Again, I don't remember.
25 Q.   Do you know why this document is not signed

Page 36

1     by either you or Amber?
2 A.   Amber refused to sign the document.  I
3     actually did sign the document.
4 Q.   Okay.  So it's your testimony that you signed
5     the document.  And then what would you have
6     done with it once you signed it?
7 A.   I would have put it in Amber's file at the
8     office.
9 Q.   Did you ever send a copy back to human
10     resources?
11 A.   I don't remember doing so, no.
12 Q.   Do you know if Lincare had a policy or your
13     understanding as a center manager as to
14     whether or not Lincare had a policy that if
15     an employee refuses to sign a document that
16     you actually put "refused to sign" so there's
17     some documentation that it was in fact
18     presented to the employee?
19 A.   Yes, and that's what happened.
20 Q.   So it's your testimony that there should be a
21     copy out there both with your signature on it
22     and then refused to sign on it?
23 A.   That is.
24 Q.   Do you know why Amber refused to sign it?
25     Did she give you any information as to why

Page 37

1    she refused to sign it?
2 A.   Not that I recall.
3 Q.   Now, going back to the time period of July
4    of -- I'm sorry, June -- January of 2011 --
5    '12. Let's go back to January -- I'm messing
6    myself up because we were just talking about
7    July of 2012.
8        January of 2012 after Greg McCarthy
9    came to the office, okay. Did you become
10   aware in January of 2012 or beginning of
11   February 2012 of Amber Renard making a
12   comment to Greg McCarthy about the
13   environment at Lincare?
14 A.   I was. That's what triggered my final
15   written warning.
16 Q.   Tell me what you understand Amber to have
17   stated to Greg McCarthy at the end of January
18   of 2012?
19 A.   My understanding is that Amber relayed to
20   him, to Greg McCarthy that a couple of people
21   had said a couple things that made Shawron
22   feel uncomfortable.
23 Q.   Okay. And did she state, as far as you know,
24   that they were things of a racial nature or
25   having racial undertones?

Page 38

1 A.   As far as I know, yes.
2 Q.   Were you in the meeting when Amber made the
3    statement to Greg McCarthy?
4 A.   No.
5 Q.   How did you become aware of it? And aware of
6    it meaning that Amber had made such a report
7    to Greg McCarthy.
8 A.   When Greg McCarthy then started pulling the
9    customer service reps in one by one or
10   Shawron and Amber to get a statement, I asked
11   Jeremy what was going on.
12 Q.   Okay. And he informed you of what Amber had
13   said?
14 A.   Yes.
15 Q.   What was your reaction when Amber said that,
16   when you learned that Amber had made such a
17   report?
18 A.   I was shocked. I had no idea.
19 Q.   Let me ask you this. When you say you have
20   no idea or had no idea prior to that report
21   being made in January of 2012, in your mind
22   did you have no idea because you never heard
23   any comments, or in your mind did you have no
24   idea because you didn't know that certain
25   comments would have had a racial undertone or

Page 39

1    connotation? Do you see the difference?
2 A.   I do. I had no idea anything was said. And
3    what I said, I had no idea it was a racial
4    issue. Again, I wouldn't have said it if I
5    did.
6        (Deposition Exhibit No. 3 was marked
7    for identification.)
8 BY MS. SCHIAVONE:
9 Q.   I'm going to hand you what we'll mark as
10   Exhibit 3 of your deposition.
11 A.   Thank you.
12 Q.   Is this the final written warning that we
13   were discussing?
14 A.   Yes.
15 Q.   And is it issued to you on January 27th of
16   2012; is that accurate?
17 A.   By my signature it was issued on
18   January 30th, 2012.
19 Q.   Do you know then, based on your understanding
20   as a center manager, would this document have
21   been prepared at corporate and then presented
22   to you sometime thereafter, is that how it
23   typically works?
24 A.   Yes, ma'am.
25 Q.   Okay. So it was actually presented to you on

Page 40

1    January 30th of 2012?
2 A.   That is what our signatures indicate.
3 Q.   And it was presented by Jeremy Felts; is that
4    accurate?
5 A.   Yes, ma'am.
6 Q.   Do you see where in that first paragraph it
7    says, "Your actions are not supporting the
8    goals and operations of the Wichita, Kansas
9    center and Lincare. It has been reported by
10   more than one individual that you have made
11   inappropriate, racially motivated comments in
12   the center." Do you see where we're at?
13 A.   Yes.
14 Q.   Did anybody relay to you what those racially
15   motivated comments are?
16 A.   It was one comment and it was the "yes,
17   massa" comment.
18 Q.   Would you agree with me that this document at
19   least says comments plural and not comment or
20   a comment?
21 A.   Take it how you want it. It was one comment.
22 Q.   But this write-up says comments in the
23   plural; is that accurate?
24 A.   That's what it says, yes.
25 Q.   And then it goes on to state, "In addition to

Page 77

1   Wichita Lincare."  Do you see where I'm at?
2 A.   I do.
3 Q.   Did anyone from corporate contact you about
4     this memo and about her allegations of
5     discrimination and disparate treatment
6     following July of 2012?
7 A.   I don't recall.
8 Q.   Is it that a no, that they didn't reach out
9     to you?
10 A.   That's I don't remember.
11 Q.   You don't remember either way; is that
12     accurate?
13 A.   That is accurate.
14         (Deposition Exhibit No. 12 was marked
15     for identification.)
16 BY MS. SCHIAVONE:
17 Q.   I'm going to hand you what we've marked as
18     Exhibit 12 to your deposition.  Have you seen
19     this document before?
20 A.   Yes.  I remember this document.
21 Q.   Okay.  And this was a document that was given
22     to you by Shawron; is that accurate?
23 A.   Yes.
24 Q.   All right.
25 A.   It was signed by Shawron.

Page 78

1 Q.   And it's dated July 25th of 2012?
2 A.   That is what it's dated.
3 Q.   And looking a little more than halfway down
4     the page where it says, "Due to the verbal
5     abuse."  Do you see where I'm at?
6 A.   I see that.
7 Q.   Okay.  "Due to the verbal abuse and negative
8     racial overtones that I have to endure on a
9     daily basis, I refuse to tolerate it any
10     further."
11 A.   There is no daily basis.  It was a one-time
12     thing.
13 Q.   I'm talking about what this memo says.  Do
14     you see what it says?
15 A.   I do see what it says.
16 Q.   So this report, this was given to you on
17     July 25, 2012; is that accurate?
18 A.   That is accurate.
19 Q.   And if you look at the back page, it looks
20     like a CC was always given to Linda Feller;
21     is that accurate?
22 A.   That is accurate.
23 Q.   Do you recall having any conversations with
24     Linda Feller after Shawron sent this memo?
25 A.   I don't recall.  I recall a conversation I

Page 79

1     had with Linda before this memo.
2 Q.   And was that a conversation in March of 2012?
3 A.   No, that was a conversation as to why on
4     July 24th, 2012 -- no, take that back.  That
5     was a different time.  I'm sorry.  I don't
6     recall.
7 Q.   What conversations do you recall having with
8     Jeremy Felts about Shawron Lounds?
9         MS. SCHECK:  Object to the form
10     as overbroad.
11 BY MS. SCHIAVONE:
12 Q.   Did you have any conversations with Jeremy
13     Felts regarding Shawron Lounds and her claims
14     of race discrimination and retaliation?
15 A.   Not that I recall.
16 Q.   Did you have any such conversations with
17     Linda Feller?
18 A.   I mean besides the obvious, no, not that I
19     recall.
20 Q.   You said besides the obvious.  What is the
21     obvious?
22 A.   The obvious is people getting written up.
23 Q.   Meaning you?
24 A.   I mean -- yes, I did get written up.
25 Q.   Did you have any conversations with Karen --

Page 80

1 A.   Shanbacher?
2 Q.   Yeah, Shanbacher regarding Shawron Lounds and
3     her allegations of race discrimination and
4     retaliation?
5 A.   Not that I recall.
6 Q.   Did you have any such conversations with Greg
7     McCarthy?
8 A.   Not that I recall.
9 Q.   And the employee counseling forms that were
10     issued on June 22nd regarding Shawron's
11     attendance and April 26th regarding her
12     attendance, that was at your prompting; is
13     that accurate, that then you had corporate
14     fill out the paperwork?
15 A.   Yes.
16 Q.   But that you're the one who decided to issue
17     those documents?
18 A.   Absolutely.  I'm her direct supervisor and it
19     causes us a lot of stress and anxiety when my
20     employees don't show up and all the rest of
21     us have to pick up the work.  Absolutely.
22 Q.   And is it accurate that it's up to your
23     discretion as a center manager as to at what
24     point you issue a document of counseling as
25     it relates to the number of absences, that

1 A.   Thank you.

2 Q.   Have you seen this document before?

3 A.   I have not seen this document, no.

4 Q.   Okay.  Do you know if you ever called a

5      doctor's office to see if Shawron had been in

6      to be seen?

7 A.   No, I did not.

8 Q.   Do you know if Linda Feller did?

9 A.   I do believe yes, she did.

10 Q.   Okay.  And how do you know that?

11 A.   Because I do remember having a conversation

12      with Linda Feller that she did call and ask

13      if she was seen in the office.

14 Q.   Are you aware of Linda Feller calling any

15      other employees' doctors to check if they had

16      actually been seen in their office?  Are you

17      aware of her doing that on any other

18      occasion?

19 A.   No.  We did not have any other attendance

20      issues like this, either.  And I'm sure if we

21      did have attendance issues like this, the

22      same thing would have happened.

23 Q.   But you're not aware of it happening with any

24      other employee; is that accurate?

25 A.   Not to my recollection, no.

1 Q.   What did you do to prepare for your

2      deposition today?

3 A.   I met with Ms. Scheck yesterday.

4 Q.   Did you look over any documents?

5 A.   The only document that I looked over

6      yesterday was document No. 13 in my

7      deposition.

8 Q.   Okay.  And did you look over any other

9      documents prior to yesterday in preparation

10      for your deposition?

11 A.   No.

12 Q.   Did you talk to Jeremy Felts at all prior to

13      your deposition?

14 A.   No.

15 Q.   Okay.  Did you talk to anybody at Lincare

16      about your deposition?

17 A.   No.

18 Q.   Have you talked to Linda Feller lately?

19 A.   No, I have not talked to her since way before

20      my termination from Lincare.

21 Q.   And what about Karen?

22 A.   No, I don't talk to Karen.

23 Q.   Anybody in corporate?

24 A.   No.  I don't even talk to Jeremy.

25           MS. SCHIAVONE:  Just give me two

1      minutes.  I think I'm going to be done.

2           THE VIDEOGRAPHER:  Off the record

3      10:23.

4           (A recess was taken from 10:23 a.m. to

5      10:24 a.m.)

6           THE VIDEOGRAPHER:  On the record

7      10:25.

8           MS. SCHIAVONE:  I don't have

9      anymore questions for you, Ms. Kraft.  Thanks

10      for your time.  Do you have some questions

11      for her?

12           CROSS-EXAMINATION

13 BY MS. SCHECK:

14 Q.   Just a few follow-up questions, Ms. Kraft.

15      If you could take a look at Exhibit 13.

16 A.   Yes.

17 Q.   And as I understand it, Exhibit 13 is an

18      employee calendar that you used just to

19      document absences for employees that were

20      under your supervision?

21 A.   And myself, correct.

22 Q.   And the handwriting on here were notes that

23      you took based on the information provided in

24      this case by Ms. Lounds regarding why she was

25      absent?

1 A.   Yes, ma'am.

2 Q.   And is it accurate to say except for the

3      absence on May 4th that she never reported to

4      you that any of the other absences were

5      related to anything regarding work?

6 A.   Correct.

7 Q.   And on the note on the calendar on May 4th --

8 A.   Yes, ma'am.

9 Q.   -- it says, "Called in due to hostile work

10      environment."  Is that correct?

11 A.   Yes, but it wasn't.

12 Q.   Okay, just --

13 A.   Yes.

14 Q.   And is the called in due to hostile work

15      environment, is that what Ms. Lounds told

16      you?  Did she use the word hostile work

17      environment?

18 A.   Yes, ma'am.

19 Q.   Okay.  And explain to me when she -- and I

20      guess did you discuss with her -- is this the

21      time she called in and spoke to you?

22 A.   No, ma'am.

23 Q.   Did she text in this absence?

24 A.   After she left me a lengthy voice mail at

25      early hours in the morning.

Page 101

1  Q.   Okay.  And what did she explain to you the
2       reason why she was not at work on May 4th?
3  A.   Because on May 3rd after 5:00, so after work
4       hours ended, there was some horseplay in the
5       office and Elyse had gotten slapped in the
6       thigh by another co-worker as a result of
7       horseplay.  And she said that was hostile
8       work environment.
9  Q.   Take a look at Exhibit 15 and 16.
10 A.   Yes, ma'am.
11 Q.   And just so the record is clear, you did not
12      prepare Exhibit 16, correct?
13 A.   No, ma'am.  I have never seen it until today.
14 Q.   Okay.  And it's your understanding that the
15      absences that led to her termination were the
16      absences other than the scheduled absences or
17      the ones relating to when she was being seen
18      by Dr. Donaldson?
19 A.   Yes, ma'am.
20 Q.   And just doing the math, it looks like
21      there's still 24 absences in less than a
22      one-year period?
23 A.   Correct.
24 Q.   And is that, in your mind as a center
25      manager, considered excessive?

Page 102

1  A.   Absolutely.
2  Q.   Have you terminated any other employees when
3       you were the center manager in Wichita for
4       absenteeism?
5  A.   Yes, ma'am.
6  Q.   And what other employees were terminated?
7  A.   Tracy Hackney.
8  Q.   And did Ms. Hackney have more or less
9       absences than Ms. Lounds?
10 A.   Way less.
11      MS. SCHECK:  I think a few times
12      we may have mentioned a patient name during
13      this deposition, and I would just ask that
14      that patient name be treated as confidential
15      and subject to protective order.  Is that
16      fine, Anne?
17      MS. SCHIAVONE:  Yes.
18      MS. SCHECK:  I don't have any
19      other questions at this time.  And you have
20      the opportunity to read and review and sign
21      the transcript and they can send that to you
22      at your home address.
23      THE WITNESS:  Yes, ma'am.
24      MS. SCHECK:  Which you do have.
25      THE WITNESS:  Uh-huh.

Page 103

1       THE VIDEOGRAPHER:  Off the record
2       10:29.
3       (Deposition concluded at 10:28 a.m.)
4              *     *     *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1       I have read or have had read to me the foregoing
2  testimony recorded on pages 4 to 103, inclusive, and the
3  same is true and correct to my knowledge and belief.
4
5
6              SUZANNE KRAFT          (Date)
7
8
9
10 STATE OF          )
                     )  ss:
11              COUNTY)
12 Subscribed and sworn to before me, the
13 undersigned authority, this, the     day of
14              ,   .
15
16
   Notary Public
17
18
19 (Commission Expires)
20
21
22
23
24
25 LOUNDS V. LINCARE

# EXHIBIT 5

# "ABOUT YOUR COMPANY"

FOR EMPLOYEES OF



*The Caring Choice*

CONFIDENTIAL

## MISSION STATEMENT

LINCARE is dedicated to improving the functional ability and quality of life of patients in the home.  Lincare provides high-quality products and services which meet the highest standards of safety and clinical proficiency.  Our commitment to service excellence ensures the quality of care expected by patients, physicians, and managed care organizations.

**This handbook does not constitute a contract for employment for a specified period of time with LINCARE, either expressed or implied, and LINCARE reserves the right at any time to change, delete or add to any of the provisions at its sole discretion. Furthermore, the provisions of this handbook are designed by LINCARE to serve as guidelines rather than absolute rules, and exceptions may be made from time to time on the basis of particular circumstances.  Nothing in this handbook or any other policy or communication changes the fact that employment is at-will and may be terminated at any time by you or by the Company.**

## TRIAL PERIOD

We try to hire only those people we feel reasonably sure are qualified to do the work, are conscientious in the performance of that work, and are compatible with others that are already working here. However, we may make mistakes. If it turns out that we have hired someone who will not or cannot do the work satisfactorily or is not compatible with others in the work force, it will be necessary to terminate our employment relationship in order to keep our business in a strong, competitive position.  If the decision to terminate an employee occurs within the first ninety (90) days of employment, the termination will be without recourse to the Problem Resolution Procedure or progressive steps of discipline.  At all times, including after successful completion of the trial period, employment with the Company is considered to be at-will, and the employment relationship may be terminated at any time for any lawful reason or no reason by either party.

This handbook is written for employees of Lincare Inc., its subsidiaries, its parent, its affiliates, and any subsidiaries thereof.

*Revised 6/2010*
*Replaces all previous editions of "About Your Company".*

i

CONFIDENTIAL

LIN_0000010

## TABLE OF CONTENTS

Mission Statement.............................i
Trial Period...................................i
Benefit Plans ................................... 2
  Dental Expense Assistance
    Plan.......................................... 2
  Dependent Care
    Reimbursement Plan ............... 2
  Life Insurance/Accidental
    Death and Dismemberment .... 2
  Medical Plan ............................... 3
  Vision Plan ................................. 3
  Savings Plan (401-K Plan) ......... 3
  Employee Stock Purchase
    Plan.......................................... 4
  Salary Continuation Plan ............ 4
  Vacation Plan.............................. 4
  Holidays ..................................... 5
  Lay-Off Allowance ...................... 6
  Company Service Credit
    Rules........................................ 6
  Educational Assistance .............. 7
  Employee Assistance
    Program ................................... 7
  Jury Duty .................................... 8
  Funeral Pay................................. 8
  Uniforms ..................................... 8
  Dress Code.................................. 8
Pay Policies .................................... 8
  Payroll Day.................................. 8
  Payroll Week ............................... 8
  Timekeeping ............................... 8
  Salary Administration.................. 8
  Salary Grades ............................. 9
  Pay Days..................................... 9
  Deductions .................................. 9
  Overtime Pay .............................. 9
  On-Call ..................................... 10
  Meal Periods............................. 10
  Holiday Pay ............................... 10
  Compensatory Pay/Time.......... 10
  Day Worked .............................. 10
  Employment Definitions............ 10
General Employment Practices..... 11
  Leaves of Absence ................... 11
  Personal Reasons..................... 11

Medical ...................................... 11
Family and Medical Leave Act ...... 11
  Military Caregiver Leave .......... 12
  Eligible Employees ................... 12
  Certification .............................. 14
  Questions ................................. 14
Military Training or Service ......... 14
Anti-Discrimination/Anti-
  Harassment/ADA Policies .......... 15
  Applicability of Policies............. 15
Equal Employment
  Opportunity Statement............... 15
Americans with Disabilities Act
  (ADA) Policy................................ 15
Policy Concerning Harassment/
Sexual and Racial Harassment ..... 16
  Supervisor/Subordinate
    Relationships .......................... 16
  Reporting Procedure ............... 17
  Investigation of Reports .......... 17
  No Retaliation .......................... 17
Safety ............................................ 18
Problem Resolution Procedure ..... 19
Corrective Actions ......................... 21
Major Infractions........................... 21
Attendance ................................... 22
Drug Free Workplace..................... 22
Substance Detection Program ...... 23
Corporate Policies......................... 23
  Business Integrity and Ethics ... 23
  Stock Trading Policy................. 24
  Compliance Standards............. 24
  Reporting of Accounting
    Concerns ................................ 25
  Lincare Electronic Media
    Policy...................................... 26
  Internet Usage .......................... 27
  Security Incidents ..................... 28
  Password/User ID..................... 29
  Malicious Software ................... 29
  Cell Phones and Electronic
    Devices................................... 29
  Solicitation and Distribution ..... 30
  Reporting of Irregularities ........ 30

1

LIN_0000011

## BENEFIT PLANS

Lincare Benefit Plans are designed to provide a comprehensive benefits program which adds to the security and well-being of our employees and their families. These benefits apply to all exempt and non-exempt scheduled employees and in some cases only to full-time scheduled employees.

The explanation of the benefit plans below is brief. If you have specific questions on a particular plan, you can refer to the Summary Plan Descriptions which supply current detailed information, or contact the Employee Relations Department at the address below:

Employee Relations Department
P.O. Box 9004
Clearwater, FL 33758-9004

*Note: For your own protection and benefit it is extremely important that designated beneficiaries and home addresses be kept current at all times. Contact your supervisor or the Employee Relations Department with any changes or questions. To be eligible for benefits, all new hires are required to enroll within the first three months of their employment.*

### DENTAL EXPENSE ASSISTANCE PLAN

This plan helps pay the dental expenses for you and your eligible dependents. Coverage begins on the first day of the month following one year of Company Service. Some types of expenses are subject to an annual deductible per individual. The Company shares the cost of this plan for you and your eligible dependents. You must notify the **Benefits Department at Lincare** within 30 days of any "change in family status".

### DEPENDENT CARE REIMBURSEMENT PLAN

The plan provides you the ability to put money aside, pre-tax, for use in payment of dependent care, so that you and your spouse may work.  There are several restrictions in the operation of the plan and it is recommended that you fully review and understand the plan before enrolling.

### LIFE INSURANCE & ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE (Life & AD&D)

This plan offers the opportunity to purchase life insurance at low rates because the Company shares the cost. Coverage begins the first day of the month following completion of three (3) months of service. Employees not enrolling timely will have to submit an "Evidence of Insurability ["EOI"]" to the carrier to determine his/her acceptance. The amount of basic insurance in force is dependent upon your salary according to the following schedule:

| Basic Annual Salary or Wage | Life Insurance | Benefit Amount of AD&D Insurance |
|---|---|---|
| Less than $ 3,600 | $5,000 | $5,000 |
| $ 3,600 but less than $ 5,000 | 7,500 | 7,500 |
| $ 5,000 but less than $ 7,500 | 10,000 | 10,000 |
| $ 7,500 but less than $10,000 | 12,500 | 12,500 |
| $10,000 but less than $12,500 | 15,000 | 15,000 |
| $12,500 but less than $15,000 | 20,000 | 20,000 |
| $15,000 but less than $20,000 | 25,000 | 25,000 |
| $20,000 but less than $26,667 | 30,000 | 30,000 |
| $26,667 but less than $33,333 | 40,000 | 40,000 |
| $33,333 and over | 50,000 | 50,000 |

2

CONFIDENTIAL

LIN_0000012

Supplemental Life Insurance is also available at group rates, and provides additional insurance for you and your eligible dependents.

MEDICAL PLAN

Lincare provides coverage for you and your eligible dependents on a shared cost basis. Coverage begins on the first of the month following three (3) months of service.

If you and your dependents do not enroll prior to the date your coverage becomes effective, you are not eligible to enroll until the next open enrollment period, unless you have a "change in family status" as defined in federal guidelines for Section 125 benefit plans. Once enrolled you may not drop out of the plan unless you have a "change in family status" as defined by federal law, or we are in an open enrollment period. You must notify the **Benefits Department at Lincare** within 30 days of any "change in family status".

VISION PLAN

This plan offers you and your eligible dependents the ability to reduce the cost of prescription glasses and eye examinations by using network physicians. The cost of the plan is paid through pre-tax payroll deductions.  Coverage begins on the first of the month following three (3) months of service.

You can participate in the Vision Plan on an annual basis and once enrolled, you may not drop out of the plan unless you have a "change in family status" as defined by federal law, or we are in an open enrollment period. You must notify the **Benefits Department at Lincare** within 30 days of any "change in family status".

SAVINGS PLAN (401(k) Plan)

If you are hired after January 1, 2006, you will automatically become a participant in the Plan through automatic deferrals on the first day of the month after you have completed ninety (90) days of credited service and are at least 18 years of age. Deductions will begin as soon as administratively possible. You may "opt out" (stop the deferral) of this automatic deferral by notifying the record keeper as explained in the Initial Notice Of Automatic Pre-Tax Salary Deferral Contributions, found in the new hire Welcome Packet. Automatic deferrals are deducted at 3% of base salary.

Active employees with ninety (90) or more days service that have opted out of the Plan can join the plan at any time by contacting the record keeper.

After one year of Lincare service, Lincare will contribute on your behalf, 5% of your base salary. Depending on your earnings, you may be allowed to contribute up to 30% of your base salary. These voluntary contributions must be whole percentages of not less than 1% and not more than 30%.

Vesting of employer contributions is according to the following schedule:

| | |
|---|---|
| 2 years Lincare Credited Service | 20% |
| 3 years Lincare Credited Service | 40% |
| 4 years Lincare Credited Service | 60% |
| 5 years Lincare Credited Service | 80% |
| 6 years Lincare Credited Service | 100% |

Full vesting of the employer contribution will also occur on any of the following dates:
1.  Date of participant's death
2.  Date participant incurs total disability
3.  Date participant attains normal retirement age

For additional details, please refer to the Summary Plan Description.

3

EMPLOYEE STOCK PURCHASE PLAN

After completion of a waiting period, you are eligible to participate in the Employee Stock Purchase Plan. If you decide to join, you can purchase Lincare Holdings Inc. common stock at a discount from market prices. Upon your authorization, deductions are taken biweekly from your paycheck and at the end of each purchase period, stock is purchased and held in your account by a broker. Stock must be held a minimum of one (1) year before it can be traded or sold. Employees subject to Trading Blackout Dates (see Stock Trading Policy) may not sell Lincare Holdings stock during blackout periods. For additional information, please see the Plan brochure.

SALARY CONTINUATION PLAN

After completion of one year of service, if you are temporarily unable to work because of your own illness (including pregnancy and childbirth) or accident or serious medical condition, your salary will be continued for a period which is dependent upon your length of service with the Company.

Any temporary disability must be certified by a physician in order to obtain salary continuation payments. Please contact the Employee Relations Department for these forms.

The maximum period for which your salary will be continued is determined by the following schedule:

| Your Completed Years of Company Service Credit | Period of Salary Continuation | Payment Amount |
| --- | --- | --- |
| 1 yr. but less than 2 yrs. | 3 days | 60% |
| 2 yrs. but less than 3 yrs. | 5 days | 60% |
| 3 yrs. but less than 4 yrs. | 5 days | 75% |
| 4 yrs. but less than 5 yrs. | 5 days | 100% |
| 5 yrs. but less than 10 yrs. | 1 day per completed year of service | 100% |
| 10 yrs. but less than 15 yrs. | 30 days | 100% |
| 15 yrs. or more | 45 days | 100% |

Payments under this plan may be reduced if you are eligible to receive benefits from government plans, "no-fault" insurance, or other loss-of-earnings plans to which the Company contributes or which are established by law. Payments are intended to run concurrently with any such plan or benefit including, but not limited to FMLA, Workers' Compensation or any other loss-of-earnings plan. Payments will be made for single day absences and are only applicable to absences occasioned by your own illness or injury, unless otherwise required by law. This plan is administered on a calendar year basis.

You may be eligible for unpaid leave for a disability, as an accommodation under the Americans with Disabilities Act, in addition to the paid leave provided by the Salary Continuation Plan. You should contact Employee Relations regarding leave for a disability or for leave due to a serious medical condition under the Family and Medical Leave Act. Employees without Salary Continuation eligibility, who take time off work, will be required to use any accrued vacation to cover these days, before taking time without pay.

VACATION PLAN

You are eligible to earn/accrue paid vacation time after you have completed six months of Company service. No paid vacation time is earned or may be taken during the first six (6) months of your employment.

4

Once you have completed six months of Company Service, full-time scheduled employees will earn approximately 3.08 hours of paid vacation for each full pay period worked.

After the January 1st following your completion of six months of service, you will continue to earn vacation according to the following schedule up to the calendar year maximum accrual.

| Length of Service Completed during the Calendar Year | Paid Vacation Hours Earned per Pay Period (Rounded) | Maximum Paid Vacation That May Be Earned During a Full Calendar Year |
|---|---|---|
| 6 months to 4 years | 3.08 hours | 80 hours (10 days) |
| 5 – 14 years | 4.62 hours | 120 hours (15 days) |
| 15 - 24 years | 6.15 hours | 160 hours (20 days) |
| 25 years or more | 7.69 hours | 200 hours (25 days) |

Part-time scheduled employees accrue paid vacation on a prorated basis, depending on the number of weekly hours scheduled.

Once you have been employed for six (6) months, you may take paid vacation prior to accruing the time, in those states that allow a recoupment of overpayment amounts. However, in no case may you take more paid vacation than the maximum amount you are expected to earn during the calendar year (calculated based on the assumption that you will remain employed through the end of that calendar year). In States not allowing the Company to recoup overpayments of vacation time when an individual leaves employment, you will be allowed to take vacation time only up to the amount accrued during the current pay period.

If your employment terminates during the calendar year, you will be paid for all earned but unused vacation time.  If your employment terminates during a calendar year and you have used more vacation time than you have earned, you must reimburse the Company for any vacation taken but not earned.

All vacation is to be taken during the calendar year in which it is earned.  Vacation time may not be carried over into the following year, unless operational needs prevent you from taking your vacation and your supervisor approves carryover to the following year. In the event that occurs, you must use all your carryover vacation time by the end of March of the following year. Prior year vacation that has been rolled over will not be paid out at termination.

Accrued vacation time will be applied to all unpaid absences unless prohibited by law.

Planned vacation time must be scheduled thirty (30) days in advance and must be approved by your manager.

If state or other location-specific laws mandate different administration requirements than those noted above, Lincare will make necessary adjustments to the administration of the Vacation Plan in those areas in order to be in compliance with applicable laws.

HOLIDAYS

All eligible employees will receive 10 paid holidays during the calendar year. To be eligible for holiday pay, you must be on active status and work (or be on pre-approved time off) your scheduled day prior to and after the holiday.

Generally, holidays falling on a Saturday will be observed the preceding Friday and holi-

5

LIN_0000015

days falling on a Sunday will be observed on the following Monday.   If a holiday falls during your scheduled vacation, that day will not be counted as a vacation day.

LAY-OFF ALLOWANCE

If a full-time employee is laid off because of a lack of work, that employee is eligible for lay-off allowance based on the following schedule:

| Company Service Credit | Layoff Allowance |
|---|---|
| Less than 1 year | No allowance |
| 1 - 3 years | 1 week's salary |
| 4 - 7 years | 2 weeks' salary |
| 8 - 10 years | 3 weeks' salary |
| More than 10 years | 4 weeks' salary |

Only completed years of Company Service Credit will be used in calculating the amount of lay-off allowance.

A lay-off allowance is not paid to an employee who:
- Terminates employment voluntarily
- Is discharged
- Resigns at Company request
- Is currently on a leave of absence

COMPANY SERVICE CREDIT RULES

Company Service Credit is based on your employment with Lincare, but will include all Company service credited if you were an employee of Linde Homecare Medical Systems, Inc. and all Company service credit earned while an employee of Union Carbide Corporation, provided you were an active employee of Linde Homecare Medical Systems, Inc. on November 27, 1987, whether on the Union Carbide Corporation payroll or the payroll of Linde Homecare Medical Systems, Inc.

Company Service Credit of all employees who were on the payroll on the date the Pension Plan became effective has been established with respect to their employment prior to the date.  Company Service Credit for employment subsequent to that date and Company Service Credit of all new employees hired after that date will be determined under the following rules.

1.   If you receive salary, wages, or commissions from Lincare, your Company Service Credit begins as of the date such salary, wages or commissions became effective.
2.   If you are on the active payroll and you had been credited with Company Service Credit for one or more periods of prior employment but you had lost such credit because of (a) a lay-off lasting for more than 3 years, or (b) termination for any other cause, such prior Company Service Credit will be restored upon completing a total of 2 years of currently credited Company Service following re-employment.  Exception: if you voluntarily resigned and you return within three (3) months of your resignation date, and management deems it to be in the interest of the Company to authorize credit for service prior to such voluntary termination, prior Company Service Credit will be restored at the time of rehire.  Prior to such completion the appropriate rule below will apply.
3.   If you are laid off by the Company on account of reduction in force and through no fault of your own:

(a) If such lay-off continues not more than 3 consecutive years, Company Service Credit will be given for service prior to such lay-off at the time of rehire.

6

CONFIDENTIAL

LIN_0000016

(b) If such lay-off continues for more than 3 years, no Company Service Credit will be given for service prior to such lay-off until you have completed an additional 2 years continuous service following re-employment.

4. If an absence is caused by temporary suspension of work (other than "lay-off" as in paragraph 3 above), disability, or absence with leave which is authorized by Management, your employment will be considered as continuous without any deduction if the absence does not exceed 3 months. However, in case such absence does exceed 3 months, the period of absence in excess of 3 months will not be considered as Company Service Credit unless otherwise authorized by Management. If you are absent and fail to return to work when able to do so and at the time designated by the Company, you will be considered as voluntarily terminating your employment and your Company Service Credit shall end as of your last day worked.

5. If you are rehired or reinstated subsequent to discharge for cause or resignation at the Company's request, credit will be given for service only since your last date of rehire or reinstatement by the Company, unless otherwise authorized by the Management.

6. Employees that had prior service credit from an acquired company will lose any non-Lincare service credit if they leave Lincare employment. Upon return only prior Lincare Service Credit will be credited following the rules specified previously under this section.

EDUCATIONAL ASSISTANCE

The Educational Refund Program provides assistance for full time employees who have completed their trial period and satisfactorily complete approved courses of study in recognized schools and colleges. These approved courses must be related to the employee's job. The Company will reimburse you for up to 75% of the cost of tuition, registration fees, books and supplies for approved course work. For employees who satisfactorily complete advanced-degree courses, the plan provides for the refund of the remaining 25% at the time the Master's or Doctoral Degree is awarded. Refunds may be considered taxable income and subject to federal taxes.

You must receive approval from your supervisor prior to enrollment to ensure that the course of instruction and the school is covered under this program.

Anyone receiving such assistance and terminating their employment with Lincare prior to one year after receiving assistance will be required to remit to the company those tuition reimbursement monies received as reimbursement for expenses incurred during the prior 12 month period.

EMPLOYEE ASSISTANCE PROGRAM (EAP)

The Employee Assistance Program provides professional help for problems such as alcoholism, drug abuse, physical illness, family-marital problems, emotional, financial or other concerns which bring about personal stress. The objective of the program is to help you resolve problems and maintain a productive role in the organization.

You may contact the EAP directly for confidential assistance for personal, medical, or behavioral problems. You may contact the Employee Relations Department in Clearwater, Florida, if you have any questions. Supervisors may also refer employees who encounter difficulties as a condition of continued employment. Your medical coverage may provide some assistance in covering the expense.

7

CONFIDENTIAL LIN_0000017

JURY DUTY

If you are a full-time and/or scheduled part-time (17.5 hours or more each week) non-exempt employee called to serve on jury duty, you will be paid the difference between the jury duty pay and your regular pay at your straight time rate. Please submit evidence of the obligation to serve and a statement from the court showing the amount of jury duty pay. Company pay is limited to the days and hours during which you would normally be scheduled to work. In the event state or local law requires other reimbursement, you will be so informed by your supervisor.

FUNERAL PAY

A full-time scheduled employee required to be absent from work due to a death in the immediate family will be protected against loss of pay for up to three (3) days, beginning with the day of death and ending with the day after the funeral. Immediate family is defined as spouse, child, parent, sister, brother, parent-in-law or other relative residing in the employee's household at the time of death.

UNIFORMS

For positions requiring them, Lincare will provide a complement of uniform clothing and safety equipment.

Uniforms furnished by Lincare remain the property of Lincare and will be returned upon employment separation.

The cleaning and maintenance of the uniform is your responsibility unless otherwise required by law.

DRESS CODE

Lincare expects all employees to dress in a professional manner fitting their particular position. Managers have the responsibility to establish the dress code to be followed in their location, but at all times it must reflect business attire.

### PAY POLICIES

PAYROLL DAY

The payroll day is the 24 hour period beginning when you start work or are scheduled to start work, whichever is earlier.

PAYROLL WEEK

The payroll week is considered as the 7-day period beginning at 12:01 AM Monday and ending at 12 midnight on the following Sunday.

TIMEKEEPING

Non-exempt employees are responsible for accurately recording their actual hours worked in Lincare's timekeeping system, and/or having their manager make adjustments to reflect actual hours worked. This includes reporting meal breaks that non-exempt employees take in the time recording system. Some states require this by law. Managers are to ensure that actual hours worked are correctly recorded in the system and submitted to Payroll.

SALARY ADMINISTRATION

It is the policy of Lincare to pay people in accordance with their performance and their

8

LIN_0000018

job responsibilities. It is also our intention to recognize significant differences in individual performance and job responsibility.

## SALARY GRADES

Jobs are evaluated by the Employee Relations Department to determine comparable jobs within and outside the Company.  The critical work elements and responsibilities of the jobs are compared to maintain internal equity with similar jobs as well as make comparisons to outside jobs. Through job evaluation and comparisons, jobs are placed into pay grades or bands rather than a single rate. This allows us to recognize individual performance as well as provide opportunities for growth within your grade.

## PAY DAYS

Employees are paid on a biweekly basis (normally every other Friday), with 26 pay periods annually. All time worked during the two preceding weeks is paid on the Friday following the last day of the pay period (Sunday), one week in arrears.

For the convenience of our employees, we offer Direct Deposit (your pay is deposited directly into the bank account of your choice) or the Debit Card Program (your pay is "deposited" to a debit card which you can then use to get cash, pay bills, or pay for purchases).  New hires may receive their first check in the office.  If you do not elect to participate in either Direct Deposit or the Debit Card program, all future pay checks will be mailed to your home address on the Tuesday of each pay week, unless an observed holiday requires an adjustment to that schedule.

## DEDUCTIONS

The Federal Government requires the Company to make certain deductions from your paycheck; these are for Federal Income Tax and Social Security. Under the Social Security Act, you and the Company are taxed equally on your annual earnings according to the current provisions of the law. The Company is also required to make deductions for State and local income taxes, where applicable.

All employees are required to authorize minimum withholdings from their paycheck for applicable Federal, State and local income taxes. With your authorization, additional withholdings can also be deducted from your paycheck for tax purposes.

If you wish, you may authorize Lincare to make certain other deductions from your paycheck. These include your payments under other Company benefit plans in which you participate.

## OVERTIME PAY

Employees in certain positions determined to be non-exempt receive overtime pay for hours physically worked over 40 in a payroll week.  Non-exempt employees on a normally scheduled day receive overtime pay of time and one-half their regular straight time rate for each hour physically worked over 40 hours in any payroll week.  Holiday hours will be counted as "hours worked" for the purpose of calculating overtime in any applicable work week.

Overtime is paid on the paycheck following the work week in which the overtime is worked.  Some state laws may require overtime be paid other than as required by the Federal Fair Labor Standards Act.  In those cases we will pay overtime in accordance with the prevailing state laws.

9

LIN_0000019

## ON-CALL

Non-exempt employees will receive normal pay for on-call hours worked. On-call hours worked is defined as the time spent on a service call, including time spent with callers serviced by telephone, after the normal work day. All on-call hours must be accurately recorded and submitted to your supervisor. If the total hours worked in a week, including on-call time exceeds 40 hours, the time worked over 40 hours will be paid at the overtime rate.

## MEAL PERIODS

All employees are required to take a mid-day break for a meal period of at least thirty (30) minutes during each work day, which must be recorded in the timekeeping system by all non-exempt employees.  This is to meet requirements that are in place in several states. If you are located in a state that requires a meal period, you must actually break from work and, if you are a non-exempt employee, you must accurately record that break in the timekeeping system.  If you are located in a state that does not require a meal period and you occasionally elect to work through the day without a meal period, your time sheet must reflect your actual hours worked.

## HOLIDAY PAY

If you are in a non-exempt position and must work on a scheduled holiday, you will be paid at one-and-a-half times your straight time rate for all hours worked in addition to holiday pay.  In order to qualify for holiday pay, you must be on active status and work (or be on pre-approved time off) your scheduled work day prior to and following the holiday.

## COMPENSATORY PAY/TIME

Lincare does not award compensatory time or pay to employees, whether exempt or non-exempt.

## DAY WORKED

A "day worked" for the purpose of administering overtime pay will include, in addition to days actually worked, any day an employee is on jury duty and each observed holiday.

## EMPLOYMENT DEFINITIONS

EXEMPT SALARIED - A salaried employee who is exempt from Federal wage and hour laws relating to the payment of overtime compensation.

NON-EXEMPT SALARIED - A salaried employee who is not exempt from Federal wage and hour laws relating to the payment of overtime compensation.

FULL-TIME EMPLOYEE - An employee hired to work a schedule that conforms to local standard working hours. However, we do not guarantee 40 hours of work per week.

PART-TIME SCHEDULED EMPLOYEE - An employee whose work schedule is at least 17.5 hours and less than 40 hours per week. We do not guarantee a part-time scheduled employee 17.5 or more hours per week.

PART-TIME NON-SCHEDULED EMPLOYEE - An employee who is paid for actual hours worked at a fixed hourly rate and generally will work a schedule of less than 17.5 hours per week.

10

CONFIDENTIAL

LIN_0000020

## GENERAL EMPLOYMENT PRACTICES

### Leaves of Absence

All leaves of absence are without pay unless you have paid vacation or salary continuation benefits that you are required and/or elect to use. If you request a leave of absence, Lincare will require you to substitute any of your accrued but unused vacation, and as applicable, available salary continuation benefits for your leave.

It is understood that in granting a personal or medical leave, the reinstatement of the employee to his/her present position or a position of like status and pay is subject to the availability of a position at the termination of the leave or in accordance with applicable laws.

When you have six or more months of Company Service Credit, you may be granted up to a maximum of six weeks' leave of absence, with management approval, for the reasons listed below:

Note: Some states have laws requiring certain employers to offer leaves of absence that are not listed here. It is Lincare's intent to fully comply with all such state laws.

### Personal Reasons

Leave may be granted for personal reasons which are sufficiently compelling or deserving and/or required by law.

### Medical

An employee may be granted a leave for medical reasons provided it is intended that the employee will return to full-time employment within a reasonable length of time (maximum 6 weeks). Alternatively, an eligible employee may be granted leave under the FMLA policy (see below).

Subject to applicable legal requirements, if an employee applies for reemployment upon timely return from an authorized medical or personal leave of absence and the position from which the employee left has been eliminated/and lay-off would have occurred had the employee remained actively at work, then;
a.  The employee will be paid any lay-off allowance due;
b.  Service Credit will cease on the earlier of
    i)  the day the lay-off would have occurred
    ii) three months following the start of the leave

## FAMILY AND MEDICAL LEAVE ACT

### Family and Medical Leave

An eligible employee (see below) may take up to twelve (12) weeks of unpaid leave in the rolling 12 month period measured backward from the date an employee first uses FMLA leave for one or more of the following reasons:

- The birth or adoption of a child or placement of a foster child with you.
  (Leave must be taken within 12 months of birth, adoption or placement).

- The serious health condition of your spouse, child, or parent.

- Your serious health condition.

- Any "qualifying exigency" (as defined by law) arising out of the fact that your spouse, child or parent is on active-duty (or has been notified of an impending call to active duty) in the Armed Forces in support of a contingency operation.

11

LIN_0000021

Military Caregiver Leave

Additionally, an eligible employee (see below) may take up to twenty-six (26) work weeks of unpaid leave during a 12-month period if he/she is a spouse, son, daughter, parent, or next of kin to a member of the Armed Forces, including a member of the National Guard or Reserves, to care for the Service Member. An eligible employee is entitled to a combined total of 26 weeks of all types of FMLA leave during a single 12-month period.

Eligible Employees

If you are full-time or part-time scheduled, have worked for Lincare for at least twelve (12) months, have worked at least 1,250 hours in the (12) month period immediately preceding the leave, and if your work location has at least fifty (50) employees or is within a seventy-five (75) mile radius of Lincare work locations that employ a total of fifty (50) or more employees, you are eligible for FMLA leave.

**BEFORE LEAVE BEGINS:**

Notification of Your Leave

In the case of the birth, adoption or placement of a foster child or in the case of a foreseeable medical condition, you must notify your supervisor in writing as soon as possible, but no less than thirty (30) days before the date your leave is scheduled to begin.

If for some reason you must take leave and you cannot notify the Company as specified above, you must report as soon as possible to your supervisor to explain your circumstances and situation.

Written notification must be received before leaves will be certified as family or medical leaves, unless it is not reasonable to do so under the particular circumstances.

The Company will evaluate your request for leave and notify you within five (5) business days following receipt of the request. You will receive a written determination by your next paycheck.

Paid and Unpaid Leave

Lincare will require you to substitute any of your accrued, but unused vacation, as well as your available salary continuation benefits for any part of your eligible family or medical leave. If you are required to use paid leave for all or a portion of your FMLA leave, you will be notified verbally within five (5) days of that determination, and by the next payday in writing. Contact the Employee Relations Department for more information. If paid leave is not available, your leave will be without pay.

Certification For Your Leave

All eligible employees who request a medical leave as outlined above may present certification from their health care provider or the health care provider of the family member in question, using the "Certification of Health Care Provider" form. This certification must be presented before leave can be approved, if possible, but in no event more than fifteen (15) days after your initial request for leave. Forms are available from the Employee Relations Department.

If leave is for the serious health condition of a family member, their health care provider must certify that you are needed to care for that family member.

12

LIN_0000022

### DURING YOUR LEAVE

#### Health and Benefits

During your approved leave, you may elect to maintain or revoke your group health coverage, etc. If you elect to maintain your coverage you must continue to pay the premiums that you now make. If you fail to pay your premiums your group health coverage may be discontinued. Should the company elect to make the premiums for you, you will generally be expected to reimburse the Company for any payments it makes on your behalf. (See also 'If You Decide Not To Return')

#### Recertification

During your approved leave, Lincare may require from time to time that a serious medical condition be recertified by your health care provider or that of your family member.

#### Regular Contacts With The Company

During your approved leave, you are responsible to keep in contact with the Company on a regular basis. Unless otherwise notified in writing, you should contact your supervisor at least every two weeks and let them know your status and when you plan to return to work. Regular contact will help to ensure all appropriate insurance coverage is in order, benefits are maintained, etc.

#### Other Employment

Lincare prohibits employees from taking other employment while on leave under this Act. Any employee that secures other employment while on leave, if they have not terminated their employment with Lincare, will be discharged.

### RETURNING TO WORK

#### Necessary Notification of Your Return

Before returning to work from your approved leave, you must contact your supervisor and let them know when you intend to return to work. Notification is necessary before your return to help ensure that you are reactivated on the payroll system as soon as possible.

Failure to return to work following an authorized leave will result in the termination of your employment.

#### Certification For Your Return

Before returning to work from your approved medical leave, you must present certification from your health care provider that you are able to return to your job duties. This certification must be presented before your return to work will be approved.

#### Your Position Upon Return

When you return from your approved leave, you will be able to return to your same position or a substantially equivalent position. Lincare will not guarantee your position or a substantially equivalent position if your leave extends beyond twelve (12) weeks, unless otherwise required by law.

#### If You Decide Not To Return

If you do not return at the expiration of your approved leave, Lincare may require you to reimburse the Company for its portion of your health coverage premium that was paid for you under the group health plan during your leave.

13

CONFIDENTIAL

LIN_0000023

Exceptions:

Lincare will not require you to reimburse the Company for maintaining coverage if you do not return to work for one of the following reasons:

If the leave is for your serious health condition and you are unable to return to work because of the continuation, recurrence or onset of the condition.

-OR-

If the leave is for the serious health condition of a family member and you are unable to return to work because you are still needed to care for the family member.

## CERTIFICATION:

If you do not return from your approved leave because of either of the two reasons preceding, you must present certification from your health care provider or the health care provider of the family member in question. This certification must be presented as soon as possible, but no later than fifteen (15) days after the last day of your scheduled leave.

The certification must contain the following information:

If the leave is for your serious health condition, the certification must include a statement that you are unable to perform the functions of your position on the date that your approved leave expired.

If the leave is for the serious health condition of a family member, the certification must include a statement that you are needed to care for that family member on the date that your approved leave expired.

## QUESTIONS:

If you have any questions about this policy or your eligibility to participate in a family or medical leave, please contact the Employee Relations Department for more information.

FOR MATTERS RELATED TO FAMILY OR MEDICAL LEAVE, LINCARE WILL ABIDE BY THE REQUIREMENTS OF THE 1993 FAMILY AND MEDICAL LEAVE ACT. THIS POLICY MAY VARY ACCORDING TO APPLICABLE STATE LAW. IF YOU ARE COVERED BY A STATE'S LAW, YOU WILL BE INFORMED OF THE APPLICABLE POLICY VARIANCES.

## MILITARY TRAINING OR SERVICE

Under the Uniformed Services Employment and Reemployment Rights Act (USERRA), an employee will be granted leave to perform military training or service in the Armed Forces of the United States, the National Guard, the State Guard, or certain types of service in the National Disaster Medical System, consistent with applicable statutes. When taking a military leave under USERRA, an employee will be reemployed in the same or comparable position provided that:

- The employee ensures that Lincare receives advance written or verbal notice of his/her service;
- The employee has five years or less of cumulative service in the uniformed services while with Lincare;
- The employee returns to work or applies for reemployment in a timely manner after conclusion of service; and
- The employee has not been separated from service with a disqualifying discharge or under other than honorable conditions.

14

CONFIDENTIAL

LIN_0000024

If the employee is eligible to be reemployed, he/she will be restored to the job and benefits he/she would have attained if he/she had not been absent due to military service, or in some cases, a comparable job.

## ANTI-DISCRIMINATION/ANTI-HARASSMENT/ADA POLICIES

All employees have the right to work in an environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive or disruptive, including harassment based on sex, race, color, ethnic background, religious belief, national origin, citizenship, ancestry, alienage, age, marital status, sexual orientation, veteran status, actual or perceived medical condition (including genetic condition and sickle cell trait), pregnancy or pregnancy-related conditions, workers compensation claims, family responsibilities, personal appearance, matriculation, political affiliation, unfavorable military discharge or other legally protected status.  Lincare does not and will not tolerate discrimination against, or harassment of or by, Lincare's employees, consultants, applicants, customers or vendors.  Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as business trips, business meetings and business-related social events.

Location managers are responsible for ensuring that their location is in compliance with these policies and is free of discrimination or harassment, sexual, racial or otherwise. Managers/supervisors will be held personally responsible by the Company and may be held personally liable if they participate in discriminating or harassing behavior or fail to adequately protect employees from discrimination or harassment.

### Applicability of Policies

All employees and applicants are covered by these policies and are strictly prohibited from engaging in any form of discriminatory or harassing conduct.

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

Lincare is an equal opportunity employer.

Lincare will not discriminate or allow discrimination against any employee or applicant on the basis of sex, race, color, ethnic background, religious belief, national origin, citizenship, ancestry, alienage, age, marital status, sexual orientation, veteran status, actual or perceived medical condition (including genetic condition and sickle cell trait), pregnancy or pregnancy-related conditions, workers compensation claims, family responsibilities, personal appearance, matriculation, political affiliation, unfavorable military discharge or other legally protected status.

Lincare will comply with all applicable federal, state and local laws relating to employment as a matter of policy and practice.  Lincare's policy has always been to hire and promote individuals without discrimination on the basis of merit and their ability to perform.

**Violation of this policy will subject an employee to disciplinary action, up to and including immediate discharge.**

## AMERICANS WITH DISABILITIES ACT (ADA) POLICY

Lincare complies with and fully supports the Americans with Disabilities Act.  No one will be denied any employment opportunity including, but not limited to, hiring, promotion, transfer, etc. or be discriminated against with respect to any term or condition of employment on the basis of disability.  Generally, disability refers to a physical or mental impairment that substantially limits one or more major life activities.

15

LIN_0000025

Any employee with a disability or history of disability who requires reasonable accommodation is responsible for notifying his/her location manager of this need. The location manager will contact the Employee Relations Director or the Human Resources Manager to evaluate the situation. Lincare will seek to reasonably accommodate qualified individuals with a known disability who, with or without reasonable accommodation, can perform the essential functions of the position for which they have applied, were hired or are qualified.

Applicants will be advised of Lincare's commitment to accommodate any limitation they might have which would make it difficult for them to apply for work with Lincare.

## POLICY CONCERNING HARASSMENT/SEXUAL
## AND RACIAL HARASSMENT

Lincare regards harassment, including sexual and racial harassment, as a form of misconduct that undermines the integrity of the employment relationship. No employee should be subject to unsolicited or unwelcome overtures or conduct, either verbal or physical, directly or via electronic means such as email, text or on social networking sites. Lincare prohibits sexual and racial harassment in the workplace, whether committed by supervisory or non-supervisory personnel, consultants, customers or vendors. Harassment based on color, ethnic background, religious belief, national origin, citizenship, ancestry, alienage, age, marital status, sexual orientation, veteran status, actual or perceived medical condition (including genetic condition and sickle cell trait), pregnancy or pregnancy-related conditions, workers compensation claims, family responsibilities, personal appearance, matriculation, political affiliation, unfavorable military discharge or other legally protected status is likewise prohibited by Lincare.

**Violation of this policy will subject an employee to disciplinary action, up to and including immediate discharge.**

Harassment refers to behavior that is not welcome, that is personally offensive, debilitates morale and interferes with work effectiveness. Unwelcome sexual advances (either verbal or physical), requests for favors or other verbal or physical conduct of a sexual nature constitute sexual harassment when:

1.  Submission to such conduct is made either an explicit or implicit term or condition of employment (e.g., promotion, training, etc.); or

2.  Submission to or rejection of the conduct is used as a basis for making employment decisions; or

3.  The conduct has the purpose or effect of substantially interfering with an individual's work performance, or creating an intimidating, hostile or offensive work environment.

Employment decisions, including wages, advancement, assignment or any condition of employment may not be predicated on the submission to or rejection of sexual advances. No employee has the authority to grant or deny promotions or to force any change in an employee's job status on the basis of the provision or denial of sexual favors by an employee. Such conduct is a direct violation of this policy.

Supervisor/Subordinate Relationships

It is virtually impossible for a supervisor to have a consensual relationship with an employee over which the supervisor has any type of influence or authority and not have it affect the work performance of either the supervisor, the subordinate, or others in the same area. The Company takes the position that if the conduct of any employee, whether during Company time or during off time, affects their performance, or the performance of

16

LIN_0000026

others in the Company, or if the conduct projects an image of the Company that is unacceptable to the senior management, proper disciplinary action will be administered up to and including discharge.

## Reporting Procedure

If you believe you have been discriminated against or harassed or you have any concerns or suspicions of discrimination or harassment in the workplace against you or anyone else, you are required to immediately notify any one of the persons listed below based on your location:

| Field locations (Centers, Call Centers, Specialty Pharmacies (CA, MO), infusion pharmacies) | Region Manager<br>Employee Relations Director<br>Human Resources Manager |
| --- | --- |
| Region Billing and Collection Offices | National Reimbursement Manager<br>Employee Relations Director<br>Human Resources Manager |
| Reliant Pharmacy (FL, MS, AR) | Pharmacy Manager<br>Employee Relations Director<br>Human Resources Manager |
| Corporate Offices | Employee Relations Director<br>Human Resources Manager |

In the event a Region Manager, National Reimbursement Manager or Pharmacy Manager is notified of a discrimination or harassment claim, they will immediately contact the Employee Relations Department, which will investigate the claim.

**Employees who have experienced conduct they believe is contrary to Lincare's Anti-Discrimination/Anti-Harassment/ADA Policies have an obligation to take advantage of this reporting procedure. An employee's failure to fulfill this obligation could adversely affect his or her rights in pursing any claim.**

The availability of this reporting procedure does not preclude individuals who believe they are being subjected to discriminatory or harassing conduct from promptly advising the alleged offender that his or her behavior is inappropriate or unwelcome and requesting that it be discontinued.

## Investigation of Reports

It is the responsibility of the Employee Relations Department to investigate any complaint of discrimination or harassment. Confidentiality will be maintained to the extent permitted by the circumstances. In determining whether the alleged conduct or employment decision was discriminatory, or harassing, the totality of the circumstances, the nature of the alleged discriminatory or harassing conduct and the context in which it is claimed to have occurred will be investigated. The complaint will be addressed as deemed appropriate by the Employee Relations Director, or his/her designee, working together with Operations Management.

## No Retaliation

Lincare prohibits retaliation against any individual who reports discrimination or harassment or participates in an investigation of such reports. Retaliation against an individual for reporting discrimination or harassment or for participating in the investigation of a claim of discrimination or harassment is a serious violation of this policy and **will subject an employee to disciplinary action, up to and including immediate discharge.**

17

CONFIDENTIAL

LIN_0000027

## SAFETY

Organization And Commitment

The efficient marketing and distribution of quality products and services is the business purpose of Lincare. SAFETY is a vital and necessary ingredient in achieving that purpose.

SAFETY is achieved when all employees perform their jobs carefully and correctly, utilizing each vehicle, and piece of equipment properly, without accident, injury, or property damage.

Work activities must be planned and conducted with the attitude that all accidents and injuries can be prevented.

The following required principles are basic to a superior safety performance:

- Safety in all areas is a prime responsibility of each employee.

- Management will provide the working conditions, programs, and initiatives, that are essential to good safety performance and show continuing and visible support for safety.

- Each employee must conduct himself or herself so as to prevent accidents, both for their personal safety and for the safety of their fellow employees.

- No job is considered so important or urgent that it cannot be done safely.

- Safety is a primary consideration in every phase of work, including specification and purchase of equipment, instructions, operation of facilities, and delivery of product to our customers.

- Each manager/supervisor is responsible for safety in their area, and will comply with all applicable sections of the Safety and Regulatory Manual.

- Each manager is responsible for the safety of visitors or other personnel who are on Lincare property, and will arrange to provide them with appropriate, safe operating guidelines for their own protection and for the protection of Lincare personnel and property.

- Off-the-job safety of employees and their families is promoted and strongly encouraged.

The safety and health of our employees, both at work and off the job, are of prime importance to Lincare. Good personal protection and accident prevention performance assures the well-being of our employees and results in our operations running efficiently and economically.

Regulations

You are required to know the safety regulations, policies and procedures pertaining to your job. It is management's responsibility to provide you access to the necessary training required.

A copy of the Lincare Safety and Regulatory Manual is available for reference at every Center and other applicable work locations. Memoranda may be issued from time to time to increase awareness of written regulations, policies and procedures that are in place for your safety and that of your fellow employees. If you have any questions concerning these or other parts of the safety program, please consult your supervisor.

18

CONFIDENTIAL

LIN_0000028

Protective Equipment

Certain jobs require employees to wear approved foot, hand, face, hearing, respiratory, and other protective devices in performance of their jobs. This is for your protection. Failure to wear proper protective equipment is not only dangerous to you but may result in discipline up to and including discharge.

Vehicle Safety

We are committed to the safety of our employees, customers and the general public. The DOT section of the Safety and Regulatory Manual applies to all employees in the Lincare organization who drive company vehicles and/or handle hazardous materials. You are required to review and know vehicle safety and hazardous materials policies applicable to your position.

On-the-Job-Injuries

Should you suffer an eligible work-related injury, illness or disease, you will receive benefits from the Company's Workers' Compensation policy. Eligibility for benefits is determined by the Company's Workers' Compensation insurance carrier, who conducts an independent review to determine qualification for benefits. The workers' compensation system is designed to aid an employee injured in the course of performing work-related duties. It is a good system, and one we endorse. To ensure the physical well-being of our employees and the correct processing of these claims, every employee has a duty to help make sure the system works properly.

Your duty is very simple. First, you must follow all safety rules and do your work in a safe manner. If you are involved in an accident, even if you do not think you are hurt, you must report the accident to your supervisor right away. There is no excuse for any delay on this point. If you are hurt, we will authorize medical treatment for you. Your supervisor will direct you to the person who will authorize you to see the doctor. You must also do exactly as the doctor says to properly treat your injury. If part of your treatment includes time away from work, it is your responsibility to maintain regular contact with your manager to keep him/her informed of your progress, provide work status updates, and communicate your anticipated return-to-work date. If necessary, depending on your injury and the medical provider's evaluation of your fitness for duty, the company will work closely with you to determine if light duty work is available for a specified period of time, pending your release to return to your normal duties.

Obeying all safety rules, reporting an injury as soon as it occurs, maintaining contact and communication with your manager during any related absence, and following your doctor's orders are material conditions of continued employment with Lincare. Your cooperation in all of these areas is expected and required. Failure to do so may result in discipline up to and including discharge.

## PROBLEM RESOLUTION PROCEDURE

Introduction

We at Lincare believe that employee problems should be handled promptly and objectively. You will not be discriminated against or in any way penalized for exercising your rights under this procedure. There will be no retribution and we encourage use of this procedure. Anyone found to be discriminating against or penalizing an employee for exercising their rights under this procedure will be subject to disciplinary action, up to and including discharge.

19

## Procedure

1. **First Step** - If you have a problem or complaint you should first try to resolve it through discussion with your immediate supervisor. Experience has shown that most problems can be resolved by discussion between the immediate manager and employee while the incident is fresh in the minds of everyone. Therefore, within 5 working days after either the incident occurred or when you reasonably could have been aware of the incident, you should advise your supervisor that your are taking advantage of the Problem Resolution Procedure and present the problem. The problem is then discussed and an answer will be given within 5 work days from the time you make the situation known.

2. **Second Step** - If you do not feel that your problem has been resolved satisfactorily in the first step, you may request a meeting with the Area Manager (or other appropriate manager).  To do this, present your problem in writing within 5 work days of receiving your first step answer.  Advise your Area Manager that you are taking advantage of the Problem Resolution Procedure.  Five work days after receiving your concern, the Area Manager (or other appropriate manager) will make arrangements to discuss the problem with you.  Once this has taken place, you will be advised of the decision within 10 work days.

3. **Third Step** - If you are not satisfied with the second step answer, your complaint may be referred to the Regional V. P. (or other appropriate manager) within 5 work days following your receipt of the second step answer. Again, within 5 work days the Regional VP, or a designated representative, will make arrangements to discuss the problem with you. You will be advised of the decision within 10 work days following that discussion.

   If an employee is *laid off, suspended or discharged* and feels such treatment is unfair, a complaint may be initiated at the third step, within 5 work days after the incident.

4. **Fourth Step** - If you are not satisfied with the third step answer, you may refer the problem to the final step by presenting a written request to the Employee Relations Director within 5 work days of the time you receive your third step answer. Within 10 work days a representative of the Employee Relations Department will make arrangements to discuss your problem with you. A written decision will be mailed within 10 work days following that discussion.

## CLARIFICATIONS

Time limits referred to in this procedure are intended to exclude Saturdays, Sundays and holidays.  It is important to note that we encourage the use of the problem resolution procedure by fully investigating each concern.  On occasion it will take longer to investigate a problem than the time periods set forth above. When that is the case, you will be notified of the delay and the expected time frame for a reply, if it can be reasonably determined.  Answers will be based on Lincare policies. Our goal is to provide fair and consistent resolution for each problem or concern.

When submitting complaints at the third step, please send a copy to the following address:

Employee Relations Department
P.O. Box 9004
Clearwater, FL 33758-9004

20

LIN_0000030

## CORRECTIVE ACTION
### (REASONABLE CONDUCT)

Progressive disciplinary action, when appropriate and with the exception noted below, will be taken to correct areas of performance or behavior which are considered unacceptable. The type and severity of corrective action taken will be determined by the seriousness and/or the frequency of the improper behavior. Your length of service, total work record, and all other pertinent facts will be reviewed before any action is taken.

The normal sequence for corrective action in order of progression is as follows:

1.  Counseling by immediate supervisor.
2.  Verbal warning by immediate supervisor.
3.  Final written warning letter or Action/Probation Plan, which reiterates the Company's concern about performance improvement and clearly states that the next step in the process may be termination.
4.  Discharge - discharge is the final phase of the corrective action process after the above measures have failed to correct performance deficiencies.

Exception:  The normal progressive sequence may start with a more severe step, up to and including discharge, depending on the seriousness of the incident.

## MAJOR INFRACTIONS

Examples of major infractions, as listed below, or any willful misconduct, may result in discharge without written notice and without prior warning or progressive discipline. This list is representative and is not intended to be all inclusive.

1.  Insubordination, e.g., willful disobedience of instructions properly issued by your supervisor.
2.  Having unauthorized possession or use of Company documents or equipment.
3.  Engaging in acts of theft or sabotage of Company property.
4.  Immoral, disorderly, indecent or harassing conduct, including the use of abusive or profane language.
5.  Theft or sabotage of the property of patients and/or fellow employees.
6.  Engaging in acts of violence or threats of violence toward fellow employees or patients.
7.  Reporting to work having in your possession weapons of any type, intoxicating liquor or illegal drugs.
8.  Reporting to work while under the influence of intoxicating liquor or illegal drugs.
9.  Engaging in behavior designed to create discord and lack of harmony, or willfully restricting work output.
10. Being absent for three consecutive work days without adequate reason or without notifying your immediate supervisor or other designated representative by the start of your shift or immediately thereafter.
11. Falsification of Company documents/records.
12. Distribution of non-Company written or printed material on the Company's premises without authorization.
13. Conducting a lottery or gambling while on Company premises.
14. Sleeping on the job.
15. Willful or habitual disregard for Company safety rules or security.
16. Substandard workmanship, negligence, or inefficiency during the perform- ance of one's duties.
17. Failing to exhibit self-control to customers and/or fellow employees.
18. Violations of the vehicle discipline policy including:
    *   Having unauthorized passengers in Company vans.

21

CONFIDENTIAL

LIN_0000031

- Smoking in Company vehicles or within 25 feet of Company vehicles, or within 50 feet of a standing bulk oxygen tank.
- Failure to report an accident or injury within 24 hours of the occurrence.
- Failure to report any moving violations received within 24 hours of the occurrence (including citations received in your personal vehicle).
- Leaving the scene of an accident involving a Company vehicle.
- Operating a Company vehicle under the influence of alcohol, an amphetamine, a narcotic drug, a formulation of an amphetamine or a derivative of a narcotic drug.
- Personal use of a Lincare vehicle.

19. Not responding to a patient call while "on call."
20. Audio recording, by telephone or otherwise, video recording, or photographing any individual without their express, written consent.
21. Unauthorized access or distribution of employee personnel and/or medical files.
22. Violation of patient confidentiality by unauthorized release of records or information pertaining to health or treatment of a patient.
23. Falsification of expense reports and/or cashing or depositing a Company expense reimbursement issued based on a false expense report.
24. Failure to comply with the Corporate Compliance Program, including the failure to immediately report any actual or perceived violations of healthcare laws or Lincare policies.
25. Being convicted of a felony or drug conviction of any type while employed.
26. Violation of HIPAA or the Electronic Media Policies.

The employment relationship depends upon the mutual consent of the Employee and the Company. Either you or the Company can terminate the employment relationship at will, at any time, without cause or advance notice. Violation of the above rules is not required.

## ATTENDANCE

You are expected to report to work at scheduled starting times, and to remain at work, except for your meal period, until quitting time. Should you find you will be absent or late, you must personally speak to your supervisor prior to, or as soon as possible after, your scheduled starting time, giving the reason for the absence or lateness and when you expect to report to work. This will enable your supervisor to assist you, if possible, and to make the necessary arrangements to keep the center operational in your absence. In addition, you should keep your supervisor informed of changes in your circumstances and plans for return to work whenever your absence will be prolonged. If you have been absent for three (3) or more days due to non-occupational illness or injury, you must be evaluated by your physician and receive a doctor's note before you return to work. If you are returning to work from a work-related illness or injury, you must be seen by the medical provider treating the work-related illness or injury and obtain a certification of your fitness to return to work, regardless of the duration of the absence.

## DRUG FREE WORKPLACE

Lincare is a "Drug Free Workplace" and all employees must comply with this policy. Therefore, employees are prohibited from engaging in the unlawful manufacturing, distribution, dispensing, possession, or use of any controlled substance in the workplace. Violations of this, or other prohibitions of drug use may result in disciplinary action, up to and including discharge, consistent with Lincare's Substance Detection Program.

Employees with questions or concerns about substance use or dependency are encouraged to discuss these matters with their supervisor or the Employee Relations Department to receive referrals to the Employee Assistance Program.

22

Employees with drug or alcohol problems that have not resulted in, and are not the immediate subject of disciplinary action, may request approval to take unpaid time off to participate in a rehabilitation or treatment program, pursuant to and in compliance with the ADA.

Under the provisions of the Drug Free Workplace Act of 1988, you are, as a condition of employment, required to notify the Employee Relations Director or the President or his designee, in writing no later than five days after conviction of, or a plea of guilty to, a violation of a criminal drug statute.

### SUBSTANCE DETECTION PROGRAM

Lincare's Substance Detection Program supplements existing personnel policies, practices and procedures to assure a safe and efficient work environment. This policy includes a general prohibition against being in an impaired condition at the workplace, whether as a result of drugs, alcohol or any other lawful or unlawful substance. This policy also prohibits the possession, on Company property, of drugs, drug paraphernalia, alcoholic beverages or other substances which could lead to impairment, unless authorized and approved. Any violation of this policy may result in summary discipline, up to and including discharge.

Prior to assuming any job, an applicant for employment will be subject to substance screening incidental to a post-offer physical or offer of employment. Refusal to submit to such screening or adulterating a sample will make it impossible to medically classify the applicant, foreclosing any further action on his/her employment.

**Substance Screening** - To assure compliance, employees and applicants for employment may be subject to substance screening under the following circumstances: Employees may be subject to testing upon reasonable evidence of impairment; under State or Federal requirements; and/or involvement in a job related accident or safety incident. Refusal to submit to such screening or adulterating a sample will be considered an act of insubordination with attendant disciplinary and employment consequences.

**Inspections** - For purposes of assuring compliance with the prohibition of possession, employees are subject to inspections of their work area, including desk, files, any Company motor vehicle, personal vehicle, lunch box, wallet or purse and/or outer clothing, without cause or on suspicion of substance possession. Refusal to submit to such an inspection will be treated as an act of insubordination with attendant disciplinary consequences.

### LICENSED STAFF REQUIREMENTS

If you are required to hold a valid license (e.g.: drivers, therapy, nursing) to perform the functions of your position, any changes in the validity of that license must be immediately reported to the company.

### CORPORATE POLICIES

### BUSINESS INTEGRITY AND ETHICS

Lincare's long established reputation for ethical business conduct is a highly prized corporate asset. There are two major safeguards protecting that reputation. The first is Lincare's firm and clearly stated policy on business ethics. The second, and no less important, is the determination of employees to apply their best moral judgement to any situation that presents a question of ethical conduct.

23

LIN_0000033

To make certain that employees everywhere feel secure in applying the highest standards, the Company has set down five principles:

1. Forego any business advantage that cannot be achieved without violating your sense of what is right.
2. Always and without exception, comply in good faith with the Company's policies and observe all laws that apply to our operations, in every location in which we do business.
3. Be concerned not only with honesty but also the appearance of honesty. Giving the impression of dishonesty can be as damaging as actually being dishonest.
4. Seek the opinion of management or counsel whenever in doubt as to whether a practice or proposal conforms to Corporate Policy.
5. Deal promptly and forthrightly with any deviation from policy. A mistake ignored is a problem compounded.

There are no shortcuts or escape clauses in applying these simple precepts.

Lincare intends to maintain its outstanding reputation, and expects the commitment of every employee to help.

### STOCK TRADING POLICY

Transactions by Lincare employees in Lincare Holdings Inc. securities are subject to the federal securities laws that prohibit insider trading and to corporate policy that prohibits taking advantage of material inside information. Information is considered material when there is a substantial likelihood that a reasonable investor would consider the information important in deciding whether to buy, sell or hold Lincare Holdings Inc. securities or in deciding how to vote those securities. Anyone in possession of material non-public information is an insider; you do not have to be a corporate executive or manager. In addition, if you are considered an 'insider', that is, you are in a position where you might possess information unavailable to the general public, you are subject to 'blackout periods' when you are restricted from exercising your options or trading any Lincare Holdings securities (such as from the Employee Stock Purchase Plan). Generally, individuals holding positions of District Manager and higher, Billing Office Managers and anyone working in the corporate office are restricted by these blackout periods.

### COMPLIANCE STANDARDS

As a health care provider, Lincare must assure compliance with Federal and State statutory and regulatory standards. The health care anti-fraud and abuse laws and regulations provide standards that Lincare and its employees are required to follow. Any violation of these legal standards can invoke penalties, which include criminal and/or civil fines and assessments, exclusion from participation in Federal and State health care programs, and imprisonment. To facilitate compliance, Lincare has implemented a Corporate Compliance Program, which imposes certain duties and reporting obligations on every Lincare employee.

The following abbreviated compliance guidelines must be followed by each employee of Lincare.

#### Prohibited Marketing Activities

You are prohibited from offering or paying any remuneration, including cash payments, gifts, or through the provision of equipment or services, to a physician or other individual or entity in order to induce them to refer patients to Lincare.

You are prohibited from automatically shipping reimbursable supplies to a patient without his/her consent.

24

CONFIDENTIAL

LIN_0000034

Prohibited Billing Activities

It is illegal to knowingly and willfully make or cause to be made any false statement or representation of a material fact in any claim for reimbursement submitted to Medicare, Medicaid, or any other federal payor.  Nor should you make such false statements to any other payor.

You are prohibited from signing the physician's name on the Certificate of Medical Necessity (CMN) or written order under any circumstances.

You are prohibited from completing any portion of Sections B or D of the Medicare CMN under any circumstances.

- You are prohibited from highlighting on the CMN.
- You are prohibited from altering the information provided by a physician on a CMN.
- You are prohibited from altering the content of any cover letters provided to physicians in conjunction with CMNs.
- You are prohibited from performing oximetry testing to qualify a patient for oxygen reimbursement from Medicare or any other federal payor, unless specifically stated otherwise in a particular payor's guidelines.
- You are prohibited from knowingly billing for any services or equipment not provided.

Required Compliance Procedures

You are required to immediately report government audit requests or inquiries to the Corporate Compliance Officer.  Center personnel may not respond directly to these government requests or inquiries, no matter how informal such government contacts may be.

You are required to immediately report any suspected or questionable misconduct of any Company personnel or of any competitor or referral source to the Corporate Compliance Officer at 800-284-2006, extension 8273.

No Retaliation

Lincare prohibits retaliation against any individual who reports any suspected or questionable misconduct related to compliance or participates in an investigation of such reports.  Retaliation against an individual for reporting any suspected or questionable misconduct related to compliance or for participating in the investigation of such reports is a serious violation of this policy and will subject an employee to disciplinary action, up to and including immediate discharge.

Please refer to your Compliance Handbook for more complete information concerning Lincare's Corporate Compliance Program.

**REPORTING OF ACCOUNTING CONCERNS**

Employees may submit complaints regarding accounting, internal control or auditing matters in writing to:

Audit Committee
c/o Corporate Compliance Department
19387 U.S. 19 North
Clearwater, FL  33764

25

CONFIDENTIAL

LIN_0000035

All complaints addressed to the Audit Committee will be received by the Corporate Compliance Department. Appropriate complaints will be referred to the Audit Committee Chairman for review. Other complaints will be referred to appropriate Lincare personnel for review.

When submitting a complaint concerning accounting, internal control and auditing practices, please be certain to indicate the nature of your complaint in as much detail as possible to facilitate a thorough investigation of the matter. Confidential, anonymous complaints may be made, however, unless you provide a detailed description of your complaint (including all relevant information such as date of occurrence, location, names of persons involved, specific facts, etc.), it may be difficult or impossible to conduct a proper investigation.

Lincare policy prohibits retaliation against employees for submitting a complaint concerning an accounting, internal accounting control or auditing matter. Neither the Audit Committee nor Lincare will tolerate employee misconduct of any kind, including the making of false or malicious reports. Misconduct will result in disciplinary action, up to and including discharge from employment.

## LINCARE ELECTRONIC MEDIA POLICY

All business equipment, electronic and telephone communications systems, and all communications and stored information transmitted, received or contained in the Company's information systems are the Company's property and are to be used solely for job-related purposes. To ensure proper use of communications systems and business equipment, the Company may monitor the use of these systems and equipment from time to time.

Lincare strictly prohibits non-job-related uses of its software and business equipment, including but not limited to facsimiles, telecopiers, computers and copy machines. Employees also are prohibited from using codes, accessing files or retrieving any stored communications of others without prior permission from an authorized Company representative. No employee may use a pass-word unknown to the Company.

Employees who violate this policy are subject to discipline, up to and including discharge.

The following procedures apply to all electronic media and services which are:
- accessed on or from Company premises,
- accessed using Company computer equipment, or via Company-paid access methods, and/or
- used in a manner which identifies the individual with the Company.

Electronic media may not be used for knowingly transmitting, retrieving or storing any communication which is discriminatory or harassing in nature, derogatory to any individual or group, obscene, defamatory or threatening in nature, intended for use as a 'chain letter', or which in any way is illegal or against Company policy or contrary to the Company's interest. Sending harassing or unwelcome messages via email, text messages and/or posting on social networking sites is strictly prohibited.

Electronic information created and/or communicated by an employee using e-mail, word processing, utility programs, spreadsheets, voicemail, telephones, Internet/BBS access, etc. will not generally be monitored by the Company. However, the following conditions should be noted:
- The Company routinely monitors usage patterns for both voice and data communications (e.g., number called or site accessed; call length; times of day). Reasons include

26

LIN_0000036

cost analysis/allocation, and the management of our gateway to the Internet.

- The Company also reserves the right, at its discretion, to monitor any employee's electronic files and messages, including stored voicemail messages and usage (including Internet usage) to the extent necessary to ensure that electronic media and services are being used in compliance with the law and with this and other Company policies.
- Employees should therefore not assume electronic communications are private and confidential and should transmit highly sensitive information in other ways.

Employees must respect the confidentiality of other employee's electronic communications and may not attempt to read or "hack" into other employee's systems or logins, attempt to "crack" passwords, breach computer or network security measures, or monitor electronic files or communications of other employees or third parties except by explicit direction of Company management.

No e-mail or other electronic communication may be sent which attempts to hide the identity of the sender, or represent the sender as another employee or someone from another Company.  No outside vendor e-mail services are allowed for use on company computers, i.e.; only the company's internal system may be used for e-mail.

Electronic media and services should not be used in a manner that is likely to cause network congestion or significantly hamper the ability of other people to access and use the system.  The use of customized backgrounds, non-business related quotes, slogans and/or pictures is prohibited.

Anyone obtaining electronic access to other companies' or individuals' materials must respect all copyrights and may not copy, retrieve, modify, or forward copyrighted materials except as permitted by the copyright owner or as a single copy for reference use only.

All communications, messages or information sent by an employee to one or more individuals via a network are statements identifiable and attributable to our Company.  All communications sent by employees via a network must comply with this and other Company policies, and may not disclose any confidential or proprietary Company information.

Any employee found to be abusing the privilege of Company facilitated access to electronic media or services will risk having the privilege of electronic access removed for himself/herself and possibly other employees and/or will be subject to discipline up to and including discharge.

No employee may record, either by audio, visual, or other electronic means, conversations of any other individual(s) without their prior written permission.  **Violation of this policy may result in immediate discharge.**

### Internet Usage:
Lincare provides limited access to the internet in some of its facilities.  The Internet represents a useful tool for Lincare in conducting its business, but like any other tool, it must be used properly.  For purposes of this policy, "Internet" includes any public electronic data communications network.

Internet email offers broadly similar capabilities to other email systems, except that correspondents are external to Lincare.  External email messages may carry one or more attachments.  An attachment may be any kind of computer file, such as a word processing document, spreadsheet, software program, or graphic image.

As a general rule, employees may not forward, distribute, or incorporate into another

27

LIN_0000037

work, material retrieved from a web site or other external system. Very limited or fair use may be permitted in certain circumstances. Any employee desiring to reproduce or store the contents of a screen or web site should contact the legal department to ascertain whether the intended use is permissible.

Use of the World Wide Web includes all restrictions which apply generally to the use of Lincare e-mail and other electronic and telephonic equipment, as noted above. In addition, the following rules apply with respect to Internet usage:

- **No browsing of restricted content web sites.** Lincare has blocked access to web sites which contain pornographic material. However, the World Wide Web changes on a daily basis. In this connection, users who find new sites, which the Company has not yet blocked, are required to report such sites to the appropriate individuals in the Systems Department.

- **No downloading of non-business related data.** Lincare allows the download of files from the Internet. However, downloading files should be limited to those which relate directly to Lincare business.

- **No downloading of application programs.** Lincare does not permit the download or installation on Lincare computers of application software from the Internet. Such software may not only contain embedded viruses, but also is untested and may interfere with the functioning of standard Lincare applications.

- **No participation in web-based surveys without authorization.** When using the Internet, the user implicitly involves Lincare in his/her expression. Therefore, users should not participate in Web or email based surveys or interviews without written authorization.

- **No use of subscription services without prior approval.** Some Internet sites require that users subscribe before being able to use them. User should not subscribe to such services without the express written approval of Lincare management.

- **No violation of copyright.** Many of the materials on the Internet are protected by copyrights. Even though they may seem to be freely accessible, many of the intellectual property laws which apply to print media still apply to software and material published on the Internet. Employees are permitted to print out web pages and to download material from the Internet for informational purposes as long as the purpose for such copying falls into the category of "fair use". Please do not copy or disseminate material which is copyrighted. Employees having any questions regarding such material should contact the legal department for guidance.

- **No disclosure of confidential or proprietary information on the Internet, whether using Company equipment or otherwise.**

<u>Security incidents:</u>

All employees, regardless of position, are responsible for reporting known or suspected security incidents. A security incident is defined as "the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with systems operations in an information system.

Failure to report a known or suspected security incident is a violation of Lincare policy and will subject the employee to discipline, up to and including termination of employment. No one may stop you from reporting a security incident.

28

CONFIDENTIAL

LIN_0000038

The Lincare Security Hotline Phone Queue is 1-888-636-6301. While calls may be made anonymously, to facilitate a proper response from the Security Incident Group, callers must leave the location where the incident occurred.

**Password/User ID:**

It is the responsibility of each employee to protect their own personal access to Lincare's computer systems. Each employee must use his or her own username/password combination when logging-on to a Lincare computer. Lincare specifically prohibits the sharing of username/password combinations.

Employees without a valid username must contact their immediate manager. Attempting to logon with the username/password combination of another employee may result in discipline up to, and including, termination of employment.

**Malicious Software:**

The following restrictions have been established to prevent the introduction of malicious software into the computer systems and networks of Lincare:

- Employees are prohibited from bringing any type of computer software into the workplace.

- Employees are prohibited from bringing electronic data storage media into the workplace.

- Employees are prohibited from bringing any computer hardware into the workplace.

- Anyone wishing to introduce new software and/or hardware into their location must first secure the approval of both their immediate manager and Field Support.

Employees that violate these restrictions are subject to discipline.

As a condition of employment, employees are required to sign a form acknowledging their understanding of this policy.

## CELL PHONES AND ELECTRONIC DEVICES

It is Lincare's policy that our employees will comply with state/local laws regarding the use of cell phones and other electronic communication and/or navigation devices (blackberries, two-way radios, GPS units) while driving company vehicles or while driving personal vehicles on company time/business.

In areas where the use of cell phones and other electronic communication and/or navigation devices is prohibited while driving, employees will not dial or receive calls, initiate or respond to communications through a two-way radio, create or view text messages, read messages on pagers or enter addresses into GPS units while actively driving. All such activity must be conducted while the vehicle is parked. The only exception is if the employee personally owns and uses devices that allow for completely hands-free operation of the cell phone or electronic communication/navigation device.

In areas where the use of cell phones and other electronic communication and/or navigation devices is not restricted, employees are not to create or view text messages, read messages on pagers or enter addresses into GPS units while actively driving company vehicles or personal vehicles on company time/business. All such activity must be conducted while

29

CONFIDENTIAL

LIN_0000039

the vehicle is parked.  Cell phones and two-way radios may be used with caution for brief, business-related communications.  If the employee personally owns hands-free devices, they should be used at all times.

Use of personal cell phones in office areas should be limited to breaks/lunch periods and true emergency situations.

## SOLICITATION AND DISTRIBUTION

Solicitation and/or distribution of literature by non-employees on Lincare property is strictly prohibited.  Solicitation by employees during working time is strictly prohibited. Distribution of literature in work areas is also strictly prohibited.

## REPORTING OF IRREGULARITIES

Any actual or suspected irregularities must be promptly reported to management.

M. R. Schuetzler, Employee Relations Director,  has been designated as your direct contact for the reporting of any known or suspected irregularities, conflict of interest or issues of business integrity and ethics. Our Corporate Compliance Officer has been designated as your direct contact for the reporting of any known or suspected compliance violations.  You should feel free to contact either of them directly by letter or telephone (1-800-284-2006) and be assured that any communication will remain confidential to the extent permitted under the circumstances.

J. P. Byrnes
CEO

30

CONFIDENTIAL

LIN_0000040

# EXHIBIT 6

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF KANSAS
 2
 3
    SHAWRON LOUNDS,
 4
           Plaintiff,
 5
    vs.                Case No. 13-CV-1091
 6
    LINCARE, INC.,
 7
           Defendant.
 8  _ _ _ _ _ _ _ _ _ _ _ _ _ /
 9
    VIDEOTAPED
10  DEPOSITION OF:  LINDA FELLER, Authorized
    Representative of Defendant Pursuant to
11  Fed.R.Civ.P. 30(b)(6)
12
    DATE:      October 14, 2013
13
    TIME:      9:53 a.m. to 1:09 p.m.
14
    PLACE:     Michael Musetta & Associates, Inc.
15             3000 Gulf to Bay Boulevard
               Suite 310
16             Clearwater, Florida
17  PURSUANT TO:  Notice by counsel for
               Plaintiff for purposes of
18             discovery, use at trial
               or such other purposes
19             as are permitted under
               the Federal Rules
20             of Civil Procedure
21  BEFORE:    LISA A. SIMONS-CLARK, RMR, CRR
               Notary Public, State of
22             Florida at Large
23
               Pages 1 to 153
24
25
```

Page 2

```
 1  APPEARANCES:
 2    KIRK D. HOLMAN, ESQUIRE
      Holman Schiavone, LLC
 3    4600 Madison, Suite 810
      Kansas City, Missouri 64112
 4    (816) 283-8738
           Attorney for Plaintiff
 5
      STEPHANIE N. SCHECK, ESQUIRE
 6    Stinson Morrison Hecker, LLP
      1625 North Waterfront Parkway, Suite 300
 7    Wichita, Kansas 67206-6620
      (316) 265-8800
 8         Attorney for Defendant
 9  ALSO PRESENT:
10    Mick Bowman, the videographer
11
12              INDEX
13                           PAGE
14  DIRECT EXAMINATION BY MR. HOLMAN        4
    CROSS-EXAMINATION BY MS. SCHECK        141
15  CERTIFICATE OF OATH              150
      REPORTER'S CERTIFICATE         151
16  DEPOSITION ERRATA SHEET          152
      ERRATA SHEET                   153
17
18
            PLAINTIFF'S EXHIBITS
19
                  ID'd  MARKED
20  1 - Notice to Take Videotaped Deposition    5    4
    2 - "About Your Company" Handbook      8    7
21  3 - 1/30/12 Lincare In-Service Record    31   31
    4 - 1/27/12/Final Written Warning/Ms. Kempke 42  42
22  5 - 1/27/12/Final Written Warning/Ms. Kraft 50  50
    6 - 4/26/12 Documented Counseling      59   58
23  7 - Charge filed by Ms. Lounds         61   61
    8 - 4/23/12 Paula Adams E-mail         62   61
24  9 - 4/26/12 Linda Feller E-mail        66   66
    10 - 6/22/12 document written by Ms. Feller  74  74
25  11 - 7/24/12 document written by Ms. Feller  80  79
```

Page 3

```
 1      PLAINTIFF'S EXHIBITS, CONTINUED
 2              ID'd  MARKED
    12 - 3/14/12 document written by Ms. Feller  69   68
 3  13 - 7/24/12/Final Written Warning/Ms. Renard 81   81
    14 - Affidavit with documents 146 to 241   86   86
 4  15 - 9/11/12 document written by Ms. Feller  87   87
    16 - 9/20/12 release from work slip      88   88
 5  17 - 9/21/12 document written by Ms. Feller  91   91
    18 - Injury Data Card                    98   98
 6  19 - 7/19/12 Feller/Lounds E-mails      101  101
    20 - E-mail from Dr. Donaldson/release/
 7      three-page letter                  104  103
    21 - 7/27/12 printout/details/Dr. Donaldson 108  108
 8  22 - 7/27/12 letter from Feller to Lounds  109  109
    23 - 9/12/12 letter from Feller to Lounds  113  113
 9  24 - April 4 and April 5, 2012 E-mails   123  123
    25 - 2/6/11 letter from Lounds to McCarthy 125  125
10  26 - 9/24/12 E-mail from Feller to Kraft  128  128
    27 - Authorization for Medical Treatment or
11      Exam                             133  133
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        THE VIDEOGRAPHER:  This is the videotaped
 2   deposition -- pardon me.  This is the videotaped
 3   deposition of Linda Feller taken in the matter of
 4   Lounds vs. Lincare held in Clearwater, Florida, on
 5   October the 14th, 2013, at approximately 9:53 a.m.
 6        Will counsel please introduce themselves,
 7   beginning with the plaintiff.
 8        MR. HOLMAN:  Kirk Holman for Plaintiff Shawron
 9   Lounds.
10        MS. SCHECK:  Stephanie Scheck for Defendant
11   Lincare.
12        THE VIDEOGRAPHER:  Thank you very much, and
13   would the court reporter please swear the witness.
14              LINDA FELLER,
15   the witness herein, being first duly sworn on oath, was
16   examined and deposed as follows:
17        THE WITNESS:  Yes.
18           DIRECT EXAMINATION
19   BY MR. HOLMAN:
20   Q.  Would you state your name, please?
21   A.  Linda Feller.
22   Q.  Okay.  Ms. Feller, I'm going to hand to you
23   what we'll mark deposition Exhibit 1.
24        (Plaintiff's Exhibit No. 1 was marked for
25   identification.)
```

Page 21

1    individuals, I don't think it's necessary to put a
2    telephone number in the policy.
3  BY MR. HOLMAN:
4    Q.   Let me ask you this, ma'am.  I see in your
5  writings that you're an SPHR; is that right?
6    A.   That's correct.
7    Q.   What does that mean?
8    A.   Senior Professional in Human Resources.
9    Q.   How long have you been doing it?
10   A.   Since 2001.
11   Q.   Okay.  Haven't you come to understand, based
12 on your training, experience, and education, that it's
13 important for an employer to communicate to its
14 employees the manner in which they can complain about
15 discrimination at the workplace?
16   A.   Yes.
17   Q.   Okay.  And haven't you learned, based on your
18 certification as an SPHR, that one of the -- one of the
19 ways that an employer effectively communicates and
20 prevents harassment at the workplace is by providing a
21 1-800 number so that employees can call that free of
22 charge?
23   A.   Yes.
24   Q.   All right.  Now, first of all --
25   A.   If I may --

Page 22

1    Q.   -- is a region manager -- first of all, is
2  that Mr. McCarthy's title?
3    A.   Mr. McCarthy is -- was at the time the region
4  manager for her area as well as being a vice president.
5    Q.   Okay.
6    A.   He is no longer the region manager for that
7  area.
8    Q.   So when we look -- so if we look at E-mails
9  during this time period, it will be signed
10 Greg McCarthy, Region Manager?
11   A.   Not necessarily.
12   Q.   Okay.  It will be signed Vice President, will
13 it not?
14   A.   I've not seen his signature, so --
15   Q.   Well, what do you think?  What --
16   A.   I'm going to guess he would put his senior
17 most title of the many hats he wears.
18   Q.   And what would have been his senior
19 most title during Ms. Lounds' employment?
20   A.   Vice president.
21   Q.   Okay.  And, in fact -- well, let me ask you
22 this:  Who's the employee relations director that is
23 listed as a person to communicate a complaint to under
24 Field Locations?
25   A.   There's not a name.

Page 23

1    Q.   Well, who is it?
2    A.   Oh, is that your question?
3    Q.   Yeah.
4    A.   I'm sorry.  I didn't understand.  Her name is
5  Paula Adams.
6    Q.   Okay.  And who's the human resources manager?
7    A.   At the time Ms. Lounds was employed, there
8  were two of us.
9    Q.   Okay.  Who is that?
10   A.   There are still two of us.  One of them is me.
11 The other is Sheila Dilly.
12   Q.   All right.  Are all those -- are all those
13 persons, listed as people for employees like Ms. Lounds
14 to complain in the event that he or she believes
15 they've been harassed, located in Florida?
16   A.   Yes.
17   Q.   Okay.  And in the policy concerning
18 harassment, sexual and racial harassment, none of those
19 individuals are identified by name; is that right?
20   A.   What page are you looking at?
21   Q.   Well, with regard to Exhibit 2, the policy
22 concerning harassment, sexual and racial harassment,
23 would you agree that none of the individuals that are
24 identified as people to whom an employee should
25 complain in the event he or she believes they've been

Page 24

1  discriminated against is identified by name?
2    A.   That is correct.
3    Q.   Okay.  Why is that?
4    A.   Because it's not reasonable to think that we
5  would print a new handbook every time someone left the
6  company.
7    Q.   Okay.  Is it -- do you think it's unreasonable
8  to provide a 1-800 number to employees?
9    A.   We have provided a 1-800 number to employees.
10 It's just not in the handbook.
11   Q.   Okay.
12   A.   It's in a place that's more redible -- readily
13 available to the employees than most of them keep their
14 handbooks.
15   Q.   But do you agree that a 1-800 number should be
16 provided in the actual policy that employees relief --
17 sign a release -- I mean, an employee, when Lincare
18 hires them, signs some kind of document acknowledging
19 that he or she has received what we've marked
20 Exhibit 2, right?
21   A.   That's correct.
22   Q.   Why?  Why does Lincare take the time to have
23 an employee sign an acknowledgment that he or she has
24 received what we've marked as Exhibit 2?
25   A.   So we have their commitment that they will be

Page 29

1    Q.   And would it be a fair statement that one of
2  the ways that Lincare endeavors to be fair with regard
3  to its employees is to look at the claim objectively?
4    A.   Yes.
5    Q.   And in looking at a claim objectively, would
6  it be a fair statement that Lincare employees are more
7  likely to be true than not true standard?
8        MS. SCHECK:  Object to the form.
9        THE WITNESS:  I don't understand the question.
10 BY MR. HOLMAN:
11   Q.   Well, when you determine that discipline is
12 warranted in the event that someone is accused of
13 violating Lincare's policy prohibiting harassment --
14   A.   Yes.
15   Q.   -- you must employ some type of standard as to
16 determine the validity of the complaint, correct?
17   A.   I still don't understand the question.
18   Q.   Well, do you simply assume that that --
19 because someone has complained, it's true?
20   A.   We will usually try to get at least one other
21 person to corroborate the story.
22   Q.   Okay.  So if I understand you then, then
23 basically you want at least some corroboration from
24 another disinterested person?
25   A.   When it's available, yes.

Page 30

1    Q.   Okay.  Now, if you have corroboration, okay,
2  and you conclude that a violation has -- well, let me
3  just ask you:  How does Lincare go about determining
4  whether or not a violation has occurred?
5    A.   By conducting an investigation.
6    Q.   Okay.  And when Lincare has concluded its
7  investigation, it looks at the totality of
8  circumstances; is that right?
9    A.   Yes.
10   Q.   Okay.  And based on the totality of
11 circumstances, it makes a decision.
12   A.   Yes.
13   Q.   Okay.  Now, you've -- you've heard proof
14 beyond a reasonable doubt, right?
15   A.   Have I heard the phrase?
16   Q.   Yeah.
17   A.   Yes.
18   Q.   Okay.  That's not what you employ in human
19 resources, is it, when making a decision?
20   A.   Typically, no.
21   Q.   Okay.
22   A.   That's not an option.
23   Q.   All right.  What kind of standard do you use?
24   A.   I don't know if there's a name for it.
25   Q.   More likely true than not true?

Page 31

1    A.   I could buy that.
2    Q.   Okay.  Would it be a fair statement that would
3  be kind of the, you know, when determining at the end
4  of the investigation and looking at all the facts,
5  Lincare makes a determination based on, well, what's --
6  looking at everything here, what's more likely true
7  than not true?
8    A.   Yes.
9    Q.   Okay.
10       (Plaintiff's Exhibit No. 3 was marked for
11 identification.)
12 BY MR. HOLMAN:
13   Q.   I'm going to hand to you what's been marked
14 Exhibit 3.  Can you identify Exhibit 3 for us?
15   A.   Exhibit 3 is the sign-in sheet for the
16 training in-service that happened on January 30th,
17 2012.
18   Q.   All right.  And at the top there is a
19 handwritten entry Lounds, Shawron.  Do you see that?
20   A.   Yes.
21   Q.   Do you -- do you have any understanding as to
22 whose handwriting that is?
23   A.   No.
24   Q.   Do you have any understanding as to why
25 Ms. Lounds' name appears at the top of what we've

Page 32

1  marked Exhibit 3?
2    A.   Probably so that it could be placed in her
3  personnel file, but no, I don't know for sure.
4    Q.   Okay.  Do you have any understanding as to why
5  this in-service -- in-service training session
6  regarding the Anti-Discrimination/Anti-Harassment
7  Policy occurred?
8    A.   Yes.
9    Q.   Why?
10   A.   On January 27, 2012, Greg McCarthy was
11 visiting the Wichita location, and Amber Renard
12 reported her belief that some things had been said that
13 had racial overtones.
14   Q.   Okay.  And who's Amber Renard?
15   A.   A customer service representative at the time
16 in Wichita.
17   Q.   We talked earlier about Greg McCarthy with
18 regard to the policy prohibiting discrimination as an
19 individual who is identified to receive complaints; is
20 that correct?
21   A.   Yes.
22   Q.   How often was Greg McCarthy at the Wichita
23 call center where Ms. Lounds worked?
24   A.   I have no idea.
25   Q.   How often do you -- well, does Lincare take

1 harassment, correct?

2    A.   That's correct.

3    Q.   And Ms. Renard, who raised the issue of the

4 alleged harassment, correct?

5    A.   That's correct.

6    Q.   Now, is there any reason that you can think of

7 as a human resources professional why it would not have

8 been appropriate to interview other hourly employees

9 with regard to the matter that was brought to the

10 attention of Mr. McCarthy?

11   A.   I believe that Ms. Adams felt like they were

12 credible in their reporting of the incidents and that

13 two individuals, as we talked about earlier, told the

14 same story about what had happened, and so she felt it

15 was not necessary to interview other employees.

16   Q.   And, in fact, apparently one of the

17 individuals who was accused of making discriminatory

18 comments in violation of Lincare's policy prohibiting

19 harassment wasn't interviewed; is that right?

20   A.   Say that again.

21   Q.   Well, who's -- Exhibit 4 was issued to a

22 Laynee Kempke; is that right?

23   A.   That's correct.

24   Q.   Was she interviewed?

25   A.   No.

1    Q.   Was Kevin Kunz interviewed?

2    A.   No.

3    Q.   Was Suzanne Kraft interviewed?

4    A.   Not that I know of.

5    Q.   Why?

6    A.   That Ms. Adams did not feel it was necessary.

7    Q.   Okay.  Well, let's look at Exhibit 4.

8 Exhibit 4, in the second full paragraph, reads, Your

9 actions and behavior have created an uncomfortable

10 working environment for at least some of the staff and

11 violate Lincare's Anti-Discrimination/Anti-Harassment

12 policy.  Did I read that correctly?

13   A.   Yes.

14   Q.   All right.  So going back to what you told us

15 earlier about Lincare's standard when it has the facts

16 in front of it --

17   A.   Uh-huh.  (Indicates affirmatively).

18   Q.   -- Lincare determined, more likely to be true

19 than not true, that Mr. -- Ms. Lempke (sic) violated

20 the policy; is that right?

21   A.   That's correct.

22   Q.   All right.  And if we look at the policy in

23 Exhibit 2 --

24   A.   What page?

25   Q.   26.

1    A.   Your 26?

2    Q.   Lin -- LIN26, yes.

3    A.   Okay.

4    Q.   Right there.  If we look at LIN26 in

5 Exhibit 2, the policy regarding harassment is defined

6 as behavior that is not welcome, that is personally

7 offensive, debilitates morale, and interferes with work

8 effectiveness.  Did I read that correctly?

9    A.   I don't see where you're reading.

10   Q.   I'm sorry.  Right there.

11   A.   Okay.  Yes.

12   Q.   All right.  So would it be a fair statement

13 then, consistent with your earlier testimony, that

14 Lincare determined that the alleged behavior involving

15 Ms. Lempke --

16   A.   Kempke.

17   Q.   Kempke.  I'm sorry.  -- debilitated --

18 debilitates morale and interferes with work

19 effectiveness?

20   A.   I don't know if that's as relevant as the part

21 that is personally offensive.

22   Q.   Okay.  Well, was there any determination by

23 Lincare as to whether or not the harassment was

24 welcome?  Wasn't there a determination that it was

25 unwelcome?

1    A.   Yes.

2    Q.   Okay.  Can we agree that it was subjectively

3 offensive to Ms. Lounds?  Lincare --

4    A.   Yes.

5    Q.   Lincare determined, more likely to be true

6 than not true, it was subjectively offensive to

7 Ms. Lounds?

8    A.   Yes.

9    Q.   Okay.  Can we agree that Lincare determined

10 that the conduct had the purpose or effect of

11 interfering with an individual's work performance?

12   A.   I don't know that it interfered with anyone's

13 work performance.

14   Q.   Okay.  Can we agree that Lincare determined it

15 created an intimidating, hostile, or offensive work

16 environment?

17   A.   I don't think we can agree on that, no.

18   Q.   No?  Why not?

19   A.   I think that true harassment relies on the

20 behavior being severe or the comments being severe and

21 pervasive.

22   Q.   You mean more pervasive?

23   A.   Okay.  "Or."

24   Q.   Okay.

25   A.   And I don't think either one of them were the

Page 49

1  case here.
2     Q.  All right.  So you don't think -- you don't
3  think the conduct that Ms. Lounds communicated as of
4  January 27, 2012, was severe; is that right?
5     A.  I don't believe it was severe.
6     Q.  Okay.  And that's -- that's Lincare's
7  position; is that right?
8     A.  Yes.
9     Q.  Okay.  And Lincare's position is the conduct
10 that was reported to it on January 27th, 2012, was not
11 pervasive?
12    A.  Correct.
13    Q.  Okay.  So in what way did Ms. Kempke violate
14 the policy?
15    A.  I think we agreed earlier that it was
16 personally offensive.
17    Q.  That's it?  That's the only -- that's the only
18 way?
19    A.  And unwelcome.
20    Q.  Okay.  And so the only way that Ms. Kempke
21 violated the policy with regard to harassment, in
22 Lincare's eyes, was that it was personally offensive to
23 Ms. Lounds, correct?
24    A.  That's right.
25    Q.  And in addition, it was not -- it was

Page 50

1  subjectively offensive to Ms. Lounds?
2     A.  Yes.
3     Q.  Okay.  By the way, do you -- can you see how,
4  as a -- as a trained human resources professional,
5  someone who hit -- who is accused of harassment and
6  never interviewed but found to have been guilty of
7  alleged harassment or a policy prohibiting harassment
8  at the workplace may be a little bit angry?
9         MS. SCHECK:  Object to the form.
10        THE WITNESS:  Yes.
11 BY MR. HOLMAN:
12    Q.  That's kind of human nature, isn't it?
13    A.  Of course.
14        (Plaintiff's Exhibit No. 5 was marked for
15 identification.)
16 BY MR. HOLMAN:
17    Q.  Let me hand you what's been marked Exhibit 5.
18 Exhibit 5 is a Final Written Warning to Suzanne Kraft
19 dated January 27, 2012; is that right?
20    A.  Yes.
21    Q.  Now, Suzanne Kraft was a center manager as of
22 January 2012 when this document was created; is that
23 right?
24    A.  Yes.
25    Q.  What's a center manager?

Page 51

1     A.  A center manager runs a small business unit
2  for the company.  In this case, it was one of our
3  larger small business units in Wichita.
4     Q.  Okay.  And when you say that the center
5  manager runs that small business unit, what do you mean
6  by "runs"?
7     A.  She is responsible for overseeing the patient
8  care that the company provides, for taking patient
9  complaints, ordering inventory, staffing, and local
10 employee relations matters.
11    Q.  All right.  Now, we've talked about
12 Jeremy Felts prior to my question, and he was -- he was
13 employed as a -- as a district manager; is that right?
14    A.  That's correct.
15    Q.  What is a district manager?
16    A.  A district manager is the next-in-line manager
17 after the center managers.  He has a number of center
18 managers that report to him -- bless you -- and a large
19 part of the district managers' responsibility is
20 managing sales.
21        So our sales representatives report to a
22 center manager but have a very heavy dotted line
23 accountability to the district managers.
24    Q.  Okay.  Do you know where Mr. Felts' office
25 was?  Did he have an office as of January 2012?

Page 52

1     A.  He probably did, but I don't know where it
2  was.
3     Q.  Okay.  And in Exhibit 5 -- by the way, who --
4  do you know who created Exhibit 4, the Final Written
5  Warning for Ms. Kempke?
6     A.  Paula Adams.
7     Q.  Okay.  And similarly with regard to Exhibit 5,
8  the Final Written Warning for Ms. Kraft, who created
9  that?
10    A.  Paula Adams.
11    Q.  Okay.  It reads at the beginning, Your actions
12 are not supporting the goals and operations of the
13 Wichita, Kansas center and Lincare.  It has been
14 reported by more than one individual that you have made
15 inappropriate, racially motivated comments in the
16 center.  Did I read that correctly?
17    A.  Yes.
18    Q.  All right.  What are the inappropriate
19 racially motivated comments that are referenced here in
20 Exhibit 5?
21    A.  I believe there were a number of different
22 versions of Ms. Lounds first name, Sharonda, Shaniqua;
23 and then prior to Mr. McCarthy's visit, something to
24 the effect of, let's just all say, Yes, Massa, when he
25 asks us a question.

Page 57

1    Q.   Okay.  Do you know how long the conduct was
2  occurring prior to January of 2012?
3    A.   I do not.
4    Q.   So you have no idea as you sit here today?
5    A.   It couldn't have been more than four months.
6    Q.   Isn't one month sufficient, according to
7  Lincare policy --
8        MS. SCHECK:  Object to the on form.
9  BY MR. HOLMAN:
10    Q.   -- for it to be considered severe?
11        MS. SCHECK:  Object to the form.
12        THE WITNESS:  If it is said one time in
13    one month, it's not severe.
14  BY MR. HOLMAN:
15    Q.   Okay.  Now, you had testified earlier that
16  it's human nature for an employee or an individual who
17  is accused of discrimination, not interviewed and
18  written up, to be angry about it, right?
19    A.   Sure.
20    Q.   Okay.  And did you speak with -- did Lincare
21  speak with Ms. Kraft about the need on her part to
22  restrain that anger?
23    A.   I don't know the answer to that.
24    Q.   Okay.  Wouldn't you agree that that would have
25  been an important aspect of this investigation?

Page 58

1    A.   What, for someone to have that conversation
2  with her or for me to know?
3    Q.   Well, both.
4    A.   It's very different questions.  I'm not saying
5  that that conversation didn't happen.  I'm saying I
6  don't know if it did.
7    Q.   So as a representative of Lincare, you can't
8  testify that it happened; is that right?
9    A.   That's correct.
10    Q.   Okay.  But you would agree, as a
11  representative of Lincare, that conversation should
12  have happened?
13    A.   Yes.
14    Q.   And why would it be important for a
15  conversation like that to happen with someone like
16  Ms. Kraft?
17    A.   In order to prevent retaliation.
18    Q.   And it would be particularly important to have
19  that conversation with someone like Ms. Kraft because
20  she was a management-level employee of Ms. Lounds, was
21  she not?
22    A.   Yes.
23    Q.   Now, I want to hand to you what we'll mark
24  Exhibit 6.
25        (Plaintiff's Exhibit No. 6 was marked for

Page 59

1  identification.)
2  BY MR. HOLMAN:
3    Q.   Exhibit 6 is a Documented Counseling issued to
4  Shawron Lounds dated April 26, 2012; is that right?
5    A.   That's correct.
6    Q.   All right.  Have you seen this prior to today?
7    A.   Yes.
8    Q.   In the second paragraph, it right -- it reads,
9  You were hired September 27, 2011.  Since that time,
10  you have missed an excessive amount of unscheduled time
11  off work; and then it goes to list the dates on which
12  Ms. -- Ms. Lounds missed work or missed un -- missed
13  work on an unscheduled basis; is that right?
14    A.   That's correct.
15    Q.   Okay.  Now, looking at those dates, it looks
16  like there are one, two, three, four, five, six, seven,
17  eight, nine, 10, 11, 12, 13, 14, 15, 16, 17, 18 days
18  from September 26th, September 27th to the date of this
19  counseling on April 26th; is that right?
20    A.   That's correct.
21    Q.   Now, at what point, according to Lincare
22  policy, did these absences that are listed here become
23  something that should have been a concern of management
24  to go into the progressive disciplinary policy of
25  document -- of documented counseling?

Page 60

1    A.   Lincare's attendance policy does not dictate
2  at what level.
3    Q.   Okay.
4    A.   We let each business unit determine what they
5  feel is excessive.
6    Q.   All right.
7    A.   I personally would not have let it go that
8  long.
9    Q.   All right.  So it's up to the discretion -- so
10  what you're telling us is that it's up to the
11  discretion of management to determine whether or not
12  it's become excessive?
13    A.   Yes.
14    Q.   And you said you personally wouldn't have let
15  it go that long.  What did you mean by that?
16    A.   Am I speaking now as a Lincare
17  representative --
18    Q.   No, no.
19    A.   -- or as a Lincare manager myself?
20    Q.   Let me ask you -- let me just reframe my
21  question so we can be more specific on that issue.  As
22  a human resources professional who is knowledgeable of
23  Lincare's policies regarding tardiness and the need to
24  work, at what point would you have considered the
25  unscheduled absences listed here in Exhibit 6 to be

Page 61

1 excessive?
2    A.   Probably by the fourth one.
3    Q.   Okay.  So -- but you -- but again, you are
4 speaking as a -- as an individual when you said "by the
5 fourth one."  Is that fair?
6    A.   Yes.
7    Q.   Okay.
8        (Plaintiff's Exhibit No. 7 was marked for
9 identification.)
10 BY MR. HOLMAN:
11    Q.   Let me hand you what's been marked Exhibit 7.
12 Exhibit 7 is a notice of a complaint alleging --
13 Exhibit 7 is a notice of a complaint that Ms. --
14 Ms. Lounds filed with the State of Kansas and attached
15 a number of documents, including her charge submitted
16 to the Kansas Human Rights Commission; is that right?
17    A.   That's correct.
18    Q.   All right.  There's no question that Lincare
19 had received what we've marked Exhibit 7 prior to the
20 documented counseling marked Exhibit 6; is that
21 correct?
22    A.   Correct.
23    Q.   Okay.
24        (Plaintiff's Exhibit No. 8 was marked for
25 identification.)

Page 62

1 BY MR. HOLMAN:
2    Q.   Let me hand you what we'll mark Exhibit 8.
3 Exhibit 8 appears to be an E-mail from Paula Adams to
4 Jeremy Felts with a courtesy copy to
5 Karen Schanbacher -- is that how you pronounce it?
6    A.   Yes.
7    Q.   -- and yourself, Ms. Feller; and in this
8 E-mail there are some -- there's some discussion
9 regarding time records of folks at -- at the Wichita
10 facility; is that right?
11    A.   Yes.
12    Q.   And in particular, there's a reference in the
13 second paragraph on the first page of Exhibit 8 to
14 Shawron Lounds; is that right?
15    A.   Yes.
16    Q.   Okay.  Why was this examination undertaken
17 that we've marked Exhibit 8?
18    A.   Mr. Felts reached out to Ms. Adams and asked
19 if it would be appropriate to begin the corrective
20 action process with Ms. Lounds based on her excessive
21 absenteeism.
22    Q.   Okay.  And do you know when Mr. Felts reached
23 out to Ms. Adams?
24    A.   I do not.
25    Q.   Was it by way of E-mail or a phone call?

Page 63

1    A.   Probably a phone call or else she would have
2 done a reply.
3    Q.   And we look at Exhibit 7, the information from
4 the Kansas Human Rights Commission was sent to the
5 Lincare facility at 7777 East Osie Street, Suite 301;
6 is that right?
7    A.   That's correct.
8    Q.   And that's in Wichita, Kansas?
9    A.   Yes.
10    Q.   What -- is that the facility at which
11 Ms. Lounds was working?
12    A.   Yes.
13    Q.   How was this directed to the attention of
14 human resources in Clearwater?
15    A.   I believe I got a phone call from Ms. Kraft
16 saying I've received something from the Kansas Human
17 Rights Commission.  I think it should probably go to
18 you.
19    Q.   Okay.  Did you speak to Ms. Kraft about the
20 contents?
21    A.   No.  Not at that time.
22    Q.   Did you speak to Mr. Felts at any point prior
23 to April 23rd regarding the charge of discrimination
24 filed with the Kansas Human Rights Commission?
25    A.   No.

Page 64

1    Q.   Why not?
2    A.   Because I wanted to work on my response and
3 then talk to them to help -- get them to help me fill
4 in any of the blanks.
5    Q.   Okay.  In Exhibit 8 there is a handwritten
6 entry regarding a Cindi Curry?
7    A.   Uh-huh.  (Indicates affirmatively.)
8    Q.   Do you see that?
9    A.   I do.
10    Q.   And it says "termed 4/13/12."  Can you
11 identify the author of that entry?
12    A.   That's my writing.
13    Q.   Okay.  Were you involved in this process of --
14 of looking at the hours of folks in the Wichita center?
15    A.   No.  Not for this particular time, no.
16    Q.   Was there any discussion with Ms. Adams about
17 the fact that issuing a documented counseling after
18 receipt of a charge of discrimination may look
19 retaliatory?
20    A.   No.
21    Q.   Was there any discussion with Mr. Felts
22 regarding the fact that issuing a documented counseling
23 after receipt of a charge of discrimination may look
24 retaliatory?
25    A.   I would guess that she probably coached him

Page 65

1  about that, but we also were looking at something that
2  was completely business related, completely unrelated
3  to the prior complaint of harassment discrimination;
4  and it had clearly -- the attendance issue had clearly
5  gotten out of control and had not been managed
6  appropriately.
7     Q.  Who had failed to manage it appropriately?
8     A.  Ms. Kraft.
9     Q.  She allowed it to go on too long?
10    A.  Yes.
11    Q.  Now, we see in Exhibit 6 that Suzanne Kraft is
12 the individual who signed this on behalf of Lincare; is
13 that right?
14    A.  That's right.
15    Q.  Why didn't Jeremy Felts sign this document
16 we've marked Exhibit 6?
17    A.  Because we like our lowest-level managers to
18 manage their employees so that they are the ones that
19 are seen as credible in the eyes of their employees.
20 If we constantly or regularly jump over them to a
21 higher-level manager, it only erodes their credibility
22 with their staff.
23    Q.  Okay.  Are you aware of any discussions that
24 Ms. Kraft had with Ms. Felts -- Mr. Felts in which
25 he -- in which she raised the issue of excessive

Page 66

1  absences prior to April 26th of 2012?
2     A.  I don't know.  I'm not aware of any.
3        MS. SCHECK:  Linda, do you need a break, or
4  are you okay?
5        THE WITNESS:  A break would be nice.
6        MS. SCHECK:  Okay.
7        MR. HOLMAN:  Sure.
8        MS. SCHECK:  We've gone over an hour, I just
9  realized.
10       MR. HOLMAN:  Any time you want to take --
11       THE VIDEOGRAPHER:  Off the record at 11:10
12 a.m.
13       (Brief recess was taken.)
14       THE VIDEOGRAPHER:  We're back on the record at
15 11:18 a.m.
16 BY MR. HOLMAN:
17    Q.  Ma'am, we took a short break, but you
18 understand you're still under oath?
19    A.  Yes.
20       (Plaintiff's Exhibit No. 9 was marked for
21 identification.)
22 BY MR. HOLMAN:
23    Q.  Okay.  I'm going to hand to you what we'll
24 mark Exhibit 9.  Exhibit 9 is an E-mail from you to
25 Paula Adams dated Thursday, April 26th, 2012, regarding

Page 67

1  Shawron; is that right?
2     A.  That's right.
3     Q.  And in this E-mail you talk about you, Suzanne
4  Kraft, and Jeremy Felts presenting Ms. Lounds with her
5  documented counseling that we previously marked and
6  identified as Exhibit 6; is that correct?
7     A.  Right.
8     Q.  Were you personally present?
9     A.  I was present by phone.
10    Q.  Okay.  Present by phone.  Why were you present
11 by phone?
12    A.  I don't understand the question.
13    Q.  Well, are you -- are you typically present by
14 phone when someone is given a documented counseling?
15    A.  No.
16    Q.  Why were you present by phone in this instance
17 with regard to Ms. Lounds?
18    A.  We knew there had been a previous complaint of
19 discrimination and an investigation that followed and a
20 follow-up visit by myself to meet with Shawron in
21 March, and so I asked to be present by phone.
22    Q.  Okay.  Now, tell me, the circumstances were
23 such that you were able to listen to the conversation
24 between Ms. -- Ms. Kraft, Mr. Felts, and Ms. Lounds by
25 phone; is that right?

Page 68

1     A.  Yes.
2     Q.  Ms. -- Ms. Lounds knew you were on the phone?
3     A.  Yes.
4     Q.  Was there anything that you said to
5  Ms. Lounds?
6     A.  Yes.
7     Q.  What did you say?
8     A.  I asked her if she felt that 16 unscheduled
9  absences were excessive.
10    Q.  And what did she say?
11    A.  "No comment."
12    Q.  All right.  Now, when she said "No comment,"
13 what was your reaction to that?
14    A.  I think I just said, "Okay.  Thank you."
15       (Plaintiff's Exhibit No. 12 was marked for
16 identification.)
17 BY MR. HOLMAN:
18    Q.  Let me hand you what we'll mark Exhibit 12.
19       MS. SCHECK:  Did we skip numbers?
20       MR. HOLMAN:  Did we?  Oh, yes, we did.
21       MS. SCHECK:  That's fine.
22       MR. HOLMAN:  We've got 10 and 11.  I went
23 down.  I apologize.
24 BY MR. HOLMAN:
25    Q.  I've handed you Exhibit 12.

1   A.   Okay.
2   Q.   Can you identify Exhibit 12 for us, please?
3   A.   Oh, you're asking me?
4   Q.   Yes.
5   A.   I'm sorry.  Those are the notes from when I
6   met with Shawron in Wichita on March 14th.
7   Q.   Did you -- did you tape anything --
8   A.   No.
9   Q.   -- while you were discussing these issues with
10   her in March?
11   A.   No.  I type very fast.  I had my laptop with
12   me.
13   Q.   So you were typing as you were speaking to
14   her?
15   A.   Yes.
16   Q.   Did you give her the opportunity to review
17   your notes?
18   A.   I did not.
19   Q.   In fact, she asked for a copy of these notes,
20   didn't she?
21   A.   She did --
22   Q.   And you said --
23   A.   -- after I got back to Clearwater.
24   Q.   And you said, If it was that important, you
25   should have taken a notepad and written down notes

1   yourself; isn't that true?
2   A.   Not in those words, no.
3   Q.   Okay.  Well, what words did you use?
4   A.   I believe I told her that if she wanted a
5   record of the conversation, she could have taken notes,
6   as I did.
7   Q.   And you didn't say anything about if she had
8   believed it was important, she should have taken notes?
9   A.   I don't remember.  That was over a year ago.
10   Q.   Okay.  Well, why wouldn't you give her notes
11   of her own statement that you transcribed apparently?
12   A.   It's just not something I've ever done.
13   Q.   Didn't you say "it's Lincare property"?
14   A.   I may have.
15   Q.   You never allow people that you've interviewed
16   to review notes that you've taken of the discussion
17   with them to ensure its accuracy?
18   A.   I have never done that, no.
19   Q.   But nevertheless, you admit that Ms. Lounds,
20   when you returned after this March 2012 interview with
21   her, asked for the notes?
22   A.   Yes.
23   Q.   And you refused to give them to her?
24   A.   That's correct.
25   Q.   You would agree that Ms. Lounds' complaints of

1   racial discrimination as to the comments that were made
2   were made in good faith?
3   A.   Well, can I clarify something?  She did not
4   make the complaint.  Ms. Renard made the complaint.
5   Q.   Okay.
6   A.   So -- but yes, I believe that they both came
7   forward with a valid concern that they had at the time.
8   Q.   And when Ms. Lounds contacts the State of
9   Kansas and the United States Equal Employment
10   Opportunity Commission in April of 2012, did you not
11   consider that a complaint?
12   A.   I believe it was -- yes, a complaint.
13   Q.   Okay.  So we can agree she made a complaint?
14   A.   Sure.
15   Q.   Okay.  Is there any reason, as you sit here
16   today as a representative of Lincare, that you believe
17   that her complaint about racial discrimination was not
18   reasonable?
19   A.   I think that the initial complaint in January
20   was investigated and managed in January very promptly
21   by the company.
22   Q.   That's not my question.
23   A.   Okay.
24   Q.   My question is, is there any reason that
25   Lincare believes that her complaint of discrimination

1   was not reasonable?
2   A.   I believe that she believed it was reasonable.
3   Q.   Okay.  Well, let me ask you this:  As a
4   representative of Lincare, do you have reason to
5   believe that it was not reasonable and in good faith
6   that Ms. Lounds believed the comments were
7   discriminatory?
8   A.   In her mind, yes, she probably believed that.
9   Q.   Okay.  But as a trained human resources
10   professional, do you have -- do you have reservations
11   about it being reasonable and in good faith?
12   A.   "It," I guess I'm caught on that word that you
13   used.
14   Q.   The complaint.  Let me just -- let me
15   backtrack here.
16   A.   Yeah, please.
17   Q.   It would be reasonable for an African American
18   to be offended by someone speaking about lynching,
19   wouldn't you agree?
20   A.   Yes.
21   Q.   Okay.  It would be reasonable for an African
22   American to be referred to by name in demeaning terms
23   like Shaquita, Shanita when her name is Shawron,
24   wouldn't you agree?
25   A.   If the names used were being used

Page 73

1  intentionally, and I do not believe that that was meant
2  to be an intentional slight.
3      Q.   You do not believe that by Ms. Kraft referring
4  to Ms. Lounds as Shaquita or Shanita, that was in any
5  way intentional on her part to slight Ms. --
6      A.   I do not.
7      Q.   Why is that?
8      A.   Because Ms. Kraft is, as much as she's a
9  lovely human being, I think she's a little bit naive in
10  the ways of the world; and I don't think that when she
11  said those things, that she had any bad intent.  I
12  think it was just honest questions that she was asking.
13      Q.   What kinds of questions was she asking?
14      A.   Is your name Shawronda?  I thought your name
15  was Shawronda.
16      Q.   So if I understand your testimony, from a
17  personal perspective, I want to talk just --
18      A.   Okay.  So now we're jumping over to Linda's
19  testimony, not the company's?
20      Q.   I'll be very specific when I do so.
21      A.   Okay.
22      Q.   From a personal perspective, are you
23  suggesting that you disagree with Ms. Adams' decision
24  to issue counseling to Ms. Kraft?
25          MS. SCHECK:  Object to the form and scope.

Page 74

1          THE WITNESS:  I do not.  I believe that
2      Ms. Lounds' perception was her reality, and we
3      needed to send a strong message to Ms. Kraft.
4      However, I can also tell you that I do not believe
5      that there was bad intent when Ms. Lounds -- I
6      mean, when Ms. Kraft said the things that she did.
7  BY MR. HOLMAN:
8      Q.   Okay.  How well do you know Ms. Kraft?
9      A.   I supported her from the time I was hired in
10  December 2011 until she left the company earlier this
11  year.
12      Q.   Okay.  Let me hand to you what we'll mark
13  Exhibit 10.
14          (Plaintiff's Exhibit No. 10 was marked for
15  identification.)
16  BY MR. HOLMAN:
17      Q.   Can you identify Exhibit 10 for us, please?
18      A.   This is a document that I wrote.  I'm going to
19  guess it was probably the corrective action meeting we
20  had with Shawron.  I don't know for sure, but I'm going
21  to say probably her documented verbal warning.
22      Q.   Okay.  And it appears that this occurred at
23  9:00 a.m. Eastern Standard Time on June 22nd, 2012, and
24  present were Mr. Felts, Ms. Kraft, Ms. Lounds, and it
25  identifies you.  Were you by phone?

Page 75

1      A.   By phone.
2      Q.   Okay.  And is this something that you typed up
3  as you were --
4      A.   Listening.
5      Q.   -- listening by phone?
6      A.   Yes, as I was listening.
7      Q.   So there were no notes, no tapes?
8      A.   Correct.
9      Q.   Okay.  In -- towards the end of the first page
10  of Exhibit 10 there's an entry of a statement that you
11  attribute to Shawron where she says, I work when I'm
12  here.  There's a lot of things going on with this
13  place.  I have doctor's notes.  Do you see that?
14      A.   I do.
15      Q.   All right.  Did you ask her what she meant
16  when she said "there's a lot going on with this place"?
17      A.   No.
18      Q.   Why not?
19      A.   Because it was rather irrelevant what was
20  going on in the work environment.  We were there to
21  talk about her unscheduled absences.
22      Q.   So if she said she had been raped, it would
23  have been irrelevant?
24          MS. SCHECK:  Object to the form.
25          THE WITNESS:  I object to the questions.

Page 76

1      She's talking about a lot of things going on in
2      this place.  She did not get raped in the office.
3  BY MR. HOLMAN:
4      Q.   You don't know what she was talking about, do
5  you, ma'am?
6      A.   I'm going to guess it was not rape.  Someone
7  would have notified --
8      Q.   Do you know what she was talking about?
9      A.   I do not know.
10      Q.   I'm not suggesting it was but --
11      A.   I find it offensive.
12      Q.   Well, I find it offensive that you won't
13  answer the question.  Okay?
14      A.   Okay.
15          MS. SCHECK:  She's answering the question.
16  BY MR. HOLMAN:
17      Q.   And to the extent that I offended you, I
18  apologize.
19      A.   Thank you.
20      Q.   And I think a number of African Americans
21  would be offended by you not believing that some of
22  this conduct was severe or pervasive, but
23  nevertheless --
24          MS. SCHECK:  Object to the form and the
25      statement.  Ask questions, Kirk.

Page 77

BY MR. HOLMAN:

1 BY MR. HOLMAN:
2   Q.  -- we'll keep it on ourselves.  Okay?
3   A.  Okay.
4   Q.  All right.  Did you -- you didn't ask her what
5 she meant --
6   A.  I did not.
7   Q.  -- when she said "there's a lot of things
8 going on with this place"?
9   A.  No.
10   Q.  But you had known that she had contacted the
11 State of Kansas and the United States Equal Employment
12 Opportunity Commission, correct?
13   A.  That's correct.
14   Q.  All right.  You knew that she believed that
15 she was being discriminated against enough to contact
16 those State agencies and the Federal Government, right?
17   A.  I knew that things had gone on up to
18 January 27th.  I also know that when I was there in
19 March, she told me that things were better.
20   Q.  Ma'am, this is -- this is where we're going to
21 get a little bit --
22     MS. SCHECK:  She's answering the question.
23 BY MR. HOLMAN:
24   Q.  Don't.  No, no, no.
25   A.  I'm answering your question.

Page 78

1   Q.  I asked you a simple yes-or-no question.  You
2 knew that she had contacted the State and the Federal
3 Government regarding what she perceived to be
4 discrimination at the workplace, correct?
5   A.  The things that she reported to those agencies
6 were the things that happened prior to January 27th.
7   Q.  Is that a "yes"?
8   A.  There was nothing new.
9   Q.  Is that a "yes"?
10   A.  Yes.
11   Q.  Now, let me ask you this, ma'am.  You talked
12 with her in March of 2012 --
13   A.  Yes.
14   Q.  -- right?
15     And you took notes that you wouldn't even let
16 her see to ensure their accuracy?
17   A.  That's correct.
18   Q.  Now, three months later in a discussion she's
19 saying "there's a lot going on with this place," right?
20   A.  Right.
21   Q.  Now, you didn't take it upon yourself as a
22 human resources professional when you heard that,
23 knowing that she had filed a complaint with the State
24 and the Federal Government to inquire as to what she
25 meant; is that correct?

Page 79

1   A.  No.  I did not.
2     MS. SCHECK:  Sorry.
3     THE WITNESS:  That was not the purpose of that
4   meeting.
5     MS. SCHECK:  Just a moment.  Sorry.  I thought
6   that the ringer was off.
7 BY MR. HOLMAN:
8   Q.  All right.  And the reason that you didn't ask
9 her what she meant by that was because that wasn't the
10 purpose of the meeting?
11   A.  That's correct.
12   Q.  All right.  Did you follow up with her after
13 the meeting to inquire as to what she meant when she
14 said "there's a lot going on"?
15   A.  I didn't have to.  She wrote me a letter.
16   Q.  Okay.  And didn't she claim that there
17 were comments of a racial nature going on at the
18 workplace?
19   A.  The things that she reported were things that
20 had happened prior to January 27th.  There was nothing
21 new in her complaint.
22   Q.  Well, let's look at Exhibit 11.
23     (Plaintiff's Exhibit No. 11 was marked for
24 identification.)
25 BY MR. HOLMAN:

Page 80

1   Q.  I could have sworn I had three.
2     MS. SCHECK:  What are the numbers on it?
3     MR. HOLMAN:  It's 79 through 82.
4     MS. SCHECK:  Lincare?
5     MR. HOLMAN:  Yes.
6 BY MR. HOLMAN:
7   Q.  Okay.  I've handed you Exhibit 11.  Can you
8 tell us what Exhibit 11 is, please?
9   A.  Exhibit 11 starts out with my notes from her
10 final written warning delivered July 24th, 2012.
11   Q.  Okay.  And again, is this -- you're appearing
12 by phone; is that right?
13   A.  That's correct.
14   Q.  And in the second to last paragraph you write,
15 Shawron claimed that because she's the only black
16 person in the office, she feels like the pink elephant
17 in the room, feels like people are always talking about
18 her.  She said, "Everytime someone says 'BOOM!' I hear
19 Laynee saying 'Boom Nigga!'"
20     Shawron said that Amber says "BON" to her
21 every day and that she's sure Suzanne has heard it, but
22 Suzanne hasn't done anything about it.  Did I read that
23 correctly?
24   A.  That's correct.
25   Q.  Okay.  Did you have any understanding as to

Page 81

1 what "BON" means?
2    A.  Not until this day.
3    Q.   Okay.  And do you have an understanding as to
4 what it means?
5    A.  I do.
6    Q.  What is it?
7    A.  Big old nigga.
8    Q.  All right.  Now, Ms. -- Ms. Lounds is saying
9 that she hears that every day, right?
10    A.  That's what she said.
11    Q.   Now, in fact, Lincare must have believed that
12 to be more likely true than not true, correct?
13    A.   We acted in good faith and took her at her
14 word, yes.
15    Q.   Okay.  Because --
16        (Plaintiff's Exhibit No. 13 was marked for
17 identification.)
18 BY MR. HOLMAN:
19    Q.   -- on that same day -- let me hand you what
20 we'll mark Exhibit 13.
21    A.  Uh-huh.  (Indicates affirmatively).
22    Q.  On that same day in Exhibit 13 you wrote up
23 Ms. Renard; is that correct?
24    A.  That's correct.
25    Q.   For making those inappropriate comments --

Page 82

1    A.  That's right.
2    Q.  -- right?
3        So you took her at her word that "big old
4 nigga" was being said every day?
5    A.  No.  BON was being said every day.
6    Q.  Okay.  BON.  And BON, you understood, to be an
7 acronym for "big old nigger"?
8    A.  Yes.
9    Q.  And you would agree that would -- could be
10 offensive to an African American?
11    A.  Yes.
12    Q.  So Lincare determined that there was conduct
13 subsequent to January of 2012 occurring at the
14 workplace?
15    A.  In July we became aware of one new claim, yes.
16    Q.  Okay.  That was allegedly occurring every day,
17 right?
18    A.  Only according to Ms. Lounds.
19    Q.  Well, but in Exhibit 13 you -- you issued a
20 final written warning to one of your employees over the
21 use of that term "BON," correct?
22    A.  Yes.  And if you look at Exhibit 11, you'll
23 see that Ms. Kraft had a conversation with Ms. Renard
24 in which Ms. Renard said she only used the "N" word one
25 time, and that was after Ms. Lounds begged her to tell

Page 83

1 her what the acronym meant.
2    Q.  But Lincare must not have believed her?
3    A.  Oh, we believed her.
4    Q.  You believed -- you believed Ms. Renard?
5    A.   We believed that the truth lies somewhere
6 between every day, as Ms. Shawron Lounds said, and one
7 time which Ms. Renard said.
8    Q.  Okay.
9    A.  Typically, you -- we find in human resources
10 that's her side, her side, and somewhere in the truth
11 you find the middle.
12    Q.  Okay.  So there was a determination by Lincare
13 that there was conduct, however, of a racially
14 discriminatory nature directed to Ms. Lounds subsequent
15 to January of 2012?
16        MS. SCHECK:  Object to the form.
17        THE WITNESS:  No.  It was not directed to her.
18 BY MR. HOLMAN:
19    Q.  Okay.  So --
20    A.  It was said in her presence.
21    Q.  All right.  Well, let me ask you this.  I
22 mean, are you suggesting that simply by using -- if it
23 wasn't specifically directed at a woman, the "C" word,
24 could not be offensive to a woman?
25        MS. SCHECK:  Object to the form.

Page 84

1        THE WITNESS:  Sure, it could be offensive.
2 BY MR. HOLMAN:
3    Q.  Of course, right?
4    A.  Of course.
5    Q.  Even though the boss might not direct it at a
6 female employee, if a woman hears it, she certainly has
7 every right to be --
8    A.  Offended.
9        MS. SCHECK:  Object to the form.
10        THE WITNESS:  Sorry.
11        MS. SCHECK:  You need to wait for me to insert
12    objections just so the court reporter is not
13    typing down all three of us at once.
14 BY MR. HOLMAN:
15    Q.  And similarly, you would agree that if someone
16 hears BON and they know what BON stands for, they
17 could -- they would rightfully be angry or offended,
18 don't you agree?
19        MS. SCHECK:  Object to the form.
20        THE WITNESS:  They could be angry.  It would
21    be an inappropriate comment for the workplace.
22 BY MR. HOLMAN:
23    Q.  All right.  Wouldn't it be an inappropriate
24 comment for most -- most settings?
25    A.  Apparently not --

Page 85

1      MS. SCHECK:  Object to the form.  Beyond the
2   scope of the deposition.
3      THE WITNESS:  Apparently it's not
4   inappropriate in Ms. Renard's household.
5 BY MR. HOLMAN:
6   Q.  Okay.  But it's inappropriate in the Lincare
7 workplace?
8   A.  It is appropriate -- inappropriate in the
9 Lincare workplace, yes.
10   Q.  Okay.  Now, there's also a statement
11 attributed to you in -- in that 7/24/12 --
12   A.  Okay.
13   Q.  -- memo that we've marked Exhibit 11 at the
14 bottom.  Do you see that, where Ms. -- Ms. Lounds
15 apparently claims that you -- you said that she didn't
16 know how to take a joke?
17   A.  That's correct.
18   Q.  Okay.  And I understand that it's your
19 contention that didn't occur in March?
20   A.  That's correct.
21   Q.  How many times have you met personally with
22 Ms. -- Ms. Lounds?
23   A.  In person?
24   Q.  Yes.
25   A.  Once.

Page 86

1   Q.  Okay.  And that was March 14th of 2012?
2   A.  That's correct.
3   Q.  How long was your interview with her?
4   A.  We met one on one probably for 15 or
5 20 minutes.  I then interviewed the customer service
6 trainer.  At the end of that interview, we brought
7 Shawron back in, and the two of them had a discussion
8 for probably 30 or 40 minutes --
9   Q.  Okay.
10   A.  -- and I was present for that.
11   Q.  All right.  Do you know what HIPAA is?
12   A.  Of course.  Yes.
13   Q.  What is it?
14   A.  The Health Information Portability and
15 Protection Act.
16   Q.  Okay.  Let me hand you what we'll mark
17 Exhibit 14.
18      (Plaintiff's Exhibit No. 14 was marked for
19 identification.)
20 BY MR. HOLMAN:
21   Q.  Exhibit 14 is an affidavit with documents
22 MR146 through MR241, which I'll represent to you were
23 produced to us pursuant to a subpoena to Ms. --
24 Ms. Lounds' medical doctor, Bonnie Smothers, Hillside
25 Medical Office.

Page 87

1   A.  Uh-huh.  (Indicates affirmatively).
2   Q.  I know that you probably haven't seen this.
3   A.  I never have seen these.
4   Q.  Okay.
5      MS. SCHECK:  Kirk, before you move on, is this
6   within the scope of the 30(b)(6)?
7      MR. HOLMAN:  I think it is, and obviously, you
8   know, you can have an objection to a 30(b)(6)
9   outside the scope, and that's not waived, I don't
10   believe anyway, since it's not a form objection.
11 BY MR. HOLMAN:
12   Q.  I want to hand to you a couple documents.  Let
13 me hand to you what we'll mark Exhibit 15.
14      (Plaintiff's Exhibit No. 15 was marked for
15 identification.)
16 BY MR. HOLMAN:
17   Q.  Exhibit 15, can you identify that for us,
18 please?
19   A.  It is my notes from a conversation that I had
20 with an office manager at Shawron's doctor's office.
21   Q.  All right.  And it's -- in particular, it's a
22 conversation that you had with Dr. Smothers' office; is
23 that right?
24   A.  Yes.
25   Q.  Okay.  And you're talking about a -- a

Page 88

1 release-from-work slip; is that right?
2   A.  Yes.
3   Q.  And just for the record, let's mark that as
4 Exhibit 16.
5      (Plaintiff's Exhibit No. 16 was marked for
6 identification.)
7 BY MR. HOLMAN:
8   Q.  So if I understand your testimony, Exhibit 15,
9 you're kind of sitting at your computer again typing up
10 a conversation with a representative of Dr. Smothers at
11 Hillside Medical Office; is that right?
12   A.  That's right.
13   Q.  Okay.  And it's regarding this note; is that
14 right?
15   A.  That's right.
16   Q.  What -- what gave you the right to talk with
17 her doctor like -- like this?
18   A.  The invitation that if I had any questions,
19 please call our office.
20   Q.  Okay.  Did -- did Ms. Lounds -- did Ms. Lounds
21 in any way sign any kind of authorization for you to
22 discuss her medical records with -- with regard to
23 Dr. Smothers in Hillside Medical?
24   A.  Dr. Smothers would have had to let me know by
25 not answering questions I had if there was such a

1    A.   Because we try to communicate with the
2 employees when possible.
3    Q.   But I thought earlier in your testimony you
4 had testified that you under -- you understood a right
5 of an employment professional like yourself to be able
6 to contact someone's physician to inquire as to
7 disability status; is that right?
8    A.   That's correct.
9    Q.   Okay.  And in the letter that -- in fact,
10 Ms. -- Ms. Lounds specifically authorized you to make
11 such contact, correct?
12    A.   Okay.
13    Q.   Is that true?
14    A.   It is.
15    Q.   All right.  And Dr. Donaldson wrote you a
16 three-page letter, correct?
17    A.   That's right.
18    Q.   And in that letter, in the second to last page
19 of Exhibit 20 at the bottom, he writes in the second
20 sentence to the bottom, I am also requesting that she
21 be provided guarantees on the Family Medical Leave Act
22 and due to the extenuating circumstances --
23 circumstances discussed in this E-mail, that you waive
24 the 12-month rule cited in your employee manual so that
25 Ms. Lounds can begin to take full advantage of time

1 away from work to recover from the acts perpetrated
2 against her on the job by Lincare employees.
3         Did I read that correctly?
4    A.   I was not reading along, but that sounds about
5 right.
6    Q.   Okay.  So you were -- you were asked by
7 Dr. Donaldson to waive the -- the legal requirements
8 for an eligible employee under the FMLA, right?
9    A.   That's correct.
10    Q.   And did you give that any consideration?
11    A.   No.
12    Q.   Did you give any consideration to submitting a
13 medical certification for him to sign that would enable
14 Ms. Lounds to avail herself of the medical leave under
15 the leave of absence policy?
16    A.   I had had that discussion with her prior, and
17 she was not interested in taking a six-week continuous
18 leave of absence.
19    Q.   Okay.  Did you -- did you contact
20 Dr. Donaldson, however, regarding --
21    A.   No.  I contacted Ms. Lounds and reminded her.
22    Q.   All right.  Was this -- was this request by
23 Dr. Donaldson insufficient under the medical leave
24 policy in Exhibit 2 to enable Ms. Lounds to avail
25 herself of leave?

1    A.   I don't understand the question.
2    Q.   Well, you talked about certification, correct?
3    A.   Medical certification.
4    Q.   Medical certification?
5    A.   Yes.
6    Q.   My question is, was this request by
7 Dr. Donaldson insufficient under Lincare's policies to
8 constitute medical certification for a request for
9 leave?
10    A.   Correct.  It was not sufficient.
11    Q.   It was not sufficient.  Did you ever advise
12 Ms. Lounds of that fact?
13    A.   Yes.
14    Q.   Okay.
15    A.   We talked about what would be required for a
16 medical leave of absence.
17    Q.   And did you specifically say that
18 Dr. Donaldson's request was insufficient, do you
19 recall?
20    A.   No, but I told her there was a form that
21 Lincare required to be filled out.
22    Q.   Okay.
23    A.   His letter is not that form.
24    Q.   All right.  Let me hand you what we'll mark
25 Exhibit 21.

1         (Plaintiff's Exhibit No. 21 was marked for
2 identification.)
3 BY MR. HOLMAN:
4    Q.   Exhibit 21 looks like it was printed off on
5 July 27th of 2012, the date that you received the
6 correspondence from Dr. Donaldson that we've marked
7 Exhibit 20.
8    A.   Yes.
9    Q.   Was this printed off by you?
10    A.   Yes.
11    Q.   Why?
12    A.   Because I did not know what all those initials
13 after his name meant, and I was hoping to get some kind
14 of an understanding about what sort of a doctor he was.
15    Q.   All right.  Did you come to that
16 understanding?
17    A.   I don't think this alone answered it for me.
18 I then went on to look up the individual initials.
19    Q.   And what did you find?
20    A.   Well, I don't know if I remember all of them.
21 I knew what a Ph.D. was.  An LCPC is a licensed
22 community practice counselor, I think; and then
23 national something counselor, and then the other one
24 was something about mental health counselor.  I don't
25 remember what they were.

Page 113

1 If you believe you have a work-related illness, you may
2 ask Suzanne for a Data Injury Card so that you can file
3 for workers' -- a workers' compensation claim.  Do you
4 see that?
5   A.  Yes.
6   Q.  All right.  But it's your testimony that she
7 wanted -- she had inquired first about workers'
8 compensation?
9   A.  No.  I suggested --
10   Q.  Okay.
11   A.  -- that that was one of her three options --
12   Q.  All right.
13   A.  -- since she did not qualify for FMLA.
14   Q.  And, of course, the -- like you said, I think
15 you testified the workers' compensation claim was
16 denied by the State of Kansas?
17   A.  That's correct.
18   Q.  Okay.
19       (Plaintiff's Exhibit No. 23 was marked for
20 identification.)
21 BY MR. HOLMAN:
22   Q.  I'm going to hand to you what we'll mark
23 Exhibit 23.  Can you identify Exhibit 23?
24   A.  A letter written by me to Shawron on
25 September 12th.

Page 114

1   Q.  And this was in response to a letter that she
2 wrote to you dated September 5th; is that right?
3   A.  Yes.
4   Q.  Okay.  Now, if I understand your previous
5 testimony, those dates that Ms. Lounds used to see
6 Dr. Donaldson were not counted against her; is that
7 correct?
8   A.  That's correct.
9   Q.  And those dates, however, where a medical
10 professional has suggested that she not be at work were
11 counted against her?
12   A.  That's correct.
13   Q.  Why?
14   A.  Because we needed to have people at work when
15 they're scheduled to be there.  The Dr. Donaldson
16 situation was directly related to her prior complaint,
17 according to her, again, giving her that good-faith
18 assumption that what she's telling us is true; and I
19 completely believed her, but she had made the complaint
20 in January.
21       We acted on it quickly.  She then filed with
22 the EEOC.  We were in the process of responding to
23 that.  We gave her every benefit of the doubt,
24 including those visits with Dr. Donaldson.
25       However, as an employee, we hire people to do

Page 115

1 a job; and, if they have absences that are excessive,
2 those, we take into consideration.  So things like
3 taking her children -- or watching her children so her
4 husband could go to a conference, you know, they needed
5 to have a Plan B.  They didn't have a Plan B.
6       That's not the employer's responsibility, and
7 we need to have employees who are respectful of the
8 attendance requirements that the company has, and
9 Lincare has very strict attendance requirements.
10   Q.  What are -- you say that Lincare has very
11 strict attendance requirements.  What are they?
12   A.  We expect you to be there on the days that you
13 are scheduled.  We expect you to be prompt and present
14 for a full 8:00-to-5:00 workday, plus any overtime
15 that's required and on call if you're an employee who
16 is on call.
17       Some employers could care less when people
18 wander in and out.  That's not the way we operate at
19 Lincare.
20   Q.  Well, but just so I understand, doctor's --
21 doctor's notes asking that a person be excused from
22 work because of illness or sickness, that -- that is
23 counted against an individual?
24   A.  That's correct.
25   Q.  In Exhibit 23, in the first sentence of the

Page 116

1 second paragraph, you write, My purpose in writing is
2 to engage in the interactive process with you.  Do you
3 see that?
4   A.  I do.
5   Q.  All right.  Well, as a trained human resources
6 professional, what -- what does an interactive process
7 mean?
8   A.  As I said earlier, we believed that because
9 she was having these ongoing appointments with
10 Dr. Donaldson that were just about every Friday, that
11 there was reason to believe that there might be some
12 sort of a disability, either short-term or a long-term.
13       Under the Americans with Disabilities Act as
14 amended, I had an obligation to work with her to try to
15 make a reasonable accommodation.  She was saying that
16 her appointments didn't last a full day, yet she was
17 taking a full day off.
18       I was trying to find a way to get her to work
19 when she could be at work and to have an understanding
20 of why she couldn't be there on the majority of the day
21 when she had those appointments.
22   Q.  And so when you were writing to her in
23 September, you were -- you were beginning, as you say,
24 to engage in the interactive process?
25   A.  That's correct.

1   Q.   It's a term of art, correct?
2   A.   Pardon?
3   Q.   You would agree it's a term of art, the
4   interactive process?
5   A.   A term of art?
6   Q.   Yeah.  I mean, is that something that -- the
7   interactive process that you engaged in was something
8   that was -- that you understood was part of the
9   Americans with Disabilities Act?
10   A.   Yes.
11   Q.   Okay.
12   A.   I don't know that "term of art."  I don't know
13   what it means.
14   Q.   Oh, a legal term.
15   A.   Okay.
16   Q.   A term -- let me just say this.  It was a term
17   that a trained human professional -- a human resources
18   professional like yourself is familiar?
19   A.   Yes.
20   Q.   All right.  And it has special meaning to an
21   individual like yourself?
22   A.   Yes.
23   Q.   Okay.  So what does -- when you began this
24   interactive process, tell us what was your -- what was
25   the -- what was the response that you got from

1   Ms. Lounds.
2   A.   I wouldn't be able to answer that without
3   looking back at the notes.
4   Q.   Okay.
5   A.   At that point, she was sending lots of
6   letters, so I don't know if there was a letter that
7   followed this or not.
8   Q.   Okay.  If you'd direct your attention to
9   Exhibit 2.
10   A.   Uh-huh.  (Indicates affirmatively).
11   Q.   And LIN14, under the box two -- two paragraphs
12   down, it says, You may be eligible for unpaid leave
13   of -- leave for a disability as an accommodation under
14   the Americans with Disabilities Act.  Do you see that?
15   A.   No, I don't.  Okay.
16   Q.   Did you give that any consideration at any
17   point prior to terminating Ms. Lounds?
18   A.   She wasn't terminated for the
19   disability-related illnesses.  I need to remind you of
20   that again.  Any of the absences related to visits to
21   Dr. Donaldson were not related to her termination.
22   Q.   Do you -- do you -- but --
23   A.   I gave her the option of a medical leave of
24   absence, a personal leave of absence, or filing
25   workers' compensation.  She filed workers' comp.  She

1   never requested the disability paperwork to be able to
2   take a medical leave of absence.
3   Q.   Okay.  My question was a little bit different.
4   Did you ever consider the option that is enumerated
5   here that you may be eligible for unpaid leave for a
6   disability as an accommodation?
7   A.   No.  In fact, we were giving her that for all
8   of those doctor's appointments.  She was getting an
9   unpaid leave of absence on an intermittent basis.
10   Q.   What -- when you say that the other -- the
11   other dates that she was -- she may have had doctor's
12   notes, but they were still counted against her?
13   A.   Usually there were not doctor's notes.  There
14   were on a couple of occasions.
15   Q.   Okay.  Well, let me ask you this:  The doctor
16   that -- the occasions that the doctor did write a note
17   for her and excused her from work, those were counted
18   against her?
19   A.   Yes.
20   Q.   Okay.
21   A.   Unless it was Dr. Donaldson.
22   Q.   How do you know that the doctor's notes in
23   which she was excused from work provided to Lincare by
24   Lynn -- by Hillside Medical Office did not have
25   anything to do with the workplace?

1   A.   I don't.
2   Q.   If you had found out that, in fact, the
3   medical treatment and care that she was receiving at
4   Hillside was also the result of what had occurred at
5   Lincare, would that still have been an unexcused
6   absence which would have counted against her?
7   A.   I don't know.
8   Q.   Why don't you know?
9   A.   I think that's the kind of thing that we would
10   have had a conversation about:  Paula Adams, Sheila
11   Dilly, myself, and our legal team.
12   Q.   Well, consistent with policy?
13   A.   I don't know that we've had this sort of
14   situation before.  There's not a specific policy that
15   addresses this.  This was a very unusual situation.
16   Q.   Well, you allowed the Dr. Donaldson -- any
17   time that she met with Dr. Donaldson, she was allowed
18   to take off; is that right?
19   A.   We were, in good faith, allowing her that time
20   off, yes, to heal.
21   Q.   So, now, the times that she was excused from
22   another physician, however, you did not consider
23   potentially as related to the workplace stress.  Is
24   that fair?
25   A.   That's a fair statement.

1 the conversation, and I did not want them to be put in
2 that position again.  Our employees do not have to work
3 with that sort of harassment from the public.
4     Q.   And what -- and similarly, your employees
5 don't have to work, you know, from being harassed by
6 their own coworkers, right?
7     A.   Correct.
8     Q.   And they don't have to be harassed by their
9 own supervisors, right?
10     A.   That's correct.
11     Q.   Okay.  So what was belligerent about his
12 conduct?
13     A.   I don't recall.  I know I took notes, but I
14 don't recall.
15     Q.   All right.  Do you remember what the
16 accusations were?
17     A.   I don't.
18     Q.   Okay.  Ms. Lounds was terminated on
19 September 24th, correct?
20     A.   I believe that's correct.
21     Q.   Now, her -- and she was terminated for
22 excessive absenteeism; is that correct?
23     A.   That's correct.
24     Q.   And the last day that she missed that was
25 unscheduled and for which she was disciplined, let's

1 say --
2     A.   Uh-huh.  (Indicates affirmatively).
3     Q.   -- was September 21st; is that correct?
4     A.   I think it was the 21st and 22nd --
5     Q.   Okay.
6     A.   -- that she missed.  She left early on
7 Thursday and then was out all day Friday and did not
8 call in, despite being told that she needed to call in.
9     Q.   And despite having provided a doctor's excuse,
10 correct?
11     A.   Yes.
12     Q.   Okay.  Why was it important for you to
13 determine the validity of the doctor's excuse if it
14 didn't matter to you or policy whether the excuse
15 was authorized or not?
16     A.   I think the reason for the termination would
17 have been affected.  So if she had written the
18 document, we would have used one reason code for the
19 termination.  If it was a valid document, there's
20 another reason code used for the termination.
21     Q.   So it simply affected the code to utilize when
22 putting the reason for termination into a computer?
23     A.   Well, and then it affects other things, like
24 unemployment benefits and things like that, because
25 typically attendance is not compensable under

1 unemployment, but -- or -- or is compensable under
2 unemployment, but falsification of a document is not.
3 So it was important to have the correct record.
4     Q.   Okay.  I want to direct your attention back to
5 Exhibit 2, the policy.
6     A.   Okay.
7     Q.   And in particular, LIN32, the attendance
8 policy.
9     A.   Uh-huh.  (Indicates affirmatively).
10     Q.   The last sentence reads, If you are returning
11 to work from a work-related illness or injury, you must
12 be seen by the medical provider treating the
13 work-related illness and injury and obtain a
14 certification of your fitness to return to work
15 regardless of the duration of any absence -- of the
16 absence.  Did I read that correctly?
17     A.   Uh-huh.  (Indicates affirmatively).
18     Q.   Is that a "yes"?
19     A.   Oh, yes.
20     Q.   And if I understand your testimony, you never
21 took it upon yourself to ascertain whether or not
22 Ms. Lounds' works -- work excuses from her doctor were
23 work-related illness; is that correct?
24     A.   For that particular absence?
25     Q.   For any particular absence that she was

1 excused by her physician.
2     A.   Are we asking human resources, or are we
3 asking the company representative?
4     Q.   I'm asking the company.  Did the company ever,
5 to your knowledge, seek to ascertain whether or not the
6 illness, the -- the reason -- the occasions in which
7 Ms. Lounds was authorized by her physician to be off
8 work were work-related illnesses?
9     A.   I don't know the answer to that.
10     Q.   Consistent with policy, if they were
11 work-related illnesses or related to work, those --
12 those unscheduled absences would not have been held
13 against her; is that right?
14     A.   No, that's not right.
15     Q.   No?  So when you have an employee who has
16 work-related illnesses or injuries and is seeking --
17 and is seeing a medical provider and gives a
18 certification upon return to work, that -- that is not
19 an authorized absence, according to your policy?
20     A.   Well, we had already found out from workers'
21 compensation that it was not a work-related absence.
22     Q.   No.  What workers' compensation concluded was
23 that it was not a compensable -- legally compensable --
24     A.   Right.
25     Q.   -- act.  That's two different things.

Page 133

1  Wouldn't you agree?
2    A.  I think you're splitting hairs.
3    Q.  In fact, let's look at the physician's
4  diagnosis.
5      (Plaintiff's Exhibit No. 27 was marked for
6  identification.)
7  BY MR. HOLMAN:
8    Q.  Let me hand you Exhibit 27.  Exhibit 27 is a
9  document created by a physician or filled out by a
10  physician related to the workers' compensation claim.
11  And do you see Physician's Diagnosis?
12    A.  I do.
13    Q.  What does it read?
14    A.  It says, Stress or anxiety related primarily
15  to work.
16    Q.  Okay.  So it appears here that the workers'
17  comp doctor has concluded that the stress or anxiety
18  was related primarily to work, correct?
19    A.  And I --
20    MS. SCHECK:  Object to the form.
21    THE WITNESS:  Oops.
22  BY MR. HOLMAN:
23    Q.  Go ahead.
24    MS. SCHECK:  Go ahead.
25    THE WITNESS:  The occupational physician --

Page 134

1  BY MR. HOLMAN:
2    Q.  All right.
3    A.  -- stated that, yes.
4    Q.  Well, it's an M.D., right?  Do you see the
5  M.D. after the name?
6    A.  Yes.
7    Q.  Okay.  An occupational physician of Lincare's
8  choosing, correct?
9    A.  Yes.
10    Q.  Okay.  Did you not see this prior to today?
11    A.  No.
12    Q.  So as you sit here on October 14, 2013, that's
13  the first occasion you've seen the document we've
14  marked Exhibit 27?
15    A.  Yes.
16    Q.  Does that change your -- your opinion as to
17  whether or not those absences that Ms. Lounds got
18  authorization from her personal physician were
19  authorized?
20    A.  No, it doesn't.
21    Q.  Why not?  Because you don't --
22    A.  Because we have a responsibility to our
23  patients to provide care by our employees.  When our
24  employees are not at work, they cannot be of service to
25  the patients.

Page 135

1    Q.  And you can't make money, right?
2    A.  I don't know that it's about the money.  It's
3  about the patient service.  We're a patient service
4  organization.  So we needed to get a handle on
5  Ms. Lounds' attendance problem, which, 34 days in less
6  than a year is clearly excessive.
7      Many of them we gave her the benefit of the
8  doubt.  Those were visits to Dr. Donaldson, but many of
9  them were just becoming excessive.
10    Q.  Many of them you don't know the reason for
11  which she sought medical attention, correct?
12    A.  And many of them, which were excessive --
13    Q.  Hold on.
14    A.  -- were for things not related to a medical
15  condition.
16    Q.  Many of the -- many of the absences you -- you
17  have no idea whether or not those -- those -- those
18  occasions that she saw a physician and was authorized
19  to not return to work was work related; is that right?
20    A.  That's true.
21    Q.  Okay.  And if that still would have been held
22  against her, those occasions in which a doctor
23  concluded that the employee, Ms. Lounds, should have --
24  should have been excused from work because of a
25  work-related illness or injury, that still would have

Page 136

1  been held against her, according to policy?
2    A.  I think those kinds of things would have come
3  out in the interactive process.  We did not get that
4  far in the process.
5    Q.  And part of that process didn't even entail
6  the company -- well, it didn't entail you, at least in
7  your personal capacity, to understand the physician's
8  diagnosis with respect to Ms. -- Ms. Lounds, correct?
9    A.  I don't manage the workers' comp process.
10    Q.  So you didn't -- you didn't --
11    A.  I was not --
12    Q.  You knew she was -- you knew she was going to
13  workers' comp, right?
14    A.  That's correct.
15    Q.  You told her that she'd get a letter of
16  denial, correct?
17    A.  Once I got an E-mail from Dawn Galloway that
18  it had been denied, yes.
19    Q.  Right.  Because you were involved in the
20  process when Dawn Galloway notified you that it would
21  be denied, right?
22    A.  Dawn sent me an E-mail that it would be
23  denied, yes.
24    Q.  Okay.  And Dawn told you in that E-mail that
25  because it did not involve a physical injury, it was

Page 141

1    you.
2        MS. SCHECK:  That's fine.
3        MR. HOLMAN:  I'm sorry.
4        MS. SCHECK:  It's just part of the process --
5        THE WITNESS:  Okay.
6        MS. SCHECK:  -- that he has to make an
7    objection.
8        MR. HOLMAN:  Oh, I just don't want to
9    interrupt her; that's all.
10        THE WITNESS:  Okay.  I thought maybe you had
11    worked with her before and didn't like her style
12    or something.
13        MR. HOLMAN:  No, no, no.  I just don't -- I
14    just don't want to interrupt the tape and stuff
15    like that; that's all.
16        THE WITNESS:  I understand.  I just didn't
17    know.
18        MR. HOLMAN:  It's okay.
19            CROSS-EXAMINATION
20    BY MS. SCHECK:
21    Q.   Regarding Exhibit 27, which is a document
22    regarding something that you hadn't seen before today,
23    under the Physician's Diagnosis section and then
24    Treatment and Medications, do you see that?
25    A.   Uh-huh.  (Indicates affirmatively).

Page 142

1    Q.   And it --
2    A.   Yes.  Sorry.
3    Q.   It indicates, Continue current medications
4    slash therapists, correct?
5    A.   It does.
6    Q.   And who was the only therapist that you were
7    aware that Ms. Lounds was seeing?
8    A.   Dr. Donaldson.
9    Q.   And did Ms. Lounds ever report to you that any
10    of the absences, except for the treatment by
11    Dr. Donaldson, were in any way related to issues in the
12    work environment?
13    A.   No.
14    Q.   You were asked questions regarding FMLA leave
15    and Ms. Lounds' eligibility.  Is it accurate to say
16    that even had she been there 12 months, she still would
17    not have been eligible because of the size of the work
18    force in the Wichita area and 75 miles around?
19    A.   That's correct.
20    Q.   You previously testified regarding a 1-800
21    number that employees had access to.  Do you recall
22    that?
23    A.   Yes.
24    Q.   Okay.  Can you explain to me how employees are
25    provided information about the 1-800 number to contact

Page 143

1    Lincare's corporate office?
2    A.   It's hanging in all of the break rooms in our
3    offices.  It's also given to them on their first day of
4    employment.
5    Q.   And did Ms. Lounds ever tell you that she
6    would have reported information sooner but she didn't
7    know how to?
8    A.   No.
9    Q.   Look at Exhibit 5, which is Ms. Kraft's final
10    written warning.
11    A.   I'm getting close.  6 and then 3.  There it
12    is.  Thank you.
13    Q.   And if you're close by, there's another --
14    another final written warning to Ms. Kempke, which is
15    Exhibit 4.
16    A.   Yes.
17    Q.   And it was your testimony that Ms. Adams
18    prepared these documents?
19    A.   Yes.
20    Q.   And did she also prepare one for Mr. Kunz?
21    A.   Yes.
22    Q.   And explain for me for the record how
23    Ms. Adams became involved in this investigation.
24    A.   Mr. McCarthy was at the center the morning of
25    January 27th holding a meeting with the customer

Page 144

1    service representatives.  During the meeting he said to
2    the employees who were present, So how are things going
3    generally?  He knew there were several new people.
4        At that point Ms. Renard said there have been
5    some things that have been said that I feel are
6    discriminatory, and he stopped the conversation and
7    said he would like to have a conversation specifically
8    about that with her and Shawron after the meeting.
9        So the three of them met, and then he placed a
10    call to Paula Adams, the employee relations director.
11    He then needed to get on a plane back to Florida.  So
12    he asked Jeremy to sit with the ladies and call Paula,
13    and Paula then gathered their statements and worked
14    with Jeremy on crafting the final written warnings.
15    Q.   And that all occurred the same day,
16    January 27th?
17    A.   January 27th, 2012.
18    Q.   And was January 27th, 2012, a Friday?
19    A.   It was.
20    Q.   And do you know when the final written
21    warnings were actually presented to the employees?
22    A.   The morning of Monday, January 30th.
23    Q.   And did Ms. Adams have any additional
24    conversations with Greg McCarthy?
25    A.   Yes.  When he got back to Florida Friday

Page 145

1 afternoon January 27th, he came straight from the
2 airport into her office, and they had a conversation
3 specifically about what had been reported to him that
4 morning.
5    Q.   Did Ms. Adams have additional conversations
6 with Ms. Lounds after January 27th, 2012?
7    A.   Yes.
8    Q.   And when did that occur?
9    A.   I believe it was early March.  They played
10 phone tag for a while, and then they actually had a
11 conversation, during which time Ms. Lounds said things
12 had gotten much better.
13    Q.   Did Ms. Adams have any additional involvement
14 in the investigation?
15    A.   She did ask me to go out there.  I was going
16 to be in Oklahoma, and so I -- in mid March, so she
17 asked me to spend an additional day driving up to
18 Wichita; and that was my first involvement with this,
19 was when I got there on March 14th.
20    Q.   If you look at Exhibit 5, in the write-up,
21 does it include information regarding retaliation?
22    A.   Yes, it does.
23    Q.   And what does it indicate regarding
24 retaliation?
25    A.   Please note that Lincare also has a policy

Page 146

1 prohibiting retaliation against any employee who brings
2 their concerns to the attention of management in good
3 faith or who participates in an investigation.
4 Consequently, you will refrain from any actions or
5 behavior that are, or could be perceived to be,
6 retaliatory in nature.  Violation of this policy will
7 result in the immediate termination of your employment.
8    Q.   And does the employee handbook, About Your
9 Company, also contain information regarding
10 retaliation?
11    A.   Yes, it does.
12    Q.   And what page is that on, Exhibit 2?
13    A.   It's Lincare's page 17, and in this packet
14 it's LIN27.
15    Q.   And it looks like the language that you read
16 from Ms. Kraft's final written warning is also
17 contained in Ms. Kempke's final written warning,
18 Exhibit 4?
19    A.   Yes.
20    Q.   Explain to me your conversations with
21 Ms. Lounds in March of 2012 when you were following up
22 at Ms. Adams' request.
23    A.   We talked about how things were going, and she
24 said they were much better.  I asked if there were any
25 new complaints, and there were not.  She said that she

Page 147

1 really liked the way things were going now, that it was
2 a much more comfortable work environment.
3        She said immediately after the investigation
4 it was a little bit uncomfortable because people were
5 afraid to talk to her but that recently it had gotten
6 much better, and then she said I'm afraid that it's
7 going to get strange again after you leave, and I said
8 it probably will.  People get a little squirrely when
9 corporate comes around, I said, but hopefully it will
10 be short lived.
11        And we went out to the front hall to look at a
12 photograph, and we had that removed; but other than
13 that, it was -- it was a very cordial meeting.  I
14 actually felt really good about the meeting and called
15 Paula right away to let her know that Shawron was
16 feeling good about where she worked, and we were
17 pleased about that.
18    Q.   The comments that led to the final written
19 warnings on January 27th, 2012, to be absolutely clear,
20 they are inappropriate for the workplace.  Is that --
21    A.   Absolutely inappropriate.
22    Q.   It is -- is it your understanding, though,
23 that those comments were isolated?
24    A.   Yes.
25    Q.   And they're inappropriate, they were isolated,

Page 148

1 but, in your mind, they were not severe and pervasive
2 because they weren't happening on a daily, constant
3 basis?
4    A.   That's correct.
5    Q.   Exhibit 6 is the April 26th, 2012 Documented
6 Counseling which -- for Shawron Lounds, correct?
7    A.   Correct.
8    Q.   Is it your understanding that Ms. Kraft had
9 issued verbal counselings to Ms. Lounds prior to
10 April 26th, 2012?
11    A.   I do believe they had a few conversations that
12 were not documented, yes.
13    Q.   And have you seen -- I don't think I have a
14 copy with me -- the handwritten notes that Ms. Kraft
15 keeps regarding each day of the absence?
16    A.   Yes.
17    Q.   Did you see that at the -- prior to this
18 lawsuit back in April 26th which Ms. Kraft would --
19 provided that to you?
20    A.   Yes.
21    Q.   And just to be clear -- there's been a lot of
22 questioning back and forth on this issue -- Lincare
23 gave Ms. Lounds the benefit of the doubt and was not
24 treating the absences, when she was being treated by
25 Dr. Donaldson, against her for attendance violations?

LINDA FELLER 30(b)(6)
SHAWRON LOUNDS vs. LINCARE, INC.

October 14, 2013
152

1              DEPOSITION ERRATA SHEET

2    Our Assignment No. 10994
     Case Caption:  Lounds vs. Lincare, Inc.

3         DECLARATION UNDER PENALTY OF PERJURY

4         I declare under penalty of perjury that I have read
     the entire transcript of my Deposition taken in the

5    captioned matter or the same has been read to me, and
     the same is true and accurate, save and except for

6    changes and/or corrections, if any, as indicated by me
     on the DEPOSITION ERRATA SHEET hereof, with the

7    understanding that I offer these changes as if still
     under oath.

8         Signed on the  19ᵗʰ  day of  November        ,
     2013.

9            *Linda P. Feller*

10   _____
              Linda P. Feller

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



LINDA FELLER 30(b)(6)                          October 14, 2013
SHAWRON LOUNDS vs. LINCARE, INC.                        153

1                 DEPOSITION ERRATA SHEET

2

    PAGE    LINE           CHANGE              REASON
3
     23      11      Dilley (not Dilly)    Correction of name
4
     48      22      or (not more)         typed incorrectly
5
     62      18      McCarthy (not Felts)  misspoke
6
     83      10      there's (not that's)  typed incorrectly
7
     83     10-11    "somewhere in the middle you find
8
                     the truth"            typed incorrectly
9
     99      1       Gallaway (not Galloway)   correction of name
10
    120      11      Dilley (not Dilly)    correction of name
11
    136      17      Gallaway (not Galloway)   correction of name
12
    136      20      Gallaway (not Galloway)   correction of name
13

14  _____  _____   _____  _____

15  _____  _____   _____  _____

16  _____  _____   _____  _____

17

18  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
19  are true.

20

21  11-19-13            _Linda P. Feller_____
    DATE                LINDA P. FELLER
22
    Reporter:  Lisa A. Simons-Clark, RMR, CRR
23

24

25



# EXHIBIT 7

LINCARE                          EMPLOYEE RELATIONS DEPARTMENT
19387 US 19 NORTH                     CLEARWATER, FLORIDA  33764

**PLEASE READ AND ACKNOWLEDGE THE FOLLOWING
BY SIGNING BELOW:**

**EMPLOYEE HANDBOOK ACKNOWLEDGEMENT**

Lincare has prepared this handbook as a guide for policies, benefits,
and general information for employees to assist you during your em-
ployment.  However, neither this handbook, nor any other Company
communication or practice, creates an employment contract for a
specified period of time.  The Company reserves the right to make
changes in content or application of its policies as it deems appropri-
ate and these changes may be implemented even if they have not
been communicated, reprinted, or substituted in this handbook.  It is
also understood that nothing in this handbook or any other policy or
communication changes the fact that employment is at-will and may
be terminated at any time by you or by the Company with or without
cause or notice.  Any employment not at-will must be by written con-
tract and signed by an officer of the Company.

**I ACKNOWLEDGE RECEIPT OF THE EMPLOYEE HANDBOOK
"ABOUT YOUR COMPANY," AND I AGREE TO READ AND ABIDE
BY THE POLICIES SET FORTH IN THE HANDBOOK.**

_Shawna Lounds_     _90416111_
PRINT NAME            LOCATION NO.

_Shawna Lounds_     _9-27-2011_
SIGNATURE             DATE

Revised 6/2010

This handbook does not constitute a contract for employment with Lincare Inc. or any
of its affiliates.

31

CENTER TOLL # 8556060

DATE 10/12/2012 8:38:18 AM (Eastern Daylight Time)

CALLER FAX #

8556077D7781 3A5

CONFIDENTIAL        LIN_0000050

# EXHIBIT 8

Page 1

1　　　IN THE UNITED STATES DISTRICT COURT
　　　　　FOR THE DISTRICT OF KANSAS
2
3
　　　SHAWRON LOUNDS,
4
　　　　　　Plaintiff,
5
　　　vs.　　　　　　　Case No. 13-CV-1091
6
　　　LINCARE, INC.,
7
　　　　　　Defendant.
8　　_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /
9
　　　VIDEOTAPED
10　DEPOSITION OF: GREG McCARTHY
11　DATE:　　　October 14, 2013
12　TIME:　　　1:47 p.m. to 2:21 p.m.
13　PLACE:　　Michael Musetta & Associates, Inc.
　　　　　　　3000 Gulf to Bay Boulevard
14　　　　　　Suite 310
　　　　　　　Clearwater, Florida
15
　　　PURSUANT TO:　Notice by counsel for
16　　　　　　Plaintiff for purposes of
　　　　　　　discovery, use at trial
17　　　　　　or such other purposes
　　　　　　　as are permitted under
18　　　　　　the Federal Rules
　　　　　　　of Civil Procedure
19
　　　BEFORE:　　LISA A. SIMONS-CLARK, RMR, CRR
20　　　　　　Notary Public, State of
　　　　　　　Florida at Large
21
22　　　　　　Pages 1 to 38
23
24
25

Page 2

1　APPEARANCES:
2　　KIRK D. HOLMAN, ESQUIRE
　　　Holman Schiavone, LLC
3　　4600 Madison, Suite 810
　　　Kansas City, Missouri 64112
4　　(816) 283-8738
　　　　Attorney for Plaintiff
5
　　　STEPHANIE N. SCHECK, ESQUIRE
6　　Stinson Morrison Hecker, LLP
　　　1625 North Waterfront Parkway, Suite 300
7　　Wichita, Kansas 67206-6620
　　　(316) 265-8800
8　　　Attorney for Defendant
9
10　ALSO PRESENT:
11　　Sheila Kalteux, in-house counsel with Lincare
12
　　　　　　　INDEX
13
　　　　　　　　　　　PAGE
14
DIRECT EXAMINATION BY MR. HOLMAN　　　3
15　CERTIFICATE OF OATH　　　　35
　　　REPORTER'S CERTIFICATE　　　36
16　DEPOSITION ERRATA SHEET　　　37
　　　ERRATA SHEET　　　　38
17
18
　　　　　　　EXHIBITS
19
　　　　　　ID'd　MARKED
20
21　　(None marked)
22
23
24
25

Page 3

1　　　THE VIDEOGRAPHER:　This is the videotaped
2　deposition of Greg McCarthy taken in the matter of
3　Lounds vs. Lincare held in Tampa (sic), Florida,
4　on October the 14th, 2013, at approximately 1:47
5　p.m.
6　　　Will counsel please introduce themselves,
7　beginning with the plaintiffs.
8　　　MR. HOLMAN:　Kirk Holman for Plaintiff
9　Shawron Lounds.
10　　　MS. SCHECK:　Stephanie Scheck for Lincare.
11　　　MS. KALTEUX:　Sheila Kalteux, in-house counsel
12　for Lincare.
13　　　THE VIDEOGRAPHER:　Thank you very much.　And
14　would the court reporter please swear the witness.
15　　　　　　GREG McCARTHY,
16　the witness herein, being first duly sworn on oath, was
17　examined and deposed as follows:
18　　　THE WITNESS:　I do.
19　　　　　DIRECT EXAMINATION
20　BY MR. HOLMAN:
21　　Q.　Would you state your full name?
22　　A.　Gregory G. McCarthy.
23　　Q.　Mr. McCarthy, we were introduced to one
24　another.　My name is Kirk Holman.　I'm an attorney from
25　Kansas City, Missouri.　Have you ever had your

Page 4

1　deposition taken before?
2　　A.　I have.
3　　Q.　Okay.　On how many occasions?
4　　A.　Less than 10 but greater than eight, somewhere
5　in there.
6　　Q.　So eight to 10?
7　　A.　Somewhere in there.
8　　Q.　In what kinds of matters have you had your
9　deposition taken?
10　　A.　Mostly employee relations.
11　　Q.　Okay.　And when you say "employee relations,"
12　you mean employment-related --
13　　A.　Correct.
14　　Q.　-- lawsuits?
15　　A.　Correct.
16　　Q.　Okay.　So then I'll dispense with a lot of the
17　formalities with regard to the deposition process, but
18　one of the things I want to impress upon you is that if
19　I ask you a question you don't understand for whatever
20　reason, tell me you don't understand it before you
21　respond.　Does that sound fair?
22　　A.　I agree.　That's fine.
23　　Q.　Okay.　Are you currently employed?
24　　A.　I am.
25　　Q.　Where?

1    A.   Lincare, Incorporated.

2    Q.   And how long have you been employed with

3   Lincare?

4    A.   Just over 17 years.

5    Q.   What do you currently do at Lincare?

6    A.   I'm vice president.

7    Q.   Vice president of what?

8    A.   Of operations.

9    Q.   What does the vice president of operations do

10  at Lincare?

11   A.   I have oversight over approximately half the

12  country, sales and operations.

13   Q.   When you say you have oversight over the sales

14  operations of half the country --

15   A.   Uh-huh.  (Indicates affirmatively).

16   Q.   -- what do you mean by "oversight"?

17   A.   So, effectively the groups of those folks in

18  those two categories report up to me ultimately in half

19  of the country.

20   Q.   Okay.  Do you have any responsibility in your

21  capacity as vice president of operations to act on

22  complaints of discrimination or harassment?

23   A.   Do I have -- say that again, please.

24   Q.   Do you have any responsibility --

25   A.   Absolutely.

1    Q.   Okay.  Let me just -- let me just get the

2   actual question out and the answer so we can have a

3   clean record.  Do you have any responsibility with

4   regard to Lincare's policy prohibiting discrimination

5   and harassment with respect to its policies permitting

6   harassment and discrimination?

7    A.   Can you restate the question?  I'm sorry.  I

8   want to --

9    Q.   Do you have any responsibilities with respect

10  to Lincare's policies prohibiting discrimination and

11  harassment at the workplace?

12   A.   I do.

13   Q.   What are they?

14   A.   Well, ultimately if there is a claim of some

15  sort, a complaint, it's my duty to make sure I make the

16  HR department aware.

17   Q.   Okay.  I want to hand you what we'll mark

18  Exhibit 2 that was previously identified as a Lincare

19  policy and a book that was in place during Ms. Lounds'

20  employment.

21   A.   Okay.

22   Q.   Okay.  And specifically, I'd direct your

23  attention to, in the bottom right-hand corner there are

24  numbers LIN27.  Okay.  And do you see that box?

25   A.   I do.

1    Q.   All right.  What's a "region manager" as that

2   term is used in Exhibit 2?

3    A.   What specifically are you looking for?  What

4   are the responsibilities --

5    Q.   No, no.

6    A.   -- or who are they?

7    Q.   What's a region manager?  Yes.

8    A.   Okay.  A region manager would have sales and

9   operational oversight for a defined geographic

10  territory.

11   Q.   Okay.

12   A.   Typically, a larger geographic territory.

13   Q.   All right.  During Ms. Lounds' employment --

14  and I'll represent to you that was September 27th,

15  2011, until September 24th, 2012 -- who were the region

16  managers during that time period?

17   A.   Towards the end of her employment I don't

18  believe there was a region manager in place, but in the

19  beginning of her employment Carlos Somoza would have

20  been a region manager.

21   Q.   Carlos?

22   A.   Somoza.

23   Q.   How do you spell his last name?

24   A.   S-o-m-o-z-a.

25   Q.   All right.  Where -- were there any other

1   region managers during that time?

2    A.   There's a division manager, which is similar,

3   which would be Karen Schanbacher.

4    Q.   Okay.  But as far as region manager, as that

5   term is used in Exhibit 2 on LIN27 during Ms. Lounds'

6   employment, that individual was Carlos Somoza?

7    A.   For the very, very beginning of it, and then

8   Carlos retired.

9    Q.   Okay.  Do you remember when Carlos retired?

10   A.   I couldn't tell you.  I don't remember.

11   Q.   All right.  But Carlos was the only region

12  manager during that time period she was employed?

13   A.   Effectively, yes.

14   Q.   Okay.  Where was Carlos?  Did he have an

15  office?

16   A.   Uh-huh.  (Indicates affirmatively).

17   Q.   Where was it?

18   A.   Monroe, Louisiana.

19   Q.   And you testified that his -- his

20  responsibilities as a region manager would have been

21  operations in a particular geographic area?

22   A.   Let me clarify.

23   Q.   Sure.

24   A.   So he was a regional vice president.

25   Q.   Okay.

Page 9

1    A.   So in that particular capacity, even -- even a
2  larger geographic territory.  So it's a bit of
3  semantics in that he wasn't classified as a region
4  manager, but it would default to him early -- early on.
5        I don't recall when he retired, though, so it
6  may have been an overlap of a very, very short period
7  of time.
8    Q.   Okay.  But as you sit here, your understanding
9  as the vice president of operations for Lincare is that
10 the region manager that is referenced here in the
11 reporting policies and procedures would have been
12 Carlos Somoza during Ms. Lounds' employment?
13   A.   In the beginning, yes.
14   Q.   Okay.  And thereafter, there was no one in
15 that capacity?
16   A.   It would have defaulted to me.
17   Q.   Okay.  When -- when did it default to you?
18   A.   When Carlos retired, but I -- again, I don't
19 know that date.
20   Q.   Okay.  How about the employee relations
21 director, do you know who that is?
22   A.   I do.
23   Q.   Who is that?
24   A.   Paula Adams.  And the human resources manager?
25   Q.   Okay.  And the human resources manager?

Page 10

1    A.   I believe -- well, there's -- there's a
2  couple.  So it would be Linda Feller or Sheila Dilly.
3    Q.   Okay.  You talked about Carlos being located
4  in Monroe, Louisiana; is that right?
5    A.   That's correct.
6    Q.   Was his number to reach him, was that
7  something that was disseminated to all employees?
8    A.   I couldn't tell you.
9    Q.   Okay.  How about your number, is your number
10 disseminated to employees?
11   A.   I don't know if it's disseminated, but it's
12 easy to get ahold of me.
13   Q.   Okay.  If an employee wanted to get ahold of
14 you, what would be the easiest way that you think the
15 employee could get ahold of you?
16   A.   Simply call the national headquarters and ask
17 the front office person, the lady who answered the
18 phone, for my extension or my line, and they'll
19 transfer them on back.
20   Q.   Okay.  You did testify that you started with
21 Lincare 17 years ago, and my question is this, what was
22 your first position at Lincare?
23   A.   I was managing our pulmonary function testing
24 program.
25   Q.   Okay.  How long did you do that?

Page 11

1    A.   Approximately eight months.
2    Q.   And then what did you do?
3    A.   I was an area manager.
4    Q.   How long were you an area manager?
5    A.   Two and a half, maybe three years.
6    Q.   And what did you do after area manager?
7    A.   Region manager for New York.
8    Q.   And how long were you a region manager?
9    A.   Until 2011, end of 2011, November.
10   Q.   All right.  And currently you're the vice
11 president of operations?
12   A.   Then I became a regional vice president for --
13 I'm giving you very approximate terms.
14   Q.   Sure.
15   A.   I don't have my time line.
16   Q.   That's fine.
17   A.   Maybe two years as a regional vice president
18 and then VP of operations.
19   Q.   When did you start the VP of operations?
20   A.   Maybe five years ago, six years ago.
21   Q.   And how about the regional VP?
22   A.   Regional VP may have been a two-year span,
23 maybe three.
24   Q.   Okay.  All right.  At some -- well, let me ask
25 you this:  At some point you found yourself in Wichita,

Page 12

1  Kansas, in January of 20 --
2    A.   I did.
3    Q.   -- 12, right?
4    A.   Correct.
5    Q.   What were you doing up in Wichita, Kansas, at
6  that time?
7    A.   Part of my job is I go from center to center,
8  meet with the staff, try to identify what is going
9  well, what isn't going well.  It's part of my normal
10 job capacity to do.
11   Q.   Okay.  And at some point when you were up in
12 Wichita, Kansas, did you -- were you told that there
13 were some issues related to perceived race
14 discrimination?
15   A.   I did.
16   Q.   Okay.  And who told you that there were
17 issues?
18   A.   One of the customer service representatives.
19   Q.   Okay.  Tell us in what context this came to
20 your attention.  In other words, was it a group
21 setting?
22   A.   It was.
23   Q.   Okay.  So you're in this group setting meeting
24 with all the --
25   A.   Customer service reps.

1   Q.   Okay.  And somebody -- somebody volunteers
2 this information?
3   A.   That's correct.  Amber, I believe is her name.
4   Q.   Okay.  Was it in response to any questions?
5   A.   Not that I recall.
6   Q.   Okay.  And so was this in front of everyone
7 that Amber volunteered this information?
8   A.   She did.
9   Q.   What exactly did she say, to the best of your
10 recollection?
11   A.   I don't recall exactly what she said, other
12 than she felt that there was some racial commentary
13 that needed my attention.
14   Q.   Okay.  How many people were present when this
15 was said?
16   A.   Maybe five.
17   Q.   Okay.  Other than Ms. Renard, do you remember
18 specifically any individuals that were present?
19   A.   Shawron was there and the rest of the customer
20 service reps.  I don't recall their names at this
21 point.
22   Q.   And what did you do when you were told that
23 there were some issues regarding race, racially
24 discriminatory comments?
25   A.   I said as soon as the meeting is done, that I

1 would sit down with Shawron and have a one-on-one
2 discussion.  I didn't feel it appropriate to do that in
3 a group format.
4   Q.   Okay.  Did -- did Ms. Renard specifically
5 identify Ms. Lounds as being the target?
6   A.   She did.
7   Q.   Okay.  So you ended the -- you ended this
8 group format, right?
9   A.   Uh-huh.  (Indicates affirmatively).
10   Q.   All right.  And then you met individually with
11 some folks?
12   A.   Well, not "some folks."  I asked Shawron after
13 the meeting, I said, Would you like to sit down with
14 Jeremy and I and review exactly what the issue is?  You
15 know, obviously I was very sensitive to the situation.
16 She said, No, I'd rather meet with you one on one.  I
17 said, Not a problem at all.
18       We sat down in the room next to, you know, the
19 open conference area and had a conversation.
20   Q.   Okay.  How did you start that conversation, to
21 the best of your recollection?
22   A.   I don't recall exactly what I would have said.
23 Obviously I was very sensitive to it and asked her, you
24 know, what was going on; but I don't recall exactly how
25 I approached it.

1   Q.   Did you take any notes?
2   A.   No, I did not.
3   Q.   When you sat down and spoke with Ms. Lounds,
4 it was just you and her?
5   A.   Correct.
6   Q.   At some point did you ask for assistance from
7 human resources?
8   A.   No, I did not.
9   Q.   Okay.  So you had this conversation with
10 Ms. Lounds.  How long did it last?
11   A.   Maybe 15 minutes.
12   Q.   All right.  Do you recall what she told you?
13   A.   Not exactly.
14   Q.   How about generally?
15   A.   There was not a lot of detail, other than she
16 felt like there were some statements made that were
17 offensive to her.  I took the matter extremely serious.
18 I told her I apologized immediately if anything was
19 missaid.  She wouldn't give me a lot of detail.
20       I said I would immediately get in touch with
21 our HR department, and she should expect to receive a
22 phone call, and I also asked her if she would be
23 willing to put what happened in writing so we could
24 address it appropriately and expeditiously.
25   Q.   Okay.  And did she -- did she do that?

1   A.   She did.
2   Q.   All right.  Did you meet with any other
3 persons on that day?
4   A.   Specific to that issue or other issues?
5   Q.   Yes.  I should rephrase that.  Did you meet
6 with any other individuals with regard to the -- the
7 issue of racial discrimination?
8   A.   I would have never done that.
9   Q.   Okay.  So you -- you met with Ms. Lounds.  You
10 asked her to articulate her -- her concerns on a piece
11 of paper, right?
12   A.   Well, at the end of the conversation, yes,
13 uh-huh.  (Indicates affirmatively).
14   Q.   Right.  And did she do it then?
15   A.   She did not.
16   Q.   Okay.  Did she do it that day?
17   A.   Not that I know of.
18   Q.   All right.
19   A.   Not in front of me.  I couldn't tell you when
20 she did it, but not in front of me.
21   Q.   Okay.  So did you speak with her at any other
22 point on the 27th of January, 2012, regarding racial
23 discrimination?
24   A.   No.
25   Q.   Did you speak to anyone else regarding these

Page 21

1  you speak to?
2     A.  Paula.
3     Q.  And what did she say?
4     A.  I -- well, I just asked her what was the
5  situation, and she said she was -- had made the phone
6  call and that she -- I believe that sensitivity
7  training was going to be done; and that was the last
8  that I dealt with it at least in that context.
9     Q.  Okay.  So Ms. Adams told you that there was
10  going to be sensitivity training conducted, right?
11     A.  Correct.
12     Q.  Did she tell you anything else?
13     A.  Not that I recall.
14     Q.  Is there anything that would help you
15  remember?  In other words, any kind of calendars,
16  Outlooks, you know, Outlook reminder meetings that you
17  could look at after -- after we chat today?
18     A.  I don't have anything that I think that's out
19  there, no.
20     Q.  Okay.  Did Ms. Adams, at any point subsequent
21  to January 27th of 2012, tell you who allegedly made
22  comments to Ms. Lounds that were racially
23  discriminatory?
24     A.  Not that I recall.
25     Q.  Okay.  Do you know a Suzanne Kraft?

Page 22

1     A.  I do.
2     Q.  Who is she?
3     A.  A center manager -- well, she was a center
4  manager in Wichita.
5     Q.  Okay.  Did you ever come to understand, in the
6  calendar year 2012, that Ms. Kraft allegedly had made
7  racially discriminatory comments to Ms. Lounds?
8     A.  I did.
9     Q.  When was that?
10     A.  It would have been when Shawron finally
11  submitted the letter to describe the situations that
12  had happened.
13     Q.  Okay.  And are you referencing -- if I can
14  find it.  Here it is.  I'm going to hand to you what's
15  been previously marked and identified as Exhibit 25, a
16  February 6th letter directed to your attention that was
17  received by Lincare corporate offices on February 13th,
18  2012.  Is -- is that the letter you're referencing?
19     A.  I am.
20     Q.  Okay.  So if I understand your testimony,
21  sometime subsequent to February 13th, 2012, is when you
22  came to understand that Suzanne Kraft was involved in
23  allegedly making racially discriminatory comments; is
24  that right?
25     A.  Correct.

Page 23

1     Q.  Okay.  And is that -- is that the first time
2  that you came to understand she -- "she" being
3  Ms. Kraft -- was allegedly doing this -- well,
4  allegedly engaging in conduct that was racially
5  discriminatory?
6     A.  Well, it was implied based off of this letter,
7  but I -- obviously I wasn't there, so I don't
8  understand the context of what may have happened or
9  what may not have happened.
10     Q.  Right.  But I guess my question was a little
11  bit imperfect.  After February 13th, 2012, would it be
12  a fair statement that that's the first occasion that
13  you understood that Ms. Kraft allegedly had made
14  comments that were offensive to Ms. Lounds?
15     A.  Correct.
16     Q.  What did you do in response to -- to that
17  knowledge?
18     A.  I took the letter that I received and gave it
19  to Paula Adams as well.
20     Q.  And when you say that you gave it to
21  Paula Adams --
22     A.  Uh-huh.  (Indicates affirmatively).
23     Q.  -- did you -- did you call up Ms. Kraft in any
24  way?
25     A.  Absolutely not.

Page 24

1     Q.  Why not?
2     A.  Because it's not part of the policy.
3     Q.  Okay.  What -- what is -- what is your -- what
4  is your understanding of your obligations under the
5  policy prohibiting discrimination and harassment?
6     A.  First of all, it's not tolerated in our
7  environment.  So we have to take the steps to make sure
8  that that's ensured, and to do that we have to
9  investigate appropriately, and it's the responsibility
10  of the HR department to do that, which is why I would
11  hand it over to Paula.
12     Q.  Okay.  So you handed the letter that was
13  marked Exhibit 25 to Ms. Adams.  You did not contact
14  Ms. Kraft, right?
15     A.  Correct.
16     Q.  Did you periodically check with Ms. Adams to
17  see what progress, if any, was made regarding the
18  investigation?
19     A.  I don't recall that I did.
20     Q.  Okay.  Was it concerning to you that a center
21  manager was implicated in conduct that violated the
22  policy prohibiting discrimination and harassment?
23        MS. SCHECK:  Object to the form.
24        THE WITNESS:  I think it's concerning enough
25     for me to have got off the plane and the very

GREG MCCARTHY                                    October 14, 2013
SHAWRON LOUNDS vs. LINCARE, INC.                          37

1                    DEPOSITION ERRATA SHEET

2    Our Assignment No. 10994
     Case Caption:  Lounds vs. Lincare, Inc.
3

4          DECLARATION UNDER PENALTY OF PERJURY
          I declare under penalty of perjury that I have read
5    the entire transcript of my Deposition taken in the
     captioned matter or the same has been read to me, and
6    the same is true and accurate, save and except for
     changes and/or corrections, if any, as indicated by me
7    on the DEPOSITION ERRATA SHEET hereof, with the
     understanding that I offer these changes as if still
8    under oath.
          Signed on the  15  day of  November , 2013.
9

10   _____

11                   Greg McCarthy

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                          ERRATA SHEET

 2        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 3    IN RE:   Lounds vs. Lincare, Inc.
              WITNESS:  GREG McCARTHY
 4            DATE OF DEPOSITION:  October 14, 2013

 5    PAGE   LINE         CHANGE              REASON

 6    _____  _____        None            _____

 7    _____  _____        _____

 8    _____  _____        _____

 9    _____  _____        _____

10    _____  _____        _____

11    _____  _____        _____

12    _____  _____        _____

13    _____  _____        _____

14    _____  _____        _____

15    _____  _____        _____

16    _____  _____        _____

17    _____  _____        _____

18    _____  _____        _____

19    _____  _____        _____

20
      Under penalties of perjury, I declare that I have read
21    the foregoing document and that the facts stated in it
      are true.
22

23    11/15/13
      DATE                    GREG McCARTHY
24

25    Reporter:  Lisa A. Simons-Clark, RMR, CRR
```



EXHIBIT 9

Page 1

1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF KANSAS
3
  SHAWRON LOUNDS,            )
4                            )
                             )
5        Plaintiff,    )
6                            )
    vs.            )Case No. 13-CV-1091
7                  )CONFIDENTIAL
                             )
8 LINCARE, INC.,         )
                             )
9                            )
         Defendant.    )
10                           )
11
12
13       D E P O S I T I O N
14    The videotape deposition of AMBER RENARD taken on
15 behalf of the Plaintiff pursuant to the Federal Rules of
16 Civil Procedure before:
17       DARLENE K. KELLEY, CSR
         KELLEY, YORK & ASSOCIATES, LTD.
18       Suite 105, 515 South Main Street
         Wichita, KS  67202
19
20
21 a Certified Shorthand Reporter of Kansas, at 1625 N.
22
23 Waterfront Parkway, Suite 300, Wichita, Sedgwick County,
24
25 Kansas, on Wednesday, October 9, 2013, at 3:33 p.m.

Page 2

1       A P P E A R A N C E S
2 PLAINTIFF:
      HOLMAN SCHIAVONE, LLC
3     Ms. Anne Schiavone
      4600 Madison Avenue
4     Suite 810
      Kansas City, Missouri 64112
5     (816) 283-8738
      aschiavone@hslawllc.com
6     (816) 283-8739
7
  DEFENDANT:
8     STINSON MORRISON HECKER LLP
      Ms. Stephanie N. Scheck
9     Suite 300
      1625 North Waterfront Parkway
10    Wichita, Kansas 67206-6602
      (316)265-8800
11    sscheck@stinson.com
12
13
14 VIDEOGRAPHER:
15    ADVANCED DOCUMENT IMAGING
16    Mr. Kyle B. Kelley
17    Suite 105
18    515 South Main
19    Wichita, Kansas 67202
20    (316) 267-0800
21    kkelley@kelleyyork.com
22
23
24
25 Also present was Mr. Jeremy Felts.

Page 3

1              I N D E X
2                      Page
3 AMBER RENARD
4   Direct Examination  By Ms. Schiavone        4
5   Cross-Examination By Ms. Scheck          56
6   Redirect Examination By Ms. Schiavone          60
7
8
9
10          E X H I B I T S
11 No.    Description            Page
12   1  7-24-12 Final Written Warning (Renard)      48
       (2 pgs.)
13
   (EXHIBITS BOUND IN SEPARATE EXHIBIT NOTEBOOK)
14
15
16
17
18
19
20
21
22
23 Signature of Witness                64
24
25 Certificate                    65

Page 4

1        THE VIDEOGRAPHER:  This begins
2    the videotape deposition of Amber Renard.
3    Today's date is October 9, 2013.  The time is
4    3:29 p.m.  Will the court reporter please
5    swear the witness.
6        AMBER RENARD,
7    having been first duly sworn on her oath to
8    state the truth, the whole truth, and nothing
9    but the truth, testifies as follows:
10        DIRECT EXAMINATION
11 BY MS. SCHIAVONE:
12 Q.   Can you state your name for the record,
13    please?
14 A.   Amber Renard.
15 Q.   Ms. Renard, I'm the attorney for Shawron
16    Lounds in a lawsuit that she's filed against
17    Lincare.  And I'm just here today to ask you
18    a few questions.
19        Just real quickly, just give verbal
20    responses so the court reporter can take down
21    your response.  Head shakes won't work.  And
22    then if you need a break at any time, just me
23    know.  And just talk a little louder because
24    the court reporter has to hear what you say.
25 A.   Okay.

Page 21

1  A.   She would complain when she would get a
2      patient or a client in the northeastern side
3      of Wichita and say that she didn't belong in
4      the ghetto.
5  Q.   And is that area -- and I'm not real familiar
6      with Wichita, so I apologize.  Was that area
7      that she referred to as the ghetto
8      predominantly of a certain race who lived
9      there?
10 A.   I couldn't say for sure because I wouldn't
11     know specifics on that.
12 Q.   But she would say something about her not
13     belonging in the ghetto?
14 A.   It's a lower income area of town.
15 Q.   What else would Laney say that you considered
16     to be having a racial undertone?
17 A.   One day she walked through the office and
18     said boom with the "N" word.
19 Q.   And just so the record is clear, the "N"
20     being nigger.
21 A.   Well, she didn't put the R at the end, but
22     yes, ma'am.
23 Q.   Okay.  Nigga, N-I-G-G-A?
24 A.   Yes, ma'am.
25 Q.   When was that, do you recall?

Page 22

1  A.   No, ma'am.
2  Q.   Do you recall if that was before January of
3      2012?
4  A.   I do not.
5  Q.   And the ghetto comment, do you recall if it
6      was before or after 2012, January of 2012?
7  A.   I do not know.
8  Q.   Was Suzanne Kraft present when these things
9      were said?
10 A.   Not back where we were.  No, ma'am.
11 Q.   So we talked about Laney making the ghetto
12     statement and the boom nigga statement.
13     Anything else you recall Laney Kempke saying?
14 A.   No, ma'am.
15 Q.   Do you recall any employee asking Shawron if
16     her hair was real or if she wore a weave?
17 A.   I never ever heard that, no.
18 Q.   Do you recall anyone asking Shawron why black
19     people listen to rap music?
20 A.   No, ma'am.
21 Q.   Do you recall -- is it Kevin?
22 A.   Kevin.
23 Q.   Yeah, how do you pronounce his last name?
24 A.   I'm not sure.
25 Q.   Kevin --

Page 23

1  A.   Kuntz, Kuntz (pronouncing).
2  Q.   Do you recall him making any comments that
3      were of a racial nature?
4  A.   No.
5  Q.   Did you ever hear or become aware of him
6      making a statement about bringing a lynching
7      back?
8  A.   I was told about it but no, ma'am, I was not
9      there for that comment.
10 Q.   Who told you about it?
11 A.   Shawron.
12 Q.   And do you know when she told you about it?
13 A.   When I came back from the funeral.
14 Q.   And what funeral, not necessarily who, but
15     the time period?
16 A.   It was in November.
17 Q.   Of 2011?
18 A.   Yes, ma'am.
19 Q.   And how did it come about that she told you
20     that?
21 A.   Because it pertained apparently to the
22     funeral I attended.
23 Q.   Was the funeral you attended somebody of a
24     minority?
25 A.   Yes, ma'am.

Page 24

1  Q.   A black person?
2  A.   Yes, ma'am.
3  Q.   And what did she relay to you?
4  A.   She had told me that the comment had been
5      made and that they had -- she told me that --
6      I can't remember exactly how the conversation
7      went, but she had basically told me that she
8      had told them they needed to be careful what
9      they said around me because it was a very
10     emotional situation for me and my family.
11 Q.   But you understand that Kevin had said
12     something of a racist nature about basically
13     hanging black people?
14     MS. SCHECK:  Object to the form.
15 BY MS. SCHIAVONE:
16 Q.   Is that accurate?
17 A.   That's, like I said, what I just told you is
18     what I heard.
19 Q.   And what I heard was that Kevin had made a
20     comment about lynching?
21 A.   The person that murdered my son's friend's
22     mom.
23 Q.   With respect to -- and I don't mean to harp
24     on it.
25 A.   May I take a break, please?

1      MS. SCHIAVONE:  Absolutely.
2      THE VIDEOGRAPHER:  Off the record
3   3:50.
4      (A recess was taken from 3:54 p.m. to
5   3:56 p.m.)
6  BY MS. SCHIAVONE:
7  Q.   And I don't mean to upset you.  I'm just
8      trying to find out what Kevin said for
9      purposes of this lawsuit.
10      So is it accurate that Shawron relayed
11      to you that while you were not there that
12      Kevin said something of a racial nature as it
13      relates to black people?
14  A.   She said that he said it relating to the
15      person that murdered my son's friend's mom.
16  Q.   And that person was black?
17  A.   Yes, ma'am.
18  Q.   Have you overheard, yourself, Kevin say
19      anything of a racial nature?
20  A.   No, ma'am.
21  Q.   Other than we talked about Laney, we talked
22      about Kevin, we talked about Suzanne, have
23      you heard anyone else at the Lincare office
24      while you were employed at the time period of
25      the fall of 2011 through September of 2012

1      make a racial or racially-charged statement?
2  A.   No, ma'am.
3  Q.   When Shawron relayed to you the fact that
4      Kevin had made a racially insensitive and
5      inappropriate comment --
6      MS. SCHECK:  Object to the form.
7  BY MS. SCHIAVONE:
8  Q.   -- did you take that to Suzanne?
9  A.   Ma'am, I was more concerned with my son's
10      wellbeing at that point in time to be worried
11      about anything at work.
12  Q.   So the answer is no?
13  A.   Yes.
14  Q.   Did you at any point in time tell Suzanne
15      about the statement that Laney Kempke had
16      made about boom and the "N" word?
17  A.   Yes, Suzanne was notified.
18  Q.   Okay.  And when was she notified?
19  A.   That day.
20  Q.   And do you recall what her response was?
21  A.   No, ma'am, I do not.
22  Q.   Okay.  Did you relate that information to her
23      about what Laney had said or did somebody
24      else do it?
25  A.   I did.  And I believe Shawron might have been

1      with me when I did it.
2  Q.   Do you know if Laney received any type of
3      discipline as a result?
4  A.   I have no idea.
5  Q.   Okay.  Do you recall what Suzanne's reaction
6      was when you told her this?
7  A.   She said she would talk to her about it.
8  Q.   And when you called Suzanne out in the
9      meeting when she made the "yes, massa"
10      comment, she was basically nonresponsive, is
11      that accurate?
12  A.   Yes, ma'am.
13  Q.   And did that comment that she made occur in a
14      staff meeting?
15  A.   Yes.
16  Q.   Yes?
17  A.   Yes, ma'am.
18  Q.   And was that in about January of 2012?
19  A.   I don't remember the time.
20  Q.   Did you hear from Shawron, other than what
21      we've already talked about, any comments that
22      she brought to your attention that had been
23      made by employees that she believed to be
24      racially derogatory?
25  A.   Other than what I've said, no.

1  Q.   Other than the time you saw Shawron upset
2      over -- visibly upset over Suzanne's "yes,
3      massa" comment, did you see her cry or become
4      visibly upset at work?
5  A.   Yes, ma'am.
6  Q.   Do you recall when those occasions were?
7  A.   Like dates?
8  Q.   I'm just -- general months and year.  It
9      would have been in 2012, I assume?
10  A.   I know once was when Greg McCarthy came from
11      corporate and once was when Linda Fellers
12      came from corporate and once was when Karen
13      came.  I couldn't tell you the dates or the
14      months.
15  Q.   Okay.  Were these all after you had brought
16      to Greg McCarthy's attention the fact that
17      there was a racially-charged environment at
18      the Lincare office?
19      MS. SCHECK:  Object to the form.
20  BY MS. SCHIAVONE:
21  Q.   Well, let's start with this.  In January
22      2012, did you inform Greg McCarthy of an
23      issue that you had in the workplace?
24  A.   Yes, ma'am.
25  Q.   And what did you inform him?

1  A.   That I didn't feel it was appropriate for my
2      co-worker to feel singled out by the color of
3      her skin at work.
4  Q.   And what led you to bring that up to Greg
5      McCarthy?
6  A.   The comments that had been made by Suzanne
7      and having heard the one about when my son's
8      friend -- and she just felt singled out.
9  Q.   Did she relay to you in conversation that she
10     felt singled out and that it bothered her?
11 A.   Yes.
12 Q.   Prior to you making a comment to Greg
13     McCarthy about this, did you tell Shawron you
14     were going to do it or discuss with Shawron
15     that you were going to make a statement about
16     it?
17 A.   No.
18 Q.   What prompted you in that meeting -- I
19     believe it was a staff meeting, is that
20     accurate?
21 A.   Yes.
22 Q.   Who was in the room at that time, do you
23     recall?
24 A.   I don't remember everybody that was in there,
25     no, ma'am.

1  Q.   Was Suzanne Kraft present?
2  A.   No.
3  Q.   Okay.  Was Jeremy Felts present?
4  A.   I don't recall.
5  Q.   And so what occurred in that meeting?  And
6      I'll represent to you that it was at the end
7      of January 2012.
8  A.   He just was asking how things were at the
9      office.  Nobody would say anything.  And he
10     looked directly at me and asked me how I felt
11     things were going.  I said do you really want
12     me to answer that?  And he said yes.  And so
13     I told him that.
14 Q.   And you told him that people were being
15     singled out based on their race?
16 A.   I said I did not feel that it was fair that
17     my co-worker felt singled out because of the
18     color of her skin.  And he immediately said
19     he would speak to her after the meeting.
20 Q.   And do you know if he in fact spoke with her?
21 A.   Yes, he did.
22 Q.   Did Shawron relate to you what was discussed?
23 A.   I was in there for part of the meeting.  She
24     just relayed to him comments that had been
25     made that -- leading up to it, the "yes,

1      massa," the why do black women name their
2      kids' names, and she did bring up the
3      situation from when I was not there.
4  Q.   Okay.  Did she bring up the Laney Kempke
5      statement?
6  A.   Yes.
7  Q.   Okay.
8  A.   Yes.
9  Q.   Have you ever overheard Laney Kempke or
10     anyone else say peace out nigga?
11 A.   No, ma'am.
12 Q.   So you haven't heard that?
13 A.   I've heard people say peace out, but no.
14 Q.   After you were in the meeting that Shawron
15     was also present in, talking with Greg
16     McCarthy, did he talk to you one on one?
17 A.   No.
18 Q.   Did anybody from corporate come and talk to
19     you one on one about the environment?
20 A.   No.
21 Q.   And Greg McCarthy didn't talk to you one on
22     one; is that accurate?
23 A.   No.
24 Q.   How much did you talk in the meeting when it
25     was you and Shawron and Greg McCarthy?

1  A.   I was just there for support for her.  She
2      asked me to come in with her.
3  Q.   So then is it accurate that nobody really
4      interviewed you or got information from you
5      other than what you said in the meeting to
6      Greg McCarthy?
7  A.   Yes, ma'am.
8  Q.   That's accurate?
9  A.   Yes, ma'am.
10 Q.   Now, you said at the times you saw Shawron
11     get upset in the workplace other than when
12     Suzanne made the "yes, massa" statement was
13     when she spoke with Greg McCarthy.  And is
14     that the meeting we just discussed?
15 A.   Yes, ma'am.
16 Q.   And then you said when she met with Linda
17     Feller and then also Karen.  Does Karen's
18     last name start with an S?
19 A.   Yes, ma'am.  That's why I didn't say it.
20 Q.   We'll just call her Karen S.
21 A.   Yes.
22 Q.   Do you recall if the meetings that Shawron
23     had with Linda Feller and Karen S were both
24     after her meeting with Greg McCarthy?
25 A.   Yes, ma'am.

1    environment?
2        MS. SCHECK:  Object to the form.
3   BY MS. SCHIAVONE:
4   Q.   You said she's got to move on past this.
5       What did you understand "this" to be?
6   A.   To make it a better work environment was what
7       I understood it as.
8   Q.   Did you -- go ahead.
9   A.   I wasn't in the meeting, so I don't know what
10      was said in what terms and what the
11      conversation was.
12  Q.   You just know Shawron was upset?
13  A.   Yes.
14  Q.   When did you talk to Shawron?  And by that I
15      mean was it a week after the meeting, was it
16      an hour after the meeting, to the best of
17      your recollection?
18  A.   It had to have been a day or two because I
19      believe she left after that meeting.
20  Q.   Did -- between February of 2012, so after the
21      meeting with Greg McCarthy, that would have
22      been January of 2012.  So let's fast forward
23      to February of 2012.  Between February of
24      2012 and Shawron's termination in September
25      of 2012, did anybody from corporate come and

1       interview you about any of Shawron's
2       allegations or the work environment?
3   A.   No.
4   Q.   Did you ever come to learn that Shawron had
5       filed a charge of discrimination with the
6       EEOC, Kansas Human Rights Commission about
7       her employment environment?
8   A.   I had heard it, yes.
9   Q.   And how did you hear it?
10  A.   Suzanne.
11  Q.   And what did Suzanne say about that?
12  A.   That she filed a claim with the EEOC.
13  Q.   And do you recall when she said that?
14  A.   No, ma'am.
15  Q.   Do you know, could you limit it down to the
16      spring of 2012?
17  A.   No, ma'am.
18  Q.   Okay.  And I'm just here to find out
19      information from you.
20  A.   Right.
21  Q.   There's no right or wrong answer.
22          And so Suzanne informed you that she
23      had filed a claim?
24  A.   Yes.
25  Q.   Did Suzanne ever interview you at any point

1       in time about the work environment or
2       Shawron's allegations?
3   A.   No.
4   Q.   Did Jeremy Felts ever interview you?
5   A.   Other than when I talked to him.
6   Q.   And you're talking about in December when you
7       brought complaints to his attention; is that
8       accurate?
9   A.   Yeah.  And then we spoke after the meeting
10      with Greg just about the environment as a
11      whole at the office.
12  Q.   And when you say environment as a whole, is
13      that when he brought everyone together and
14      gave the employee handbook page dealing with
15      the company's EEO policies?
16  A.   Where they went over it, yes.
17  Q.   And following that meeting with Greg McCarthy
18      and this meeting you were talking about, did
19      Jeremy Felts pass out the page of the
20      employee handbook and go over it that dealt
21      with antidiscrimination?
22  A.   They had a meeting, a whole meeting over it.
23  Q.   And when you say a whole meeting, how long
24      would you say the meeting lasted?
25  A.   Ma'am, I don't know.

1   Q.   What was discussed in the meeting?
2   A.   Basically appropriate workplace comments and
3       antidiscriminatory policies.
4   Q.   Did he review the employee handbook with you?
5   A.   Yes, ma'am.
6   Q.   And I'm going to hand you what we'll mark
7       as -- well, do you recall signing a sign-in
8       sheet saying that you were in attendance at
9       that meeting?
10  A.   We had to sign sign-in sheets for everything,
11      so I don't remember.  I would assume, yes.
12  Q.   And other than that meeting, did you have any
13      other conversations with Jeremy Felts?  We're
14      talking about the January meeting that he had
15      with everybody and your meeting with him in
16      December.  Any other meetings that you can
17      think of with Jeremy Felts where Shawron's
18      work environment or allegations were
19      discussed?
20  A.   No.
21  Q.   Did Jeremy ever discuss Shawron with you?
22  A.   No.
23  Q.   What about Suzanne Kraft, other than the
24      statement she made about Shawron having filed
25      a charge?  Did she say anything else about

Page 41

1    Shawron to you?
2  A.   Did who say anything else to me?
3  Q.   Suzanne Kraft.
4  A.   No, ma'am.
5  Q.   When she said that Shawron had filed a
6        charge, what was her demeanor when she said
7        that, if you can recall?
8  A.   Just that she had gotten a letter and it
9        was -- I can't really like pinpoint a
10       demeanor.  It was Suzanne demeanor.
11 Q.   What's Suzanne demeanor?  I haven't had the
12       opportunity to meet her yet.  Is she aloof,
13       is she flippant about stuff?  How would you
14       describe her?
15 A.   What is your description of aloof.
16 Q.   Kind of shrugs everything off and acts like
17       things that maybe are a big deal are not a
18       big deal.
19 A.   I would say she was aloof about it.
20 Q.   Okay.  Did you consider Suzanne to be your
21       direct supervisor?
22 A.   She was technically my direct supervisor.
23 Q.   And same thing for Shawron?
24 A.   Yes, ma'am.
25 Q.   Did you understand Suzanne to have the

Page 42

1        authority to discipline you?
2  A.   Yes.
3  Q.   Write you up?
4  A.   Yes.
5  Q.   Fire you?
6  A.   Yes.
7  Q.   At some point in time did your relationship
8        with Shawron change?
9  A.   Yes.
10 Q.   Okay.  Do you recall when that occurred?
11 A.   I do not.
12 Q.   Was it after the meeting with Greg McCarthy?
13 A.   It was after it, yes, but it was a little
14       while after it, yes.
15 Q.   And what in your mind, based on your
16       observations and how you were feeling, what
17       triggered the change in that relationship?
18 A.   When I had come to a decision within myself
19       that I could not come into work and not be
20       cordial and speak to people, because I have a
21       child to raise.  So I was not distant to a
22       point of being rude to people and I was --
23       changed my attitude towards work and put my
24       all into it because I needed to have a job to
25       support my son.

Page 43

1  Q.   Was it anything that Shawron did or was it an
2        internal decision on your part that you're
3        not really going to talk at work and you're
4        just going to --
5  A.   It was an internal decision based on my own
6        based on my classes at school and being a
7        single mom.
8  Q.   After you made that report to Greg McCarthy
9        and had basically told him the comments that
10       Suzanne had made, were you fearful that
11       Suzanne might write you up or do something to
12       your employment because you had brought that
13       to Greg McCarthy's attention?
14 A.   Initially, yes, but there's retaliation laws
15       against that.
16 Q.   And you say initially, yes.  About how long
17       did that go on that you had that --
18 A.   I just had my initial feeling of oh, gosh,
19       what have I done?  I forgot to use my filter.
20       But I also know that there is laws protecting
21       me because, again, based off my education we
22       were actually going over things of that
23       nature in my class.
24 Q.   Did your decision to be more to yourself at
25       work and really just focus on work in part

Page 44

1        have to do with the fact that there was this
2        environment that you had reported that you
3        kind of wanted to stay above the fray and
4        just focus on work?
5            MS. SCHECK:  Object to the form.
6  BY MS. SCHIAVONE:
7  Q.   You can answer.
8  A.   It was because I want to move up and be able
9        to provide well for my son because he is my
10       sole focus.
11 Q.   Did you, following your meeting with Greg
12       McCarthy, did you ever hear employees say,
13       "Boom, nigger," in the workplace?
14 A.   Past the one time when Laney said it?
15 Q.   Yes.
16 A.   No.
17 Q.   Did you hear them walk by and say boom?
18 A.   Shawron and I used to say boom all the time.
19 Q.   But without the "N" word attached?
20 A.   Yes, ma'am.
21 Q.   Did you hear anything of a racial nature
22       after you reported it to Greg McCarthy?
23 A.   I did not personally hear anything.
24 Q.   Did you hear anything through the grapevine
25       or, as you would call it, hearsay?

Page 45

1  A.   Ma'am, I withdrew myself from being involved
2       in it because I was there to take care of my
3       child.
4  Q.   Did Shawron ever bring anything to your
5       attention after the meeting with Greg
6       McCarthy?
7  A.   Everything that she talked about was stuff
8       that had been brought up and talked about.
9  Q.   And do you recall whether or not any of that
10      was after the conversation with Greg
11      McCarthy?
12 A.   I do not recall dates.
13 Q.   And we talked about the meeting that you
14      seeing her with Linda Feller and then her
15      conversation with -- after her meeting with
16      Karen.  Is there anything that you can think
17      of that she relayed to you about management's
18      interactions with her afterwards?
19 A.   That she did not like Suzanne's interactions
20      with her.
21 Q.   And what did she say to you that made you
22      believe that?
23 A.   That she didn't like Suzanne's way of dealing
24      with her, and dealing with anybody in
25      general.

Page 46

1  Q.   Did Shawron feel like Suzanne picked on her?
2  A.   I'm not sure about that.  I don't know that
3       for sure.
4  Q.   Is it accurate that Shawron -- do you recall
5       Shawron being at work religiously from in the
6       fall of 2011 until about January or February
7       of 2012?
8  A.   I did not keep track of her attendance.
9  Q.   Did you ever miss work?
10 A.   Not on a regular basis, no.
11 Q.   Did you ever have to be absent from work?
12 A.   If my son was sick, yes.
13 Q.   Did you ever text in the fact that you were
14      going to be absent?
15 A.   No, ma'am.  I would call in.
16 Q.   Are you aware of any employees texting in
17      absences?
18 A.   Not to my knowledge, other than I know
19      Shawron would text in.
20 Q.   Can you just briefly tell me, it's my
21      understanding that at some point in time, I
22      think it was in the spring or summer of 2012,
23      Shawron took some medicine from you, thought
24      it was Tylenol or aspirin and had an allergic
25      reaction.

Page 47

1  A.   She had come to me and had asked me if I had
2       any aspirin.  I said no, I don't.  I don't
3       take aspirin.  The only thing I have is my
4       headache medicine.  And I said, but it's a
5       prescription.  And she said, well, I may ask
6       you for one later because I've taken almost a
7       whole bottle of ibuprofen over the last 24
8       hours and it's not helping my mouth.  She was
9       having some dental issues.
10          She came and she asked me for it.  I
11      said, Shawron, it's a prescription.  It's a
12      non-narcotic, but it is a prescription.  She
13      took it.
14 Q.   And then it's my understanding there was some
15      allergic reaction?
16 A.   Apparently, yes.  I left to take a rental car
17      back, came back from lunch, and she was sick
18      and had had an allergic reaction is what she
19      told me at the next day at work.
20 Q.   Did her husband come in at any point in time
21      during that day?
22 A.   He came in and picked her up to take her to
23      the doctor or hospital.
24 Q.   Did he say anything when he came in?
25 A.   He said, you guys are trying to poison her.

Page 48

1  Q.   Who did he say that to?
2  A.   He just said it in general.  I'm not sure
3       exactly who it was directed at.
4  Q.   Did he confront you at all?
5  A.   He came over and asked me what it was she
6       took and I told him.
7  Q.   Did he appear angry?
8  A.   Yes.
9  Q.   Do you recall having a conversation with
10      Shawron in April or so of 2012 where you were
11      talking about a friend's event on a flight to
12      Texas named Craig and made a statement saying
13      that he was a little darker?
14 A.   I've never been on a flight to Texas and met
15      anybody named Craig.
16 Q.   Do you recall getting a write-up in July of
17      2012?
18 A.   Yes, ma'am.
19 Q.   Okay.
20          (Deposition Exhibit No. 1 was marked
21      for identification.)
22 BY MS. SCHIAVONE:
23 Q.   I'm going to now hand you what we'll mark as
24      Exhibit 1 to your deposition.  Have you seen
25      that document before?

Page 49

1 A.  Yes, I've seen it.
2 Q.   Okay.  And what did you understand this to
3    relate to?
4 A.   A comment that my boyfriend had made and she
5    asked me what did it mean.
6 Q.   Okay.  And was that the B-O-N comment?
7 A.   Yes, ma'am.
8 Q.   Okay.  And the B-O-N standing for big old?
9 A.   He called himself that, yes.
10 Q.   And tell me how that conversation came about.
11 A.   I was coming in from lunch talking to him on
12    the phone laughing, and I said I will not say
13    that, and he just you can just say B-O-N.
14    After I got off the phone, she asked me what
15    did it mean.
16 Q.   And you said?
17 A.   Big old N and I did not say the word because
18    I don't say the word.
19 Q.   And how did you come to receive a written
20    warning?  And I understand you didn't sign
21    it.  But how did you come to have this
22    presented to you?
23 A.   Suzanne called me in her office and gave it
24    to me.
25 Q.   Do you know how Suzanne became aware of that?

Page 50

1 A.   No, ma'am.
2 Q.   Do you know if Shawron reported it or do
3    you --
4 A.   I would assume.  No, I don't know for sure.
5 Q.   Did Shawron appear upset at all when you
6    said --
7 A.   No, she laughed.
8 Q.   And to the best of your recollection you
9    don't recall any conversation about -- do you
10    recall something about having a friend named
11    J.J.?
12 A.   Yes.
13 Q.   Okay.  Do you recall any conversation --
14 A.   Are you talking about the basketball
15    conversation?
16 Q.   Tell me what you recall.
17 A.   That they had called because there had been
18    an incident at a basketball tournament, and
19    the team that my son had played told -- the
20    coach told his team that all of -- every time
21    you guys play this team of black kids, you
22    guys get in fights.  And the coach came to me
23    and said, Amber, did you know your son is
24    black now.  And J.J. had called me at work.
25    Well, it was my lunch hour, and we were

Page 51

1    talking about it and she had asked me about
2    it.
3 Q.   And was J. J. the coach or was J.J. a friend?
4 A.   He was assistant coach and one of my very
5    best friends.
6 Q.   And was J.J. black or white?
7 A.   He's black.
8 Q.   When you first started at Lincare, did you
9    receive any type of employee training on the
10    policies and procedures of the company?  Did
11    you --
12 A.   We went over the videos.
13 Q.   What videos did you see when you first
14    started?
15 A.   There's a whole list of them.
16 Q.   Did any of them deal with antidiscrimination?
17 A.   I can't remember, ma'am.  It's been two
18    years.
19 Q.   And I assume you received a handbook, an
20    employee handbook when you started?
21 A.   Yes, ma'am.
22 Q.   And when you received the employee handbook,
23    did people go over all the paragraphs of the
24    handbook with you or did they give it to you
25    and have you sign an acknowledgment form?

Page 52

1 A.   Suzanne gave it to me and had me sign an
2    acknowledgment form that she gave it to me.
3 Q.   Overall, based on your personal observations
4    and experience with Suzanne Kraft, did you
5    believe her to be a professional in the
6    workplace?  You can answer.
7 A.   No.
8 Q.   What leads you to that conclusion?  What did
9    you observe other than the racial comments
10    we've talked about, what else did she do to
11    make you form that opinion about her?
12 A.   The way she spoke to people, the way she
13    handled situations, the way she would handle
14    our patients.
15 Q.   How -- and let's just limit it to employees.
16    How would she speak to employees that you
17    thought was unprofessional?
18 A.   She would yell at them as if they were a
19    child and degrade them in front of other
20    people.
21 Q.   Can you give me an example?
22 A.   One day when one of the employees had done
23    something, which I do not know exactly what,
24    she was yelling at her in the area, like
25    the -- there's a big common area where we had

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| SHAWRON LOUNDS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 13-CV-1091-RDR-KGS |
| | ) |
| LINCARE INC., | ) |
| | ) |
| Defendant. | ) |

**AFFIDAVIT OF PAULA ADAMS**

I, Paula Adams, being first duly sworn, state:

1.    I am over the age of twenty-one and have personal knowledge of, and am otherwise competent to testify regarding, the matters set forth herein.

2.    I have worked for Lincare Inc. ("Lincare") for five years, and have personal knowledge of its policies, practices, and business operations.

3.    I have been Director of Employee Relations for Lincare since October 2011.  My office is in Clearwater, Florida, which is where Lincare is headquartered.

4.    As Lincare's Director of Employee Relations, one of my responsibilities is to investigate employee complaints of racial harassment or discrimination and to work with management to determine appropriate action.

5.    On January 27, 2013, Greg McCarthy ("McCarthy), Lincare's vice president of operations, informed me that Amber Renard, a customer service representative ("CSR") in Wichita, had complained that inappropriate racial statements had been made to a co-worker, Shawron Lounds ("Lounds"), in the workplace.  McCarthy described the situation briefly, then asked me to investigate her complaint.

6.      To investigate, I called Jeremy Felts, District Manager, on January 27, 2012.  He was in Wichita and brought Renard and Lounds into a private office so that we could discuss the complaint.  My notes from the call are attached to this Affidavit as Exhibit A.

7.      During the phone call, Lounds complained about a variety of statements and identified three persons who had made the comments:  Laynee Kempke ("Kempke"), one of Lounds' co-workers in the Wichita center; Suzanne Kraft ("Kraft"), Lounds' supervisor; and Kevin Kunz ("Kunz"), one of Lounds' co-workers in the Wichita center.

8.      In our conversation, Lounds alleged that:

    a.    Kempke had said,  "peace out nigga" in the workplace;

    b.    Kunz had made a comment about lynching;

    c.    Kraft had told her (Lounds) to address McCarthy as "yes massa"; and

    d.    Kraft had asked "who names their kid Shawron?"

9.      Based on my conversation with Lounds, Renard and Felts, it was mutually agreed between management and me that Kempke, Kraft, and Kunz would immediately be issued final written warnings.  Also, Jeremy Felts in-serviced the staff on the Company's policy prohibiting racial discrimination and/or harassment.

10.     McCarthy had asked Lounds to provide a written statement describing her allegations.  On February 13, 2012, I received two "Memorandums" from Lounds, one dated February 3, 2012, the other dated February 6, 2012.

11.     I reviewed the two Memorandums, and determined that Lounds had not identified any other Lincare employees as having made inappropriate statements.  Instead, Lounds identified the same three Lincare employees that she identified on January 27—Kempke, Kraft, and Kunz.  She reported a few new comments by these three employees, and provided more

2

detail and context for the comments she had already reported to McCarthy and me, but did not specify anyone else as having made what she perceived as offensive statements.

12.     For this reason, it was determined that the Final Written Warnings addressed all documented issues and no further corrective action was needed. I was traveling for work in February 2012, and was not able to email her until February 22. At that time, I attempted to set up a phone call with Lounds.

13.     We spoke on March 6, 2012. My notes from the conversation are attached as Exhibit B.

14.     We covered a variety of topics in the conversation. Lounds said she felt like the "pink elephant" in the room, which I took to mean that her co-workers were uncomfortable around her because of her complaint. But she did not allege that anyone had said anything inappropriate to her. Never once in the conversation did Lounds report any new racial comments in the workplace, allege that she had been subjected to retaliation, or complain of a hostile work environment.

15.     Based on Lounds' representation that there had been no additional offensive racial statements, and based on the fact that she had not identified any other Lincare employees as having made statements that she perceived to be offensive, I believed that the final written warnings to Kempke, Kraft, and Kunz, as well as the in service training of all personnel at the center, had been effective.

16.     I later asked Linda Feller ("Feller") to visit the Wichita office to follow up.

17.     Feller met with Lounds on March 14, 2012. Feller called me after her meeting with Lounds and told me that it went well. She informed me that Lounds seemed positive and upbeat about the direction the Wichita office's work environment was heading.

3

18.     I was later contacted by McCarthy regarding Lounds' numerous unscheduled absences, and asked whether it would be appropriate to begin a corrective action process with Lounds.

19.     To determine whether discipline was appropriate, I analyzed the time sheets for the employees in the Wichita center from January 1, 2011 through April 16, 2012, and sent an email summarizing my findings to Felts, with a copy to Karen Schanbacher, which is attached as Exhibit C.

20.     I found that Lounds had missed sixteen days of work in the relevant time frame. I initially believed that all sixteen were unscheduled absences, but I later determined that two of them (absences on March 28 and March 29, 2012) had been approved in advance. Thus, Lounds had accrued fourteen unscheduled absences in the relevant time frame. This was far more unscheduled absences than anyone else in the Wichita office. By way of comparison, Kunz had the second highest number of unscheduled absences, with a total of six. Kunz, however, accumulated his six absences in sixteen months, unlike Lounds, who had accrued her fourteen unscheduled absences in just seven months.

21.     Lincare has strict attendance requirements. Employees are expected to timely report to work when they are scheduled and to remain at work, except during meal breaks, until the scheduled end of the workday.

22.     As a health care services provider, Lincare's business depends on its ability to serve its customers' needs. All employees, including CSRs, are a crucial part of Lincare's business. CSRs are on the front line for Lincare's interactions with customers, as they answer phones, take and process orders, maintain files, verify insurance, and respond to patient requests.

23.     It is crucial for all employees, including CSRs, to show up to work on time when they are scheduled to be there.  When one employee is absent, the other employees in the office have to shoulder the burden of the absent employee's work, in addition to getting their own work done. This decreases efficiency and can have a detrimental impact on Lincare's core mission of providing outstanding respiratory care services to its customers.

FURTHER AFFIANT SAITH NAUGHT.

_Paula Adams_
Paula Adams

STATE OF FLORIDA          )
            Pinellas          )
COUNTY OF ~~HILLSBOROUGH~~  )

On this 19th day of November, 2013, before me appeared Paula Adams, known to me to be the person who executed the foregoing Affidavit and acknowledged to me that she executed the same for the purposes therein stated and that the information contained therein was true to the best of her knowledge, information and belief.

_____
Notary Public

My Commission Expires:

05-13-17

GAYLE M DAVIS
Notary Public - State of Florida
My Comm. Expires Jul 13, 2017
Commission # FF 005629
Bonded Through National Notary Assn.

5

# EXHIBIT A

1/27/2012   Jeremy Felts
1:10pm

Greg was in Wichita, KS

In CSR group, one said uncomfortable
things being said.

History - in the past someone said borderline
racist comments. Would not give
details. Will let him know if anything
happens again.
                                    2 mos ago.

Comments have been since then.

Insensitive, racist comments. Possible use
of "N" word by Has. Also CM has
made some comments.

The CSR who complained is a minority.
Multiple instances.
Spoke to Amber- who's the one who spoke up.
Shawron is the minority CSR who

Shawron Launds ⟩ Jeremy also present.
Amber Renard

SL- Lot of events. Since hire called
variations of name - Shawronda - had
to say name is not ghetto.

HCS - Laynee - says to SL - Peace out
Nigga. What Kind of

CM - who names their kid Shawron?
Made a comment about the name of a person
Yes - Massa

AR - Anytime someone mentions the
ghetto, Ask SL what it was like.
Kevin -

CM - Suzanne, Becky other BR's. Said to
address someone as yes Master -
trainer tapped tapped her on the
shoulder - no just say yes.

talking
about how to
address those

AR - hate seeing her hurt like that.
Has personally witnessed the comments
being made.

SL - has thing documented.

HOS has an issue going to north side of town - There is another lady here more fit to go.

November Kevin - issue whould bring lyindlip beck - enough trees. Tracey + SL told him wrong + issy.

Main ones
Suzanne Kraft
Laynee Kenpke
Kevin Kuhz

Yesterday Kevin made a comment - I'm a-goes to the hood - came to her cubicle + pointed at her.

# EXHIBIT B

3/6/2012 Shawron Lands - 41-61-11

After Meg was there.

Laney (Laynee) - said she should not have
gotten in trouble for what I said.
Asked her for a manual - "handbook"

Dan - watch what you say (in front of her)
Bog       she will get you in trouble.
Trainer  Bog trainer from Missouri

Feels like pink elephant in the room.

Becky - vog trainer - sat w/ her one time.
Katen She gets upset when Shawron
says she's not been

Amber henard hired 9/12/11 - 2 full
days one-on-one with Becky in a room.
(Becky said she trained Amber because
she threatened to quit).

Amber
got a
raise

Becky cops an attitude w/ her when
she asks her questions. Has also
accused her of errors that she
did not make.

It is clear that everyone is upset
w/her.

When Karen met w/her it was
clear that she had already made up
her mind about her. "Becky has
already told me all about you."
You're negative, bad attitude.

Now Jody is new - Becky cannot
train Shawron because she needs
to train Jody.

Took manual home & read it.
Needs help w/ details

Becky is mad @ her for saying she
hasn't been trained in front of Aug

- Jeremy told her that she is imagining
it. She told him to look her in the eyes & tell
me that I am imagining.

- JF - Ever since all that happened you've
been different.

Just wants to do her job.

CONFIDENTIAL                                                    LIN_0000470

# EXHIBIT C

## Feller, Linda (LFeller)

**From:**  Adams, Paula (PAdams5)
**Sent:**  Monday, April 23, 2012 3:46 PM
**To:**  Felts, Jeremy (JFelts)
**Cc:**  Schanbacher, Karen (kschanba); Feller, Linda (LFeller)
**Subject:** Wichita, KS

I have reviewed the time sheets for Wichita, KS from 1/1/11 through 4/16/12. Absences that were entered or occurred since then may not be reflected below. I highlighted "sick" or "unpaid time" in blue text – I am assuming that all vacation time was scheduled/approved in advance. If that is not accurate, please advise. Absences highlighted in red text were within the 90-day trial period.

As you can see, Shawron does have more absences than any other current employee in the center. I think we can issue a documented counseling over this, but I am curious to know what the standard is in the center. For example, have we addressed any concerns with Cindi Curry who has missed one day every month since she was hired?                                                                         └ Planned 4-13-12

Thanks!

**Weimer, Jodee** – DOH 2/13/12 (1 unscheduled absence in 2 months)
      04/09/12 – No hours entered

**Curry, Cindi** – DOH 1/30/12 (3 unscheduled absences in 3 months)
      02/22/12 – No hours entered
      03/13/12 – No hours entered
      04/03/12 – Unpaid Salary Deduct

**Foulk, Christopher** – DOH 03/19/12
      No time missed

**Grisamore, Elyse** – DOH 07/26/10 (1 unscheduled absence in 16 months)
      01/10/11 – No hours entered
      All other absences were vacation.

**Hutchinson, Melissa** – DOH 12/06/11 (3 unscheduled absences in 4 months)
      12/29/11 – Sick (if paid, should not have been)
      12/30/11 – Sick (if paid, should not have been)
      03/02/12 – Unpaid Salary Deduct

**Keck, Tara** – DOH 04/13/11
      No absences other than one vacation day on 11/14/11.

**Kempke, Laynee** – DOH 7/29/11 (4 unscheduled absences in 9 months)
      08/05/11 – Unpaid Salary Deduct
      11/10/11 – Unpaid Salary Deduct
      01/09/12 – No hours entered
      02/10/12 – Vacation
      03/19/12 – Unpaid Salary Deduct
      03/22/12 – worked 3.07 hours (11:53 a.m. to 2:57 p.m.)
      03/26/12 – Vacation

**Kraft, Suzanne** – DOH 09/12/05 (2 unscheduled absences in 16 months)
      01/19/11 – Sick
      01/20/11 – Sick
      02/09/11 – Weather (not sure why this was only paid to her and Kevin Kunz – the rest of the staff
            appears to have worked – weather pay is only to be paid when the work location
            closes for the day)
      Rest of vacation and sick time was taken with maternity leave.

4/23/2012

CONFIDENTIAL                                                                                                    LIN_0000128

**Kunz, Kevin** – DOH – 02/16/10 (6 unscheduled absences in 16 months)
    02/09/11 – Weather (see question above under Suzanne)
    03/07/11 – Sick
    05/06/11 – Sick
    06/13/11 – Sick
    06/28/11 – Vacation 2.0 hours
    07/13/11 – Vacation
    07/14/11 – Vacation
    07/15/11 - Vacation
    07/27/11 – Sick 2.0 hours
    09/06/11 - Vacation
    10/03/11 – Sick
    11/14/11 – Unpaid Salary Deduct
    11/21/11 – Vacation
    11/28/11 - Vacation
    01/06/12 – Unpaid Salary Deduct
    03/19/12 – Vacation

**Lounds, Shawron** – DOH 09/27/11 (16 unscheduled absences in 7 months)
    11/04/11 – Unpaid Salary Deduct
    12/19/11 – Sick – (if paid, should not have been)
    01/20/12 – no hours entered
    02/03/12 – Unpaid Salary Deduct
    02/07/12 – Unpaid Salary Deduct
    02/16/12 – Unpaid Salary Deduct
    02/17/12 – Unpaid Salary Deduct
    03/09/12 – Unpaid Salary Deduct
    03/19/12 – Unpaid Salary Deduct
*Approved* {    03/28/12 – Unpaid Salary Deduct
    03/29/12 – Unpaid Salary Deduct
    03/30/12 – Unpaid Salary Deduct
    04/09/12 – Unpaid Salary Deduct
    04/12/12 – Unpaid Salary Deduct
    04/13/12 – Unpaid Salary Deduct
    04/19/12 – Unpaid Salary Deduct

**Renard, Amber** – DOH 10/12/11 (3 unscheduled absences in 6 months)
    11/21/11 – Unpaid Salary Deduct
    02/27/12 – Unpaid Salary Deduct
    03/16/12 – Unpaid Salary Deduct

**Roche, Martin** – DOH 11/1/11
    No absences

**Rozendal, Scott** – DOH 08/24/09
    All recorded absences were vacation

**Shuck, Micki** – DOH 12/13/11 (3 unscheduled absences in 5 months)
    02/03/12 – Unpaid Salary Deduct
    03/12/12 – Unpaid Salary Deduct
    03/13/12 – Unpaid Salary Deduct

**Sturgeon, Theodore** – DOH 11/1/11
    No absences

**Van Dever, Charles** – DOH 08/23/10 (1 unscheduled absence in 16 months)
    08/08/11 – Sick
    12/30/11 – Vacation
    03/22/12 – Vacation
    03/23/12 – Vacation

4/23/2012

CONFIDENTIAL

Paula Adams
Director of Employee Relations
Lincare
19387 US Highway 19 North
Clearwater, FL  33764
(727)530-7700, extension 8481
(800)284-2006
Fax:  (727)524-8733

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

SHAWRON LOUNDS,     )
                       )
       Plaintiff,    )
                       )
v.                   )    Case No. 13-CV-1091-RDR-KGS
                       )
LINCARE INC.,      )
                       )
       Defendant.   )

I, Karen Schanbacher, being first duly sworn, state:

1.    I am over the age of twenty-one and have personal knowledge of, and am otherwise competent to testify regarding, the matters set forth herein.

2.    I have worked at Lincare Inc. ("Lincare") for 13 years, and have personal knowledge of its policies, practices, and business operations.

3.    I worked as a division manager for Lincare throughout 2011 and 2012. My office is based in Quincy, Illinois, and I report to Greg McCarthy ("McCarthy"), a vice president who works in Lincare's offices in Clearwater, Florida.

4.    As a division manager, I supervise six district managers, who in turn supervise the Lincare centers within their respective districts. All total, I oversee about forty Lincare centers in Kansas, Missouri, Illinois, and Oklahoma. I help manage these centers' business operations, day-to-day operations, and sales force. I also work with district managers and center managers when they need to address employee discipline issues.

5.    I routinely call each of my district managers. These calls are normally on Fridays, and the purpose is to discuss with each manager ongoing business operations, any questions the particular manager has and any issues that may have come up in that manager's centers.

6.      One of the locations I oversee is Lincare's Wichita's center.  In 2011 and 2012, Suzanne Kraft was the center manager in Wichita, and she reported to Jeremy Felts ("Felts"), the district manager.

7.      In approximately mid-February 2012, I was in the Wichita center to address various business matters.  While I was there, Shawron Lounds ("Lounds"), a customer service representative ("CSR"), told me that she did not believe she had received enough training.

8.      Felts and I met with Lounds, and I told her that I would be sure she received additional training.  I then assigned Rebecca Roettering ("Roettering"), a regional trainer for Lincare, to work with Lounds and make sure she received training.

9.      On Friday, April 13, 2012, I spoke with Felts during one of our regular end-of-the-week calls.  I asked him how Lounds' training was going and whether she was making progress.  Felts informed me that Lounds' training was hampered by her frequent and excessive absences and that she had sent a text message to her Center Manager on Thursday, April 12, 2012 indicating that she would be off the rest of the week.

10.     I examined Lounds' attendance record, which indicated that she had missed thirteen days of work in about six-and-a-half months of employment.

11.     This number of absences is absolutely unacceptable.  Lincare has strict attendance requirements.  Employees are expected to timely report to work when they are scheduled and to remain at work, except during meals, until the end of their workday.  This is especially the case for CSRs because when one is absent, the other CSRs in the office have to shoulder the burden of the absent CSR's work, in addition to getting their own work done. This decreases efficiency and has a detrimental impact on Lincare's business operations.

12.     Having determined that Lounds' attendance was a significant problem, I contacted McCarthy that same day (April 13, 2012) and let him know of the issue with Lounds' attendance.

13.     I later learned that Lounds had filed a charge of discrimination with the Kansas Human Rights Commission on April 6, 2012.  But I did not know about Lounds' charge of discrimination when I contacted McCarthy about Lounds' attendance issues on April 13, 2012.

FURTHER AFFIANT SAITH NAUGHT.

Karen Schanbacher

STATE OF ILLINOIS *Missouri* )
                                                    )
COUNTY OF ___St. Louis___ )

On this 20th day of November, 2013, before me appeared Karen Schanbacher, known to me to be the person who executed the foregoing Affidavit and acknowledged to me that she executed the same for the purposes therein stated and that the information contained therein was true to the best of her knowledge, information and belief.

Notary Public

My Commission Expires:

5/29/16

MICHAEL STURGEON
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis County
My Commission Expires: May 29, 2016
12348073

3

# EXHIBIT 12



**To:**      Laynee Kempke, Healthcare Specialist

**Date:**    January 27, 2012

**Subject:   Final Written Warning**

---

Your actions are not supporting the goals and operations of the Wichita, Kansas center and Lincare. It has been reported by more than one individual that you have made inappropriate, racially motivated comments in the center.

Your actions and behavior have created an uncomfortable working environment for at least some of the staff and violate Lincare's Anti-Discrimination/Anti-Harassment policy, which states:

*"All employees have the right to work in an environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive or disruptive, including harassment based on sex, race, color, ethnic background . . . Lincare does not and will not tolerate discrimination against or harassment of or by, Lincare's employees . . . "*

As a Lincare employee, you are required to comply with all company policies, including the Anti-Discrimination/Anti-Harassment policy partially quoted above, which can and should be reviewed in its entirety on page 15 of the "About Your Company" handbook.

Any further comments made in violation of this policy will result in the immediate termination of your employment. Additionally, if you witness anyone else making discriminatory or harassing comments, you have an obligation to report it immediately to management or Employee Relations.

Please note that Lincare also has a policy prohibiting retaliation against any employee who brings their concerns to the attention of management in good faith or who participates in an investigation. Consequently, you will refrain from any actions or behavior that are, or could be perceived to be, retaliatory in nature. Violation of this policy will result in the immediate termination of your employment.

The responsibility for improving lies with you. If you are unclear about your responsibilities or the company's expectations, please advise me immediately.

Jeremy Felts, District Manager                                   1/30/12
                                                                 Date

CENTER TOLL # 85671   DATE 1/30/2012 12:22:12 PM [Eastern Standard Time]   CALLER FAX#   EFA4F268BF2ADAB

CONFIDENTIAL                                                    LIN_0000135

Final Written Warning – Laynee Kempke
January 27, 2012
Page 2 of 2

Your signature below acknowledges only that this document has been reviewed with you; it does not necessarily represent your agreement with any or all of the information presented herein.

_____                    ___1/30/12___
Laynee Kempke, Healthcare Specialist                Date

---

My initials below acknowledge my understanding that I have the right to formally dispute any information contained in this corrective action document that I believe to be untrue or misrepresented in any way by contacting the next appropriate level of management utilizing the Problem Resolution Procedure, which is outlined in the "About Your Company" handbook.

_____
Laynee Kempke's Initials

cc:    Personnel File
       G. McCarthy
       K. Schanbacher

# EXHIBIT 13



**To:**       Suzanne Kraft, Center Manager

**Date:**    January 27, 2012

**Subject:**  **Final Written Warning**

Your actions are not supporting the goals and operations of the Wichita, Kansas center and Lincare. It has been reported by more than one individual that you have made inappropriate, racially motivated comments in the center. In addition to making comments yourself, you have witnessed and allowed other individuals who report directly to you to make similar comments in the center.

Your actions and behavior have created an uncomfortable working environment for at least some of the staff and violate Lincare's Anti-Discrimination/Anti-Harassment policy, which states:

*"All employees have the right to work in an environment that is free from all forms if discrimination and conduct that can be considered harassing, coercive or disruptive, including harassment based on sex, race, color, ethnic background . . . Lincare does not and will not tolerate discrimination against or harassment of or by, Lincare's employees . . . Location managers are responsible for ensuring that their location is in compliance with these policies and is free of discrimination or harassment, sexual, racial or otherwise. Managers/supervisors will be held personally responsible by the Company and may be held personally liable if they participate in discriminating or harassing behavior of fail to adequately protect employees from discrimination and harassment. "*

As a Lincare employee, you are required to comply with all company policies. As a member of management for Lincare, you are required to ensure that your staff is in compliance with all company policies, including the Anti-Discrimination/Anti-Harassment policy partially quoted above, which can and should be reviewed in its entirety on page 15 of the "About Your Company" handbook.

Any further comments made in violation of this policy will result in the immediate termination of your employment. Additionally, if you witness anyone else making discriminatory or harassing comments, you have an obligation to take action to stop the behavior and report it immediately to upper management or Employee Relations.

Please note that Lincare also has a policy prohibiting retaliation against any employee who brings their concerns to the attention of management in good faith or who participates in an investigation. Consequently, you will refrain from any actions or behavior that are, or could be perceived to be, retaliatory in nature. Violation of this policy will result in the immediate termination of your employment.

CENTER TOLL# 85671

DATE 1/30/2012 12:22:12 PM [Eastern Standard Time]

CALLER FAX#

EFA4F269BF2ADAB

LIN_0000137

Final Written Warning – Suzanne Kraft
January 27, 2012
Page 2 of 2

The responsibility for improving lies with you. If you are unclear about your responsibilities or the company's expectations, please advise me immediately.

_____          _____
Jeremy Felts, District Manager                         Date   1/30/12

Your signature below acknowledges only that this document has been reviewed with you; it does not necessarily represent your agreement with any or all of the information presented herein.

_____          _____
Suzanne Kraft, Center Manager                        Date   01-30-2012

My initials below acknowledge my understanding that I have the right to formally dispute any information contained in this corrective action document that I believe to be untrue or misrepresented in any way by contacting the next appropriate level of management utilizing the Problem Resolution Procedure, which is outlined in the "About Your Company" handbook.

_____
Suzanne Kraft's Initials

cc:     Personnel File
        G. McCarthy
        K. Schanbacher

# EXHIBIT 14



**To:**      Kevin Kunz, Sales Representative

**Date:**    January 27, 2012

**Subject:   Final Written Warning**

---

Your actions are not supporting the goals and operations of the Wichita, Kansas center and Lincare. It has been reported by more than one individual that you have made inappropriate, racially motivated comments in the center.

Your actions and behavior have created an uncomfortable working environment for at least some of the staff and violate Lincare's Anti-Discrimination/Anti-Harassment policy, which states:

*"All employees have the right to work in an environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive or disruptive, including harassment based on sex, race, color, ethnic background . . . Lincare does not and will not tolerate discrimination against or harassment of or by, Lincare's employees . . . "*

As a Lincare employee, you are required to comply with all company policies, including the Anti-Discrimination/Anti-Harassment policy partially quoted above, which can and should be reviewed in its entirety on page 15 of the "About Your Company" handbook.

Any further comments made in violation of this policy will result in the immediate termination of your employment. Additionally, if you witness anyone else making discriminatory or harassing comments, you have an obligation to report it immediately to management or Employee Relations.

Please note that Lincare also has a policy prohibiting retaliation against any employee who brings their concerns to the attention of management in good faith or who participates in an investigation. Consequently, you will refrain from any actions or behavior that are, or could be perceived to be, retaliatory in nature. Violation of this policy will result in the immediate termination of your employment.

The responsibility for improving lies with you. If you are unclear about your responsibilities or the company's expectations, please advise me immediately.

_____               1/30/12
Jeremy Eels, District Manager                    Date

LIN_0000139

CENTER TOLL# 86571   DATE 1/30/2012 12:22:12 PM (Eastern Standard Time)   CALLER FAX#   EFA4F268BF2ADAB

Final Written Warning – Kevin Kunz
January 27, 2012
Page 2 of 2

Your signature below acknowledges only that this document has been reviewed with you; it does not necessarily represent your agreement with any or all of the information presented herein.

_____          _____
Kevin Kunz, Sales Representative                                    Date

My initials below acknowledge my understanding that I have the right to formally dispute any information contained in this corrective action document that I believe to be untrue or misrepresented in any way by contacting the next appropriate level of management utilizing the Problem Resolution Procedure, which is outlined in the "About Your Company" handbook.

_____
Kevin Kunz's Initials

cc:      Personnel File
         G. McCarthy
         K. Schanbacher

*This is inaccurate*
*I fully dispute this!*

CONFIDENTIAL

LIN_0000140

CENTER TOLL# 96571          DATE 1/30/2012 12:22:12 PM (Eastern Standard Time)          CALLER FAX#          EFA4F269BF2ADAB

# EXHIBIT 15

Lounds, Shawna

# LINCARE

## IN-SERVICE RECORD

Date: 1/30/12  Center/Location: Wichita, KS

Presenter/Faculty: Jeremy Felts

Topic: Anti-Descrimination / Anti-Harrassment Policy
Pg. 15 - Employee Handbook

| Name: | Title: | Credentials: |
|-------|--------|--------------|
| 1. Nathan Van Dyke | SVR | |
| 2. Marty Roche | service Rep | |
| 3. Jennifer Llamas | inside Sales | |
| 4. Amber Renard | CSR | |
| 5. Shawna Lounds | CSR | |
| 6. Cindi Curry | | |
| 7. Micki Sheck | HealthCare Sp | |
| 8. Tracey Hickney | CSR | |
| 9. Aurora Kemper - HCS | CR | |
| 10. Ima Dyce | SLC | |
| 11. Scott Brenda L | SLR | |
| 12. Eric Meister | SLR | |
| 13. Ted Sturgeon | TS | |
| 14. | | |
| 15. | | |

CONFIDENTIAL

LIN_0000008

CENTER TOLL# 9957
DATE 1/30/2012 12:22:12 PM [Eastern Standard Time]
CALLER FAX#
EFA4F2689F2ADAB

# EXHIBIT 16

3 February 2012

MEMORANDUM FOR RECORD

Statement of Discrimination in the Workplace-Lincare-Wichita, KS

My name is Shawron Lounds and I have been working for Lincare-Wichita since 27 Sept 2011, I am employed as a Customer Service Rep. I enjoy working with clients, but I don't enjoy the "*directed racial jokes and intentional racial slurs directed at me by selected employees, but by my direct supervisors!*

On my 1st day of work, Suzanne, Center Supervisor, requested I introduce myself, after I introduced myself, Suzanne spoke from the side of the crowd in a loud voice **"I thought your name was Shaniqua!** *Then she laughed aloud.* Two co-workers: Tracey Hackney and Jennifer Ilmas, *informed me they "felt uncomfortable with what Suzanne had said after my introduction, as well as the way she said it."* They informed me that Suzanne, prior to my start date was telling employees at the Monday meeting, how she hired a black girl, and her name was Sha-ne-ne *(as in comic Jamie Foxx's demeaning black female character  Sha-nea-nea.)*  When I reported to work, Suzanne asked me was my name Shaquita? Suzanne then laughed.

I informed her no, my is name Shawron, I then stated my name like a compound SHAW-RON.

**On 14 Nov 2012,** I listened as employees Kevin and Nate were speaking of a Black man who had recently killed his wife. Kevin stated *"we need to bring back lynching, because we have enough trees"* Kevin then began speaking offensively of Vietnamese people, and how they all had bad teeth.

Tracey asked me could I believe what I was hearing? I gave her no reaction. Tracey became upset and told him, Enough! Shawron's Husband is Black and Vietnamese, and that he (Kevin) should not talk about other races in such an offensive manner and speak of lynching, because it was racist talk! Kevin rebutted  and stated *"I'm not racist, and there was nothing  wrong with lynching. Then he approached me and said I'm not trying to offend you, it's not like I said "lets go down 9th and Grove (the Black Neighborhood) and drag every black person with a noose, tie them to a truck and drag them after hanging them."*

I said to  Kevin Kuntz who is a  Medical Salesmen, 'we should  not be having this conversation, its racist.' Kevin then said that "*people are just being over sensitive.* "

LIN_0000194

**14 Jan 2012: On or about 2:40pm** Health Care Spec. Laynee Kempkee, returned from seeing a patient, speaking in a loud voice so others could hear, "I just came back from the 'Hood' seeing a patient, then started chanting in a sing-song manner BOOM! As if she were a black rapper, then corrected herself and said Boom, Nigga! and started laughing.

Amber said Wow, *"what did you say?"* I too asked what did you say Laynee, as I addressed her by name. Laynee then turned and walked away. I felt sick to my stomach, I was embarrassed, and felt extremely offended.

This was not the first time she or other employees made such racial comments. Amber came over to my cubicle and asked if I was ok, I told her I was upset. My desk sits in front of the copy room, and I noticed my Manager, Suzanne. I was going to talk to her about what had just taken place with Laynee, Suzanne walked into the copy room and said *"Hey Shawron, I need to ask you a question,"* surprised, I responded by saying what?" Suzanne then asked me *"what kind of name is Roshonda?"* I responded I don't know, why? Amber and I looked at each other, I asked again, why? Suzanne stated *"because your Black, that's why!*!

Suzanne continued, that a Black woman at her church named her daughter Roshonda, she's Black so what kind of name is it? I explained that I don't speak for all Black people, I didn't know and continued my with my work, thinking I can't even complain to my management about what Laynee had said.

Later Laynee did come to my desk and asked, *why are you upset?* I informed her I was upset that she thought it appropriate to say **Boom Nigga! in a loud unprofessional voice in a work place environment**, I asked her why she had said that? Laynee, then turned her back and walked away from me without answering.

Tracey Hackney who overheard the exchange, approached me and stated, Shawron, that is not the first time Laynee said or used the "N Word," the day you interviewed with Laynee, she said more than once "Peace out my Nigga!" Tracey Hackney also stated that Laynee says it comfortably as she interacts with other caucasian employees. This incident was witnessed by Amber Renard who also agreed with Tacey Hackney's statement.

At meeting on **17 January 2012 @11:12 am**, Center Manager Suzanne Kraft, Regional Trainer and Becky Roeingter were speaking to us during the daily meeting when one of the Sales Reps., joined in so the meeting consisted of myself, Amber Renard, Tracey Hackney, Else Grisamore, and Nathan Van Dever. Suzanne looked at Nate and said, "Nate do you feel like a minority," and laughed, we all kind of looked at each other in shock, Nate looked shocked at what she said to him, and stated no.

LIN_0000195

Suzanne then informed us that Lincare was being investigated by CHAPS (Medicare Accreditation Home Health ) because Lincare is not compliant and in violation with our dirty Uni-Med vans, that have mold growing in some of the equipment that our patients could use.

Suzanne proceeded to tell us a story about the Vice President of Lincare, Greg McCarty; and how Lincare employees should never want to make him make mad because he gets redder than fire, and so would Div. Manager: Karen Schanbacher.

An employee: Amber Renard asked why can't we call them? What is their contact numbers? Suzanne was taken aback and stated *"You will never have it, trust me, you don't want to call him."* Suzanne also stated that when these two people call, we all need to be scared, and say yes to their every word! Suzanne then laughed, looked at me and stated no, we say **YES MASSA**, with a racially condescending tone, her head and eyes rolling back in a 1930's racial stereotyped movie character.

I was totally shocked and caught off guard, I involuntarily said what!! Amber Renard, sitting next to me said Whoa!!

Becky, the Regional Trainer tapped Suzanne in a comforting way and stated "*We say yes*"and smiled at Suzanne. I looked down in embarrassment, as it was just another racially motivated remark from management. I slowly got up and noticed all my co-workers looking at me, Tracey Hackney came up to me and asked if I was ok, I was clearly upset. Amber came to me and stated *"That was not right and it was very racist."* Tracey then said *"I feel so bad for you, there is just too much racist things said in this place."*

It is my contention, that I am being bombarded with racial slurs and comments, because I have seen too much: unprofessionalism, ethics violations and lack of training and lack of moral turpitude.

Since my hire I have yet to receive any formal training, this training was to be given by Becky Roteter, but all I hear from Becky is how she was sent to Wichita to "clean house" and I was to *"just read my training manual and learn on my own, because that's how she and Suzanne had to do it!"*

Amber Renard, a Cust. Svcs.Rep., employed 3 weeks *after* I was hired, has had one on one training with Becky. Amber was sent to Winfield Lincare's offiice 7 Nov 2011 until 9 Nov 2011 for further training to train.

I was initially informed that I would go to Winfield for Training, but was informed by Becky, that *"she would get around to training me."*

CONFIDENTIAL

I have not had any formal *one on one* training with her as of the date of this correspondence. Amber, (a white female) told me in late December that she is being groomed to take Suzanne's job, and that she could get a raise.

I have been instructed to work Medicare Audits on patients files, that I know nothing about. I informed Suzanne that I'd only been at the job a month and felt uncomfortable working on files, I know nothing about. Suzanne said *"do your best."*

I have witnessed patient files being thrown away, I have witnessed my manager write patient initials or sign for them just to get billing on them. She then instructed me to just send it on.

Becky has informed me, Tracey Hackney, Amber Renard and Eylse Grisamore, that *"Lincare could get in trouble and we all need to start doing more or Compliance would shut them down."* Where is the training? Where are the compliance regulations and guidance to do things correctly the first time?

15 Jan 2012 Tracey warned me to watch my back, because Becky was talking bad about me to Suzanne. At this point my nerves and emotions were at a peak, due to the racism and disrespect I cope with on a daily basis at Lincare. I requested to speak with Becky and inquired as to what was going on. she said "oh, you did not know I corrected the problem? From now on get the paperwork ready for the drivers! And I told her that this was the firsthand I heard about it.

But for her not to inform to me, as I am the only black person and the only one not informed of any new changes in the work place. When Becky speaks to me, she speaks to me as if I was a child, or a person who she feels is inferior to herself. I have even informed her that I feel like my intelligence is insulted when she spoke to me in that manner, she would just respond with "its not you Shawron, I'm just frustrated with this place, and its not you." It is my understanding that Becky was sent here from Missouri to help with training, Becky constantly complains that Lincare Wichita is the worst branch of all the Lincare branches nationwide and she was surprised the center had not been shut down already due to compliance and lack of concern, Becky then asked me if I really wanted to work for such a company?

At this statement I really became concern about my job. I love what I do, and always wanted to work to do the job I'm doing. I did notice that the equipment that was to be recycled was being dumped in the dumpster behind the building on Thursday and immediately retrieved by men waiting in a vehicle in a nearby parking lot.

CONFIDENTIAL

When I'm approached at work by several employees it's always with in a black accent dialect with  YO! Yo whats up? Since I have been working for Lincare Wichita, it has been nothing but day after day of either racist comments or insulting remarks. I find that I am confined to a hostile environment because of my color and race.

Ethnic slurs and racially based jokes that continue even after I have voiced objections, even my immediate supervisors participate in these types of behaviors. The slurs and jokes continue, but I need this job and now I fear I will be terminated because I have standing up to my aggressors.

In another incident Jeremy Felts Regional Manager, who was temporarily in charge of Lincare Wichita, due to Suzanne Kraft's maternity leave, was told of an incident when a patient that came in the office and made racist remarks about a picture, the front desk medical sales rep. Jennifer, a Mexican-American Female, informed Jeremy Felts the patient said, "*I wonder how many Slaves it took to keep that garden pretty, and I wonder how many wet backs it took to pour water on them.*" Jenifer ran back to me, and said Shawron, "I'm so offended by what this guy said." I told her to inform Jeremy when he gets out the meeting.

Jeremy came from his meeting, and Jennifer told him what was going on, Jeremy said **"well unfortunately we live in a world where racism will never change, and that people will never change."** Jennifer looked at me I said well, what can you do? Jeremy said well next time let him know, and we said we are, you were in a meeting, Jennifer said can you please take the picture down? He said yes, but the picture is still up in the front office.

And it's a constant reminder to Jennifer and I, everyday I walk in, I think of what that patient said. Witness Jennifer llamas.

In the latter part of October, 2011, a patient by the name of Bill [Redacted] and every-time he would call Suzanne would and hang up on him.  Once I answered the phone and he threaten to kill everyone in our office.

 I informed her, and she laughed stating he won't do it, she then stated "we will give all his the calls to me." Suzanne stated  *"I'm sure you can give him attitude."* I informed her no, I don't speak slang, I am a professional and I keep everything on a professional level. Lincare employees Elyse and Tracey witnessed her saying things about Mr. [Redacted]' being a black man. Mr[Redacted] did come to Lincare-Wichita and filed a complaint with Dan the Compliance Manager,  against both Suzanne and Lincare-Wichita.

When Suzanne found out he was in the building she ran to the back where I and other Cust.Svcs.Reps. work and said *"Oh my god,"* no offense Shawron, **"but I thought he was a big black man, no offense,"** I said why?, **"Oh he sounded mean and his name**

**sounded black,"** she said *"he's just a little old white guy."* Other Cust.Svcs.Reps., who heard her say this Elyse, Tracey Hackney, and Jennifer Ilmas. From that incident forward Suzanne would laugh out loud and even in meetings, she would bring it up and say *"I can't believe he was a white guy"* and laugh.

It has come to a point, that I request training in areas of my work where I need clarity during meetings, both Suzanne and Becky. I have pointedly asked Becky: Why don't I get the training I need? Becky will look me in the eye and say "you'll just have to learn as Suzanne and I did, we never had trainers. It's when I ask questions, I am a bother.

Other employees: Tracey 6 Mos./Elyes 9 Mos., both have had some form of training. I have been on staff for 4 Mos. and have not received no one on one training or formal training. Amber has been here 3Mos. and as previously stated received training in Windfield, Ks. I feel I am being set up for failure.

Becky always tells me it only takes a year to learn the job, and directing me to *"turn my head,"* or stating, *"pretend you did not see this,"* referring to the altering the patient files in the billing office, I have, and when this was done I would ask why would they do this? and I assuming to my lack of training, I was told *"if we didn't, you and I would not have a job." "this is how we get paid."*

I am told to work Lincare 600,000.00 held sales report, with my alpha having the highest amount, and I asked for help everyday because I don't understand how to get money off. Alpha means to number of patient files I have to manage. I feel out of place because **social nepotism** is rampant at this Center

Elyse Grisamore, is related to Jeremy Felts (Regional Manager) by marriage, so whenever I to tell her something, it is repeated back to him. Suzanne and Elyse are Best Friends. Elyse has been the only Customer Service Rep that has helped Amber Renard and I learn how to do our job, when something comes back wrong, I can only refer back to who has trained me.

Since I have been employed at Lincare-Wichita, I've been confronted by Disparate Treatment because of my Race. I have been the subject of ridicule, called out my name, stereotyped and degraded. My immediate Supervisors act as ring leaders. I am 34 yrs old, and have never witnessed such behavior or been subjected to such extreme racism.

I have witnessed misappropriation of Medicare/Medicaid funds and Forgery of government documents, I've only been here 4 mos. I am the only Black employee at Lincare-Wichita. The blatant racism. The alteration of government documentation to obtain a certain percentage. The lack of supportive guidance of management in insuring proper training is given in a timely manner. I need my job, especially during these trying times.

CONFIDENTIAL

But emotionally I'm about spent. Everyday I wonder what will happen, are they setting me up for blame when their lack of moral turpitude is uncovered.

On **01/26/2012** A call came into the center that CHAPS was coming to audit Lincare, Suzanne said oh great Greg McCarty will be here Friday also! She texted all the Sales Reps and other employees to come in and clean house, Pizza was bought for everyone. Kevin Kuntz was sitting at he lunch table, he kept saying things like,

"**I never go in the ghetto, the hood has gangsters,**" then he came to my cubicle where I was minding my own business and said, "**you know**" as he pointed down to me, "**the HOOD!**" and laughed Jennifer llamas whom was asking me a question about a patient said Kevin what is wrong with you?

Suzanne the center manager heard him and told him to leave, because Chaps was coming in to audit Lincare and she did not want them (the sales reps) to speak to them.

I saw Suzanne and Dan Myers manipulate fire extinguisher tags, (putting our life in danger from them not being properly inspected) I saw them redoing some of my files, and other CSR files, hiding files, saying things like, we are doing a overall cleaning, and we are cleaning house, Dan told Becky have the CSR's hide stuff.

Dan Myers went to the dollar store and bought taupe colored bed sheets that Eric and Suzanne put up to cover up patient names on the boards. Suzanne erased all the names off the DME board that had been there for months.

A patient called for Suzanne and she never answered the phone, she stated, I have more important things to worry about, CHAPS is coming, so I logged what was said in our CIS system.

Around 4:30pm Becky saw what I wrote, because I had to ask her a question about the patient, later that evening I told her I did not like what I saw today, and I felt unsafe not knowing what's going on. She said "*not to worry, Chaps is coming in for another issue, I know I haven't trained you, but I will pull you out of Lincare-Wichita and train you in the Winfield Center, but I will need you to sign off on it to show that I have trained you.*" I said after almost 4 months? why now?.

I'm afraid that if I don't say anything it will get worse I cannot go to Jeremy Felts, Regional Manager, Suzanne Kraft, Center Manager, Becky R. Regional Trainer, or Dan Myers (Regional Service Trainer) because of their friendships, and how they loud talk about other employee's without it being confidential. I see that they all (Management) stick together and will lie and hide and cheat just to keep their jobs.

Witness to the cleaning house as Suzanne put it, was Amber Renard, Tracey Hackney, Jennifer Llmas, all the Salesmen, Scott, Eric Miser, Nate Van Dever, and Kevin Kunts, as well as Health Specialist Laynee Kemkee were called to clean her office.

LIN_0000200

**01/27/2012** Greg McCarthy (Vice president) came in to the Wichita, Ks Center Around 10:30 am he had a meeting with me, Tracey Hackney, Amber Renard, Becky Roetier, and Jeremy Felts, Mr. McCarthy asked what was going on and why held sales was so high, we told him how long we all been employed with the company, and he clearly knew that Amber, Tracy myself, were still fairly new, Becky said that, *"Shawron is doing a great job, but she is frustrated that she hasn't had any training"* then Becky said she will take me to Lincare in Winfield, KS for training.

Mr. McCarthy then asked, **"What else is going on here? "** Amber said, *"I'm putting it out here on the table, There is to much racism going on in here, and something needs to be done."* Shortly after that Mr. McCarthy asked to speak with me in private, I informed him everything from, when I started this job, there has been non stop racist comments being made on a daily basis, starting with Suzanne Kraft,  Kevin, Kuntz, and Laynee Kepkee and so on, I knew he was pressed for time, I told him as much as I could and told him that I would send a letter to HR.

Around 12:20 when I came back from lunch Jeremy wanted to speak with me, He told me that he had Patty Adams from Human resources on the phone and at that time he wanted me to give a verbal statement. Amber who was was one of my witnesses was available and was present during the call. At that time I gave Patty a brief statement and that I would follow up with my written statement.

This statement is a true and honest presentation of my employment with Lindcare-Wichita.


Shawron Lounds
2/3/2012


CC: Greg Mcarthy, Vice President

CONFIDENTIAL

EXHIBIT 17



Shawron Lounds
910 S. Armour
Wichita, KS 67217
816.799.7692

Feb 6, 2011

Re: Memorandum for record

To: Greg McCarthy

My name is Shawron Lounds and I have been working for Lincare-Wichita since 27 Sept 2011, I am employed as a Customer Service Rep. I enjoy working with clients, but I don't enjoy the "*directed racial jokes and intentional racial slurs directed at me by selected employees, but by my direct supervisor!*

I have been humiliated in front of my peers in my workplace by my immediate supervisors and Center Supervisor by calling me out my name, using racial metaphors such as: Sha-nea-nea or Shaquita, names that are a stereotypical racial trigger for Black American women as an instantaneous minority reference.

On my 1st day of work, Suzanne, Center Supervisor, requested I introduce myself, after I introduced myself, Suzanne spoke from the side of the crowd in a loud voice *"I thought your name was Shaniqua!* Then she laughed aloud.

*Two male employees spoke of a recent incident where a husband killed his wife (both black). Kevin stated "we need to bring back lynching, because we have enough trees." Me, being the only African-American in the office, found this type of talk especially in a loud non-conversational voice and tone to be extremely offensive. He then when on to degrade the Vietnamese people knowing my husband was part Vietnamese. Kevin then came to my cubicle and made the statement "I'm not racist, but it's not like I said let's go to 9th & Grove (a predominately black neighborhood) and drag every black person with a noose, tie them to a truck and drag them after hanging them. "* Another employee Laynee Kempkee has a habit of returning from seeing a black patient and stating how she thought she would be raped, and stating in a loud sing-song voice **BOOM-Nigga** in my presence, walking away laughing, when she does this I feel extremely violated, offended and sick to my stomach. There is so much racial prejudice I wondered why I was hired. As stated above I enjoy my job but not the extreme racism I endure on a daily basis. I was informed by Suzanne to respond to Greg McCarty, a Vice President, Lincare, as **Yes Massa**!

CONFIDENTIAL

LIN_0000192

I have not received any formal training from the regional trainer. Whenever I ask about training, I am put off by management.

I am disappointed because as an African-American I am receiving disparate treatment in my current work environment. Ethnic slurs and racially based jokes continue even after I have voiced my objections. My Supervisor are aware and take part in the open discrimination.
I have personally met with Mr. McCarty, Vice President, Lincare and informed him of what is going on, after other co-workers complained of the racist working environment in an open meeting.

Since Amber Renard revealed the racism taking place in the work place to the Vice-president Mr. Mcarthy in the presence of Jeremy, Becky, Tracy and Elyse. My co-workers have been giving me the cold shoulder, extreme tension is felt in the workplace and it is a hostile work environment. I did not bring this upon myself, I was going on as business as usual but so many incidents were taking place, that my-workers felt for me and brought the subject up, however I am the victim of another persons outcry.

On February 3rd, I even had to go to the doctor due to feeling ill. My Doctor was so concerned with my blood pressure being so high 168/100 she immediately prescribed me high blood pressure medication and anti-depressants. Before this incident my health was fine.

Since my conversation with Mr. McCarthy, nothing has changed. Sensitivity Training was ordered, but consisted of Jeremy Felts searching for an employee manual and ripping a page out and reading it and everybody signing a copy of it. Everything went down hill after that.

Because of the situation and the lack of response I am sending this letter and an enclosure to your office, as well as filing my complaint with the appropriate agencies set up to prevent this type of behavior in the workplace.

I enjoy my job and want to keep it, especially during these hard economic times, but this being 2012, there needs to be some type of professionalism and order to this madness.
I have read of other employees' complaints of incidences within the Lincare workplaces, and those employees losing their employment within Lincare because of their complaints, hopefully my complaint of racial discrimination and racial isolation will be acted upon rather than be used as a means for termination.
Because I want to make this brief I have one enclosure, but I have other documentation for presentation if needed by your office or other agency.

Yours sincerely

Shawron Lounds

# EXHIBIT 18

Message                                                                Page 1 of 2

## Adams, Paula (PAdams5)

**From:**    Adams, Paula (PAdams5)
**Sent:**    Wednesday, February 29, 2012 5:24 PM
**To:**      Lounds, Shawron (SLounds)
**Subject:** FW:

Hi Shawron,

Just left a message on your cell phone.  Let me know if there is a better time to try to reach you.  Thanks!

Paula Adams

**From:** Adams, Paula (PAdams5)
**Sent:** Wednesday, February 29, 2012 11:57 AM
**To:** Lounds, Shawron (SLounds)
**Subject:** RE:

No problem.  I will try again this evening.

Paula Adams

**From:** Lounds, Shawron (SLounds)
**Sent:** Tuesday, February 28, 2012 5:46 PM
**To:** Adams, Paula (PAdams5)
**Subject:** RE:

Looks like I'm going to stay late again tonight, I'm sorry please if we can same time tomorrow, just very overloaded:(

> -----Original Message-----
> **From:** Adams, Paula (PAdams5)
> **Sent:** Tuesday, February 28, 2012 9:52 AM
> **To:** Lounds, Shawron (SLounds)
> **Subject:** RE:
>
> Shawron,
>
> No problem – I totally understand "busy" and how the day gets away from you.  I will plan to call you on your cell phone today around 5:10 p.m.  If that doesn't work, please let me know and we'll arrange an alternate time.  Thanks!
>
> Paula Adams
>
> **From:** Lounds, Shawron (SLounds)
> **Sent:** Monday, February 27, 2012 9:11 AM
> **To:** Adams, Paula (PAdams5)
> **Subject:** RE:
>
> I'm sorry I have not responded, it has been so busy. If today or tomorrow sounds good, I would like to speak with you. I don't know if I will have a lunch today, but my number is 816-799-7692. I get off I hope at 5:00pm, And the letter should be dated Feb 06,2012 my apologies. Or early morning I'm up @5:00am CST.
>
> > -----Original Message-----
> > **From:** Adams, Paula (PAdams5)
> > **Sent:** Wednesday, February 22, 2012 9:46 AM

02/29/2012

CONFIDENTIAL                                          LIN_0000185

**To:** Lounds, Shawron (SLounds)
**Subject:**

Shawron,

Good morning!  I received your letter dated February 6, 2011 (I'm sure it should be 2012) on or around February 13th, but I was traveling for work February 14th – February 17th, so I've not had the chance to reach out to you.  Given the sensitive nature of the concerns in your letter and my perception that there is little privacy in the typical center, I was wondering if we could arrange a time to talk when you would be somewhere you could speak freely.  I am typically in the office shortly after 7:00 a.m. Eastern Time, so with the time difference, perhaps we could talk before you go to work one day – or perhaps during your lunch break?

Please let me know a convenient time for you and the best number to reach you at.

Thank you!

Paula Adams
Director of Employee Relations
Lincare
19387 US Highway 19 North
Clearwater, FL  33764
(727)530-7700, extension 8481
(800)284-2006
Fax:  (727)524-8733

CONFIDENTIAL                                                                      LIN_0000186

# EXHIBIT 19

**Met with Shawron Lounds at 9am on 3/14/12:**

*I wanted to follow up with you to find out how things have been going since all that happened in January.  I want you to know that Paula took your concerns very seriously and there was disciplinary action taken at the time.*

Yeah, I heard about it.  They let me know.  It was watch "Watch you say.  Shhhhh, here she comes.  Don't say nothing."

*Who said things like that?*

Laynee.  She asked for a manual.  She said she felt like what she said wasn't wrong.  Scott said, "I'm just mad.  I feel like I was reamed."  He has treated me different after that.  Since everything has been exposed, it's like the elephant in the room.

The last few days have been better.  I wish it was like this all the time.

Last week Dan was here.  He was up front.  I heard him say, "Watch what you say or 'that' will tell."

*Who did he say that to?*

He said that to Jennifer (inside sales…she quit.)

*Do you think the things that were said were intentional?*

When they said things like Sharonda, no.  I don't.

When Laynee made the comparison to the hood or the ghetto, yes.  I do not live in the ghetto.  I do not relate to that kind of language.  I know they're adults, but who am I to keep bringing it up?  Maybe it's not intentional.   But it's not right either.  I want people to see me for who I am and for my work, not the color of my skin.  It's just so awkward.

*If you were me, how would you approach this?*

I would get everybody together.  I would go through some type of sensitivity training so they are put in that type of position.  Maybe that would help them understand.  That would be better than pulling a page out of a manual and having everyone sign.

I'm not even the one who brought up the racial thing.  It was Amber.  That day when Greg came, he was addressing some issues.  He asked how do you like it.  He asked how I liked it.  I told him I like it but I haven't been trained.  Becky didn't like that I brought it up.  He said "Is there anything else?"  Amber told him there were racial issues coming up.

People are going to say things, and I get that.  In a workplace when it's constantly in your face....  Maybe they're used to saying that kind of thing.

*Do you think that sometimes people make comments out of their own ignorance?  I went to training several years ago to become a Diversity Trainer and I became aware of certain words and phrases that had historical significance that I didn't know about before that training.  Most people haven't been exposed to that kind of training and may say things that they don't mean to be ugly but feel ugly.  That's really different than intentionally saying racially discriminatory things, don't you think?*

When I first started, I didn't hear it but it was brought up to me that Laynee said, "Peace out, my nigga." There was an instance where a black gentleman tried to get a job here.  Suzanne said, "I don't want to hire him because he looks like a convict."

I've had issues getting trained around here.  They hate me for that.  I felt like Amber was getting the training. She said she was going to quit, and then she got trained.  When Tracy got fired, I got overwhelmed.  I started noticing that I was having problems.  Then Amber got a raise because she said she was going to quit.  All I'm asking is equal training and equal pay.  Here we are doing the same job.

This thing with me and Becky, it seems like after I asked her for training and mentioned it to Greg, she was upset.  I said "I'm sorry if you're upset."  She said, "I trained myself.  It's going to take you a year to learn everything."  Becky said, "CSRs are the bottom feeders."  I said, "Am I doing that bad?"  Amber said, "Am I doing that bad?"  She said, "No, Amber, you're doing fine."  She didn't address me.

*Do you feel like you've had enough training now?*

I don't.

*Do you feel like you've had the same training as Amber had and that Jodi is getting?*

I don't.  She's been to Winfield to train and has been able to help at Hutch.  I was supposed to go to Winfield, too, but that didn't happen.  They said they'd get to me.

*You're free to travel and interested in travelling to get the training?*

Yes, Winfield is only 35-45 minutes away.  Hutch is a different situation.  It's over an hour.  I don't think I'd want to go that far.

The way she told me about the raise....it was when all that stuff happened.  I said, "How did that happen?"  She said, "It's a little bit of hush money."  What do you mean "hush money?"  She made it sound like it was to not say anything anymore.

CONFIDENTIAL

LIN_0000180

I don't take everything that way.  When Karen was here, she introduced herself to me.  We had a meeting.  I voiced my opinion.  It wasn't rude or insensitive.  At that time I told her I hadn't been properly trained.  I told her we have so much work back there and Amber is getting a new position with Held Sales.  The girls that showed me what to do got fired.  Karen said she got fired because she was a hoarder.

Karen told me I was rude and insensitive.  She said, "I didn't appreciate how you were talking to me in the meeting."   Jeremy was there, too.   Jeremy told me I'm not myself anymore.  I told him "After all that stuff that happened, I lost my spirit."  Karen said, "You need to go find it.  Whatever happened with Greg is done and over."  I let her know how when somebody passes by, people are talking about me.

For awhile I thought, "Why am I at a place where they don't even care?"  I just decided to put my big girl pants on.  I come to work for the patients.  I really like working with them and making them smile.  I wish everything was great.  It seems like slowly, slowly things are coming around.

*I'm glad you're seeing a little bit of improvement.*

I think after this it's probably going to get weird again.

*I imagine you're right, but hopefully not for long.  People tend to be uncomfortable whenever corporate is involved.  You know, this is the first time I've worked at corporate.  In my past jobs, I got a little uncomfortable when corporate would get involved, too, so I understand it, but there's really no reason to be uncomfortable.  We're just like everyone else.  We have a job to do, that's all.*

*The picture up front, is that the one you wrote about?*

Yes

*I don't understand.  I think it's a beautiful painting.  Why did you find it offensive?*

A patient said, "It took a lot of slaves to make that garden and a lot of wetbacks to water it."  Jennifer was really upset.  She took it down and put it back in the copy room.  Jeremy put it back up.  I don't care about it.  I don't know where that man got that from.  It's your opinion.  I'm not going to tell them to take it down again.

*I hear what you're saying, but I don't want it to be a constant reminder to you.*

It is.  It's a constant reminder.

*If it makes you uncomfortable, we'll take it down.*

I don't want to be that person who makes other people uncomfortable.  I just don't want to be that person.

Everyone's so nice today.  I didn't realize you were here, but I guess they knew.  Jeremy came over and said, "Is everything good?"  That's weird.  That's not something he usually says.  When I leave, I go from work to work.  I have 2 little boys and a husband.  At first, I would take this home with me.  But I can't do that anymore.   My husband told me to let it go, it'll die down.

*Tell me about your training with Becky.*

She showed me certain things from the training that I just didn't know.

*Becky did?*

Yes.  The only other thing is that they take files from my office.    I understand it's Lincare property.  But they take it upfront and I heard her say, "What is wrong her?"  It was the patient **Redacted**

I asked her to tell me what was wrong to please show me what I did wrong.  She showed me the file.  There were 5 or 6 other patient names.  It was really weird.  She asked me if I put the file together.  I told her, "No, Jodi did."

There was tension.  I know everyone's under pressure because of Held Sales.  I think she doesn't even want to be here.  If I do something wrong, show me, tell me.  Don't take it to everyone else.  As a trainer, she should show me.  If I had known that in the beginning, it probably wouldn't be wrong.

*I'm glad it's starting to get better.  I agree that it really is going to take a year for you to start to feel like you've mastered the position.  I feel that way about my job too. I started a month after you did.   There are plenty of things I don't know.  It'll take me awhile, too, but until I learn it all, I'll just wow them with what I do know.*

That's what I'm trying to do.  I like to talk to the patients and make the smile.  There were repercussions after the whole incident.  I was starting to look at my resume.  I appreciate you guys listening.  I think you guys really care.

*I'm glad.  We do, you know.  We're taking your concerns very seriously, and we want you to feel comfortable at work.  Remember what we talked about, though.  Not all comments are intentional, sometimes it's just ignorance.*

Kevin, I think that was intentional.   He said, "Shawron, you know where the hood is.  Shawron, do you smoke Marlboros?"  I told him, "No, I don't smoke."  He said, "You know, black people smoke Marlboros."  They let me know after all that that they were not happy.  He's starting to come around now, though.

# EXHIBIT 20

# STATE OF KANSAS
# KANSAS HUMAN RIGHTS COMMISSION

DOCKET NO. 35554-12 W

On the complaint of

Shawron Lounds

Complainant,

vs.

Respondent,

Lincare, Inc. and its Representatives

I, Shawron Lounds residing at 910 Armour Rd., Wichita, KS 67207

charge Lincare, Inc. and its Representatives whose address is 7777 E. Osie St., Ste. 301, Wichita, KS 67207

With an unlawful practice within the meaning of:
[X] The Kansas Act Against Discrimination (Chapter 44, Art. 10, K.S.A.) and specifically within the meaning of subsection (a)(1) (a)(4) of Section 44-1009 of said Act, because of my :

(X) RACE        ( ) SEX                ( ) ANCESTRY      (X) RETALIATION
( ) RELIGION    ( ) NATIONAL ORIGIN    ( ) DISABILITY    ( ) FAMILIAL STATUS
( ) COLOR       ( ) GENETIC INFORMATION

[] The Kansas Age Discrimination in Employment Act (Chapter 44, Art. 11, K.S.A.) and specifically within the meaning of subsection of Section 44-1113 of said Act, because of my AGE.

Alleged Date of Incident, on or about September 27, 2011, to at least March 19, 2012. The aforesaid charges are based on the following facts:

I.     I am African American. I have openly opposed acts and practices forbidden by the Kansas Act Against Discrimination.

II.    I have been employed by the Respondent since September 27, 2011. I currently hold the position of Customer Service Representative.

   A.   From September 27, 2011, to January 27, 2012, I was subjected to derogatory racial comments, slurs, and innuendoes.

   B.   From September 27, 2011, to March 2012, I was subjected to disparate training compared to a similarly situated Caucasian employee, in that I was not provided one on one training.

   C.   From September 27, 2011, to at least March 19, 2012, I was subjected to harassment due to my race, in that I was treated in a demeaning manner, ridiculed, and teased. Furthermore, during this timeframe, I was subjected to disparate treatment compared to similarly situated Caucasian employees, in that my work was more closely scrutinized, I

CONFIDENTIAL

LIN_0000434

# STATE OF KANSAS
# KANSAS HUMAN RIGHTS COMMISSION

(continued)                35554-12 u
Docket No.

was denied assistance, I was not provided training in a timely manner, and I was held to a different work standard. Therefore, on January 27, 2012, a co-worker made an initial complaint to the Vice President, regarding race discrimination, at which time she informed the Vice President that I was being discriminated against due to my race. Subsequently, I was questioned by the Vice President at which time I complained of race discrimination. Furthermore, on this date, I made a 2nd complaint to Human Resources regarding race discrimination. However, despite my complaint, nothing was resolved and the harassment and disparate treatment got worse which I believe is in retaliation for confirming the race discrimination.

III.     I hereby charge Lincare, Inc. and its Representatives with a violation of the Kansas Act Against Discrimination, in that I was subjected to racial comments, slurs, and innuendoes due to my race, African American, and subjected to disparate training, harassment, and disparate terms, conditions, and privileges of employment due to my race, African American, and as acts of retaliation for having openly opposed acts and practices forbidden by the Kansas Act Against Discrimination.

I have not commenced any action, civil or criminal, based upon the grievance set forth above, except

STATE OF KANSAS          )          X _____
                                            (Signature of Complainant)
                                   )ss:
COUNTY OF Sedgwick        )

Shawron Lounds, being duly sworn, deposes and says that: that she/he is the Complainant herein; that she/he has read the foregoing complaint and knows the contents thereof; that the same is true of her/his own knowledge except as to the matters therein stated or information and belief; that as to those matters she/he believes the same to be true.

Subscribed and sworn to before me

this 6th day of April _____, 2012          X _____
                                                       (Signature of Complainant)

_____
(Signature of Notary Public)

MY COMMISSION EXPIRES:

JOHNNIE WEBB
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. 7-5-2012

KANSAS HUMAN RIGHTS COMMIS

RECEIVED
APR 0 9 2012

# EXHIBIT 21

1 May 2012

Human Resources Lincare

Attention: Suzanne Kraft, Center Manager and Jeremy Felts, Lincare Wichita

This is a Rebuttal to the "Documented Counseling" I received April 26 2012 in which dates were used to document my absences from Lincare, specifically unscheduled time off.

I would like to state that, I understand the importance work and how we are expected to function as a team to accomplish a specific mission, but to state that my excessive absenteeism is affecting the daily operations of the Wichita Center, and the service we provide is not realistic.

I have stated in past documents that I had to get verbal and file complaints with a higher authority to get the minute training I did receive.

The statement that Lincare prohibits texting to report absences is totally inaccurate and facetious. All employees' text the Center Manager of their absences and to single me out is disparate treatment as defined by the EEOC as well as other government agencies.

I have consulted with current and past employees' and every single person has used texting as a communication tool to inform you of absence, tardiness and patient information which violates HIPPAA rules.

Your letter is presented as a threat to my employment status. It seems that you, as the center manager failed to truly investigate my situation and the racial overtones that yourself and other employees have participated in which I have been subjected to since my hiring on September 27, 2011, which should be looked into as well.

I have not received any verbal counseling or warnings up to my final letter. Yet I find myself threatened.

You have made employment with Lincare a war zone for me with changing policies and whim decisions. Jobs are hard to find and keep in the current environment and I think I am being treated differently from my peers.

You also state the responsibility for improvement lies with me; you also state that if I am unclear about my responsibilies or company's expectations. I should advise you immediately.

I have informed you and as always there seems to be a history of non-response on your part.

According to page 21 of the Lincare manual here are a list of MAJOR INFRACTIONS that take place at Lincare, Wichita on a daily basis and no one has been held accountable for due to poor management, nepotism, and favoritism.

4. Immoral, disorderly, indecent or harassing conduct, including the use of abusive or profane language.
6. Engaging in acts of violence or threats of violence toward fellow employees or patients.
9. Engaging in behavior designed to create discord and lack of harmony, or willfully
11. Falsification of Company documents/records
15. Willful or habitual disregard for Company safety rules or security.
17. Failing to exhibit self-control to customers and/or fellow employees.
20. Audio recording, by telephone or otherwise, video recording, or photographing any individual without their express, written consent.
23. Falsification of expense reports and/or cashing or depositing a Company expense reimbursement issued based on a false expense report.
24. Failure to comply with the Corporate Compliance Program, including the failure to immediately report any actual or perceived violations of healthcare laws or Lincare policies.
26. Violation of HIPPAA or the Electronic Media Policies

                LIN_0000410

I feel this is a retaliation based off conversation and complaints that I had no choice to make since Amber Renards' exposing the racism issue to the Vice President in early January. Since then the overall work environment has been hostile towards me.

There are two ways to do something; the right way and the wrong way, if I am failing in my responsibility let me know, in writing or verbally, my authorized trainer does not even speak to me. I am prepared to rebut everything that comes my way for future litigation. I would like this letter of rebuttal to accompany the "Documented Counseling" in all correspondence.


Shawron Lounds

*Shawron Lounds*


CC: Linda Feller
    Greg McCarthy

CONFIDENTIAL

# EXHIBIT 22



Messages    **Shawron Lou...**    Edit

I called you at 5:45am, you did not answer, so i left a voice mail. Due to a hostile workplace I will not go in today. Yesterday in your office infront of Michelle, Kevin slapped eylse left thigh so hard it left his huge hand print and brused it. Michelle, jody myself and becky saw it. I even told Becky she took her phone out to take a picture of it. Then they started doing the same thing they always do punching and hitting each other, I couldn't focus.

Text Message    Send

CONFIDENTIAL



Becky was like now, now children. You yourself see them horseplay all the time, but this freeked me out because I can tell it really hurt her. Im scared that he will hit her and knock her into something. I can't be around that and nothing is done about it. Please advise Michelle that I won't be in today. You are my manager I know you and eylse are very close, I don't care if you tell the whole office, this really freaked me out.

May 4, 2012, 10:03 AM

Text Message    Send

CONFIDENTIAL

LIN_0000238

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

SHAWRON LOUNDS,                  )
                                 )
             Plaintiff,          )
                                 )
v.                               )     Case No. 13-CV-1091-RDR-KGS
                                 )
LINCARE INC.,                    )
                                 )
             Defendant.          )
_____)

## AFFIDAVIT OF LINDA FELLER

I, Linda Feller, being first duly sworn, state:

1.      I am over the age of twenty-one and have personal knowledge of, and am otherwise competent to testify regarding, the matters set forth herein.

2.      I have worked for Lincare Inc. ("Lincare") for two years, and have personal knowledge of its policies, practices, and business operations.

3.      In 2011 and 2012, I worked as a Human Resources Manager for Lincare.  My office is in Clearwater, Florida, which is where Lincare is headquartered.

4.      I have a variety of responsibilities as a Human Resources Manager, including working with management center managers, district managers, and division managers to assist with handling employee discipline and performance issues.  I also investigate complaints of harassment or discrimination in the workplace, and to work with management to ensure that Lincare's Anti-Discrimination/Anti-Harassment policies are being followed.

5.      During Shawron Lounds ("Lounds") employment with Lincare, I worked closely with her (Lounds), Suzanne Kraft ("Kraft"), Jeremy Felts ("Felts"), and Paula Adams ("Adams")

to address various matters that arose during her employment with Lincare. My involvement in the above case was largely described in my deposition on October 14, 2013.

6.     One incident that I investigated that was not discussed in my deposition was a text message Lounds sent to Kraft in early May 2012. In the text, Lounds claimed that she would not come into work because of a "hostile workplace." Lounds claimed that she could not be around this kind of behavior in the workplace.

7.     I asked Kraft what happened, and Kraft informed me that some of the employees were horsing around after the end of the work day, and that Kevin Kunz ("Kunz") had jokingly slapped someone on the leg. Based on this report, I did not believe that there had been a violation of Lincare's Anti-Discrimination/Anti-Harassment policies.

8.     Lounds' first "formal" discipline was a Documented Counseling on April 26, 2012, which she received because she had sixteen unscheduled absences after only seven months of employment. The decision to give Lounds the Documented Counseling was made for business reasons, and had no connection to her previous complaint of what she had perceivd to be discrimination, harassment or retaliation. Instead, Lounds received the Documented Counseling solely because her unscheduled absences were out of control and had not been managed appropriately.

9.     Over the next two months after her Documented Counseling, Lounds missed nine more days or partial days of work which were not approved in advance, as required by Lincare policy. As a result, she was given a Documented Verbal Warning on June 22, 2012.

10.    The decision to give Lounds the Documented Verbal Warning on June 22, 2012, was made for business reasons, and had no connection to her previous complaint of what she had

2

perceivd to be discrimination, harassment or retaliation.   It was purely the result of her failure to improve her poor attendance.

11.     Despite her previous warnings, Lounds had two more unscheduled absences in July 2012, missing work on July 9 and July 20.  I spoke with the Kansas Human Rights Commission investigator on July 20 about Lounds' continued excessive absenteeism and he indicated support for Lincare's decision to proceed with a Final Written Warning.   Lounds received a Final Written Warning on July 24, 2012 as a result of these unscheduled absences. She also received the Final Written Warning because of a disrespectful message she sent to Kraft.

12.     The decision to give Lounds the Final Written Warning on July 24, 2012, was made for business reasons and had no connection to her previous complaint of what she had perceivd to be discrimination, harassment or retaliation.  She received it solely because of her continued unscheduled absences and her disrespectful message to Kraft.

13.     After her Final Written Warning on July 24, 2012, Lounds missed seven more days or partial days of work over the next two months.  In addition to these 7 instances, Lounds took additional time off from work for the stated purpose of attending therapy sessions with hermental health counselor, Dr. Joseph Donaldson, but that missed time was not considered for purposes of calculating her attendance record.

14.     Because of Lounds' excessive absenteeism, the decision was made to terminate her employment on September 24, 2012.

15.     The decision to terminate Lounds' employment was made for business reasons, and had no connection to her complaints of discrimination, harassment, or retaliation.  Instead, she was terminated because of continued unscheduled absences.

3

16.     During Lounds' time with Lincare, the only employee who had an even remotely comparable attendance record was Tracey Hackney ("Hackney").   Hackney is a Caucasian woman who was hired as a CSR in May 2011.

17.     Hackney has similar attendance issues as Lounds.  She frequently clocked in late or completely failed to show up at all.  And like Lounds, Hackney was terminated after going through Lincare's disciplinary procedure—Documented Counseling, then Documented Verbal Warning, then Final Written Warning, then termination in February 2012. Hackney's termination notice is attached as Exhibit A.

18.     Lounds had far more absences than Hackney, yet was given many more chances than Hackney.  Lounds was given nearly a full year to correct her behavior, while Hackney was terminated after less than nine months.

4

19.     Hackney never complained of discrimination or harassment of any kind during her employment.

FURTHER AFFIANT SAITH NAUGHT.


_Linda Feller_
Linda Feller


STATE OF FLORIDA            )
                            )
COUNTY OF PINELLAS          )

On this  20  day of November, 2013, before me appeared Linda Feller, known to me to be the person who executed the foregoing Affidavit and acknowledged to me that she executed the same for the purposes therein stated and that the information contained therein was true to the best of her knowledge, information and belief.


_Nancy L Sanders_
Notary Public

My Commission Expires:

NANCY L. SANDERS
MY COMMISSION # EE 136797
EXPIRES: October 24, 2015
Bonded Thru Budget Notary Services

5

# EXHIBIT A



**To:**       Tracey Hackney, Customer Service Representative

**Date:**     February 1, 2012

**Subject:   Employment Termination**

---

On January 25 you received a Final Written Warning for a number of unacceptable workplace actions, including attendance and poor workmanship.  On January 31 you took an unscheduled day off and today you were late to work.  While you were out January 31, a large stack of patient charts which had not been batched were found at your desk, and a doctor's faxed order for a CPAP, dated 1/16, had not been set up despite my specifically asking you about this order when it came in.

These deficiencies violate Lincare Major Infraction:
*#16 -   Substandard workmanship, negligence, or inefficiency during the performance of one's duties.*

Consequently, your employment is being terminated effective immediately.



                                        Suzanne Kraft
                                        Center Manager

cc:     Personnel File
        J. Felts

CONFIDENTIAL                                                                    LIN_0000620

# EXHIBIT 24

5/7/12:  Spoke to Suzanne Kraft at 2:40pm

Shawron's latest complaints:

1.  Other people are allowed to text in their absences.  Suzanne said that when people text in (like this morning), she tells them they need to call her, and they do.  She is consistent in enforcing this.

2.  Suzanne was going out of town last week and stopped by the office Wednesday with her girls.  Shawron was holding the baby and the baby put her head on Shawron's shoulder.  Shawron asked Suzanne to take a picture of them, so she did.  Suzanne then texted the photo to Shawron.  Shawron wrote back that she didn't want Suzanne to have that picture, and she wanted Suzanne to delete it.

3.  On Thursday afternoon some of the employees were horsing around in the office, and Kevin hit Elyse on the leg.  Jodee mentioned it to Shawron, and Shawron sent Suzanne a text stating she was not going to work on Friday because it was a hostile work environment and she was afraid.  Note:  Amber was off on Friday.

4.  Shawron texted Suzanne today while she was at lunch.  She said she couldn't return to work because she didn't feel well.  Note:  Amber left after the Monday Morning Meeting because she couldn't stop throwing up.

CONFIDENTIAL

# EXHIBIT 25

# STATE OF KANSAS
# KANSAS HUMAN RIGHTS COMMISSION

On the complaint of

DOCKET NO. 35657-12W

Shawron Lounds

Complainant,

vs.

Respondent,

Lincare, Inc. and its Representatives

I, Shawron Lounds residing at 910 Armour Rd., Wichita, KS 67207

charge Lincare, Inc. and its Representatives whose address is 7777 E. Osie St., Ste. 301, Wichita, KS 67207

With an unlawful practice within the meaning of:

[X] The Kansas Act Against Discrimination (Chapter 44, Art. 10, K.S.A.) and specifically within the meaning of subsection (a)(4) of Section 44-1009 of said Act, because of my :

( ) RACE    ( ) SEX               ( ) ANCESTRY    (X) RETALIATION
( ) RELIGION   ( ) NATIONAL ORIGIN    ( ) DISABILITY    ( ) FAMILIAL STATUS
( ) COLOR    ( ) GENETIC INFORMATION

[] The Kansas Age Discrimination in Employment Act (Chapter 44, Art. 11, K.S.A.) and specifically within the meaning of subsection of Section 44-1113 of said Act, because of my AGE.

Alleged Date of Incident, on or about April 26, 2012.

The aforesaid charges are based on the following facts:

I.    I have previously filed a discrimination complaint against the Respondent, the charge number is 35554-12W.

II.    I have been employed by the Respondent since September 27, 2011.  I currently hold the position of Customer Service Representative.

     A. On April 26, 2012, I was subjected to a written reprimand due to absences and alleged work performance.  However, similarly situated employees who have not filed a discrimination complaint against the Respondent were not subjected to a written reprimand due to similar actions. Therefore, on May 1, 2012, I made a complaint to Human Resources regarding retaliation.

CONFIDENTIAL

LIN_0000268

# STATE OF KANSAS
# KANSAS HUMAN RIGHTS COMMISSION

(continued)  *85657-12W*
Docket No.

III.   I hereby charge Lincare, Inc. and its Representatives with a violation of the Kansas Act Against Discrimination, in that I was subjected to a reprimand as an act of retaliation for having previously filed a discrimination complaint.

I have not commenced any action, civil or criminal, based upon the grievance set forth above, except

STATE OF KANSAS                )

COUNTY OF *Sedgwick*          )ss:   X _____
                                         (Signature of Complainant)

Shawron Lounds, being duly sworn, deposes and says that: that she/he is the Complainant herein; that she/he has read the foregoing complaint and knows the contents thereof; that the same is true of her/his own knowledge except as to the matters therein stated on information and belief; that as to those matters she/he believes the same to be true.

Subscribed and sworn to before me

this *18* day of *May*, 2012         X _____
                                          (Signature of Complainant)

_____
(Signature of Notary Public)



CHRISTOPHER LUTTRELL
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp.

MY COMMISSION EXPIRES:

RECEIVED
MAY 23 2012
KANSAS HUMAN RIGHTS COMMISSION

*(right margin, rotated)* CENTER TOLL# 8556060x   DATE 2/16/2013 1:18:53 PM [Eastern Standard Time]   CALLER FAX#   85651 1E3368B2904

CONFIDENTIAL

# EXHIBIT 26



**To:**      Shawron Lounds, Customer Service Representative

**Date:**    June 22, 2012

**Re:**      **Documented Verbal Warning**

---

Your actions are not supporting the goals and operations of the Wichita, Kansas center and Lincare.

You were hired September 27, 2011. You received a Documented Counseling on April 26, 2012 for excessive unscheduled absences. You continue to have an unacceptably large number of unscheduled absences:

| | |
|---|---|
| Friday, May 4 | full day |
| Monday, May 7 | ½ day |
| Friday, May 11 | ¾ day |
| Wednesday, May 30 | full day |
| Monday, June 4 | full day |
| Monday, June 11 | ¼ day |
| Wednesday, June 13 | full day |
| Friday, June 15 | full day |
| Thursday, June 21 | full day |

This is in addition to a scheduled day off, approved in advance:
       Friday, May 18

Our service levels suffer when we are unable to plan in advance for someone's absence. It is essential that you request time off and get approval in advance of your days off. We understand that there are occasional emergencies that cannot be scheduled, but those should be the exception, not the rule.

In your Counseling you were reminded that Lincare policy prohibits texting to report your absence. Page 22 of the "About Your Company" handbook states, "Should you find you will be absent or late, you must <u>personally speak to your supervisor</u> prior to, or as soon as possible after, your scheduled starting time." This means that you call and speak with me. Even if I am not able to answer the phone, the expectation is that you will continue trying until we have a conversation.

This verbal warning is being issued to formally advise you that if you do not demonstrate immediate and sustained improvement in your adherence to company policy, while maintaining overall satisfactory job performance, further corrective action, up to and including employment termination, will occur.

*See page 2*

CENTER TOLL# 8556060

DATE 10/12/2012 8:38:18 AM (Eastern Daylight Time)

CALLER FAX# 8556077D77813A6

Documented Verbal Warning – Shawron Lounds
June 22, 2012
Page 2 of 2

The responsibility for improving lies with you.  If you are unclear about your responsibilities or the company's expectations, please advise me immediately.

_____         _____
Suzanne Kraft, Center Manager                            Date    06·22·2012

Your signature below acknowledges only that this document has been reviewed with you; it does not necessarily represent your agreement with any or all of the information presented herein.

_____         _____
Shawron Lounds, Customer Service Representative     Date   6/22/12

My initials below acknowledge my understanding that I have the right to formally dispute any . information contained in this corrective action document that I believe to be untrue or misrepresented in any way by contacting the next appropriate level of management utilizing the Problem Resolution Procedure, which is outlined in the "About Your Company" handbook.

_____
S. Lounds' Initials

cc:     Personnel File
        J. Felts

CONFIDENTIAL

CENTER TOLL# 956606      DATE 10/12/2012 8:36:18 AM [Eastern Daylight Time]      CALLER FAX#      956607TD77813A6

# EXHIBIT 27

**9am (Eastern) on 6/22/12**: (Jeremy Felts, Suzanne Kraft, Linda Feller & Shawron Lounds)

Suzanne:  Can you hear everyone ok?

Linda:  I can

Jeremy:  Shawron, the reason we brought you in is we wanted to talk about your absences.  First and foremost, when you are here I think you do a nice job with the customers.  You have a very good manner with them.

When you're not here and we can't plan accordingly, it will make those customers suffer because we can't plan for the service levels.  That's what we wanted to talk to you about.

Also, the manner in which you're calling in – I know we talked about it last time – I guess there is a way in which you can send an email message with a voice attachment?  You need to talk to Suzanne when you can't come in.

Shawron:  No one has ever gotten in trouble for texting but me.  Jennifer told me, Tracy, Amber told me.  They call text in.

Suzanne:  No, they all called in.  That is my rule for everyone.

Jeremy:  I know we discussed it last time.  Do you remember talking about it?

Shawron:  Yes

Jeremy:  There's been a lot of absences and it's hard for us to take care of our business.

Shawron:  I work when I'm here.  There's a lot of things going on with this place.  I have doctor's notes.

Jeremy:  Here's the write-up.  We'll let you read it, and then if Linda has anything to say, we'll let her…….

Jeremy:  Linda, do you have anything to add?  Linda?  Linda, can you hear us?  <my phone was on mute>

Linda:  I just want to mention that it's the unscheduled absences we're concerned about, Shawron.  We – Suzanne – has been generous in offering you time off when you've requested it in advance and she can plan for the absences.  What we can't do is plan when you don't notify her until 5am.

Shawron:  I'll call earlier.

Jeremy:  I don't think that's what Linda's saying.

Linda:  Right.  Shawron, that would be an unscheduled absence, too.  We need for you to plan in advance, and request the time off.  When Suzanne approves the time, that sort of absence is ok.  It's the unscheduled absences that are a problem.

Jeremy: You can sign right here.  Do you have any questions?

Shawron:  No

Jeremy:  Linda, do you have anything else?

Linda:  No

*After Shawron left the room…….*

Suzanne:  I'm consistent with that.  No one is allowed to text in.  My Ops Manager texted me this morning because he had strep throat, and I told him that was not acceptable and he needed to call me.  No one can text in.

CONFIDENTIAL

# EXHIBIT 28

16 July 2012

Human Resources Lincare

Attention: Suzanne Kraft, Center Manager and Jeremy Felts, Lincare Wichita

This is a Rebuttal to the "Documented Counseling" I received June 22, 2012 in which dates were used to document my absences from Lincare, specifically unscheduled time off and texting absences in..

During my counseling Jeremy Felts and Suzanne Kraft stated that they never received any text messages from Lincare Employees texting in their absences.

That statement was totally false. I have documentation from recent former employees that state they always texted their absences in to Suzanne Kraft and Jeremy Felts.

When I first started my employment whenever I reported my absences, I called them in. During that time I do not ever recall Suzanne Kraft answering a phone call or calling me back.  My Co-workers informed me that you could text message in absences, and that was the accepted standard practice for our office.

The statement that Lincare prohibits texting to report absences is totally inaccurate and facetious. All employees' text the Center Manager of their absences and to single me out is disparate treatment as defined by the EEOC as well as other government agencies.

I believe these counseling's are a result of my complaints of racial discrimination and disparate treatment that I have been and still the victim of at Wichita Lincare.

We still have daily violations in company policy that take place in Wichita Lincare, and yet no one is ever held accountable.

I have consulted with current and past employees' and every single person has used texting as a communication tool to inform the center manager of absences, tardiness and patient information. Suzanne Kraft has been openly known to text patient information and have employees' text information to her which violate HIPPAA rules.

This is another example of Lincare of Wichita's management making rules up. Playing favoritism and continuing to ignore the policies as stated in the Lincare employee manual.


Shawron Lounds

*Shawron Lounds*

CC: Linda Feller
     Greg McCarthy

LIN_0000368

# EXHIBIT 29



**To:**     Shawron Lounds, Customer Service Representative

**Date:**   July 24, 2012

**Re:**     **Final Written Warning**

Your actions are not supporting the goals and operations of the Wichita, Kansas center and Lincare.

You were hired September 27, 2011. You received a Documented Counseling on April 26, 2012, and a Documented Verbal Warning on June 22, 2012, for excessive unscheduled absences. You then called in on July 9 and July 20, continuing the trend. This is in addition to the day you requested off, and had approved in advance (June 29).

Additionally, on July 20, you indicated in your call that you would only be a couple hours late, arriving by 10:30am. Half an hour later, you sent a text message stating you would be out all day. I asked you to call me if that was your plan because that was not what we had agreed to by phone. You responded with an inappropriate text message back to me. Let me be very clear: it is my job as your manager to let you know my expectations. When I texted you that I would expect you at around 10:30 unless you called me, that was absolutely appropriate. The words you chose to use in your text message were unacceptable and violate the following Lincare policies:

> *#9 – Engaging in behavior designed to create discord and lack of harmony, or willfully restricting work output*
> *#17 – Failing to exhibit self-control to customers and/or fellow employees*

This final written warning is being issued to formally advise you that if you do not demonstrate immediate and sustained improvement in your adherence to company policy, while maintaining overall satisfactory job performance, further corrective action, up to and including employment termination, will occur.

The responsibility for improving lies with you. If you are unclear about your responsibilities or the company's expectations, please advise me immediately.

_____          _07/24/2012_
Suzanne Kraft, Center Manager                    Date

Your signature below acknowledges only that this document has been reviewed with you; it does not necessarily represent your agreement with any or all of the information presented herein.

_____ *Refused to Sign* _____
Shawron Lounds, Customer Service Representative      Date

My initials below acknowledge my understanding that I have the right to formally dispute any information contained in this corrective action document that I believe to be untrue or misrepresented in any way by contacting the next appropriate level of management utilizing the Problem Resolution Procedure, which is outlined in the "About Your Company" handbook.

_____
S. Lounds' Initials

cc:   Personnel File
      J. Felts

CONFIDENTIAL

CENTER TOLL # 8666060

DATE 10/12/2012 8:36:16 AM (Eastern Daylight Time)

CALLER FAX#   8666077D77813A6

# EXHIBIT 30

**7/24/12 at 9:10am**
*Present: Suzanne Kraft, Jeremy Felts, Shawron Lounds & Linda Feller (by phone)*

As Jeremy walked Shawron into Suzanne's office, Shawron said, "Alright, here we go again!"

Jeremy led the conversation and did a very nice job explaining that we continue to have concerns about her unscheduled absences as well as the way she responded to Suzanne's text on Friday. He told Shawron that we had agreed previously that if she was not going to be able to come in, she was to call, and while she did call initially, her follow-up text did not reflect what had been agreed upon, so it was appropriate for Suzanne to ask for another call to discuss it. He told Shawron that her response was completely inappropriate. Shawron said, "Well, that's how I felt." He said, "I understand. It was not an out of line text message she sent you. We had previously discussed phone calls and what you sent her was not appropriate."

Jeremy asked Shawron to review the write-up. She asked what #9 meant. I let her know that it was one of Lincare's Major Infractions, from the employee handbook. She said she was a hard worker and not restricting work. We explained that #9 also referenced inappropriate behavior, and that's what we were addressing.

Shawron then said that what she wrote in the text "was no worse than what Suzanne said to her, and nothing happened to her." I reminded Shawron that immediate action was taken back in January as soon as we were notified that there was a problem, and I reminded her that she took part in an inservice training on the topic.

Shawron claimed that because she's the only black person in the office, she feels like the pink elephant in the room and feels that people are always talking about her. She said, "Everytime someone says 'BOOM!' I hear Laynee saying 'Boom Nigga!'" Shawron then said that Amber says "BON" to her every day, and she's sure Suzanne has heard it, but Suzanne hasn't done anything about it. Suzanne said, she doesn't remember hearing it but since she doesn't know what it means or know that it's offensive, it would not have triggered her to take action. All three of us told Shawron that she needs to bring things to us if she's feeling targeted, but so far, she hasn't.

I then told Shawron that I was really surprised to hear her comment about the pink elephant in the room. I reminded her of our conversation back in March, and how that had been a primary concern for her at that time, that people were being so careful after the incident in January that she felt like a pink elephant. I told her, "That day we met, you told me it was getting better, though, and you told me you'd let me know if things got worse again." She said to me, "Yeah, and you also told me I didn't know how to take a joke." I said, "No, ma'am, I certainly did not. I took your concerns very seriously, and I thought we had a very good conversation that day." She said, "Well, it's your word against mine, and you said it."

CONFIDENTIAL

I asked Shawron how we were going to move forward if she kept focusing on the past. I told her we were working really hard for it to be a positive work environment for everyone. She then turned my words around again and told me she can't just forget what happened. I told her I'm not asking her to forget. Jeremy and Suzanne echoed that statement. I told her that the only way to move forward, though, is to stay focused on the future and the positive things we've been doing to try to make this a good place for everyone to work.

Shawron then said she sees a doctor every day because "I'm not right. I'm not right from all of this. I've even already talked to Mary Bennett about taking leave." I told her I was glad she brought that up because I knew she had told Suzanne that she was approved for her doctors' appointments once a week. I reminded her that we have not received medical certification yet, nor is she able to take a medical leave intermittently. She said she would get the certification on Friday.

Shawron refused to sign the Final Written Warning. I instructed Suzanne to write "Employee Refused to Sign" on the signature line and send it in to Emily for Shawron's personnel file anyway.

I hung up around 9:30am.

**At 10am I received a call from Jeremy and Suzanne:** They said they had just finished up with Shawron. After I hung up, they talked some more. They talked about the past. Suzanne said she apologized for "anything I may have said in the past that offended Shawron. She accepted my apology." Suzanne told Shawron she is not a prejudiced person and doesn't even know some of the words that have been used that Shawron found offensive had that meaning. She then told Shawron she has "six black cousins who I love dearly."

Jeremy then asked more about the situation with Amber and asked why she hadn't mentioned it before. Shawron told them she didn't bring it up because "nothing would be done. Nothing happened to you." Suzanne told her, "Yes it did. Not everyone airs it when they get in trouble." Jeremy confirmed for Shawron that Suzanne did get in trouble for what was reported that she said back in January. Suzanne told her "I tried to learn from it and move forward to make this a good place for everyone to work."

Shawron then said, "I did come to you about Kevin because he was treating me differently." Suzanne told her, "And I met with him about it."

Jeremy asked Shawron again about Amber. He asked her what Amber had said to Shawron to upset her. There were two things: Amber asked her one day if she knew what a BON was because her boyfriend, who is black, wanted her to call him a Big Ol' Nigger. The other thing was that Amber's son is on a football team. The coach of the team has said something about "all blackies are stupid." Jeremy asked her if she

expressed to Amber that she felt uncomfortable by those statements.  Shawron said, "I'm not the type to attack anyone."

Next they talked about feeling like the pink elephant in the room.  Shawron told them it's how she feels.  She feels that way every day and doesn't feel sorry for it.

Shawron asked if she could take the rest of the day off.  They said, "No."  She said she needed to pull herself together.  Jeremy told her she could go on home until noon, but then she needed to come back.  If she didn't feel pulled together by that time, she was to call Suzanne at noon and talk to her about why.

Suzanne, Jeremy and I then talked about how to handle the complaints Shawron had made against Amber.  I said to be consistent with how it was handled in January, I felt that a Final Written Warning for Amber was appropriate.  They agreed.  I told them I would draft it, but I felt it was important to get Amber's side of the story about what was said before Suzanne delivers it to her.  If by chance she hears something drastically different from what Shawron told us, to hold off on presenting it until we talked.  They agreed.

**At 10:53am I received another call from Jeremy and Suzanne**:  Jeremy said, "We just had a visitor."  I asked who, and he said it was Shawron's husband.  Suzanne said she felt like they were being tape recorded.  The husband kept saying over and over that Amber was trying to poison Shawron and we didn't do anything about it.  He started out by saying, "What's going on here?  My wife came home crying!"  Then he told them what terrible managers they both are.

He wanted to get a copy of her write-up and they told him they could not give it to him, but that Shawron could have a copy when she came back to work.

He made claims that Suzanne and Jeremy allowed discrimination to go on and didn't do anything about it.  He claimed to know the Lincare handbook better than anyone in the company.  He said he has a copy at home and reads it regularly.

Then he told them they'll be writing a letter, which he'll send certified, about all the things that are going on.

At 3:16pm I sent Suzanne the Final Written Warning for Amber.

**At 5:35pm I called Suzanne** to find out how it went with Amber.  She said that Amber had a really bad day.  While Shawron's husband was in the building talking to Suzanne and Jeremy, a woman called the center and asked to speak with Amber.  She told Amber

CONFIDENTIAL

that she was Amber's boyfriend's "baby mama" and she should stay away from him and that he has STDs.  Amber was quite shaken up by the call.  Amber called the boyfriend who said that he's never told anyone where she works.

Suzanne said she and Amber had a really good conversation, though, about Amber and Shawron.  Amber said their friendship has really suffered since the time she reported the discrimination to Greg McCarthy, and she wishes she hadn't even brought it up to him.  Suzanne assured her it was the right thing to do at the time.

Suzanne asked her about the two situations Shawron had shared with her and Jeremy this morning.  Amber told her that it was a black coach of a basketball team that her son plays on and that his comment was that "I consider Jordan one of the black boys now" since Jordan (Amber's son) is the only white child on the team.  Shawron's statement to Amber after Amber telling that story was "Oh ok."

Suzanne then asked about "BON."  Amber said she was giggling when she returned from lunch one day.  Shawron asked her why she was so happy.  Amber said, "Just something my boyfriend said."  Shawron asked what it was.  Amber told Shawron, "I can't tell."  Shawron said, "Tell me."  Amber said, "He asked me to call him a BON."  Shawron asked, "What's that?"  Amber told her, "I won't say the last word out loud, but it's a Big Ol' ___."  Amber told Suzanne she "never used the N word" and she never said the comment about "the blackies are stupid."

Suzanne said she was waiting until the end of the day to give Amber the write-up, but she felt like Amber was probably expecting it after their talk.  I told her I thought we should hang up, then since it was 4:45 their time.

CONFIDENTIAL

# EXHIBIT 31



**To:**      Amber Renard, Customer Service Representative

**Date:**    July 24, 2012

**Subject:** **Final Written Warning**

Your actions are not supporting the goals and operations of the Wichita, Kansas center and Lincare. It has been reported that you have made inappropriate, racially offensive comments in the center.

Your actions and behavior have created an uncomfortable working environment for at least some of the staff and violate Lincare's Anti-Discrimination/Anti-Harassment policy, which states:

*"All employees have the right to work in an environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive or disruptive, including harassment based on sex, race, color, ethnic background . . . Lincare does not and will not tolerate discrimination against or harassment of or by, Lincare's employees . . . "*

As a Lincare employee, you are required to comply with all company policies, including the Anti-Discrimination/Anti-Harassment policy partially quoted above, which can and should be reviewed in its entirety on page 15 of the "About Your Company" handbook.

Any further comments made in violation of this policy will result in the immediate termination of your employment. Additionally, if you witness anyone else making discriminatory or harassing comments, you have an obligation to report it immediately to management or Employee Relations.

Please note that Lincare also has a policy prohibiting retaliation against any employee who brings their concerns to the attention of management in good faith or who participates in an investigation. Consequently, you will refrain from any actions or behavior that are, or could be perceived to be, retaliatory in nature. Violation of this policy will result in the immediate termination of your employment.

The responsibility for improving lies with you. If you are unclear about your responsibilities or the company's expec tations, please advise me immediately.

_____          _____
Suzanne Kraft, Center Manager                         Date

CONFIDENTIAL



Renard
EXHIBIT NO. 1
DATE 10/9/13
*Kelley, York & Associates*

LIN_0000375

Final Written Warning – Amber Renard
July 24, 2012
Page 2 of 2

Your signature below acknowledges only that this document has been reviewed with you; it does not necessarily represent your agreement with any or all of the information presented herein.

_____        _____
Amber Renard, Customer Service Representative        Date

My initials below acknowledge my understanding that I have the right to formally dispute any information contained in this corrective action document that I believe to be untrue or misrepresented in any way by contacting the next appropriate level of management utilizing the Problem Resolution Procedure, which is outlined in the "About Your Company" handbook.

_____
A. Renard's Initials

cc:    Personnel File
       J. Felts

CONFIDENTIAL

# EXHIBIT 32

July 25, 2012

Human Resources Lincare

Attention: Suzanne Kraft, Center Manager and Jeremy Felts, Lincare Wichita

This is a rebuttal to the counseling dated July 24, 2012

On July 20th I called Suzanne Kraft to inform her I would be a few hours late. A few minutes later I sent a text message indicating I would not be coming in. I also informed her that I would provide a doctors note if necessary in the text message.

You claim I violated the Lincare policies

#9- Engaging in behavior designed to create discord and lack of harmony, or willfully restricting work output.

#17-Failing to exhibit self-control to customers and fellow employees

My two previous counseling's were for texting in absences. In my final letter it clearly states that I called in on July 9th and 20th continuing the trend. Those two days I was at the doctor. Suzanne has never requested a Doctor's note or even spoke to me about the absences.

To single out the tone of my text message as inappropriate shows the retaliatory nature of Suzanne Kraft, Who has a history of demeaning, demoralizing and embarrassing current and past employees.

Due to the verbal abuse and negative racial overtones that I have to endure on a daily basis I refused to tolerate it any further.

When you have current employees swearing and making threats to the manager and other employees and nothing is being done. Shows that she is abusing her power as a center manager by not addressing the issues head on and letting the disruptive behavior of other employees continue.

I find these counseling to be trivial and retaliatory; to claim I am failing to exhibit self-control to fellow employees is totally false. If I do behave in this manner please provide examples. This write up is the first I have heard of such behavior.

Suzanne Kraft has violated numerous policies that are stated in the employee manual; because she is the center manager she is not being held accountable. Here is a brief list of situations that violate the HIPAA rules and violate the Lincare electronic media policy. These are some issues that should be addressed by upper management.

CONFIDENTIAL

On May 22nd Suzanne Kraft and Dan Meyers took equipment to [Redacted] whose daughter is a well-known celebrity, [Redacted]. She boasted how she got [Redacted] [Redacted]'s phone number and showed a picture of [Redacted] in a leopard halter dress bending over caring for her father as he sat in a chair. She then makes derogatory comments about her body and how fat she was. Suzanne Kraft showed everyone present in the office at that time a picture (Becky, Amber, Elyse, Jody and myself) that she took unbeknownst to [Redacted]. I said to Suzanne at the time why did you do that? Suzanne responds she won't know. Elyse then responds BOOM TMZ bitches!

On June 27th Suzanne said very loudly "I had an unemployment hearing about Tracy (a former employee) She said she did not even show up, That's why she's not getting it (Unemployment benefits)" Amber states, "Why are you even a manager, you are not supposed to tell that, you can get in trouble" Suzanne boldly and jokingly says sarcastically, "I would like to see that!"

My manger continues to violate the HIPAA and Lincare Electronic media policies. I state this to demonstrate the unprofessionalism of her character.

The fact that I started to be written up on counseling's right after my formal complaints of discrimination, shows a systematic coordinated effort to retaliate toward me which violates Federal law. There have been much more serious violations that I have reported to Suzanne where other employees received minimal if any discipline at all.


Shawron Lounds

*Shawron Lounds*

Cc
Suzanne Kraft
Jeremy Felts
Linda Feller

CONFIDENTIAL

# EXHIBIT 33

 **First Starr Rehabilitation & Behavioral Health, LLC** 

7/27/2012

Linda P. Feller, SPHR
Human Resources Manager
Lincare
19387 US Highway 19 North
Clearwater, FL 33764

Dear Ms. Feller:

This email is sent to serve you and all concerned notice that Mrs. Shawron Lounds, a customer service representative for Lincare has been a patient of mine since June 13, 2012. During the past month and a half, I have met with her on a weekly basis to listen to her about her problems and help her deal with an ongoing onslaught of verbal abuse and harassing racial comments, slurs, epithets, and innuendos that she is plagued with by a number of employees, including managers and administration, at Lincare.

By her report, since starting as a CSR with Lincare Mrs. Lounds has been forced to repeatedly interface with a hostile environment (Lincare of Wichita, KS) that has caused her significant anxiety, frustration, uncertainty, anger, and depression. These symptoms have not abated and continue to permeate most, if not all, of her activities even outside of work as well; manifesting in sleepless and restless nights, lost weight, lost confidence in her abilities, and the effects do not dissipate even during periods when she is away from the job for more than two days. These symptoms caused her to seek the services I provide as a mental health professional.

Here are some examples of statements that she has been subjected to by European/Caucasian Americans while working on the job:

> "Boom Nigga!" A phrase that was bantered around in the office daily; now it has been
> reduced to the word "Boom; however, everyone knows what it refers to:
> Do you know what BON means? You don't? It means Big Old Nigga;
> We need to bring lynching back because we have enough trees now;
> I thought your name was Shaniqua; and continually told that was her name;
> I'm not racist but it's not like I said, 'let's go to 9th & Grove (Predominately African
> American Community in Wichita, KS) and drag every black person with a noose, tie
> them to a truck and drag them after hanging them.
> She was also told to respond by saying "Yes Massa" to a high ranking officer of Lincare
> during his visit.

I am sure by now you get the idea of the kind of environment she is working in; more importantly, she is the only African American employee at this location, and, this is a just a fraction of what is said to her directly or indirectly during any typical day. As you know she has documented the above comments and many others.

The problems she encounters at work is making simple and routine activities of daily living more and more difficult because she realizes the inevitability of having to return to an environment that causes her problems and undue concerns, as opposed to feeling appreciated, respected and thought of as a professional who contributes to the overall purpose, commitment, and vision of Lincare.

260 N. Rock Road, Suite 210 Wichita, Kansas 67206-2240

P.O. Box 780591 Wichita, Kansas, 67278                        Telephone: (316) 201-1273
Email: firststarr1@sbcglobal.net                              Fax        (316) 260-9389

CONFIDENTIAL

 **FirstStarr Rehabilitation & Behavioral Health, LLC** 

Her attempts at addressing the harassment and discriminatory practices by using the proper channels and procedures outlined in the employee manual is met with either reverse discriminatory statements (i.e., red herrings) and others such as she should "Get over it," or "Take a joke," or she should respond in a way that is reminiscent of "Ghetto" type behavior. Her attempts at redressing grievances are not treated as serious matters and are relegated to being insignificant and unworthy of any further attention. Despite being ostracized for her skin color, Mrs. Lounds has tried to maintain a professional attitude, demeanor, and decorum while at work and at every turn she is made to feel as if she is the butt of negative racial jokes, racial stereotypes, and any negative racial characteristic that is projected, first as an African American person, and second as an African American woman. The only exceptions to this ongoing discrimination and harassment at work is with Lincare customers and vendors; otherwise, she has repeatedly been forced to interface with harassing racial slights and outright blatant racist verbal attacks and threats to her well-being by Lincare employees. You and others in your company should be ashamed of yourselves for having inflicted this kind of wanton discrimination and outright racism upon Mrs. Lounds within the rank and file of your company.

During the time of this verbal racial harassment, the likes of which I have not heard of since the Civil Rights movement, Mrs. Lounds has attempted to bring examples of racial harassment to you and other managers and supervisors of Lincare. All of her attempts at trying to bring attention and resolution to these most egregious acts, which means being protected from the abuse, understood based on how it impacts her ethnic heritage, and most importantly, feel as if she is being treated as an equal on the job has been to no avail.

Your company has a policy against such unprofessional, unethical, immoral, and criminal behavior; it is located on page 15 of the employee manual; it is entitled *Anti-Discrimination/Anti-Harassment/ADA Policies.* It states as follows:

> All employees have the right to work in an environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive or disruptive, including harassment based on sex, race, color, ethnic background, religious belief, national origin, citizenship, ancestry, alienage, age, marital status, sexual orientation, veteran status, actual or perceived medical condition...Lincare does not and will not tolerate discrimination against, or harassment of or by, Lincare employees, consultants, applicants, customers, or vendors. Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as business trips, business meetings...Location managers are responsible for ensuring that their location is in compliance with these policies and is free of discrimination or harassment, sexual, racial, or otherwise. Managers/supervisors will be held personally responsible by the Company and may be held personally liable if they participate in discriminating or harassing behavior or fail to adequately protect employees from discrimination or harassment.

I am demanding in the strongest terms that employees/managers/supervisors in your company cease and desist from all forms of discriminatory practices and racist comments immediately; as these unwanted behaviors of Lincare employees have detrimentally and harmfully affected the health and well-being of Mrs. Lounds. Furthermore, I am also requesting that she be provided guarantees under the Family Medical Leave Act (FMLA); and due to the extenuating circumstances discussed in this email, that you waive the 12 month rule cited in your employee manual so that Mrs. Lounds can begin to take full advantage of time away from work to recover from the acts perpetrated against her on the job by Lincare employees.

260 N. Rock Road, Suite 210 Wichita, Kansas 67206-2240

P.O. Box 780591 Wichita, Kansas. 67278                    Telephone: (316) 201-1273
Email: firststarr1@sbcglobal.net                          Fax        (316)260-9389

CONFIDENTIAL

 **FirstStarr Rehabilitation & Behavioral Health, LLC** 

Lastly, I will be forwarding this email to the Kansas state's attorney office, the state of Kansas human rights commission, the National Association for the Advancement of colored People (NAACP); and her state and federal congressman to prevent the potential for you or anyone else in your company to retaliate against Mrs. Lounds. I hope you and others in your company will take this as an opportunity to right the numerous wrongs that have been perpetrated against Mrs. Lounds during her employment with Lincare.

Respectfully,

Joseph Donaldson, PhD, LCPC, NCC, CCMHC
Executive Director

260 N. Rock Road, Suite 210 Wichita, Kansas 67206-2240
P.O. Box 780591 Wichita, Kansas, 67278                          Telephone: (316) 201-1273
Email: firststarr1@sbcglobal.net                                Fax       (316)260-9389

CONFIDENTIAL                                                          LIN_0000363

# EXHIBIT 34



**To:**     Shawron Lounds, Customer Service Representative

**Date:**   April 26, 2012

**Re:**     **Documented Counseling**

Your actions are not supporting the goals and operations of the Wichita, Kansas center and Lincare.

You were hired September 27, 2011.  Since that time, you have missed an excessive amount of unscheduled time off work:

| | | | |
|---|---|---|---|
| 11/4/11 | 2/7/12 | 3/19/12 | 4/13/12 |
| 12/19/11 | 2/16/12 | 3/30/12 | 4/19/12 |
| 1/20/12 | 2/17/12 | 4/9/12 | 4/24/12 |
| 2/3/12 | 3/9/12 | 4/12/12 | 4/25/12 |

This is in addition to two scheduled days off, approved in advance:
    3/28/12     3/29/12

Your excessive absenteeism is affecting the daily operations of the Wichita center and the service we provide.  It is an essential requirement of your job that you attend work regularly.

You are reminded that Lincare policy prohibits texting to report your absence.  Page 22 of the "About Your Company" handbook states, "Should you find you will be absent or late, you must personally speak to your supervisor prior to, or as soon as possible after, your scheduled starting time."

This documented counseling is being issued to formally advise you that if you do not demonstrate immediate and sustained improvement in your adherence to company policy, while maintaining overall satisfactory job performance, further corrective action, up to and including employment termination, will occur.

The responsibility for improving lies with you.  If you are unclear about your responsibilities or the company's expectations, please advise me immediately.

_____          _04·26·2012_
Suzanne Kraft, Center Manager                Date

                                                    *See page 2*

CONFIDENTIAL

Documented Counseling – Shawron Lounds
April 26, 2012
Page 2 of 2

Your signature below acknowledges only that this document has been reviewed with you; it does not necessarily represent your agreement with any or all of the information presented herein.

_Shawron Lounds_                  _4- 26-12_

Shawron Lounds, Customer Service Representative       Date

---

My initials below acknowledge my understanding that I have the right to formally dispute any information contained in this corrective action document that I believe to be untrue or misrepresented in any way by contacting the next appropriate level of management utilizing the Problem Resolution Procedure, which is outlined in the "About Your Company" handbook.

_SL_

S. Lounds' Initials

---

cc:      Personnel File
         J. Felts

CENTER TOLL # 8656066C     DATE 10/12/2012 8:38:18 AM [Eastern Daylight Time]     CALLER FAX#     865607707813A6

# EXHIBIT 35



**To:**       Shawron Lounds

**Date:**     September 24, 2012

**Subject:   Employment Termination**

---

Your absenteeism continues to be excessive.  In accordance with Lincare's Corrective Action Process, you were issued a Counseling on April 26, 2012.  On June 22, 2012, you received a Verbal Warning.  Your Final Written Warning was dated July 24, 2012.  Since that time, you have missed seven additional full days.  In all, since your hire date of September 27, 2011, you have missed thirty-four (34) full days of work.  Some of those thirty-four days were scheduled and approved in advance, but the vast majority of the missed days were unscheduled absences.

Lincare employees in their first year of employment earn five days of vacation.  Clearly, you have exceeded that total allotment.

Your ongoing, excessive absenteeism continues to be a disruption to the business.  Consequently, your employment is being terminated effective immediately.



Suzanne Kraft
Center Manager


cc:      Personnel File
         J. Felts

CONFIDENTIAL

LIN_0000049

EXHIBIT 36

October 3rd, 2012

I would like to explain my termination with Lincare. I was terminated as of September 24, 2012 at 10:00 am; I was subjected to racial discrimination and retaliation in my place of employment. I filed my initial charge of discrimination alleging race discrimination and retaliation on or about April 9, 2012 with the EEOC and KHRC,

The charge was filed after complaints were made to the Vice President Greg McCarthy during his visit to the Wichita Lincare in January 2012, by Amber Renard a white co-worker brought the issue up during an open meeting with the Vice President and all the customer service reps, manager and trainer. She also brought this issue up to the Jeremy Felts the regional manager in November 2011 but he failed to take any action on the issue.

The Vice President asked me to explain what was going on in a private meeting. After that took place being the only black employee in the center, everyone started to treat me like I did something wrong when initially Amber Renard made the complaints.

Since my co-worker was vocal about the racism issue, management went on to pacify her by giving a new position and a raise to keep her quiet about the issue. She even admitted it was a form of hush money to keep her quiet.

Some issues that took place.

- My first day of work, September 27, 2011 Suzanne Kraft told me to introduce myself, in front of my co-workers I told them my name is Shawron she abruptly stopped me and said I thought your name was sha-nea-nea, or its Shaqutia, names that are stereotypical racial profiled names for black American.

- I was subject to hearing co-workers saying BOOM NIGGA, the word BOOM was used around the office to humiliate me, because co- workers knew where boom came from, mainly my manager Suzanne Kraft, Jeremy Felts, Amber Renard.

- Suzanne Kraft and other co-workers would ask me do I live in the ghetto because I'm black or often address me using slang words stereotypical of African Americans.

- Suzanne Kraft would advise me and other co-workers to address Corporate as "YES MASSA"

- We had a patient by the name of Bill ████ and Suzanne assumed he was a big black guy when he called because he was irate with her and his last name was ████. She would then single me out because I was a black female and asked me to give him attitude over the phone, because she was afraid to deal with him.  Bill ████ was a white gentleman but Suzanne often associated the name ████ with black people.

**P109**

I have not received any formal training from the regional trainer. Whenever I ask about training, I am put off by management.

I am disappointed because as an African-American I am receiving disparate treatment in my current work environment. Ethnic slurs and racially based jokes continue even after I have voiced my objections. My Supervisor are aware and take part in the open discrimination.
I have personally met with Mr. McCarty, Vice President, Lincare and informed him of what is going on, after other co-workers complained of the racist working environment in an open meeting.

Since Amber Renard revealed the racism taking place in the work place to the Vice-president Mr. Mcarthy in the presence of Jeremy, Becky, Tracy and Elyse. My co-workers have been giving me the cold shoulder, extreme tension is felt in the workplace and it is a hostile work environment. I did not bring this upon myself, I was going on as business as usual but so many incidents were taking place, that my-workers felt for me and brought the subject up, however I am the victim of another persons outcry.

On February 3rd, I even had to go to the doctor due to feeling ill. My Doctor was so concerned with my blood pressure being so high 168/100 she immediately prescribed me high blood pressure medication and anti-depressants. Before this incident my health was fine.

Since my conversation with Mr. McCarthy, nothing has changed. Sensitivity Training was ordered, but consisted of Jeremy Felts searching for an employee manual and ripping a page out and reading it and everybody signing a copy of it. Everything went down hill after that. It has been a very hostile wok environment, very awkward to work, and very uncomfortable. I feel retaliated against. Not to mention The co-worker who exposed the racism issue. gets a promotion the following Monday and a raise. In communicating with her after the incident she admits to getting a raise and saying they thought it would keep her quiet.

Because of the situation lack of response I am filing a KHRC compliant to prevent this type of behavior from continuing in the workplace

I enjoy my job and the satisfaction from helping the patients. During these hard economic times I don't think I should just quit my job because of no wrong doing of my own. I need my job especially during these hard economic times.

- A White male Co-worker named Kevin Kuntz made a statement to me that we need to bring lynching back and told me Hitler would be proud of him. I also felt threatened by this employee who often made racial comments. I made this clear to management but due to nepotism and favoritism nothing was ever done.

- A male co-worker Kevin Kuntz slapped and punched a female employee under the guise of horse playing. I complained to my manager; however since they are all close the issue was never addressed properly. There would be times I knew I would be in the office alone with this employee and due to security issues I told my manager I would not be coming to work because this was the same co-worker who said we should bring lynching back and that Hitler would be proud of him. This same co-worker would also say he is crazy and forgot to take his meds.

- I endured lack of training while other employees who started after me received proper training. I had to write letters to human resources and even tell the Vice-President. When I did receive training, it was forced, rushed and my trainer made it seem like it was a burden for her to do her job because she was forced by corporate due to my numerous complaints.

These incidents are a small fraction of the situations that took place, I have sent numerous certified letters to human resources regarding these issues and nothing was ever done about them. I was only told to "Get over it", "Take a joke", "Move on" by management.

Following my filing of the charge of discrimination, in April of 2012, the retaliation increased. I therefore filed a second charge of retaliation on or about May 23, 2012 with the EEOC and KHRC. Following the filing of the charges of discrimination, I continued to be subjected to a hostile work environment. I experienced anxiety and stress, depression, embarrassment, humiliation, high blood pressure along with other health issues such as heart palpitations.  My personal doctor, Lincare's Doctor and my Therapist, verified all these issues.

I was terminated on September 24, 2012. My termination was approximately one week after I wrote a recent complaint to the Human Resources Department about their failure to address the discrimination and retaliation, and also I provided a doctors note for having the flu on 09/20/2012 thru 09-21-2012 and was told that it did not matter.

It is clear my termination was due to complaints I made towards Lincare inc and its' management. My work performance has never been an issue. The only issue management could use against me was my attendance issues which were due to situations that took place at the job.


Shawron Lounds

_Shawron Lounds_

# EXHIBIT 37

# STATE OF KANSAS
## KANSAS HUMAN RIGHTS COMMISSION
DOCKET NO. 35657-12W Amended

On the complaint of

Shawron Lounds

Complainant,

vs.

Respondent,

Lincare, Inc. and its Representatives

I, Shawron Lounds residing at 910 Armour Rd., Wichita, KS 67207

charge Lincare, Inc. and its Representatives whose address is 7777 E. Osie St., Ste. 301, Wichita, KS 67207

With an unlawful practice within the meaning of:

[X] The Kansas Act Against Discrimination (Chapter 44, Art. 10, K.S.A.) and specifically within the meaning of subsection (a)(4) of Section 44-1009 of said Act, because of my :

( ) RACE          ( ) SEX                    ( ) ANCESTRY      (X) RETALIATION
( ) RELIGION   ( ) NATIONAL ORIGIN   ( ) DISABILITY      ( ) FAMILIAL STATUS
( ) COLOR        ( ) GENETIC INFORMATION

[] The Kansas Age Discrimination in Employment Act (Chapter 44, Art. 11, K.S.A.) and specifically within the meaning of subsection of Section 44-1113 of said Act, because of my AGE.

Alleged Date of Incident, on or about April 26, 2012, to September 24, 2012.

The aforesaid charges are based on the following facts:

I.   I have previously filed a discrimination complaint against the Respondent, the charge number is 35554-12W. I have openly opposed acts and practices forbidden by the Kansas Act Against Discrimination.

II.  I was employed by the Respondent from September 27, 2011, to September 24, 2012. I last held the position of Customer Service Representative.

   A.   On April 26, 2012, I was subjected to a written reprimand due to absences and alleged work performance. However, similarly situated employees who have not filed a discrimination complaint against the Respondent were not subjected to a written reprimand due to similar actions. Therefore, on May 1, 2012, I made a complaint to Human Resources regarding retaliation.

(continued)<br>Docket No.

CONFIDENTIAL

LIN_0000002

## STATE OF KANSAS
## KANSAS HUMAN RIGHTS COMMISSION

B.   On approximately September 17, 2012, I made a complaint to Human Resources regarding their failure to address the previous discrimination and retaliation. Subsequently, on September 24, 2012, I was terminated due to absenteeism. However, similarly situated employees were not terminated due to similar actions.

III.   I hereby charge Lincare, Inc. and its Representatives with a violation of the Kansas Act Against Discrimination, in that I was subjected to a reprimand and terminated as acts of retaliation for having previously filed a discrimination complaint against the Respondent and for having openly opposed acts and practices forbidden by the Kansas Act Against Discrimination.

I have not commenced any action, civil or criminal, based upon the grievance set forth above, except

STATE OF KANSAS            )
                           )ss:
COUNTY OF Sebwilk          )

X _____
          (Signature of Complainant)

Shawron Lounds, being duly sworn, deposes and says that: that she/he is the Complainant herein; that she/he has read the foregoing complaint and knows the contents thereof; that the same is true of her/his own knowledge except as to the matters therein stated on information and belief; that as to those matters she/he believes the same to be true.

Subscribed and sworn to before me

this 19ᵗʰ day of Oct. , 2012

X _____
          (Signature of Complainant)

_____
(Signature of Notary Public)

MY COMMISSION EXPIRES:
12-23-2013

```
BETTIE THOMAS-WRIGHT
NOTARY PUBLIC
STATE OF KANSAS
My Appt. Exp. 12-23-2013
```
Bettie Thomas Wright
10/19/2012

RECEIVED

OCT 2 3 2012

KANSAS HUMAN
RIGHTS COMMISSION

LIN_0000003

CENTER TOLL# 8556060:   [Eastern Standard Time]   DATE 2/16/2013 1:16:53 PM [Eastern Standard Time]   CALLER FAX#   8555118368829O4

EXHIBIT 38

162621

**2012 EMPLOYEE CALENDAR**

**ABSENCE CODE**
U – Unpaid     V – Vacation
L – Late       F – Funeral
H – Holiday    E – Sal. Con.
J – Jury Duty

*Unpaid days document on reverse side*

**OTHER CODES**
D – Discipline*
W – Warning*
R – Review*

NAME Shawron Lounds
SS# REDACTED
LOCATION# 90·41·61·11
HIRE DATE 09·27·2011

*Document and place in employee's file. See reverse side.*

**JANUARY**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| 1 | 2 H | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 DC | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

1/20 - Documented counseling

**FEBRUARY**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 U | 4 |
| 5 | 6 U | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 U | 17 DC | 18 |
| 19 H | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | | | |

2/3 - texted in sick     2/17 - Documented
2/7 - texted in sick     Counseling
2/16 - texted in sick

**MARCH**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 U | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 U | 29 U | 30 U | 31 |

3/9 - stayed home w/ kids
3/19 - texted in sick
3/28-3/29 - pre-approved vacation
3/30 - texted in sick

**APRIL**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 H | 7 |
| 8 | 9 U | 10 | 11 | 12 U | 13 U | 14 |
| 15 | 16 | 17 | 18 | 19 U | 20 | 21 |
| 22 | 23 | 24 U | 25 U | 26 W | 27 | 28 |
| 29 | 30 | | | | | |

26 - documented counseling

4/9 - texted in sick
4/12 - texted in sick for 4/12-4/13
4/19 - texted in sick  4/25-
4/24 - texted in sick    Same

**MAY**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 U | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 V | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 H | 28 U | 29 | 30 | 31 | | |

5/3 - Called in due to Hostile work environment
5/11 - left @ 9:45 am due to being sick
5/18 - pre-approved day off

**JUNE**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 U | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 V | 30 |

6/4 - texted/vm - stayed home w/ kids
6/11 - left @ noon for an appt. Called in at 2:30 stating she wouldn't be back

**JULY**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 H | 5 | 6 | 7 |
| 8 | 9 U | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 U | 21 |
| 22 | 23 W | 24 U | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

7/24/12 - Final Written Warning
Called in 7/9/12 sick
texted 7/23/12 in sick
7/20/12 - called in sick

**AUGUST**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

**SEPTEMBER**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 H | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 U | 21 U | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 Termed | | | | | | |

9/14 - came in at 8, 9:45 received call from Husband, She left and texted in, she was sick, dr.'s note brought in by Husband, he was asked that she still had to call in - She did not.

9/24/12 - Termed 8am

**OCTOBER**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

**NOVEMBER**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 H | 23 H | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

**DECEMBER**

| SUN. | MON. | TUE. | WED. | THU. | FRI. | SAT. |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 H | 25 H | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

EC 1/1/12

CONFIDENTIAL

EXHIBIT 39

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

SHAWRON LOUNDS,                )
                              )
            Plaintiff,         )
                              )
v.                            )        Case No. 13-CV-1091-RDR-KGS
                              )
LINCARE INC.,                 )
                              )
            Defendant.         )
_____      )

## AFFIDAVIT OF REBECCA ROETTERING

I, Rebecca Roettering, being first duly sworn, state:

1.     I am over the age of twenty-one and have personal knowledge of, and am otherwise competent to testify regarding, the matters set forth herein.

2.     I have worked at Lincare Inc. ("Lincare") for 6 years, and have personal knowledge of its policies, practices, and business operations.

3.     In 2011 and 2012, I worked as regional trainer for Lincare.  While I live in Missouri, I travel to various Lincare centers and provide training to the customer service representatives ("CSR") who work in that center.

4.     I was assigned to Lincare's Wichita center from approximately August 2011 to August 2012.  During my assignment to Wichita, I spent about four days per week (usually Monday to Thursday) working with and around the CSRs in the Wichita center.

5.     I worked in close proximity to Shawron Lounds ("Lounds") during my time in Wichita.  I often worked directly with her and provided training to her, and my cubicle was next to hers.

6.      During my time at the Wichita center in close proximity to Lounds, I never heard any of her co-workers make a single comment, joke, or statement of a racial nature.

FURTHER AFFIANT SAITH NAUGHT.


_Rebecca Roettering_
Rebecca Roettering


STATE OF MISSOURI          )
COUNTY OF Livingston      )

On this 19th day of November, 2013, before me appeared Rebecca Roettering, known to me to be the person who executed the foregoing Affidavit and acknowledged to me that she executed the same for the purposes therein stated and that the information contained therein was true to the best of her knowledge, information and belief.


_Retta S. Darr_
Notary Public

My Commission Expires:

_____

RETTA S. DARR
Notary Public-Notary Seal
STATE OF MISSOURI
Livingston County
My Commission expires: 5/3/2017
Commission# 13541793

2

DB04/0801316.0026/9881691.1

# EXHIBIT 40

# LINCARE
## Job Description

**Job Title:**        Customer Service Representative
**Reports To:**       Center Manager
**FLSA Status:**      Non Exempt
**Job Level/Code:**   1 - 020109, 020209
**Job Level/Code:**   2 - 020110, 020210

**SUMMARY** - Handles patients, referral sources and administrative department inquires.  Sets-up records of patient information into computer by performing the following duties.

**JOB LEVEL BENCHMARK DATA-**
**Level 1 -** Minimum of one year experience in customer service role or similar position dealing with the public.

**Level 2 -** Minimum of two years experience in customer service role or similar position dealing with the public.

**ESSENTIAL DUTIES AND RESPONSIBILITIES** include the following. Other duties may be assigned.

Answers all incoming calls as the main responder is usually the first contact for referral sources. Makes determination of required action.

Takes orders, from physician's office or other referral sources; enters orders and comments into the CIS.  Determines all required equipment and enters into CIS.

Coordinates new patient delivery schedule with the service area and notes in CIS.

Processes patient information on a series of forms where accuracy and timely processing is most important.

Maintains and files patient information on a regular basis.

Verifies insurance coverage and advises collections department of required actions about billing.

Maintains copy of current patient's files and files on referral sources.

Responds to new and current patient's requests.

Processes unit dose, renewal reports, and held sales reports by contacting customers, providers, physician's offices and reviewing with regional accounting office.

Handles mail and outgoing courier packages for the center including responding to requests for information from internal sources when possible.

Must be knowledgeable of existing and new information regarding Lincare equipment and carrier policies.

In smaller centers (5 or less employees) would be DOT certified and be able to fill in for the service representative in emergencies and be available for on call on weekends and evenings.

CONFIDENTIAL

**EDUCATION and/or EXPERIENCE-** Must have proven human relations skills dealing with referral sources, patients, and administrative departments. General office skills such as proficiency in PC programs and data entry, typing, filing, and basic math are essential.

**CERTIFICATES, LICENSES, REGISTRATIONS-**May be required to obtain a commercial drivers license (CDL) with hazmat endorsement.

**PHYSICAL DEMANDS-** While performing the duties of this job, the employee is regularly required to use hands to finger, handle, or feel and talk or hear.  The employee frequently is required to sit.  The employee is occasionally required to stand; walk; reach with hands and arms; and stoop, kneel, crouch, or crawl.  The employee must occasionally lift and/or move up to 25 pounds.  Specific vision abilities required by this job include close vision.

**WORK ENVIRONMENT-** The noise level in the work environment is usually moderate.

_Shawron Lounds_    90416111
Signature           Location Code

_Shawron Lounds_    9-27-2011
Print Name           Date

LIN_0000555

# EXHIBIT 41

**LINCARE**
**MEASURES OF PERFORMANCE (MOPS)**
**FOR CUSTOMER SERVICE REPRTSENTATIVE**

Name: Shawon Lounds   Center:  Wichita, KS

## 1.  GENERAL

Hours of work are 8:00a.m. -5:00p.m. M-F.  Office coverage for Saturday office hours of 9:00a.m. -1:00p.m. will be noted with the rest of the staff on a regular basis.

Employees must call in to center and let center manager know when absent for any reason.  Do not leave a message on service or have spouse call.

Time off for personal business is at the discretion of the center manager and must be approved in advance.

Dress should be professional business attire.  Jeans in good repair are acceptable for "dress-down" Fridays.
Conduct yourself and represent Lincare in a professional manner.

Always maintain a courteous and positive attitude when dealing with patients and their families.

All supplies/tools provided to employee, i.e. keys, pagers, gasoline cards, equipment, repair tools, planners, are the property of Lincare and must be returned upon termination of employment.

Respects patient confidentiality and right to privacy at all times.

## 2.  SAFETY

Adheres to all safety policies and procedures.

No on the job preventable injuries resulting in lost days of work.

Page 2

**3.  NEW PATIENT INFORMATION**

Fills in verbal order with customer information, referral information, and concise instructions to be related to the service representative.

Is courteous and polite on the phone with customers, their families, and referral sources.

Is knowledgeable about pricing and Medicare/insurance coverage.

Inputs new setups in to the computer and compiles the chart for the files within 48 hours of the setup.

Keeps track of setups and pickups for the month.

Utilizes selling skills and tools that are made available.

Can manage a cash sale of DME equipment.

**3.  UNIT DOSE PATIENT MANAGEMENT**

Calls Unit Dose patients monthly to inquire about reorder needs.

Orders medication, as needed for unit dose patients.

Communicates any changes in information to Reliant.

Establishes a telephone relationship with patients so they will feel comfortable in calling.

**4.  HELD AND UNBOOKED SALES**

Works the held and unbooked sales report on a regular basis to maintain the amount below 10%.

Follow through with requirements of resending scripts, etc. necessary to get sales off of the report.

Page 3

CONFIDENTIAL

5. **OFFICE/CLERICAL WORK**

Answers all calls politely, professionally, and before the 4th ring.

Timely batching of delivery tickets and packets prior to sending to RAO.  Manages charts in active, inactive and archive files

Files DT's and other paperwork in patient files

Attends  inservices and safety meeting regularly.

Keeps desk area neat and professional.

**EMPLOYEE
SIGNATURE:** _Shannon Lourds_ **DATE:** _9-27-2011_

**AREA MANAGER/
CENTER MANAGER** _S. Kroff_ **DATE:** _09·27·2011_

LIN_0000558