## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

```
SHAWRON LOUNDS,               )
                              )
            Plaintiff,        )
                              )
    v.                        )    Case No. 13-1091-RDR
                              )
                              )
LINCARE, INC.                 )
            Defendant.        )
```

## MEMORANDUM AND ORDER

In this case, plaintiff makes claims alleging a hostile work environment in violation of 42 U.S.C. § 1981 and retaliation in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Defendant has filed a motion for summary judgment arguing that the evidence is not sufficient for a reasonable jury to rule in plaintiff's favor on either claim. After careful review, the court agrees with defendant.

I.  SUMMARY JUDGMENT STANDARDS

Summary judgment is warranted if the materials on record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.CIV.P. 56(a). The court considers "all of the facts in the light most favorable to the non-movant and reasonable inferences from the record must be drawn in favor of the non-moving party." Piercy v. Maketa, 480 F.3d 1192, 1197 (10th Cir. 2007). From this viewpoint, the court attempts to determine

whether a reasonable jury could return a verdict in favor of the non-moving party.  Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004).  "While we view the record in the light most favorable to the non-moving party, that party must still identify sufficient evidence requiring submission to the jury to survive summary judgment."  Piercy, 480 F.3d at 1197.  In other words, the court may consider evidence produced by the moving party as well as the absence of admissible evidence in favor of an essential element of the non-moving party's claim.  Adams v. Am. Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000).  "If the evidence [in support of a claim] is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986)(interior citations omitted).  "[P]urely conclusory allegations of discrimination" which are devoid of "concrete particulars" are not sufficient to avoid summary judgment.  Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 119 (2d Cir. 2010)(interior quotations omitted); see also, Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(non-moving party must set forth specific facts admissible in evidence from which a rational jury could find for non-movant).  "Unsubstantiated allegations carry no probative weight . . . evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  Bones, 366 F.3d at 875.

II.  UNCONTROVERTED FACTS

Plaintiff is an African-American woman who worked for almost a year as a customer service representative (CSR) for defendant in Wichita, Kansas.  Plaintiff was the only African-American who worked at the Wichita facility during her employment with defendant.

Defendant is a company providing respiratory services.  Defendant has locations across the nation.  Its corporate headquarters is in Clearwater, Florida.  Defendant's Wichita facility had 17 or 18 employees, about four of whom were CSRs.  Defendant had smaller offices in Winfield and Hutchinson, Kansas.

The duties of a CSR are to answer phones, take and process orders, maintain files, verify insurance and respond to patient requests.  Attendance and punctuality are important.  Facility managers have the discretion to determine whether the number of work absences has been excessive.  Company policy does not dictate that a certain number of absences shall be considered excessive.

Plaintiff was hired by Suzanne Kraft, defendant's facility manager in Wichita, on September 27, 2011.  Kraft was plaintiff's direct supervisor.

Plaintiff received an employee handbook when she started.  The handbook contains defendant's anti-discrimination and anti-

3

retaliation policies, reporting procedures and disciplinary policies.

Approximately four months after plaintiff began her employment, Greg McCarthy, a vice-president for defendant, visited the Wichita facility. While he was there an employee named Amber Renard, a Caucasian woman, complained during a staff meeting that there had been inappropriate racial statements in the workplace that made plaintiff uncomfortable. McCarthy met with plaintiff one-on-one to discuss what happened. Immediately after the meeting, McCarthy spoke with defendant's employee relations director (Paula Adams) and with a district manager for the Wichita office (Jeremy Felts) regarding a follow-up investigation. The same day Adams spoke with plaintiff regarding her complaints.

During the January 27, 2012 conversation between plaintiff and Adams, plaintiff complained of the following comments:

- That a co-worker named Laynee Kempke, a healthcare specialist, said "Boom nigga" and "peace out my nigga" in the workplace;

- That a co-worker named Kevin Kunz, a salesman, made a comment about lynching;

- That Kunz also made a comment that Hitler would be proud of him because of his blue eyes, but not his black hair;

- That Kraft had told plaintiff to address McCarthy as "yes massa;"

4

- That Kraft had asked her if she knew why black people give their children names like "Roshonda." Plaintiff replied "no" and said that she could not speak for every black person. Kraft said that she asked because plaintiff was black;

- That a co-worker named Nathan Van Dever asked plaintiff if she smoked "Newports" and asked "Why do black people always smoke Newports."

After this conversation, Adams concluded that Kempke, Kraft and Kunz should be disciplined because of the alleged statements. On January 30, 2012, each one received a "final written warning" that their actions violated defendant's policies and that any further violations would result in immediate termination. They were also told to report any additional harassment if they observed it and they were reminded of defendant's policy against retaliation and told that, if they appeared to retaliate against plaintiff, they would be terminated. Also on January 30, 2012, Felts held a 10-minute in-service training at the Wichita facility with the goal of reminding employees of the company's anti-discrimination policies. Kraft and Kunz were not present at the training session.

When McCarthy met with plaintiff on January 27, 2012, he asked her to put everything in writing so that defendant could address her allegations properly. Plaintiff sent a letter labelled a "Memorandum for Record" to the human resources

department on February 3, 2012. The "memorandum" contained the following allegations:

- Around January 14, 2012, Kempke returned from seeing a patient and loudly said, "I just came back from the 'Hood'" then chanted "Boom" and "Boom Nigga."  One of plaintiff's co-workers then told her that before plaintiff began employment for defendant, Kempke said, "peace out my nigga."

- Kraft made comments about plaintiff's name ("Shawron") or asked about other African-Americans' names.

- On January 17, 2012, Kraft was speaking at a staff meeting that Nathan Van Dever ("Van Dever") was attending along with five women.  Kraft said to Van Dever, "Nate do you feel like a minority[?]"

- At the same staff meeting on January 17, 2012, Kraft told everyone they did not want to make McCarthy mad, and to say yes to his every word.  Kraft then told them to say, "Yes Massa" to him.

- A patient called in late October 2011, and after plaintiff answered the phone, he threatened to kill everyone in the office.  When plaintiff reported this to Kraft, Kraft said, "I'm sure you can give him attitude."

- Other employees witnessed Kraft referring to this patient as a black man.  Later, when the patient came to the facility, Kraft said, "I thought he was a big black man, no offense … he sounded mean and his name sounded black" and "I can't believe he was a white guy."

- On November 14, 2011, Kunz and Van Dever were discussing a black man who had murdered his wife. Kunz said, "we need to bring back lynching, because we have enough trees."  Kunz then spoke about Vietnamese people offensively and said they have bad teeth.  Kunz then disagreed with a co-worker that his comments were racist, saying, "I'm not racist, and there was nothing wrong with lynching."  Kunz then approached plaintiff and said, "I'm not trying to offend you, it's not like

6

> I said 'lets go down [to] 9th and Grove (the Black neighborhood) and drag every black person with a noose, tie them to a truck, and drag them after hanging them."

- On January 26, 2012, Kunz said, "I never go in the ghetto, the hood has gangsters," then approached plaintiff and said, "you know … the Hood."

- Several workers (unidentified by plaintiff) approached plaintiff by saying, "Yo! Yo whats up?" in a black accent dialect.

- A patient made a remark about a picture of a garden saying "I wonder how many slaves it took to keep that garden pretty, and I wonder how many wetbacks it took to pour water on them."  Felts had said he would remove the picture, but had not done so yet, and plaintiff claimed the picture was a constant reminder of the patient's comments.

In a later "Memorandum for Record" dated February 6, 2012, plaintiff included allegations that:

- Kempke had "a habit of returning from seeing a black patient and stating how she thought she would be raped.

- Plaintiff's co-workers had been giving her the cold shoulder since she reported discrimination and that there was extreme tension in the workplace.

Adams decided after reading plaintiff's "memorandums" that the same three employees who received warning letters were involved in plaintiff's new allegations and that the issues had been addressed with those employees so that no further corrective action was needed.  Adams also attempted to arrange a telephone conference with plaintiff.

Before such a phone conference was arranged, Karen Schanbacher, a divisional manager and Felts' direct supervisor, had a mid-February 2012 meeting with plaintiff and Felts during which plaintiff expressed her belief that she had not received adequate training. During the meeting Schanbacher asked plaintiff several times whether she had any other concerns that Schanbacher could address. Plaintiff did not report any new racial comments in the workplace, but she did state that she felt like the "big pink elephant in the room" and how she was uncomfortable in the workplace. Plaintiff also said that she felt like her "spirit was gone." Schanbacher responded that "you just need to go find it" and that plaintiff should not worry when Kraft shut the door to her office while speaking with plaintiff's co-workers.

Adams spoke with plaintiff on March 6, 2012. Plaintiff did not report any new racial comments in the workplace, did not allege that she had been subjected to retaliation, and did not complain of a hostile work environment.

Linda Feller, a human resources manager in defendant's human resources department, met with plaintiff on March 14, 2012. Plaintiff mentioned the same allegations she previously raised, including the "pink elephant" feeling and her complaint about the painting which drew hurtful remarks from a patient. Feller had the painting removed. But, plaintiff asserts via the

testimony of another employee that the painting was returned to the same place a week later.  Plaintiff also complained that the work environment was "awkward" and that employees would warn of her presence by making such comments as "Watch what you say" and "Shhh, here she comes."  And, plaintiff said that when plaintiff first started, Kraft commented that she would not hire a black man who applied for employment because he looked "like a convict."

Plaintiff filed a complaint with the Kansas Human Rights Commission (KHRC) on April 6, 2012.  It alleges that plaintiff was subjected to derogatory racial comments, slurs, and innuendoes, and that she was discriminated against on the basis of her race.  Plaintiff, however, did not specifically describe any new racial comments or statements in the workplace from those already described in this opinion.  She simply alleged that she was treated in a demeaning manner, ridiculed and teased.

Plaintiff received a "documented counseling" on April 26, 2012 which described an excessive number of unscheduled absences.  It also reminded plaintiff of the company's policy prohibiting texting to report work absences.  Plaintiff had missed a total of 16 days of unscheduled time as of that date.  Plaintiff was advised that further corrective action, including termination, could occur if she did not demonstrate immediate

and sustained improvement.   Kraft and Felts and other corporate officers collaborated in the decision to discipline plaintiff. Doc. No. 55, p. 43.   But, Kraft delivered the "documented counseling" and testified that it was her decision to discipline plaintiff.   Plaintiff responded by claiming that the disciplinary action was retaliatory and that her supervisors and co-workers were either participating in or failing to stop or investigate disparate treatment and harassing conduct. Plaintiff had received an informal counseling prior to April 26, 2012.   The subject of the counseling was not recorded, but there is testimony that it likely concerned absenteeism.

In early May 2012, plaintiff sent Kraft a text stating that she would not be coming to work because of a "hostile workplace."   The text describes an incident the day before in which Kevin Kunz slapped the leg of another employee.   The text did not describe a racial motivation, but said that plaintiff could not focus.   Plaintiff has also stated in her deposition that she was worried that Kevin Kunz would "flip out" on her because he would pound his fist around the workplace and complain about people running their mouths.

Plaintiff filed a second complaint with the KHRC on May 18, 2012.   This complaint alleges retaliation, but does not mention any additional racial comments in the workplace.

On June 22, 2012, plaintiff received a "Documented Verbal Warning" regarding her continued unscheduled absences.  Again, plaintiff was reminded not to send text messages to report absences.  Felts and Kraft met with plaintiff regarding the warning and Feller participated by phone.  During the meeting, plaintiff stated that:  "There's a lot of things going on with this place.  I have doctor's notes."  Plaintiff was again warned that she might be terminated if she did not achieve immediate and sustained improvement in her attendance.

On July 16, 2012, plaintiff sent a "Rebuttal" to the human resources department concerning the June 22, 2012 verbal warning.  The "Rebuttal" complained that plaintiff was subjected to disparate treatment when she was told that she should not text her supervisor to report absences.  It also stated that the warnings were acts of retaliation.  Jennifer Llamas was an employee who had texted to report absences and was not disciplined for doing so.  She testified in a deposition that she believed other employees also texted to report absences.  Llamas left employment with defendant in March 2012.

Plaintiff received a Final Written Warning on July 24, 2012.  The warning alleged that plaintiff had too many unscheduled absences and had made inappropriate statements to her manager.  A meeting was conducted to go over the warning with plaintiff.  Kraft and Felts attended the meeting and Feller

participated by phone.  Plaintiff mentioned that she felt like the "pink elephant" in the office.  She further stated that when somebody said "Boom," she heard Kempke saying "Boom Nigga."  She also mentioned that Amber Renard had said "BON" to her every day and that Kraft had heard Renard using the term but didn't do anything about it.  Kraft denied hearing the term and also denied knowing what the term meant.  After Feller ended her participation in the meeting, Felts asked plaintiff about Renard's conduct.  Plaintiff said that one day Renard asked her if she knew what a "BON" was because Renard's boyfriend, who was African-American, wanted Renard to call him a "Big 'Ol Nigga."[1] Plaintiff also said that Renard had mentioned that her son's football coach had made a comment to the effect that "all blackies are stupid."

Kraft spoke with Renard about plaintiff's allegations the same day.  Renard gave a different version of events.  Renard said that plaintiff asked Renard to say what "BON" meant and that Renard did not use the "N" word.  Renard also denied relating the alleged statement from her son's football coach. Despite Renard's explanation, Kraft gave Renard a final written warning stating that Renard's action had created an uncomfortable environment for plaintiff and warning of

---

[1] In her deposition, plaintiff states that this is the only inappropriate racial statement she recalled Renard making.  Doc. No. 55, Exhibit B, pp. 73-75 of deposition.

termination if there were any additional violations of defendant's anti-discrimination policies. Renard was also warned against retaliating against plaintiff.

The next day, July 25, 2012, plaintiff addressed a "rebuttal" to the counseling dated July 24, 2012. The statement alleged that the counseling was an act of retaliation and referred to "verbal abuse and negative racial overtones that I have to endure on a daily basis."

On July 27, 2012, plaintiff's mental health counselor, Dr. Joseph Donaldson, sent a letter to plaintiff stating that plaintiff had been subjected to "an ongoing onslaught of verbal abuse and harassing racial comments, slurs, epithets, and innuendos" and "blatant racist verbal attacks and threats" in the workplace. Plaintiff had started seeing Dr. Donaldson on June 13, 2012.

On September 24, 2012, plaintiff was terminated by defendant. Defendant listed the cause of termination as "ongoing, excessive absenteeism," noting that since plaintiff's hire date she had missed 34 full days of work, the "vast majority" of which were unscheduled absences. Plaintiff had missed seven more days of work after her final written warning on July 24, 2012. Plaintiff has alleged that seven of her absences were because of visits to Dr. Donaldson and that three absences were scheduled days off.

On October 3, 2012, plaintiff responded to her termination with a letter to defendant's human resources department. Plaintiff generally alleged racial discrimination and retaliation. More specifically, she stated:

- That on her first day at work, Suzanne Kraft interrupted plaintiff as she stated her name and said that Kraft thought plaintiff's name was "[S]ha-nea-nea" or "Shaquitia";

- That she was subjected to hearing co-workers say "Boom Nigga" and that the word "Boom" was used around the office to humiliate plaintiff;

- That Kraft and others would ask if she lived in the ghetto, address her using slang words stereotypical of African-Americans, and that Kraft would advise plaintiff and others to address corporate officials as "Yes Massa";

- That Kraft asked her to deal over the phone with an irate customer because Kraft thought (wrongly) that the customer was black and Kraft was afraid to interact with him;

- That she never received proper training in spite of numerous requests for training;

- That she felt extreme tension in the workplace, "the cold shoulder," and a hostile work environment because of her complaints or because a co-worker (Amber Renard) raised a concern regarding racial comments on the job;

- That she was concerned about Kevin Kunz who had made the lynching and Hitler comments and engaged in slapping and punching as horseplay. Plaintiff said she felt uncomfortable around him because Kunz would say he was crazy and forgot to take his meds;

- That the various incidents mentioned in her letter were "a small fraction of the situations that took place;"

14

- That her health suffered because of the conditions she endured at the workplace;

During her deposition, plaintiff was asked to identify what she considered improper racial comments at the workplace. In addition to comments already identified, plaintiff listed the following:

- A co-worker, Becky Roettering, said her car was "a black boy;"

- Kevin Kunz asked plaintiff what "skeet skeet" meant in rap songs;

- Kevin Kunz said that Nicki Minaj, a black female rapper, had a great body and asked plaintiff what she thought;

- Suzanne Kraft would say "I's be's getting" or "You's be's getting" and look at plaintiff and laugh;

- Kraft asked plaintiff if she spoke Ebonics and asked if plaintiff ever looked at the "urban dictionary;"

- Kraft apologized to plaintiff and said that Kraft had six black cousins;

- Kraft would tell plaintiff to "get ghetto" or "give attitude" to some patients who called;

- Kempke also would tell plaintiff to "get ghetto;"

- Kraft would make plaintiff take calls from a certain customers who had complaints if Kraft believed the customer was African-American;

- Kraft made a comment to plaintiff about checks coming up missing;

- Plaintiff was asked by an employee if her hair was real or a weave; and

- A co-worker, Nathan Van Dever, asked plaintiff why black people smoke Newports;

When plaintiff was deposed, she alleged that defendant retaliated against her in the following ways:

- Her work was scrutinized more;

- People started to make a mess, like food wrappers, at her desk;

- Kraft would go into her cubicle and rearrange plaintiff's files;

- Roettering told her that she messed up orders or put in the wrong code, when she had made no mistake;

- Roettering would tell her that she could go to Winfield to train, but would never actually let her go;

- Roettering had another CSR redo plaintiff's folders and then, when files were missing, would blame plaintiff;

- Roettering forged plaintiff's name on a work order;

- Defendant began to make an issue out of her absences and complained about her work;

- When plaintiff walked into meetings, people would say, "Shh, be quiet or you might get HR called on you," and would not say anything around her.

III. A REASONABLE JURY WOULD NOT FIND THAT PLAINTIFF'S WORK ENVIRONMENT MET THE OBJECTIVE STANDARD OF A HOSTILE WORK ENVIRONMENT.

A. <u>Standards</u>

The Tenth Circuit has stated that the elements of a hostile work environment claim under § 1981 are the same as those under Title VII. See <u>Aramburu v. Boeing Co.</u>, 112 F.3d 1398, 1410 (10th

16

Cir. 1997); see also <u>Tademy v. Union Pacific Corp.</u>, 614 F.3d 1132, 1152 (10th Cir. 2008)(referring to Title VII standards when discussing § 1981 hostile work environment claim).  So, the court will refer to Title VII cases in some instances when discussing plaintiff's hostile work environment claim.

The issue raised by defendant's summary judgment motion is whether plaintiff's work environment was objectively hostile and offensive.  This is a required element for making a hostile work environment claim.  <u>Morris v. City of Colorado Springs</u>, 666 F.3d 654, 664 (10th Cir. 2012).  We must examine "'the objective severity of the harassment from the perspective of a reasonable person in plaintiff's position, considering all the circumstances.'"  <u>Id.</u>, quoting <u>Harsco Corp. v. Renner</u>, 475 F.3d 1179, 1187 (10th Cir. 2007).  Some factors which have been suggested for consideration are: "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  <u>Id.</u> quoting, <u>Chavez v. New Mexico</u>, 397 F.3d 826, 832-33 (10th Cir. 2005).  The court must determine whether the alleged harassment was pervasive <u>or</u> severe.  <u>Id.</u> at 663.

To survive summary judgment, a plaintiff "must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was]

17

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and that the victim was targeted for harassment because of her race or national origin." Hernandez v. Valley View Hosp. Ass'n, 684 F.3d 950, 957 (10th Cir. 2012)(interior quotations omitted); see also, Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1326-27 (10th Cir. 2004).  "[R]un-of-the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." Morris, 666 F.3d at 664.

In Hernandez, the Tenth Circuit quoted O'Shea v. Yellow Tech. Servs., Inc,, 185 F.3d 1093, 1098 (10th Cir. 1999) for the proposition that "the severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact."  684 F.3d at 957.  Nevertheless, on multiple occasions the Tenth Circuit has affirmed summary judgment granted at least partially on the basis of a severity and pervasiveness evaluation.  E.g., Morris, 666 F.3d at 665-666; Faragalla v. Douglas County School Dist., 411 Fed.Appx. 140, 153-54 (10th Cir. 2011); Nettle v. Central Oklahoma American Health Council, Inc., 334 Fed.Appx. 914, 921-26 (10th Cir. 2009); MacKenzie v. City and County of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005).

The Tenth Circuit has stated that a hostile work environment generally entails a "steady barrage of opprobrious racial comments." Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007)(quoting Chavez, 397 F.3d at 832); Ford v. West, 222 F.3d 767, 777 (10th Cir. 2000)(quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)). According to the Oxford English Dictionary, "opprobrious" means expressing scorn; vituperative; reproachful; shameful. The Merriam-Webster Dictionary includes "scurrilous" as one of the definitions. In Hernandez, the Tenth Circuit overturned a grant of summary judgment in a case involving "at least a dozen racially offensive comments and jokes" over a period of fourteen months. In Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1414-15 (10th Cir. 1997), the Tenth Circuit held that evidence of six sexually derogatory statements over twenty-three months, some repeated frequently, was sufficient to support a finding of pervasive harassment.

B. A reasonable jury would not find the alleged harassment to be sufficiently severe to sustain a claim of hostile work environment.

After careful consideration, the court easily concludes that the alleged offensive statements or actions were not so severely offensive or discriminatory that a reasonable jury would find that plaintiff's working conditions were abusive. With the possible exception of fist-pounding by Kevin Kunz,

which was not expressly directed at plaintiff and appeared isolated in frequency, there were no threatening or menacing words or actions directed at plaintiff. There were no opprobrious insults or epithets pointed at plaintiff. Also, the alleged racial comments made to plaintiff were not made with animosity or scorn. The court finds that the fist-pounding was not so severe or prevalent that it created a hostile work environment. The closer question raised in this case is whether the alleged offensive statements or actions in total were so pervasive that a reasonable jury would consider plaintiff's work environment to be hostile or abusive.

C. A reasonable jury would not find the alleged harassment to be sufficiently pervasive to sustain a claim of hostile work environment.

1. Facially race-neutral statements or actions

There are some allegedly offensive comments or actions which the court does not consider racially offensive on their face. The comment which Suzanne Kraft made to Nathan Van Dever, "Do you feel like a minority," is not racially offensive. When the statement was made, Van Dever was the only male in attendance at a meeting. Also, Kraft's apology to plaintiff and her statement that Kraft has six black cousins is not racially offensive. Likewise, a statement that Nicki Minaj is an attractive woman is not a racially offensive statement. Also, slapping a woman's leg and pounding one's fist are not racially

offensive actions in the context described in the record. Kunz's comment that he was crazy and forgot to take his meds also is not racially offensive. The question as to whether plaintiff's hair was a weave and the statement that checks had turned up missing also appear to be race-neutral. Finally, the Hitler remark seems boorish, but not racially offensive.

Nevertheless, the court shall consider all of these remarks in our analysis because "'[f]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct.'" Hernandez, 684 F.3d at 960 (quoting O'Shea, 185 F.3d at 1097). In our view, none of the comments or actions (viewed objectively) occurred so frequently or were so abusive as to add significantly to a hostile work environment claim.

### 2. Racial comments or actions

Plaintiff was upset by questions which implied that, as an African-American, plaintiff was an authority who could or should answer questions white people had about black people. Van Dever asked plaintiff why black people always smoked Newports. Kraft asked plaintiff why black people give their children names like Roshonda. Kraft also asked about plaintiff's name. Kraft asked plaintiff if she spoke ebonics and if plaintiff ever looked at the "urban dictionary." Kunz asked plaintiff what "skeet skeet"

meant in rap songs. The court believes a reasonable person could find this annoying, but not more than annoying. While this is not a role that plaintiff wanted, it is not unusual in the workplace for a person to be asked questions (sometimes stupid questions) related to that person's perceived background or experience. See Bradley v. Allegiance Health Management, Inc., 2011 WL 4479304 *7 (E.D.Ark. 9/28/2011)(questioning plaintiff as to why black women have children without being married is not sufficient to create a racially hostile environment)

Plaintiff also took offense to references made in her presence to the "ghetto" or the "hood" as a dangerous neighborhood with "gangsters" that her white co-workers did not like to visit because of a fear of crime. These terms may be taken as racially-tinged pejoratives. See Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348 (5th Cir. 2007)(calling inner-city children "ghetto children" inappropriate, but along with other comments not sufficient to find a hostile work environment). The statements apparently had nothing specifically to do with plaintiff or plaintiff's family or friends. There are crime-ridden neighborhoods which people may feel uncomfortable visiting. Sometimes, such neighborhoods are labelled as "ghettos" or the "hood." If the references to going to the "ghetto" or the "hood" were made mockingly as a racial

22

slight, then a reasonable jury would consider them offensive. If the statements were a sincere expression of unease, a reasonable jury could find them slightly offensive in the manner they were worded. Here, the record does not suggest that the comments were directed to embarrass or aggravate plaintiff. Plaintiff also complains that she was asked if she lived in the "ghetto." A reasonable jury might consider this question to be racially offensive and annoying.

Given its context, the "lynching" comment would be considered mildly offensive by a reasonable jury. The record indicates that the comment was made in regard to a crime where a black man had murdered his wife. The victim was an acquaintance of someone who worked in the office. The co-worker who made the comment appealed to plaintiff that he was not a racist and was not trying to offend plaintiff. It is not uncommon for people to voice a desire to take short-cuts towards "justice." While many people would criticize the statement for good reasons, a reasonable jury would not consider the comment, in this context, to be more than mildly offensive.

Plaintiff has stated that she was offended when co-workers would say "Yo, what's up," when Kraft told her subordinates to say "Yes, massa," to a visiting corporate officer, and when Kraft would say "I's be getting'" or "You's be getting." At worst, these comments could be considered as annoying or

obnoxious by a reasonable jury. But see Widermyre v. Transamerica Commercial Fin. Corp., 1995 WL 688709 *3 (N.D.Ill. 11/17/1995)(finding that "yo" and other "hip-hop" phrases were not facially racist). They were not directed solely toward plaintiff and there's no indication that their purpose was to insult or ridicule plaintiff. The "yes, massa" suggestion was more of a poorly-stated directive by Kraft to be obsequious towards a corporate executive than an effort to offend plaintiff.

The phrases "boom nigga" and "peace out my nigga" could be considered racially offensive by a reasonable jury. See Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031, 1035 (8th Cir. 2006)("What's up, my nigga" and several other racial comments were offensive, but insufficient to meet threshold of a hostile work environment); see also, Fair v. Basic Metals, Inc., 2007 WL 1847282 *7 (E.D.Wis. 6/26/2007)(finding that context can be important in analyzing the use of the term "nigga"); but see Tyrrell v. Oaklawn Jockey Club, 2012 WL 5397610 *4 (W.D.Ark. 11/2/2012)(non-derogatory use of n-word was coarse jesting and did not create a hostile work environment). The potential sting of these statements, however, is mitigated by their context. The "boom nigga" statement was made in plaintiff's presence, but not made directly to plaintiff or for the purpose of offending plaintiff. The "peace out" statement was not made

24

in plaintiff's presence, but she heard of it from another employee. The statements were not hostile in the sense of being intentionally antagonistic or scornful. And they are attributed to one co-worker, not multiple co-workers.

Plaintiff was offended because she was asked by Kraft to deal with an irate customer who Kraft perceived (wrongly) to be black. Kraft suggested that plaintiff give the customer some "attitude" or "get ghetto" with him. It is not entirely clear on the record whether this occurred with one client or whether Kraft encouraged plaintiff to deal with other black customers because plaintiff was black. While a reasonable jury might consider this slightly offensive, the court does not believe a reasonable jury would consider it as derogatory or abusive. See Blount v. Southwest Oklahoma Juvenile Center, 2012 WL 6045911 *11 (W.D.Okla 12/5/2012)(statements that plaintiff would be able to relate to African American juveniles is not racially hostile); see also, Miller v. Coca-Cola Enterprises, Inc., 178 Fed.Appx. 583, 585 (8th Cir. 2006)(statement that black drivers had "attitude" and other remarks not sufficient to create a hostile work environment); Vasquez v. County of Los Angeles, 349 F.3d 634, 643 (9th Cir. 2003)(reference to "typical Hispanic macho attitude" and other remarks not sufficient to create a hostile work environment).

When plaintiff was first hired, Kraft remarked that she had recently turned down a job applicant who was black because he looked like a convict.   Kraft also misstated plaintiff's first name when she introduced plaintiff to the office after plaintiff was hired.   Kempke made the comment one time that she thought she'd be raped by a black patient.   These isolated comments could be considered offensive by a reasonable jury, although there is no evidence that the statements were made to insult or antagonize plaintiff.

Plaintiff was bothered by a patient's comment regarding a picture of a garden at plaintiff's workplace.   The patient wondered aloud how many slaves and "wetbacks" had tended the garden.   A reasonable jury could find this comment marginally offensive.   It was unpleasant, but not abusive.   The comment obviously was not made by an employee of defendant.   It apparently was not intended to demean plaintiff.   The comment was an isolated event, although the picture continued to remind plaintiff of the comment.

3.  <u>Frequency of alleged discriminatory conduct</u>

Our analysis must consider the frequency of the alleged discriminatory conduct.   "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."   <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788

26

(1998)(interior  quotations  omitted).    "A  hostile  work  environment … typically  comprises  a  succession  of  harassing  acts,  each  of  which  may  not  be  actionable  on  its  own.    In  addition,  a  hostile  work  environment  claim  cannot  be  said  to  occur  on  any  particular  day.    In  other  words,  the  actionable  wrong  is  the  environment,  not  the  individual  acts  that,  taken  together,  create  the  environment."   Ledbetter v. Goodyear Tire &  Rubber Co., Inc., 550  U.S.  618,  638  (2007)(interior  citations  and  quotations  omitted);  see  also  Hicks v. Gates Rubber Co., 833  F.2d  1406,  1415  (10th  Cir.  1987)(general  work  atmosphere  is  an  important  factor).    So,  the  court  must  consider  not  only  the  frequency  of  each  described  incident  of  misconduct  but  also  the  entire  series  of  incidents.

Most  of  the  incidents  alleged  by  plaintiff  were  one-time  utterances  by  different  individuals  which  occurred  prior  to  January  27,  2012,  the  date  when  plaintiff  first  complained  to  a  supervisor.    Plaintiff  asserts  that  Kempke  used  the  term  "boom  nigga"  more  than  once  and  made  a  habit  of  referring  to  the  "ghetto"  or  the  "hood."[2]    Plaintiff  also  asserts  that  several

---

[2] Jennifer  Llamas  testified  that  Kempke  used  the  "N"  word  a  couple  of  times  and  that  Kempke  would  not  call  somebody  the  "N"  word.   Doc.  No.  55-5,  pp.  23-24  of  deposition.    She  also  testified  that  the  use  of  the  term  diminished  in  the  office  and  that  Llamas  never  heard  Kempke  say  it  after  plaintiff  complained.   Id.  at  p.  45  of  deposition.    She  stated  that  Kempke  would  often  refer  to  the  "ghetto."   Id.  at  p.  25  of  deposition.    Llamas  also  testified  that  Renard  would  always  use  the  "N"  word,  but  she  did  not  recall  the  "BON"  term.   Id.  at  pp.  26  &  36  of  deposition.    According  to  Llamas,  Renard  would  not  call  anybody  the  "N"  word.   Id.  at  pp.  26-27  ("[S]he  was  a  white  girl  but  she  would  kind  of  talk  in  that  kind  of  slang  and  demeanor,  because  .  .  .  she

workers said "yo."   Most of the alleged offensive utterances would be considered by a reasonable jury to be insensitive as opposed to vituperative, demeaning, scurrilous, or insulting. The court believes the series of statements complained of by plaintiff could not reasonably be considered to amount to a steady barrage of opprobrious comments.

After January 27, 2012 and plaintiff's complaints to her supervisors, disciplinary action was taken against Kraft, Kunz and Kempke on January 30, 2012.   Plaintiff makes few specific allegations of offensive statements occurring after that date. Plaintiff has alleged that Becky Roettering said her car was a "black boy."   A reasonable jury would not consider this statement as more than nominally offensive.   It was also after January 27, 2011 that Amber Renard allegedly discussed the term "BON" and her African-American boyfriend with plaintiff, and said (according to plaintiff) that a football coach made the remark that "all blackies are stupid."   These comments, assuming they were made, are not alleged to have been directed at plaintiff with the intent of degrading or ridiculing or antagonizing plaintiff.   Renard and Kraft also received discipline shortly after plaintiff complained of these statements.

---

hung around with those kind of people too, and so she just kind of, you know, conformed to how . . . they acted.").

In general, the parts of the record which indicate a persistent or pervasive use of potentially abusive terminology are conclusory allegations which are insufficient to support a claim of a succession of harassing acts or of an environment permeated with opprobrious comments or ridicule. See Nettle, 334 Fed.Appx. at 922-23; Muragara v. Mackenzie Place Union, LLC, 2014 WL 334640 *5 (D.Colo. 1/30/14); Powell-Pickett v. AK Steel Corp., 904 F.Supp.2d 767, 776 (S.D.Ohio 2012); Walker v. Miss. Delta Com'n on Mental Health Illness & Mental Retardation, 2012 WL 5304755 *7-8 (N.D.Miss.10/25/12).

C. A reasonable jury would not consider the work environment as a whole to be hostile or abusive.

The court has considered plaintiff's work environment before and after January 27, 2011. The court concludes that a reasonable jury could not conclude that plaintiff was made to suffer an abusive working environment or that the offensive remarks and actions were so negative and insulting or humiliating that they created a discriminatory working condition or a hostile work environment. The court is not endorsing the comments and has indicated that in many instances a reasonable person could find them annoying or obnoxious or offensive. But, it is commonly stated that a hostile work environment claim is not intended to enforce a general code of civility (Faragher, 524 U.S. at 788) and that it is intended as a remedy for a

workplace permeated with racial opprobrium or discriminatory intimidation, ridicule and insult. See Hernandez, 684 F.3d at 956-57. This was not a scornful, vituperative atmosphere. The statements were not obscene, profane or personally demeaning or degrading. Several statements were mildly offensive, insensitive or annoying. But, few if any could reasonably be considered disgraceful or shameful.

Also, many statements which upset plaintiff were not directed at plaintiff. This makes such statements less indicative of a hostile work environment. Harris v. Wackenhut Services, Inc., 590 F.Supp.2d 54, 76 (D.D.C. 2008). In addition, efforts were made to investigate and enforce discipline against those who made offensive remarks. These actions would diminish the chance that a reasonable person might consider the alleged racial commentary to be a condition of employment as opposed to a violation of company policy.

We acknowledge that plaintiff has also complained of receiving the cold shoulder from other employees after she complained about her working conditions and certain employees received discipline. Most courts, however, find that ostracism or shunning fails to satisfy the objective test of an abusive work environment. See Clay v. Lafarge North America, 2013 WL 6250776 *12 (S.D.Iowa 2/13/2013)(citing several cases); see also, Johnson v. Weld Cnty, 594 F.3d 1202, 1216 (10th Cir.

2010)(supervisors giving employee the "cold shoulder," not answering questions, and avoiding the employee not sufficient to support retaliation claim); <u>Willey v. Slater</u>, 20 Fed.Appx. 404, 405-06 (6th Cir. 2001)(same); <u>Melin v. Verizon Business, Inc.</u>, 2014 WL 978813 *11 (D.Kan. 3/12/2014)(allegations of ostracism and lack of coworker support do not rise to level necessary to support retaliation claim); <u>Jones v. Wichita State Univ.</u>, 528 F.Supp.2d 1182, 1193 (D.Kan. 2007)(cold shoulder treatment not materially adverse for purposes of a retaliation claim); <u>Bozeman v. Per-Se Technologies, Inc.</u>, 456 F.Supp.2d 1282, 1345-46 (N.D.Ga. 2006)(same, citing several cases); <u>Martin v. Merck & Co.</u>, 446 F.Supp.2d 615, 639 (W.D.Va. 2006)(same).

D.   <u>Summary</u>

In summary, the court has considered the various statements and actions which plaintiff alleges constituted a hostile work environment. The court agrees with defendant that no reasonable jury considering the evidence in a light most favorable to plaintiff, would find that the objective standard for a hostile work environment is satisfied.

IV.   THE ALLEGED RETALIATORY ACTIONS AGAINST PLAINTIFF EITHER WERE NOT "MATERIALLY ADVERSE" OR WERE NOT CAUSED BY PLAINTIFF'S PROTECTED ACTIVITY.

"To make out [a] prima facie case [of retaliation], [a plaintiff] must show 1) 'she engaged in protected opposition to discrimination, 2) a reasonable employee would have considered

the challenged employment action materially adverse, and 3) a causal connection existed between the protected activity and the materially adverse action.'" <u>Daniels v. United Parcel Service, Inc.</u>, 701 F.3d 620, 637-38 (10th Cir. 2012) quoting, <u>Hinds v. Sprint/United Mgmt. Co.</u>, 523 F.3d 1187, 1202 (10th Cir. 2008). A plaintiff making a retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2534 (2013).

Defendant's arguments for summary judgment against plaintiff's retaliation claim focus on the second and third elements. First, defendant contends that many of the alleged retaliatory actions do not rise to the level of a "materially adverse" job action and therefore, do not provide a cognizable basis for a retaliation claim under Title VII. Second, defendant contends that those disciplinary actions which were "materially adverse" were not motivated or caused by plaintiff's protected activity. Defendant does not dispute that plaintiff engaged in protected activity.

A. <u>Many of the alleged retaliatory actions could not reasonably be considered "materially adverse."</u>

Plaintiff has cited the following alleged conduct as part of the basis for her retaliation claim:

■ Her work started to be more scrutinized;

32

- People started to make a mess at her desk – like leaving food wrappers;

- Her files would be rearranged by others;

- She was accused of making coding mistakes that she did not actually make;

- She was told she could go to Winfield for training, but never actually allowed to go;

- Her folders were redone by others and then when files were missing, she would be blamed;

- Her name was forged on a work order;

- Defendant started to make an issue out of her absences and the quality of her work; and

- Co-workers would say, "shh, be quiet or you might get HR called on you," or not say anything around plaintiff, when plaintiff walked into meetings.

Plaintiff has also asserted that the discipline she received because of her alleged excessive absenteeism constituted materially adverse job actions in retaliation for protected conduct. Defendant does not dispute that plaintiff's job discipline and termination were materially adverse job actions for the purposes of this motion.

The Supreme Court has stated that an individual is not protected from "all retaliation," but is protected from retaliation that produces "an injury or harm" which reaches a level of seriousness such that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548

U.S. 53, 67-68 (2006) (interior quotation omitted). Such actions must be more than "trivial harms" and must go beyond the "petty slights or minor annoyances that often take place at work and that all employees experience." Id. A "materially adverse" action is a more lenient standard than an "adverse employment action." Piercy, 480 F.3d at 1203 n. 12. In Semsroth v. City of Wichita, 555 F.3d 1182, 1184-85 (10th Cir. 2009), the Tenth Circuit emphasized that deciding whether an employer's actions are "materially adverse" is a case-specific exercise which requires an objective inquiry that does not turn on a plaintiff's personal feelings. In making a decision, the court is obliged to consider the "'constellation of surrounding circumstances, expectations and relationships.'" Barone v. United Airlines, Inc., 355 Fed.Appx. 169, 183 (10th Cir. 2009)(quoting White, 548 U.S. at 69 (interior quotation omitted)). In addition, "to succeed on a retaliation claim based on a hostile work environment, a Title VII plaintiff must present evidence that "the workplace [was] ... permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." McGowan v. City of Eufala, 472 F.3d 736, 743 (10th Cir. 2006).

Because of the reasons and the case authority already cited, the court does not believe a reasonable jury could

conclude that a hostile work environment existed for the purposes of plaintiff's retaliation claim. The court further concludes that the other alleged retaliatory acts (outside of plaintiff's job discipline and termination) could not reasonably be considered as materially adverse. The record does not contain facts which demonstrate that the effect of all of the non-disciplinary actions complained of by plaintiff would deter a reasonable person from filing a discrimination complaint or engaging in other protected activity. See <u>Daniels</u>, 701 F.3d at 640 (professional isolation and drop in communications are not materially adverse actions); <u>Keller v. Crown Cork & Seal USA, Inc.</u>, 491 Fed.Appx. 908, 914 (10th Cir. 2012)(strict application of policies and increased supervision are not materially adverse actions); <u>Littleton v. Pilot Travel Centers</u>, 568 F.3d 641, 644 (8th Cir. 2009)(falsely reporting poor performance does not establish prima facie case of retaliation absent showing of materially adverse consequences to employee); <u>McGowan</u>, 472 F.3d at 743-44 (petty criticism is not a materially adverse action); <u>Wooyoung Chung v. Berkman</u>, 2014 WL 2611837 *13 (N.D.Ohio 6/11/14)(false allegations regarding work on computer application, not materially adverse); <u>Rodriguez v. Hudson Square Pharmacy, LLC</u>, 2012 WL 3195554 *6 n.13 (S.D.N.Y. 8/2/2012)(false accusation of causing a register shortage is not an adverse employment action); <u>Rogers v. Apria Healthcare, Inc.</u>, 2013 WL

3773838 *13 n.15 (D.Kan. 7/17/13)(failure to train not a materially adverse action); Armstead v. Wood, 2012 WL 2298495 *6 (D.Colo. 6/15/2012)(false accusation of causing submission of untimely and incorrect reports is not an adverse employment action); Rhone v. U.S. Capitol Police, 865 F.Supp.2d 65, 70-71 (D.D.C. 2012)(untruthful remarks regarding job performance are not materially adverse job actions); Brenna v. Salazar, 2010 WL 582357 *13-14 (D.Colo. 2/17/10)(failure to train not a materially adverse action); Mitchell v. Qwest Communications Int'l, Inc., 2007 WL 4287499 *4-5 (D.Colo. 12/4/07)(nitpicking, shortness and rudeness, not materially adverse actions).

    B.  A reasonable jury would not find on this record that plaintiff's job discipline and termination were caused by plaintiff's protected activity.

    As stated earlier, defendant contends that plaintiff cannot demonstrate a causal connection between her protected activity and the disciplinary actions taken against by defendant.  Given the absence of direct evidence of retaliation as to these alleged actions, a burden-shifting framework of analysis should be applied to determine whether there is a material issue of fact that illegal retaliation caused these alleged actions to occur.  See Hinds, 523 F.3d at 1201.  Plaintiff bears a burden of production to establish a prima facie case of retaliation. Id. at 1201-02.

Here, plaintiff has presented facts indicating a temporal relationship between plaintiff's protected activity and the disciplinary actions taken against her.  Assuming that this is sufficient to produce a prima facie case of retaliation,[3] defendant has set out evidence that the disciplinary actions were taken because her supervisors believed plaintiff was too often absent from work.  Therefore, plaintiff has the burden to produce evidence demonstrating a genuine issue of material fact exists as to whether this justification is merely a pretext for illegal retaliation.  See Macon v. United Parcel Service, Inc., 743 F.3d 708, 713 (10th Cir. 2014).  "Such a showing, so long as it would allow a reasonable jury to find the discharge was pretextual, entitles the plaintiff to proceed to trial."  Id. Plaintiff must present evidence that defendant's proffered reasons for disciplining and terminating plaintiff are so incoherent, weak, inconsistent or contradictory that a rational factfinder could conclude the reasons are unworthy of belief. Hinds, 523 F.3d at 1197 (quoting Young v. Dillon Cos., Inc., 468 F.3d 1243, 1250 (10th Cir. 2006)).

Plaintiff has set forth no information directly indicating that defendant's claim of valid business reasons for its discipline and termination of plaintiff is incoherent, weak,

---

[3] The Tenth Circuit has stated that "temporal proximity is sufficient to establish a prima facie case, but not to establish pretext, because the evidentiary burden is different." Proctor v. United Parcel Serv., 502 F.3d 1200, 1213 n.6 (10th Cir. 2007)(emphasis added).

inconsistent or contradictory. Plaintiff does not deny that she was absent when defendant alleges, but she suggests that some of her absences either were or should have been excused because they related to the stress she suffered from her working conditions. Plaintiff does not deny that attendance was important. Plaintiff does not contend that other employees had similar attendance records but were retained by defendant. Indeed, a former employee who was absent often, but not quite as frequently as plaintiff, was also terminated by defendant.[4] Finally, plaintiff does not allege that there is evidence which directly contradicts defendant's purported reasons for disciplining and terminating plaintiff.

Nevertheless, plaintiff contends that a reasonable jury could find the defendant's alleged ground for disciplining and terminating plaintiff is pretextual on the basis of the following points. First, plaintiff notes that there was no explicit attendance standard or official attendance policy and that discipline for poor attendance was discretionary with the office manager. While this is correct, the court does not believe it weakens the believability of defendant's alleged grounds for disciplining and terminating plaintiff. Attendance is normally important and it was important for plaintiff's job with defendant – this is undisputed. Therefore, it would be a

---

[4] This employee, however, had other issues of poor performance in addition to an absenteeism problem.

reasonable exercise of discretion to discipline and terminate an employee for poor attendance, particularly when the only evidence suggests that the policy was applied evenhandedly.

Plaintiff contends, as evidence of pretext, that Suzanne Kraft made the decision to write-up plaintiff on April 26, 2012 and that Kraft had made racial comments and committed retaliatory acts against plaintiff. Plaintiff has not proffered that the alleged "racial comments" from Kraft were made with animosity towards plaintiff. Moreover, the comments did not begin after plaintiff engaged in protected activity. So, the comments do not substantiate a retaliatory motive as opposed to a racial motive. Kenfield v. Colorado Dept. of Public Health & Environment, 557 Fed.Appx. 728, 733 (10th Cir. 2014)(the continuance of alleged adverse comments or actions which formed the basis of a grievance or administrative charge, cannot be retaliatory since plaintiff alleges it preceded the protected activities). Furthermore, the evidence is undisputed that other corporate executives, in addition to Kraft, suggested that plaintiff's absenteeism be addressed shortly before the April 26, 2012 write-up from Kraft and that they participated in later disciplinary actions. Therefore, the court does not believe the remarks provide evidence that the warnings given to plaintiff and her eventual termination were based upon a pretext that plaintiff's absenteeism was unacceptable to defendant.

As for Kraft's alleged retaliatory acts, plaintiff asserts that Kraft left a mess (food wrappers) on plaintiff's desk and caused plaintiff's files to be disorganized.   Plaintiff, however, provides no evidence that these actions were motivated to retaliate against plaintiff.   Also, as mentioned, other corporate officers besides Kraft supported the disciplinary actions taken against plaintiff.   Therefore, the court does not believe a reasonable jury would consider plaintiff's allegations as evidence that the discipline issued for absenteeism was motivated by retaliation.

Plaintiff contends that absenteeism was a pretext for the discipline given plaintiff because the April 26th write-up discussed absences going back to November 4, 2011 and that Kraft approved of some of plaintiff's absences on August 7, 2012 because they were related to stress and anxiety.   The court does not believe a reasonable jury would find that these points demonstrate that the absenteeism rationale for plaintiff's discipline and termination was weak, contradictory or implausible.   It would be reasonable for an employer to consider the total number of absences over time in counseling or disciplining an employee.   In addition, the fact that some absences were approved by Kraft does not imply that the total number was acceptable or would be acceptable to a reasonable employer.   The evidence in the record is that defendant

concluded that plaintiff's number of absences was excessive even excluding those absences which were excused or related to valid medical purposes.

Plaintiff further asserts that defendant did not follow its progressive discipline policy.  But, the record does not support this assertion.  Defendant's normal sequence for corrective action was: counseling by an immediate supervisor; verbal warning by an immediate supervisor; final written warning stating that the next step will be termination; and termination. See Doc. No. 55 at p. 6.  This sequence is optional, according to the employee handbook, but it appears to have been followed in this case.

Finally, as evidence of pretext, plaintiff alleges that she was written up for texting to report a work absence when another employee (Jennifer Llamas) did the same thing without receiving discipline.  Plaintiff, however, provides no evidence that the attendance or discipline records of plaintiff and Llamas were comparable.  There is no evidence of how often Llamas texted in absences, but there is evidence that plaintiff (who apparently was absent more frequently than Llamas) continued to text-in absences even after she was warned against the practice.  See Defendant's exhibits 26, 29 and 34.  The Tenth Circuit has observed that increased supervisory scrutiny and discipline is an appropriate result of poor adherence to procedures, and that

differences in treatment can legitimately stem from differences in disciplinary history rather than from retaliatory motive. Macon, 743 F.3d at 715 n.7 & 718-19. Here, plaintiff has failed to proffer sufficient evidence of pretext because she has not proffered evidence which suggests that Llamas and plaintiff were similarly-situated. Plaintiff had a record of high absenteeism which logically could have resulted in increased scrutiny of plaintiff's adherence to the no-texting policy.

In addition, Llamas left defendant's employment in March 2012. Llamas deposition, Doc. No. 55-5 at p. 10 of the deposition. Defendant placed greater emphasis upon enforcing the no-texting policy after that date.[5] The alleged difference in defendant's treatment of plaintiff and Llamas with regard to texting notice of work absences could easily have been based on attendance or performance issues and changes in enforcement policy, as opposed to a desire to retaliate against plaintiff for protected activity.

To summarize, the court believes that plaintiff's proffer of evidence to prove pretext is not sufficient for a reasonable jury to conclude that defendant's reasons to discipline and terminate plaintiff were a pretext for retaliation. Therefore,

---

[5] Suzanne Kraft testified that there was a greater emphasis upon enforcing the no-texting policy after March or April 2012 because the practice was getting out of hand. Doc. No. 55-4 at pp. 67-69 of Kraft's deposition; see also, plaintiff's deposition, Doc. No. 51 at p. 111 of deposition. Plaintiff does not dispute this point. Doc. No. 55, p. 44.

there is no material issue of fact as to whether defendant took materially adverse actions to retaliate against plaintiff because of her opposition to discrimination.

V. CONCLUSION

For the above-stated reasons, the court shall grant defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated this 9th day of July, 2014, at Topeka, Kansas.


s/RICHARD D. ROGERS
Richard D. Rogers
United States District Judge